# In the United States Court of Federal Claims

No. 16-1406C
Filed: April 23, 2021
Redacted Version Issued for Publication: August 26, 2021[1]

```
*  *  *  *  *  *  *  *  *  *  *  *  *   *
                                        *
LCC-MZT TEAM IV,                        *
                                        *
            Plaintiff,                  *
       v.                               *
                                        *
UNITED STATES,                          *
                                        *
            Defendant.                  *
*  *  *  *  *  *  *  *  *  *  *  *  *   *
```

**Katherine M. Knudsen**, Procopio, San Diego, California for plaintiff. With her was **Craig A. Ramseyer**, Procopio, San Diego, California.

**Erin K. Murdock-Park**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her were **Kelly Krystyniak**, **Margaret J. Jantzen**, and **Sonia Orfield**, Trial Attorneys, Commercial Litigation Branch, **L. Misha Preheim**, Assistant Director, Commercial Litigation Branch, **Martin F. Hockey, Jr.**, Acting Director, Commercial Litigation Branch, and **Brian Boynton**, Acting Assistant Attorney General, Civil Division, Department of Justice.

**O P I N I O N**

<u>**HORN, J.**</u>

At issue in the above-captioned case are numerous disputes arising out of a construction contract between LCC-MZT Team IV (LCC-MZT), also known as Larkor Construction/Macro-Z-Technology Team IV Joint Venture, and the United States Naval Facilities Engineering Command Northwest (NAVFAC). In the above-captioned case, plaintiff LCC-MZT filed a complaint in the United States Court of Federal Claims on October 26, 2016. Subsequently, plaintiff filed an amended complaint, followed by a second amended complaint in which plaintiff identifies fifteen claims which were submitted to the NAVFAC contracting officer for a final decision. Plaintiff's second

---

[1] This Opinion was issued under seal on April 23, 2021. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued with the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

amended complaint seeks an amount "in excess of $4,130,905.12" in damages in this court, "together with interest thereon pursuant to the Contract Disputes Act." Thereafter, defendant filed an answer to plaintiff's second amended complaint. Following the second amended complaint and answer, and, after extensive discovery, the court held a lengthy trial, after which the parties filed post-trial briefs and the court held closing argument.

## FINDINGS OF FACT

LCC-MZT was a joint venture consisting of Larkor Construction Company, Inc. (LCC) and Macro-Z-Technology Company (MZT). The parties stipulated that MZT is a general contractor specializing in facilities construction and civil construction. Bryan Zatica testified at the trial in the above-captioned case that he incorporated MZT and that he was the president and owner of MZT at the time of contract performance and the trial. Bryan Zatica testified that MZT entered into the Small Business Administration's (SBA's) section 8(a) program in 1999 or 2000, and that MZT graduated from the SBA's 8(a) program in 2008 or 2009. Bryan Zatica testified that he and LCC's principal, Larry Landa, "grew up together." On June 8, 2011, LCC and MZT entered into a joint venture agreement forming the LCC-MZT joint venture. The LCC-MZT joint venture was a joint venture under SBA's section 8(a) mentor-protégé joint venture program. LCC was a section 8(a) contractor and a protégé, and MZT was a former section 8(a) contractor and was the mentor in the LCC-MZT joint venture. According to Bryan Zatica's testimony at trial, the LCC-MZT joint venture was formed with the intention of submitting a bid in response to a solicitation issued by NAVFAC related to a construction project at Naval Base Kitsap Bangor in Silverdale, Washington. Mr. Zatica testified that, prior to LCC-MZT's work on the construction project, MZT had completed "five or six projects" on Naval Base Kitsap Bangor since 2004, with a total revenue of approximately $35,000,000.00. One of the projects at Naval Base Kitsap Bangor that MZT had worked on was a project referred to as P-971, which Mr. Zatica testified commenced in 2004 and, similar to the project at issue in the above-captioned case, also involved construction of a concrete building.

<u>The Contract and the Contract's Specifications</u>

NAVFAC awarded Contract No. N4425-12-C-3007 (the Contract) to LCC-MZT, which had had a value of $10,590,000.00 and had been set-aside for section 8(a) contractors. The scope of work in the Contract involved the construction of the P-913 Explosive Handling Wharf Security Force Facility (P-913) at Naval Base Kitsap Bangor in Silverdale, Washington. The parties have stipulated that the P-913 project "entailed the construction of a building structure, which included a concrete foundation and floor slab, concrete exterior walls, and a reinforced concrete roof. The building was constructed of reinforced concrete." Bryan Zatica testified at trial that LCC-MZT submitted the lowest price bid in connection with the P-913 project at Naval Base Kitsap Bangor.[2]

---

[2] According to the parties' joint stipulation of facts, about eight months after award of the Contract, a California State court ordered that Kenneth Baker of Hill International be appointed as receiver of the LCC-MZT joint venture. Bryan Zatica testified that "Mr. Baker

As issued on January 31, 2012, the Contract stated that LCC-MZT was to begin performance of the P-913 project within fifteen days of award, and that work under the Contract was required to be complete within 555 calendar days of award, which produced an original contract completion date of August 8, 2013. The Contract also incorporated clauses from the Federal Acquisition Regulation (FAR), including FAR clause 52.211-12, titled "LIQUIDATED DAMAGES--CONSTRUCTION (SEP 2000)." (capitalization in original). Pursuant to FAR clause 52.211-12, which was included in the Contract, LCC-MZT was responsible for compensating the government $4,285.00 for each calendar day of delay until the contract work was completed.

The Contract's Specifications was a 1600-plus page document, prepared by design company, URS Corporation, which detailed the work to be completed on the P-913 project, and the manner in which the work was to be completed. The Contract's Specifications required that a secure parking garage be included within the structure LCC-MZT was to construct. The Contract's Specifications stated that "[s]pecial construction features include seismic reinforcement, a reinforced roof to support automatic weapons mounts, a loading dock and environmental protection measures." Additionally, the Contract's Specifications stated that the Explosive Handling Wharf "will remain in operation during the entire construction period" of the P-913 project, and that "work under this contract requires special attention to the scheduling and conduct of the work in connection with existing operations." The parties stipulated that the site for the P-913 facility LCC-MZT would be constructing was located within a "high security area" on Naval Base Kitsap Bangor, and "[t]he days when the convoys moving [redacted] would impact work were referred to as 'Red Days.'" During the trial, NAVFAC construction manager for the Contract, Justin Nodolf, testified that the "local user" of the P-913 building was the United States Strategic Weapons Facility Pacific (SWFPAC). Mr. Nodolf stated that SWFPAC was "in charge of, effectively, the assets located on the base in terms of maintaining and delivering the product down to the boat. However, they actually report directly to Strategic Systems Programs, SSP, who's ultimately the end client on this project."

Section 1.16 of the Contract required "LEVEL A PARTNERING," which required "[k]ey personnel" from LCC-MZT and NAVFAC to periodically meet in-person at an off-site location with a facilitator "in an effort to achieve a quality project done right the first time, within budget, on schedule, and without any safety mishaps." (capitalization in original). The parties have stipulated that Dorriah Rogers of Paradyne Consulting served as the facilitator for the Level A Partnering meetings.

Section 01 14 00 of the Contract's Specifications was titled "WORK

---

was a court-appointed receiver for MZT and Larkor to ensure that when the Navy did pay us that the money went appropriately to the vendors and suppliers and not to one company or the other." Mr. Zatica asserted that LCC "could not fund their portion of the joint venture. They were having financial issues. And for that reason, the Navy wanted to exclude them from the joint venture. And in doing so, this gave the Navy the avenue to be able to pay the bills with a clear mind."

RESTRICTIONS." (capitalization in original). Paragraph 1.3.2 in section 01 14 00 defined the Contract's "[r]egular core working hours" as an eight-and-a-half-hour period "between 7:00 a.m. and 5:00 p.m., Monday through Friday, excluding Government holidays." Pursuant to paragraph 1.3.3 in section 01 14 00, if LCC-MZT wished to work outside of regular working hours, LCC-MZT needed to apply for approval from the contracting officer fifteen days before such work. Paragraph 1.2.1 in section 01 14 00 states:

(1) 10 work days a month will be impacted by convoys and operations at the Explosive Handling Wharf Area. The impacted work days may not be consecutive. A schedule reflecting open or available timeframes will be provided to the Contractor after award, and monthly during the project. An updated schedule will be provided five (5) days prior to the beginning of each month for the following month. Urgent operation requirements will require adjustments to the schedule. Changes resulting in less than 48 hours notice [sic] will be considered a changed condition.

(2) Notification, 10 days in advance of activities that will need to access the Waterfront Restricted Area (Explosive Handling Wharf Entry Control Point at [redacted]) will need to be coordinated with the Contracting Officer and SWFPAC Facilities.

[Redacted]; the contractor shall stop all exterior work and move to their personnel out of visual range of [redacted] Road. There will be approximately 300 convoys during this project.

During times of convoys past the construction site the contractor will be directed, by the Contracting Officer or designate, to a muster [sic] his forces so that they will not be in visual contact with the convoy. Contractor shall provide an area, or means to prevent observation of the convoy. Contractor shall submit a View Obstruction Plan for Contracting Officer approval.

(3) [Redacted] Road will not be accessible during convoys or operations at EHW. No Equipment or material deliveries will be allowed. Contractor will be restricted to the Construction Enclave during convoys and Operations at EHW. Access to the project site will be through the [redacted] Road Trail from [redacted] Road, material and equipment must be staged in the Construction Enclave or be brought in through the [redacted] Road Trail. Contractor parking will be relocated to a site within 5 miles of the project site. Exact location will be provided by the Contracting Officer. Contractor will be responsible for shuttling workers from this parking area.

a. All Zones:

(1) Direct access must be maintained to all facilities, roads, and structures at all times. As a minimum, a least one road (no less than 15') shall be provided for vehicle access to facilities or roads.

4

> Separate pedestrian access must be maintained.

(capitalization in original).

Section 01 32 17.00 20 of the Contract's Specifications was titled "NETWORK ANALYSIS SCHEDULES (NAS)," and states:

> The schedule is a tool to manage the project, both for Contractor and Government activities. The Contractor shall use the Critical Path Method (CPM) and the Precedence Diagram Method (PDM) to satisfy time and cost applications. It will also be used to report progress and evaluate time extensions. It will provide the basis for progress payments.

(capitalization in original). Paragraph 1.3.1 in Section 01 32 17.00 20 of the Contract's Specifications states that "[s]ubmittal and acceptance of the Baseline Network Analysis Schedule and accurate updated schedules accompanying the pay requests are both conditions precedent to processing pay requests." (capitalization in original). Paragraph 1.7.6 in section 01 32 17.00 20 states that "the submission of an error free, acceptable updated schedule to the Government is a condition precedent to the processing of the Contractor's pay request." (capitalization in original). The parties stipulated that Casey Caughie worked as NAVFAC's schedule analyst under the Contract.

Paragraph 1.6.2.5 in section 01 32 17.00 20, titled "Anticipated Weather Delays," states that schedules were to be constructed to allow for "normal adverse weather conditions," and provides that a "schedule of normal anticipated adverse weather delays shall be represented by programming the Weather Calendar(s) to include non-work days occurring within work weeks and are in addition to the non-work days associated with Federal Holidays, and/or security delays." (capitalization in original). Paragraph 1.6.2.5 in section 01 32 17.00 20 provides a number of anticipated days to be impacted by adverse weather for each month, based on whether the contractor is working a five-day work week, a six-day work week, or a seven-day work week.

Paragraph 1.6.2.6 in section 01 32 17.00 20 of the Contract's Specifications, titled "Anticipated Operation-Restricted Delays," provides:

> The Contractor shall use the requirements listed in Specification Section 01 14 00 "Work Restrictions" following schedule of anticipated monthly non-work days due to operations as the basis for establishing a [sic] "Operation-Restricted Delay Calendar" showing the number of anticipated non-workdays for each month due to operations, exercises and and [sic] are in addition to non-work days associated with weekends, Federal Holidays, and/or weather delays unless otherwise approved by the Contracting Officer.
>
> Schedule activity duration(s) shall be formulated with allowance for required adverse operational restrictions. Any activity duration, which could be

impacted by prescribed operational restrictions (security drills, alerts, exercises or missile movements, etc.), due to the time period that the Contractor has scheduled the work, shall include an adjustment to include the anticipated operation-restricted delay. The number of anticipated adverse delays allocated to an activity will be reflected in the activity's calendar.

A lost workday due to security, convoy, and/or operational restriction delay, is defined as scheduled workday activity(s) in which the contractor's workforce cannot work 50 percent or more of the day on the impacted activity(s). The contractor shall immediately notify the Contracting Officer when a lost workday due to restricted conditions has occurred and shall identify the activity(s) impacted; the operational-restricted condition encountered and the reason for resultant activity(s) impacted. The contractor shall record on Quality Control and Production Daily Reports the occurrence; the adverse restricted condition encountered, and reason for resultant activity(s) impacted.

(capitalization in original).

Section 01 50 01 of the Contract's Specifications, titled "PROCUREMENT AND INSTALLATIONS OF FURNITURE, FIXTURES AND EQUIPMENT," provides at paragraph 1.1 that LCC-MZT "shall provide the procurement and installation of all Furnishings, Fixtures, and Equipment (FF&E) exactly as designed and specified or approved equal by the Government, URS, and it's subcontractor 3B Designs during the design phase of this project." (capitalization in original). Paragraph 1.2.1 in section 01 50 01 of the Contract's Specifications states that the FF&E package was to be a "planned modification," and that "[u]pon receipt of required funding, the Prime Contractor shall be authorized by the Contracting Officer, as a planned modification to the construction contract, to procure and install all Final FF&E using Federal Government price schedules (NAVSUP BPAs and/or GSA)." (capitalization in original). Paragraph 1.2 states that the FF&E package awarded was to include "shipping, freight, handling, installation, and the contractor's FF&E Handling and Administration Rate (HAR) percentage as applied to the final FF&E total cost." (capitalization in original). Regarding the Handling and Administration Rate, paragraph 1.2.1 states:

The HAR [Handling and Administration Rate] includes all of the Prime Contractor's effort related to storage, coordination, handling, administration of subcontractors, and all other associated costs and profit for the procurement of FF&E. The Prime Contractor will propose in the contract solicitation the FF&E HAR. The prime Contractor's proposed HAR may not exceed 5 percent of the total FF&E costs, as noted on the bid schedule.

(capitalization in original). Regarding "PROCUREMENT AND INSTALLATION" of the FF&E package, paragraph 1.3 in Section 01 50 01 of the Contract's Specifications states:

The Contractor shall coordinate the building completion date with the installation dealer(s) specified in the FF&E Package.

The FF&E package provided to the Prime Contractor at the modification award shall reflect current pricing certified by the manufacturers and the Interior Designer of Record, NAVFAC NW. Pricing will be guaranteed, but the Prime Contractor shall be responsible for verifying the pricing prior to the award of the modification.

The Prime Contractor shall anticipate possible manufacturer price increases if order placement is delayed. It is recommended to order the FF&E product once the planned modification is awarded and funds are received to avoid incurring additional costs. Delayed production and delivery dates can be noted at the time of order placement to coincide with building completion dates. Any costs incurred due to manufacturer price increases will be the burden of the Prime Contractor.

(capitalization in original).

<u>Ordering of the FF&E Package</u>

On July 3, 2012, NAVFAC contracting officer Mona Carlson unilaterally issued Modification No. A00002 (Modification 2) to the Contract. Modification 2 increased the value of the Contract by $514,026.25 to compensate LCC-MZT for the costs, but not for time, associated with providing and installing the FF&E package set forth in Modification 2, which included items such as beds, rifle cabinets, treadmills, squat racks, microwaves, and televisions. Attached to Modification 2 is a document titled "**FINAL COST ESTIMATE SUMMARY - revised**," which included a line-item breakdown of the $514,026.25 awarded to LCC-MZT through Modification 2. (capitalization and emphasis in original). The breakdown included the prices for all of the FF&E items to be purchased, including a subtotal of $226,882.00 for items manufactured by Turnbull, and a subtotal of $106,335.74 for all other items. An amount of $95,882.00 was added to the Turnbull items for "**Installation**," and an amount of $21,267.15 was added to the remaining items for "Delivery and Installation." (capitalization and emphasis in original). An amount of $39,181.92 was added for "WA State Sales/Use Tax" at 8.7%, and an amount of $24,477.44 was added for "Contractor's HAR" at 5%. (capitalization in original). A separate document attached to Modification 2 titled "**STEEL BERTH AND LOCKER QUOTE**," indicates that the prices for the items manufactured by Turnbull were taken from a quote dated August 15, 2011, but Modification 2 does not indicate from what date the remaining items in the FF&E package were quoted. (capitalization and emphasis in original).

According to Bryan Zatica's testimony, NAVFAC issued Modification 2 when LCC-MZT "roughly" was mobilizing to the project site. Bryan Zatica testified that "typically"

> [y]ou want to do it [the FF&E] at the very end. You want to have them come
> in -- and unfortunately they don't show up like a desk. They show up with
> pieces and parts, screws and nuts and all that stuff. So you want to make
> sure that the place is cleaned, ready, install the FF&E, wipe it down, walk
> out the door.

Jim Mortensen, one of LCC-MZT's project manager during the Contract, testified that in February 2013, he attempted to "request proposals for the FF&E package only to have the suppliers tell me that we weren't authorized to purchase." Thereafter, LCC-MZT requested authorization from NAVFAC to purchase from the sources in the FF&E package. On February 21, 2013, Mona Carlson sent LCC-MZT a letter stating that LCC-MZT was "hereby authorized to utilize General Services Administration (GSA) supply sources for the purchase of furniture, fixtures, and equipment (FF&E) under the subject contract."

Pre-Work Delays

As stated above, NAVFAC awarded the Contract to LCC-MZT on January 31, 2012, and performance under the Contract was required to begin within fifteen days of Contract award. Also as stated above, work under the Contract was required to be completed within 555 calendar days of award, resulting in an original contract completion date of August 8, 2013. Award of the Contract to LCC-MZT, however, was protested at the United States Government Accountability Office (GAO), which the parties stipulated "delayed the commencement of the Project" by thirty-five days to March 7, 2012. On July 23, 2012, after LCC-MZT had mobilized to the site, Bryan Zatica and Mona Carlson bilaterally executed Modification No. A00003 (Modification 3) to the Contract, which, as a result of the protest at the GAO, extended the Contract's completion date by thirty-five days to September 12, 2013, at no cost to the government. Although the GAO protest challenging the award of the Contract to LCC-MZT was filed in January 2012 and complete by March 7, 2012, the parties did not bilaterally execute Modification 3 extending the completion date of the Contract by thirty-five days until July 23, 2012.

Undisclosed Electrical Duct Bank and Water Line

At trial, Bryan Zatica testified that, under the Contract, LCC-MZT was to first "go in and to clear several acres, heavily wooded area, and recut the slope and open it up so that the building, itself, could have a larger footprint to sit in with parking and -- and the building." According to LCC-MZT's Contractor Production Report No. 025, LCC-MZT started clearing and logging the construction site on July 16, 2012. Bryan Zatica testified that, after LCC-MZT had cleared the construction site, LCC-MZT "potholed,"[3] during

---

[3] Mr. Zatica described the term "potholed" as:

> That's just a term of where you take a backhoe or a vacuum truck, and you
> have a location of where the utility is, and then from there you carefully
> excavate to find out if it's in that location. Sometimes they're six feet off in

which LCC-MZT discovered a duct bank and a water line. Scott Wakefield, the owner of one of LCC-MZT's subcontractors under the Contract, PSW Electric, Inc. (PSW Electric), testified at trial that PSW Electric first began working as a subcontractor when LCC-MZT was mobilizing to the construction site. Regarding the duct bank LCC-MZT discovered when potholing, Mr. Wakefield stated that the issues with the duct bank included:

> [W]here to relocate it. How to relocate it. Is it an existing -- we -- we had no idea what was even in the duct bank. So was it something that was abandoned in place that could be, or was it something we had to reroute because it went through the building footprint and the elevation of it was different? Was it something that we could abandon in place or that we had to reroute or -- and what did they need rerouted?

On August 1, 2012, LCC-MZT submitted a request for information (RFI) No. 28 to NAVFAC. In RFI No. 28, LCC-MZT stated that when LCC-MZT was potholing, it "discovered that the main 24" water line and electrical/communication duct bank (concrete encased) running through the project site is inconsistent with the drawing for the project." LCC-MZT asserted that the water line and duct bank "will be exposed on western slope of project due to excavation required to construct the new structure and exterior provided by the contract," and that the duct bank would interfere with the southwest corner of the project's foundation. In RFI No. 28, LCC-MZT also stated that LCC-MZT's performance already had been impacted by the undisclosed water line and duct bank and requested that NAVFAC provide direction or information regarding how LCC-MZT should proceed. On August 10, 2012, NAVFAC responded to LCC-MZT's RFI No. 28, in which NAVFAC instructed LCC-MZT to "relocate conflicting utilities as necessary to complete all" work under the Contract.

On August 14, 2012, LCC-MZT submitted RFI No. 32 to NAVFAC, in which LCC-MZT requested drawings "with full specifications from your designer of record" regarding relocation of the water line and duct bank. NAVFAC responded and provided the drawings on August 20, 2012. According to Bryan Zatica's testimony at trial, the drawings required LCC-MZT to "add additional communication lines and duct bank lines into the new rerouted area." Regarding the relocation of the water line and duct bank, Mr. Zatica testified:

> We had to purchase not only the pipe but the -- the additional excavation. We were geared up to do a building. All of a sudden we're a utility contractor for major water lines. We had to import material. We had to export material. We had to use different personnel that understood the situation.

Mr. Zatica testified that LCC-MZT was not paid in advance for relocating the water line and duct bank, and that LCC-MZT "finance[d] this work for the Navy."

---

one direction or the other, or, in this case, the duct bank and the water line were not in the elevation of what they were supposed to be.

Also on August 14, 2012, LCC-MZT's project manager at the time, James Thompson, sent a letter to NAVFAC contracting officer Mona Carlson requesting an equitable adjustment due to differing site conditions. In the August 14, 2012 letter, James Thompson stated that, on July 26, 2012, LCC-MZT was potholing the construction site and discovered that an electrical duct bank would interfere with the building's foundation. Mr. Thompson stated that, "[a]lso, it was discovered that the waterline and electrical, fire alarm and communication duct bank where [sic] at an elevation that they would be exposed when the site was brought to grade as shown on the plans." Mr. Thompson indicated that LCC-MZT had informed NAVFAC of the site issues by telephone on July 24, 2012, and that LCC-MZT had sent a request for information to NAVFAC on July 27, 2012. According to Mr. Thompson's August 14, 2012 letter, LCC-MZT had been delayed in its performance and was going to incur additional costs. Mr. Thompson requested that "a Change Order be set up to account" for LCC-MZT's additional costs, as well as the delay.

That same day, August 14, 2012, NAVFAC contracting officer Mona Carlson sent a letter to LCC-MZT responding to James Thompson's August 14, 2012 letter. In Mona Carlson's August 14, 2012 letter, Ms. Carlson stated that, after reviewing Mr. Thompson's letter and LCC-MZT's RFI No. 28, she found that there was a differing site condition related to the "additional work to mitigate utility line interference," and that LCC-MZT was entitled to an equitable adjustment for impacted costs and time. Mona Carlson's August 14, 2012 letter provided:

Please submit your Request for Equitable Adjustment (REA) and schedule fragnet[4] for the impacts in a timely manner for final resolution. Ensure you include as a minimum:

(1) An original cost estimate or basis for establishment of the original budgeted estimate for this activity. The estimate should be in sufficient detail to identify material, labor, equipment, subcontracts, and associated costs (overhead) for the original planned activity.

(2) The actual impact costs, including labor, material, equipment, and time associated with any additional work. The estimate should be in sufficient detail to identify material, labor, equipment, subcontracts, and associated costs (overhead) for the impacts related to the activity. As an equitable adjustment, only actual impacts will be reimbursed.

---

4 Defendant's expert during the trial, Stephen Weathers, testified that a fragnet was "a mini set of schedule activities that would model the impact of a delay event," and that "[y]ou would take that subset of activities, put that into the schedule, run the schedule, and see what the corresponding impact on this – on the project completion would be." Plaintiff's expert, William Manginelli, explained that a fragnet was "a set of activities and interconnected logic that would be then inserted into a schedule."

(3) Proposed schedule fragnet, in accordance with Section 01 32 17.00 20, that identifies the new activity associated with this change and how it impacts the schedule. The fragnet should be based on the current, approved schedule.

For tracking purposes, PC [Proposed Change] 0004 has been established. Please note that failure to provide a proposal and resolve this issue in a timely manner will not constitute a Government caused delay. Notify the undersigned if it is determined that there is no impact and the PC will be closed.

Mona Carlson's August 14, 2012 letter also stated that, "[i]n accordance with FAR 52.233-1 DISPUTES, pending final resolution of any request for relief, claim, appeal, or action arising under the contract you are directed to proceed diligently with the performance of the contract." (capitalization in original).

On August 27, 2012, NAVFAC contracting officer Mona Carlson sent the first of four contract progress notices to LCC-MZT, in which NAVFAC asserted that LCC-MZT's Network Analysis Schedule update for July 2012 indicated a contract completion date fifty-six calendar days beyond the current completion date of September 12, 2013. Despite Ms. Carlson's August 14, 2012 letter to LCC-MZT which acknowledged that LCC-MZT was "entitled to an equitable adjustment" related to the undisclosed duct bank and water line, the August 27, 2012 letter stated:

Currently the Government is unaware of any contributing events (outstanding issues) or other contractual conditions causing a delay in completing the work from unforeseeable causes beyond the control and without the fault or negligence of the Contactor. If you feel that a contract time extension is justified for which you believe the Government is liable, Submit a Request for Equitable Adjustment (REA), as appropriate with the specific reference to the incident, basis for change, FAR clause under which you are seeking contractual relief, and contractual deficiencies and circumstances surrounding the situation for which you believe the Government is liable. The Contracting Officer can then review, determine merit of your claim, and provide contractual direction.

Mona Carlson instructed LCC-MZT in the August 27, 2012 letter to take "all actions necessary, at no additional cost to the Government," to complete the project by the contract completion date of September 12, 2013.

On September 6, 2012, LCC-MZT project manager James Thompson sent a letter to Mona Carlson asserting that LCC-MZT could not provide the requested updated schedule and that the "major contributing factor to continued process on the previously scheduled critical path activities is the relocation of the existing utility lines which do not allow MZT-LCC to progress in an efficient and safe manner." James Thompson stated that LCC-MZT would be meeting with its experts the following week to discuss costs and

impacts associated with relocating the duct bank and water line, and that, thereafter, LCC-MZT would schedule a meeting with NAVFAC.

On September 10, 2012, Mona Carlson sent a second contract progress notice to LCC-MZT asserting that LCC-MZT's September 6, 2012 letter was "non-responsive and in direct violation of the Contracting Officer's direction." Ms. Carlson's second contract progress notice stated:

> The Government's findings were based on your Network Analysis Schedule (NAS) update for July 2012 which reflects a completion date 56-calendar days beyond the CCD [Contract Completion Date] of September 12, 2013. At that time, the schedule reflects no activities for which the Government is liable. It is the Government's position that you are not progressing the work with due diligence. In your response, you claim that the delays are related to "utility line interferences" which was identified as an impact on, and responded to on the same day, August 14, 2012. There is insufficient data in your schedule and response to reflect how this activity impacted the schedule which reflects a late completion. Furthermore, the Contracting Officer acknowledged merit (Serial No. 0010 dated August 14, 2012) to your claim of this unforeseen condition, requested an REA, and directed you to proceed with the work in accordance with FAR 52.233-1 Disputes. You should have proceeded with the work immediately, and as stated in the Contracting Officer's letter, updated the schedule to accurately record the impacts to the established schedule activities. While the repairs may be on-going, the schedule can be progressed properly to reflect this impact and an updated NAS provided as directed. Failure to accomplish this task or maintain the NAS is non-compliant with the terms and conditions set for [sic] in Section 01 32 17.00 and causes the Government concern regarding your scheduler's qualifications.

(capitalization in original). Mona Carlson asserted that failure to provide an updated Network Analysis Schedule would result in removal of LCC-MZT's scheduler and, if appropriate, LCC-MZT's project manager. At trial, Bryan Zatica testified that LCC-MZT completed relocation of the water line and duct bank in November 2012. LCC-MZT's January 18, 2013 request for equitable adjustment, which is discussed below, states that LCC-MZT had finished relocating the water line and duct bank on November 9, 2012.

On January 10, 2013, Mona Carlson sent LCC-MZT a third contract progress notice, in which Ms. Carlson stated that LCC-MZT had failed to provide a proposal to resolve PC 0004 concerning the differing site conditions, which Mona Carlson had established in her August 14, 2012 letter to LCC-MZT. According to the January 10, 2013, third contract progress notice, LCC-MZT also had "failed to submit monthly Network Analysis Schedule (NAS) updates for October 2012 through December 2012," and LCC-MZT's most recent monthly schedule update, which had been submitted for September 2012, indicated a completion date eighty-eight days beyond the then-established contract completion date of September 12, 2013. Mona Carlson instructed LCC-MZT to submit an

updated Network Analysis Schedule, as well as a schedule recovery plan, within fourteen days of her January 10, 2013, third contract progress notice. Mona Carlson also sent a copy of the third contract progress notice to Western Surety Company[5] and stated in the third contract progress notice that "[g]iven the Government's ongoing concern regarding your contract progress, your surety has been included on the distribution of this notification."

On January 18, 2013, LCC-MZT sent a letter requesting an equitable adjustment to NAVFAC, which requested an adjustment of $999,701.00 to the Contract and asserted that the differing site conditions impacted the project's critical path by 107 calendar days. LCC-MZT's January 18, 2013 letter stated that LCC-MZT's request for $999,701.00 did not include costs regarding the following seven categories of alleged impacts: (1) "Impacts to base bid work;" (2) "Schedule recovery;" (3) "Inefficiencies to pour, strip and backfill the wall of the Retaining Wall;" (4) "Inefficiencies to pour the building footing, walls and roof;" (5) "Additional Erosion Control/Water Protection after November 9th [2012];" (6) "Haul-off and Stockpile Excavated Material;" and (7) "Protection of Excavated Material." LCC-MZT's January 18, 2013 letter also stated:

> This differing site condition precluded LCC-MZT Team IV from completing work that was extremely weather sensitive prior to the wet season as originally planned. This work includes but is not limited to site grading, excavation, backfill, forming and pouring the building footings. These additional costs will be submitted with the Recovery Schedule.

Regarding NAVFAC's response to LCC-MZT's request for equitable adjustment for the differing site conditions, Bryan Zatica and plaintiff's counsel Craig Ramseyer had the following colloquy:

---

[5] On cross-examination, plaintiff's counsel Craig Ramseyer and NAVFAC contracting officer Mona Carlson had the following colloquy regarding Western Surety Company:

> Mr. Ramseyer: Who is Western Surety?
>
> Ms. Carlson: They held the bond on this contract. . . .
>
> Mr. Ramseyer: When you say they held the bond, they were the performance bond surety for the joint venture; is that right?
>
> Ms. Carlson: I believe so, yes.
>
> Mr. Ramseyer: And those bonds are turned in to the government at the beginning of the project?
>
> Ms. Carlson: Yes.

Mr. Ramseyer: In response to this letter that's identified almost a million dollars in costs but said that there are other impacts and other costs that are not included within the number, do you recall how NAVFAC responded to that?

Mr. Zatica: Yeah. They responded back and said that they would not issue a change order with those items excluded that we were talking about.

They come [sic] back to us and said that they wanted us to put together an all-inclusive change order for all of the impacts that we could foresee on the project, past and present.

Mr. Ramseyer: Now, in this -- and at some point in time, then -- well, let me back up. As of the point of January [2013], did you even know all the costs of the impact?

Mr. Zatica: No, we did not.

Mr. Ramseyer: They were still accumulating?

Mr. Zatica: Correct.

Mr. Ramseyer: Meanwhile, were you still continuing to hear from NAVFAC with regard to the schedule?

Mr. Zatica: Schedule and nonpayment. So we didn't get paid for this work.

On April 12, 2013, NAVFAC contracting officer Mona Carlson sent LCC-MZT a fourth contract progress notice, in which NAVFAC stated that LCC-MZT had failed to adequately address NAVFAC's concerns regarding contract progress. NAVFAC asserted that, "since our last notice additional delays have been incurred for which no evidence of Government liability has been presented." NAVFAC also asserted that LCC-MZT had failed to provide a revised price proposal or time impact analysis related to PC 0004, involving the differing site conditions. In the April 12, 2013 fourth contract progress notice, NAVFAC contracting officer Mona Carlson stated:

While PC 0004 remains in dispute, based on the information presented to date the Government is willing to assume liability anywhere from zero (0) to 60 calendar days of the claimed time impact. Based on the Government's current position, allowing for an adjustment of 60 calendar days, the adjusted CCD would be November 11, 2013. Based upon your 0213 NAS [Network Analysis Schedule] update, you would still need to recover approximately 115 calendar days.

(capitalization in original).

In the April 12, 2013 fourth contract progress notice, Mona Carlson further stated:

In accordance with FAR 52.236-15 SCHEDULES FOR CONSTRUCTION CONTRACTS, citing from paragraph (b), "*If in the opinion of the Contracting Officer, the Contractor falls behind the approved schedule, the Contractor shall take steps necessary to improve its progress, including those that may be required by the Contracting Officer, without additional cost to the Government*". Accordingly, you are hereby directed as follows:

- Increase the number of crews. Based on Government's observations there are insufficient crews on site to accomplish the required work. Multiple crews for welding, reinforcing steel, building forms, etc. Identify sufficient work force (crew members) for upcoming activities such as mechanical and electrical.

- Increase the number of shifts or alter work schedules to allow for longer production days.

- Establish a secondary production area as necessary to pre-fabricate forms, reinforced steel meshes/cages, etc. The Government has identified a site on base for your use.

- Increase work days to seven (7) calendar days per week.

Provide a plan detailing implementation of these requirements no later than April 19, 2013. You will need to recover approximately 16-20 days per month to demonstrate satisfactory progress.

(capitalization and emphasis in original). NAVFAC asserted that failure to demonstrate progress on the construction project could result in the removal of LCC-MZT's project manager and superintendent and could result in LCC-MZT being terminated for default. A copy of the fourth contract progress notice also was sent to Western Surety Company.

On April 17, 2013, LCC-MZT sent a request for equitable adjustment to Mona Carlson related to PC 0004, which involved the differing site conditions regarding the electrical duct bank and water line. In the April 17, 2013 request for equitable adjustment, LCC-MZT requested costs of $4,831,573.00. John King, who, at the time of the P-913 project, was an employee of LCC-MZT's subcontractor, Mirack Construction, and who, the parties jointly stipulated, served as a scheduler, claims consultant, and interim project manager during the Contract, testified that he assisted in preparing the request for equitable adjustment related to PC 0004. John King further testified that the request for equitable adjustment related to PC 0004 "was the additional pricing that NAVFAC requested from us for PC 0004 to price all the forward impacts from the unforeseen utilities." John King also testified that NAVFAC had requested the additional information in NAVFAC's serial letters to LCC-MZT.

15

One day later, on April 18, 2013, LCC-MZT and NAVFAC engaged in a partnering meeting moderated by Dorriah Rogers. Jodus Hortin, who the parties jointly stipulated was a NAVFAC contract specialist, and who subsequently acted as a NAVFAC contracting officer,[6] also was present at the April 18, 2013 partnering meeting and testified regarding LCC-MZT's submission of the request for equitable adjustment related to PC 0004. At the trial, Mr. Hortin stated that, prior to the April 18, 2013 partnering meeting, he had started to review a copy of the request for equitable adjustment related to PC 0004 "at his desk" with Justin Nodolf, NAVFAC's construction manager for the Contract. Although Mr. Hortin described the review as a "cursory review," he testified that he "had an opportunity to review the contents." During his testimony,[7] Mr. Nodolf approximated that normally "[i]t would take us several months just to get through it to a point where we could at least establish an initial government position to be able to enter negotiations." During the trial, NAVFAC contracting officer Mona Carlson testified that the purpose of the April 18, 2013 partnering meeting was to discuss issues between NAVFAC and LCC-MZT, "but a $4.8 million technical proposal would require an extensive review. We couldn't do it in a partnering meeting. That wasn't the purpose of a partnering meeting." Bryan Zatica testified that it would "[n]ot necessarily" be unusual to discuss costs in a request for equitable adjustment at a partnering meeting, and "that's why we presented it, so we could all sit down." Justin Nodolf testified that he was involved with the negotiation regarding PC 0004 at the April 18, 2013 partnering meeting and the subsequently executed modification, which is discussed below. At the beginning of the April 18, 2013 partnering meeting, LCC-MZT provided a hardcopy of its request for equitable adjustment related to PC 0004 to NAVFAC. Regarding the submission of the hardcopy at the April 18, 2013 partnering meeting, plaintiff's counsel Mr. Ramseyer and Mr. Nodolf had the following colloquy:

> Mr. Ramseyer: Okay. And what do you recall about receiving LCC-MZT's binder of support for its claim?
>
> Mr. Nodolf: So what I recall was it was in pretty poor taste to -- to put this giant binders [sic] of all this information and then have a -- like, $4.8 million total there right at the very beginning of the partnering session. I mean, it was -- you know, we had no time to look at this thing. It was just all of a sudden here's this -- this giant binder of all this material, and -- and here's a huge number.

---

[6] Jodus Hortin graduated from the University of Utah in 2005 with a Bachelor of Science degree in economics and graduated from the Naval Postgraduate School with a Master of Science degree in contract management in 2016, after the P-913 project was complete. In 2009, Mr. Hortin joined NAVFAC as an intern in what Mr. Hortin referred to as a "three-year developmental program," during which time Mr. Hortin was assigned to construction projects from February 2010 to April 2011.

[7] Although on direct examination by the government, Justin Nodolf was responsive to questions posed by government counsel, during cross-examination by plaintiff's counsel, Mr. Nodolf seemed on more than a few occasions not to remember the answers to plaintiff's counsel's questions.

Mr. Ramseyer: And what -- about the size of the binder, was it like one of the binders in front of you or was it more than that?

Mr. Nodolf: From what I recall, I -- it was a large binder. I don't recall the full size or even if it was even multiple binders. But it was a -- it was a lot of information.

Mr. Nodolf stated that, after receiving the hardcopy, the NAVFAC representatives "got up and left" because "[w]e had no time to review this." According to John King, LCC-MZT's scheduler at the time of the April 18, 2013 partnering meeting, after providing NAFVAC with a hardcopy of the request for equitable adjustment related to PC 0004, the NAVFAC representatives became "upset" and "Ms. Carlson got up and left the room, and then the facilitator [Dorriah Rogers] went after her and took the rest of the people and they gathered in another room to conference." Mr. Zatica also testified that LCC-MZT's delivering of the hardcopy of the request for equitable adjustment related to PC 0004 "upset" the NAVFAC representatives.

Bryan Zatica stated that, after leaving the room in which the partnering meeting was occurring, NAVFAC met in a separate room in the same building as the partnering meeting. Mr. Zatica testified that, over the course of several hours, Dorriah Rogers went back and forth between the room the LCC-MZT representatives were in and the room with NAVFAC representatives. The following discussion between plaintiff's counsel Craig Ramseyer, and Mr. Zatica occurred:

Mr. Ramseyer: So as I understand your testimony they never came back -- NAVFAC never came back into your room. Is that right?

Mr. Zatica: No, they did actually come back later in the day. They come [sic] back and made an offer for the differing site conditions and said, we're going to give you a million five [$1,500,000.00]. You got 24 hours to take it or leave it.

Mr. Ramseyer: And who made that statement?

Mr. Zatica: Mona Carlson.

Mr. Ramseyer: Did they tell you how they calculated a million five?

Mr. Zatica: No.

Mr. Ramseyer: And in saying take it or leave it, did Ms. Carlson advise you that she was -- she was leaving the country?

Mr. Zatica: She'd mentioned that she was going to Naples, Italy, for 30 days and nothing would happen. If we did not accept it within 24 hours, we were out of luck.

Mr. Ramseyer: So go back to that time frame, April 18th [2013], yourself. Where were you financially?

Mr. Zatica: I was in trouble. I had almost maxed out my line of credit. I could not max it out -- in essence it was maxed out because we'd get paid on a receivable basis for our line of credit, and we have to pay back what we borrow every 90 days. So we had to leave a buffer, which would be free to the bank, so that we could continue to pay down and borrow back, and we were maxed out at that point.

Mr. Ramseyer: So I understand it, you had a line of credit. There has to be a certain amount left on that so the bank can come in and take their interest payment off of that?

Mr. Zatica: That, and it shows that we're being paid so that we can pay down what we borrowed in the previous months.

Mr. Ramseyer: Okay. So you've got that situation. You told us before you'd been paid in December with liquidated damages taken out, correct?

Mr. Zatica: Correct.

Mr. Ramseyer: And subsequent payments, you had not been paid on the DSC [differing site conditions] obviously at all, correct?

Mr. Zatica: No, we had not.

Mr. Ramseyer: And so you were upside down on the project, correct?

Mr. Zatica: Huge. Yes, very much so.

Mr. Ramseyer: All right. So how badly did Macro-Z-Technology need cash at the time?

Mr. Zatica: We needed it or we were going out of business, period.

Mr. Ramseyer: If you did not accept the offer, did you feel that you would end up having to shut down the operations?

Mr. Zatica: Yeah, we would have to close. I mean, it was an inordinate amount of stress in the fact that, you know, I've got a house that's on the line with the surety. The bank has my assets tied up. I have employees that have been with me 25 years. I've got to tell them that we're going out of business. You know, I've got children. I mean, it's not fun.

Mr. Ramseyer: What about -- and you had no working capital from Larkor, correct?

Mr. Zatica: Nothing.

Mr. Ramseyer: All right. So given the 24-hour dictate, what did you do?

Mr. Zatica: Well, I was getting on a plane the next day, and it would have been past 24 hours, so the next day I accepted it.

Mr. King of LCC-MZT also testified regarding NAVFAC's April 18, 2013 offer, stating that NAVFAC "didn't ever offer to discuss it with us. They gave us 24 hours to sign the change order." Mr. King asserted that, as of April 2013, LCC-MZT may have had to go out of business if LCC-MZT did not receive a "cash infusion." Mr. King stated that he considered NAVFAC's offer to be a "take-it-or-leave-it offer" and that the "comment was made that, you know, they would get us the written change order within a week, and it had to be signed prior to her [Mona Carlson] leaving town" because "she was the only one that could sign it." According to the testimony of NAVFAC's then construction manager Justin Nodolf, however, two individuals, Mona Carlson and Lieutenant Commander Wood, both of whom were present at the April 18, 2013 partnering meeting, could have signed a modification with a value of $1,500,000.00. Justin Nodolf asserted that "[b]oth Lieutenant Commander Wood and -- and Mona Carlson would have been warranted to that level." Jodus Hortin and plaintiff's counsel Craig Ramseyer also discussed Mona Carlson's unavailability to sign a contract modification, as follows:

Mr. Ramseyer: And do you recall statements being made that, "Hey, Mona Carlson is leaving. So if you don't accept this by tomorrow, basically, it's off the table and it's going to take a lot longer to go through the process of trying to get this thing resolved"?

Mr. Hortin: That was only emphasized with regard to someone else. Some other warrant contracting officer would be inheriting this issue to see it toward -- to -- to resolution and would be handling it differently. This was her offer, her ability to resolve it within the time frame that she had before she left the country.

NAVFAC contracting officer Mona Carlson also testified that she made an offer of $1,500,000.00 during the April 18, 2013 partnering meeting, although Ms. Carlson could not recall whether she said the offer was "take-it-or-leave-it." Ms. Carlson stated that it was a "possibility" that she said LCC-MZT needed to decide whether to accept the $1,500,000.00 offer within twenty-four hours. Ms. Carlson further testified that "[w]e offered the contractor a settlement, and he accepted it. The negotiations were over." According to Ms. Carlson, her trip to Naples, Italy, was not thirty days long and she did not "believe" that she left for Naples until May 1, 2013.

At trial, Justin Nodolf and Jodus Hortin testified about how the government calculated its $1,500,000.00 offer to LCC-MZT. Mr. Nodolf stated:

> So we were working basically the original proposal they gave us back in January.[8] We'd gone through portions of it at that point. We had determined it was anywhere between 6– to 700,000 on direct costs. And so when Mona [Carlson] asked me, she said, how much -- how much should we offer them? And I said, well, it's like 6– to 700,000 direct costs. So she said, great. Should we just double it and round up? And that's where we came to the 1.5.

(alteration added). According to NAVFAC contract specialist Jodus Hortin:

> [I]t [the $1,500,000.00 offer] was a combination of the total costs presented, the original REA and our review of it, and the technical review and understanding of remaining activities. . . .
>
> Our position was the culmination of the seven or eight months it took to get a complete REA, our handling of the project site, our receipt of QC [quality control] daily reports, schedules. We didn't just review this issue and develop a position in the span of one business day. We were actively working towards it for months.

Mr. Hortin also testified:

> It's [$1,500,000.00] a number that was derived at from a very high level, not into specific line items in a robust cost estimate with all kinds of data. We didn't have the time to do that. We didn't have the ability to do that. The 1.5 number was derived with all those other considerations in mind.

Mr. Hortin testified that he "remember[ed] the consensus being that we couldn't properly substantiate entitlement for anything higher than" $1,500,00.00. Mr. Hortin further asserted:

> If the 1.5 million wouldn't have been accepted, we would have entertained a more thorough comprehensive cost analysis in relation to the other information we requested and not received, further pursued how much of the work was compensable and -- and how much of the time extension was owned by the government. The 1.5 offer was presented in lieu of the additional time needed to perform that more granular line item robust assessment, and there was no guarantee that the ultimate outcome of an

---

[8] As stated above, on January 18, 2013, LCC-MZT sent NAVFAC a request for an equitable adjustment of $999,701.00 related to the differing site conditions of the water line and electrical duct bank, which excluded the seven categories of costs from the January 18, 2013 request for equitable adjustment.

REA would have been higher or lower. The 1.5 was the offer to settle the issue given the time constraints that we were in and the other circumstances.

On April 19, 2013, Bryan Zatica sent an e-mail message to Dorriah Rogers, stating:

I called and left a message on Mona's office phone that MZT accepts the Navy's offer 1.5 million dollars and the date of SCD [substantial completion date] of November 15, 2013. I also request that the REA for the incorrect electrical scale be processed. Note this REA has been in since March. Thanks again and we look forward to moving forward and completing the project on time.

During her testimony at trial, Mona Carlson asserted that she would not have "defaulted" or "terminated" LCC-MZT if LCC-MZT had not accepted NAVFAC's $1,500,000.00 offer. Mr. Zatica also stated that he did not believe that LCC-MZT would have been terminated if LCC-MZT had declined to accept NAVFAC's offer of $1,500,000.00.

On May 1, 2013, John King sent an e-mail message to Dorriah Rogers requesting that changes be made to the draft modification involving LCC-MZT's acceptance of NAVFAC's $1,500,000.00 offer. Mr. King's proposed changes to the modification are indicated below in the portions struck and in italics:

**The following items are applicable to this modification:**

(1) The subject contract is hereby modified to compensate the Contractor for all additional labor, material, equipment, and associated costs regarding a differing site condition resulting from utility line interferences as further defined in the Contractor's Request for Equitable Adjustment (REA) (Serial Letter No. 0005) dated August 14, 2012, the Government's response (Serial Letter No. 0010) dated August 14, 2012, the Contractor's amended REA (Serial Letter No. 0024) dated April 17, 2013, and the settlement reached April 19, 2013, summarized as follows. These documents are hereby incorporated by reference. This settlement accounts for all associated impacts including re-sequencing, acceleration, seasonal impacts, changes to means and methods, ~~et cetera~~, necessary to provide for substantial completion, as further defined in paragraph (2) below. ~~Neither party's rights for contractual relief for future impacts/situations are waived by this settlement.~~ *Contractual relief for impacts/situations outside the scope for relocating the existing utilities defined by PCO 0004 are not waived by either party by this settlement.*

**PC 0004 ~ REA – Utility Line Interference          Increase: $1,500,000**

(alterations and emphasis in original).

21

On May 2, 2013, Mona Carlson signed Modification No. A00009 (Modification 9) to the Contract. Modification 9 also was signed by Kenneth Baker of Hill International, who, as discussed above, was the court-appointed receiver of the LCC-MZT joint venture. Modification 9 was entered into under the "AUTHORITY" of the Changes Clause, FAR clause 52.243-4. (capitalization in original). Modification 9 states:

> The subject contract is hereby modified to compensate the Contractor for all additional labor, material, equipment, and associated costs regarding a differing site condition resulting from utility line interferences as further defined in the Contractor's Request for Equitable Adjustment (REA) (Serial Letter No. 0005) dated August 14, 2012, the Government's response (Serial Letter No. 0010) dated August 14, 2012, the Contractor's amended REA (Serial Letter No 0024) dated April 17, 2013, and the settlement reached April 19, 2013, summarized as follows. These documents are hereby incorporated by reference. This settlement accounts for all associated impacts including re-sequencing, acceleration, seasonal impacts, changes to means and methods, et cetera, necessary to provide for substantial completion as further defined in paragraph 2 below. Neither party's rights for contractual relief for future impacts/situations are waived by this settlement.

> **PC 0004 ~ REA – Utility Line Interference        Increase: $1,500,000**

(capitalization and emphasis in original). The language in Modification 9 did not incorporate the changes proposed by John King. Regarding an extension of time, Modification 9 states:

> (2) Extension of time is required by reason of this modification. As per the agreement for PC 0004 (REA Utility Line Interference), the contract is modified as follows:

> (a) Substantial Completion Date (SCD) of **NOVEMBER 15, 2013**, as further defined in 5252.211-9301 ~ Phased Construction Schedule, is hereby established. Liquidated damages, as further defined in 52.211-12, have been adjusted accordingly to provide for completion as agreed.

> (b) The Contract Completion Date (CCD), as further defined in 5252.211-9301 ~ Phased Construction Schedule, is hereby extended by 125 calendar days to **JANUARY 15, 2014**. Liquidated damages, as further defined in 52.211-12, have been adjusted accordingly to provide for completion as agreed.

(emphasis and capitalization in original). Modification 9 further states:

> (3) Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full (for both time and money)

and for any and all costs, impact effect, and for delays and disruptions arising out of or incidental to the work as herein revised.

Modification 9 also amended the application of certain FAR clauses in the Contract. The application of FAR clause 52.211-12 in the Contract was amended as follows:

52.211-12 LIQUIDATED DAMAGES--CONSTRUCTION (SEP 2000)

(a) If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of $4,825.00—IDENTIFIED BELOW— for each calendar day of delay until the work is completed or accepted.

| Phase* | Rate Per Day |
|--------|--------------|
| A | $4,413 |
| B | $412 |

*Phases are defined in 5252.211-9301 PHASED CONSTRUCTION SCHEDULE*

Modification 9 also inserted clause 5252.211-9301 of the Navy Facilities Acquisitions Standards (NFAS),[9] titled "PHASED CONSTRUCTION SCHEDULE (SEP 1996)," into the Contract. (capitalization in original). Clause 5252.211-9301 in Modification 9 states, "[w]ithin the overall project schedule, commence and complete the work in phases. Complete each phase of the work within the number of calendar days stated in the following schedule." The schedule in clause 5252.211-9301 provides:

---

[9] Clause 1.101 of the NFAS states that the purpose of the NFAS is to "provide general guidance to field Contracting Officers in the execution of their delegated authority," and that the NFAS "implements or supplements the Federal Acquisition Regulation (FAR), Defense Federal Acquisition Regulation Supplement (DFARS) and the Navy Marine Corps Acquisition Regulations Supplement (NMCARS). It is not a stand-alone document, but must be read together with the FAR, DFARS, and NMCARS." See NAVAL FACILITIES ACQUISITION STANDARDS (NFAS) 2018 EDITION, available at https://www.navfac.navy.mil/content/dam/navfac/Small%20Business/PDFs/Contracting_with_NAVFAC/sb_navfac_naval_facilities_acq_standard_oct_2018_change1_aug2019.pdf. (last visited Apr. 23, 2021).

| Phase | Description | Start Date | Completion Date |
|---|---|---|---|
| A | SUBSTANTIAL COMPLETION. Completion of all on-site construction efforts identified in the contract documents for CLIN 0001 less work identified as punch list items or administrative submittals required for contract closeout as identified in Phase B below. Substantial completion is achieved upon issuance of a Final Building Occupancy Date (BOD) letter. Punch list work is limited to work that does not preclude the Government use of the construction work. Warranty period begins as specified in each partial BOD letter. | Contract Award Date | November 15, 2013 |
| B | CONTRACT CLOSE-OUT. Documents necessary to close out the contract such as OM&N, as-builts, admin submittals necessary to close out the contract for CLIN 0001. Documents necessary for final inspection and acceptance are not included as close out submittals. | Determined by Contractor | January 15, 2014 |

(capitalization in original).

Concrete Pours

Following the execution of Modification 9, LCC-MZT continued its work on the P-913 project. In order to place the concrete roof of the building LCC-MZT was constructing, LCC-MZT intended to perform two concrete pours. Ultimately, the first pour occurred on August 28, 2013, and the second pour occurred on September 4, 2013. On August 27, 2013, representatives from LCC-MZT, including Robert Berger and Jeremy Wastweet, met with representatives from NAVFAC, including Dan Van Natta and Justin Nodolf, to discuss the concrete pour scheduled to occur on August 28, 2013. In the parties' joint stipulation of facts, the parties stipulate that Mr. Berger was LCC-MZT's quality control manager from "the beginning of the Project until approximately September 19, 2013,"[10] that Mr. Wastweet "was LCC-MZT's Superintendent from the beginning of the Project until approximately September 19, 2013," and that, thereafter, Mr. Wastweet was LCC-MZT's foreman. The parties also stipulate that Dan Van Natta was NAVFAC's engineering technician for the work on the P-913 project.

According to a Contractor Quality Control Report dated August 27, 2013, during the August 27, 2013 meeting, Dan Van Natta indicated that he believed that LCC-MZT's proposed plan of spacing the concrete trucks out by approximately ten minutes could result in concrete trucks timing out. Mr. Van Natta also asked LCC-MZT about cleaning out the beam pockets before pouring concrete, to which LCC-MZT representatives indicated it "has had crew cleaning forms for the past week and are going over deck again." Regarding LCC-MZT's cleaning of the beam pockets, Jeremy Wastweet testified at trial that, to clean the beam pockets, "[t]here were multiple techniques where we were using compressed air, vacuum cleaners, magnets, grab sticks if you will, multiple things

---

[10] Although Robert Berger was an employee of LCC-MZT, Mr. Berger testified that "my job is to make sure the done -- the work is done per the plans, per the specs, and per the drawings. I'm essentially a third-party-type employee."

we were using in an attempt to get all that material out of there." According to a Contractor Production Report dated August 26, 2013, LCC-MZT expended forty billable hours on "clean[ing] up tie wire, sun flower seeds and debris caused by the rebar operation on the roof."[11] Dan Van Natta also testified at trial that LCC-MZT "had some people actively working to clean" the beam pockets.

Robert Berger and Dan Van Natta both were on site during the first concrete roof pour on August 28, 2013. Mr. Berger testified that, originally, LCC-MZT had planned on having two pump trucks on site for the August 28, 2013 roof pour. Mr. Berger asserted that it was not necessary to have two pump trucks for the August 28, 2013 concrete pour, but that having two pump trucks on site would have allowed LCC-MZT to "get the pour done quicker." According to Mr. Berger, one of the two pump trucks canceled on the morning of the August 28, 2013 roof pour. Robert Berger also stated that "I didn't have any concern about having one pump truck" and that "I felt that we were still in a good spot to place the roof, so I allowed him to place." Mr. Berger asserted that "[o]ne pump truck allowed for continuous pour of the concrete."

The single pump truck that was to "place" the concrete, however, was delayed at a gate when the pump truck was attempting to access the Naval Base Kitsap Banger on the morning of August 28, 2013. Regarding the cause of the pump truck's delay at the gate, Robert Berger testified:

> I believe it was because nobody informed the -- and I'm -- nobody informed the security people that we needed to come through early. There was a -- if I remember correctly, there was a -- they only open the commercial gate at a certain time. We made arrangements with Dan Van Natta, I believe, to ensure that that truck would get through early when -- when it arrived. Security wouldn't let it through.

The pump truck subsequently proceeded through the security gate, although Mr. Berger testified that the delay "caused our concrete trucks to get backed up and out of sequence." Mr. Berger also testified about his role in the August 28, 2013 roof pour, stating: "I was moving between both areas, where the concrete trucks were being tested and up above to monitor and make sure all the inspectors were doing what needed to be done and monitoring the entire project." The "inspectors" referenced in Mr. Berger's testimony include a company referred to as MTC, which was a third-party inspector brought in to test the concrete that was being placed on August 28, 2013.

In his testimony, Mr. Van Natta stated that the August 28, 2013 roof pour was

---

[11] Subsequently, according to a Contractor Production Report dated September 3, 2013, LCC-MZT expended 50 billable hours to "[f]inish cleaning up tie wire, sun flower seeds and debris caused by the rebar operation on the roof in preparation to place concrete tomorrow." The September 3, 2013 cleaning occurred after the first roof pour on August 28, 2013, but before the second roof pour on September 4, 2013.

outside of only one truck showing up, initially uneventful. They -- the contractor had the workers ready up on the roof. The pump truck arrived on-site and -- and had set up. They started placing concrete. And instead of filling the beam pockets -- excuse me -- they were putting some material in beam pockets and then moving in kind of like from the south to the north and then coming back to the area where they had first started.

Mr. Van Natta further testified:

> [T]the concern on this day especially was that the concrete that they had placed initially in the southern part of the building had started to set up already. So that when they went to the north and came back and tried to deposit new concrete or additional concrete on top of that first layer, that layer had set up to the point where we weren't going to get consolidation of the first and second layers of concrete.

During cross-examination of Mr. Van Natta, the following discussion between plaintiff's attorney Craig Ramseyer and Mr. Van Natta occurred:

> Mr. Ramseyer: When placing concrete, it's typically placed in what would be called a lift, correct?
>
> Mr. Van Natta: Yes.
>
> Mr. Ramseyer: So just as an example, if we're pouring 36 inches or three-feet deep slab or some other pavement or something, that's not all poured at the same time 36 inches. They do it in smaller lifts, correct?
>
> Mr. Van Natta: Correct.
>
> Mr. Ramseyer: For instance, that lift may be 12 inches, and they may do three lifts to meet the standard of the 36 inches?
>
> Mr. Van Natta: Whatever was called out in the specs or with ACI [American Concrete Institute].
>
> Mr. Ramseyer: All right. And so what happened here that you referred to was that the hose man had the hose over his shoulder. He's filling up that beam pocket to the approximate size of that first lift called for in the specs, true?
>
> Mr. Van Natta: I think that was their intent, yes.

Mr. Ramseyer: All right. And then they would come back with a second lift. Hose man coming back through -- after they vibrated[12] that first lift, the hose man's coming back through with the concrete for a second lift, correct?

Mr. Van Natta: What I remember on that day was that they had put a first lift in a couple of the beam pockets, and then they started moving to the north. By the time they got back to put that second lift in is where the problems began.

Mr. Ramseyer: All right. That's what you perceive to be the problems, correct?

Mr. Van Natta: Yes.

In his testimony, Dan Van Natta asserted that "[m]y concern was that there was going to be a cold joint[13] there because there was no way to tie the two layers together." After observing what Mr. Van Natta believed to be a cold joint, Mr. Van Natta spoke with Robert Berger about the alleged cold joint. According to Robert Berger's testimony:

He [Mr. Van Natta] called me up. I was working -- to me it was more important to get to my concrete back on -- on -- in sync because of the pump truck problems and that so we had -- we could continue and everything. He called me up and he said, "You need to stop this placement. You're going to have a cold joint." Which anybody -- it flabbergasted me because, if I did stop the pour, there would be a cold joint. He was concerned about a cold joint, but he wanted me to stop the placement. I told him that if he wanted me to stop the placement, give it to me in writing. He did not.

---

12 According to the testimony of Robert Berger a "vibrator is a -- it's got a long tube. It's got a vibrator in it and it's got a head on it that vibrates, and you put that down into the concrete so that it consolidates the concrete around the rebar and gets the air out and all that."

13 According to the testimony of Bryan Zatica:

[A] cold joint is considered when the concrete becomes more of a solid than it is plastic. And so when the concrete's coming out of the hose, it's considered plastic. It's not like water, but it's -- it's somewhat of a fluid for the lack of a better word. And when you vibrate it and it's plastic, it all meshes as one.

If you get a cold joint where you have a break in trucks or something happens -- I don't know -- then the concrete that you've placed will tend to become more solid. And when you put plastic against it, they too won't mesh. It kind of gets what they call a -- a cold joint between the two.

Mr. Van Natta, however, recounted the August 28, 2013 pour differently, testifying in an exchange with defendant's counsel Erin Murdock-Park, as follows:

> Ms. Murdock-Park: What did you express to Mr. Berger with respect to your concerns?
>
> Mr. Van Natta: I said -- I -- I told him, "Hey, your guys cannot" -- "We're going to have cold joint here because they can't -- with the vibrator, they can't tie these two layers together because the first layer had set up." And he just -- he kind of looked at me, and I said, "See." And I picked up my heel, and I kind of showed him. I dug it in. And it was -- wasn't even moving. It had started to set up.
>
> Ms. Murdock-Park: And what do you recall about his response?
>
> Mr. Van Natta: Honestly, I -- I don't recall him having a lot of feedback. I think he was -- I think he was just as shocked as anybody that that was happening.
>
> Ms. Murdock-Park: Did you tell him to stop the roof pour?
>
> Mr. Van Natta: I don't recall telling him that, no.
>
> Ms. Murdock-Park: Would that be something that you think that you would have done?
>
> Mr. Van Natta: I don't have the authority to -- to stop a concrete placement like that unless there was a safety issue so egregious that somebody was going to get hurt or -- or worse, yes, then I would have -- then I would have stopped whatever activity there was.

Justin Nodolf also testified that he believed there was a cold joint forming during the August 28, 2013 roof pour and that the "the concrete itself was flashing early, and so it was stiffening. It was hardening up too quick."

On August 30, 2013, NAVFAC issued Non-Compliance Notice No. 0003 to LCC-MZT. In Non-Compliance Notice No. 0003, NAVFAC stated that, "[o]n 28 August 2013, NAVFAC NW [Northwest] representative was onsite to inspect the concrete placement of the structural roof slab and observed fresh concrete being placed over hardened non-plastic concrete." NAVFAC in Non-Compliance No. 0003 instructed that any non-compliant work was to be repaired to the satisfaction of NAVFAC.

In defendant's post-trial brief, defendant states that "[t]he second roof pour, which occurred on September 4, 2013, notably did not experience these same problems." Bryan Zatica testified that there was "not really" any issues with the September 4, 2013 roof pour and that the September 4, 2013 roof pour "I know went fairly smoothly." In plaintiff's

post-trial brief, plaintiff asserts that "[i]t was only after the forms began to be removed from the underside of the deck and beams that issues arose," which plaintiff in its post-trial brief contends "engendered unwarranted hysteria from NAVFAC."

On September 16, 2013, LCC-MZT began removing forms from the concrete on the P-913 building. Dan Van Natta stated:

> I remember looking up and seeing some dark areas in the south bay where you could see that that was the -- the grinding, the slag material.[14] I had a stick, and I reached up and I poked up at the ceiling with the stick, and all of this debris came down on top of me.

In plaintiff's post-trial brief, plaintiff contends that "Mr. Van Natta's testimony that after the formwork was removed, he stuck something into the bottom of the roof deck and material fell on him," was a "gross exaggeration. There is no documentary or photographic evidence of the same." Mr. Van Natta asserted that he also saw "bug holes" and "huge rock pockets and exposed bar in some areas." NAVFAC's then supervisory civil engineer, Mark Aguilar, testified that he was on the P-913 site when the forms were removed from the concrete and that "[w]e saw some rock pockets, some exposed rebar, some cold joints."

A number of photographs of the concrete after the forms had been removed were shown during trial, including the following photographs:



---

[14] Mr. Van Natta defined slag as "a by-product of welding operations when the welder removes the electrode from -- or strikes the electrode and then removes it, you get a piece that kind of glows ember red for a few seconds and then falls on the ground."







The above pictures are illustrative of some of the larger voids and rock pockets on the building's roof and beams. As indicated in the chart in Exponent Failure Analysis Associates' (Exponent) November 8, 2013 report, discussed in more detail below, the entirety of the roof and beams did not have such issues. Rather, there appear to have been only certain areas of the roof which experienced issues with voids and rock pockets.

At the trial, plaintiff's attorney Craig Ramseyer and Robert Berger had the following discussion regarding how concrete is poured into beams:

> Mr. Ramseyer: Now, do you have a recollection of how deep the concrete was being poured on the roof?
>
> Mr. Berger: The roof, itself, was, I believe, eight inches. I'm guessing. The beams, there were beams that ran in there, and they were, I want to say foot and a half, 18 inches, 24 inches by probably 18 inches wide.
>
> Mr. Ramseyer: They're pretty deep?
>
> Mr. Berger: Yes.
>
> Mr. Ramseyer: Are you able to see the consolidation at the bottom of the form in those -- what did you just call them, the columns or the --
>
> Mr. Berger: No.
>
> Mr. Ramseyer: Okay. And nobody would be able to. Is that a fair statement?

Mr. Berger: No.

Mr. Ramseyer: So in watching the consolidation, what is it that you are observing to ensure the best possible consolidation?

Mr. Berger: The guy that does the vibrating is probably one of the most important on the team because if you vibrate too much, then it forces all the rock to the bottom of the forms. If you don't vibrate enough, you can get air pockets or it might not get the concrete down into the beam or to the bottom of the beam.

And it happens. Almost any concrete pour you will find a rock pocket -- for different sizes. Could be cosmetic. Beams are very hard. On this project it was very difficult because the aggregate size was not really conducive to the mass of rebar that was in there, so it was difficult to get the stinger, which we call the vibrator down into it. We -- if I remember correctly, we requested that we be allowed to change the mix design to allow this concrete to better consolidate around the beams, and that was turned down.

Dan Van Natta, NAVFAC's engineering technician, also indicated in his testimony that "it would be very tough" to pour the concrete mix into certain areas of the rebar.

Additionally, Mr. Ramseyer asked NAVFAC supervisory engineer Mark Aguilar about pouring concrete into the beams, as follows:

Mr. Ramseyer: Sir, was the concrete in the beam pockets placed in lifts?

Mr. Aguilar: Yes.

Mr. Ramseyer: And so is there a way, as that hose man is filling up those beam pockets and the guy with the vibrator is vibrating it, to kind of see through the concrete that's been placed in that first lift and ensure to yourself that it's getting all the way through the rebar right smack dab up against the forms?

Mr. Aguilar: You're asking me if I can see through concrete?

Mr. Ramseyer: That's exactly what I'm asking you.

Mr. Aguilar: So the answer to that question is no.

Mr. Ramseyer: Okay. So since you can't see through the concrete, is it fair to assume that neither Mr. Poor[15] nor Mr. Berger could see through concrete?

Mr. Aguilar: Correct.

On September 17, 2013, LCC-MZT's project manager at the time, Jim Mortensen, sent an e-mail message to John King and Bryan Zatica, in which Mr. Mortensen stated that "[t]hey started removing the forms yesterday and it appears we have some issues regarding rock pockets, concrete not forming around the beams, open rebar at the bottom of the beams, etc." Also, Mr. Mortensen stated that "[t]his may require us to put together a structural repair plan which may require a structural engineer – just thinking ahead." During the trial, Bryan Zatica, after having been shown one of the above photographs on cross-examination, was asked whether the concrete in the photograph was "sufficient to withstand and meet the specifications that were set forth in the contract?" to which Mr. Zatica replied, "[a]fter you chip it out and dry pack it, yes." Robert Berger, who, as indicated above, was LCC-MZT's quality control manager until approximately September 19, 2013, also testified that the concrete as originally poured would have to be repaired in order to meet contract specifications by utilizing a "common" technique "in concrete construction" called "sack and patch." NAVFAC's supervisory civil engineer Mark Aguilar also indicated that he believed the concrete could have been repaired. NAVFAC's then construction manager Justin Nodolf, however, testified that an individual named "Mr. Starkel," who "led the structural department of our NAVFAC Northwest," believed that the concrete could not be repaired to meet contract specifications and that the entire P-913 building needed to be torn down. Mr. Nodolf also testified that Lt. Commander Garret, who, by September 16, 2013, had replaced Lt. Commander Wood on the P-913 project, "was afraid to even go in the building." Mr. Nodolf testified that he was not afraid to go into the building and that "[w]e started shoring up, so I assumed it was supported with the shoring."

On September 19, 2013, NAFVAC contracting officer Mona Carlson issued a Stop Work Order to LCC-MZT, in which Ms. Carlson stated that, during a site inspection following the removal of the forms from the concrete, the government found "[v]isual deficiencies including air pockets, exposed rebar, cold joints, and delaminating concrete." Ms. Carlson contended that the deficiencies rendered LCC-MZT's work on the concrete roof non-compliant with the specifications in the Contract. Ms. Carlson further stated:

The Government finds that the structural integrity of the facility may have been compromised. In accordance with FAR 52.246-12 INSPECTION OF CONSTRUCTION, you are hereby directed to stop all work pertaining to structural concrete as further defined by Specification Sections 03 30 00 and 03 37 13 pending resolution of all the quality performance issues.

---

[15] Bryan Zatica testified that Patrick Poor was an assistant quality control manager for LCC-MZT on the P-913 project.

(capitalization in original). Ms. Carlson directed that LCC-MZT "provide an independent third party," which was required to be a government-approved, licensed, structural engineer, "to facilitate additional inspection and analysis of the structural roof slab," including a "report attesting to the structural capability of the roof slab." Additionally, Ms. Carlson instructed LCC-MZT to remove its superintendent, Jeremy Wastweet, and quality control manager, Robert Berger, from the project. In the Stop Work Order, Ms. Carlson stated, "[p]ending receipt of this direction, satisfactory corrective actions, and lifting of this stop work order, minor concrete work will be approved on a case-by-case basis with a detailed work plan for Government review and approval."

That same day, on September 19, 2013, LCC-MZT submitted a letter in response to NAVFAC's Stop Work Order, in which LCC-MZT stated that it "is also concerned and will take all necessary steps required to repair as required." LCC-MZT stated that it "agrees with the Government that measures to fully-determine the extent of damage and identify corrective actions are warranted. LCC-MZT will provide an independent third party to facilitate additional inspection and analysis of the Roof Slab Structural Concrete Placement #1." (capitalization in original). LCC-MZT, however, stated that it "takes exceptions to the Government's directions to stop all work pertaining to placement of structural concrete, the Government's findings and subsequent request to remove key personnel from the project."[16]

At the trial, John King testified that "[w]e had a pour scheduled for two days after we got this letter, and they stopped us." During the period in which the Stop Work Order was in effect, however, John King testified that NAVFAC did approve and permit some concrete work to take place, including "shotcrete work,"[17] as well as "some cast-in-place concrete work too." On September 27, 2013, NAVFAC issued a letter permitting LCC-MZT "to proceed with shotcrete activities pertaining to the loading dock walls, sally ports, and transformer walls."

Steven Jirsa, who testified at the trial that he was licensed as a professional engineer in the State of California and that he has a Master of Science in structural engineering from the University of California, Berkley, testified that LCC-MZT retained the firm he was working for at the time, Exponent, in connection with the P-913 project at Naval Base Kitsap Bangor. Mr. Jirsa stated that Exponent's "scope of the retention was essentially to identify any conditions related to the concrete roof structure." On October 9, 2013, Exponent provided a recommended plan to test the concrete roof, determine the extent of the defects, and develop a repair plan. Exponent's recommended plan stated:

---

[16] Robert Berger was removed from the project on approximately September 19, 2013. Jeremy Wastweet's position was changed from superintendent to foreman on approximately September 18, 2013.

[17] At the trial, Mr. Zatica described shotcrete as "a method of placing concrete where basically you have a very high-pressure compressor that combines air with the concrete. So they merge together in a valve system, and then the air blows the concrete into the form and around the rebar."

> [W]e recommend a combination of destructive and nondestructive testing
> to determine if voids extend into the concrete beyond what are visible from
> surface defects. Nondestructive testing (NDT) techniques will be used to
> evaluate subsurface concrete in the region of the surface defects.
> Afterward, selected coring[18] or chipping will be used to evaluate the
> accuracy of the NDT.

(capitalization in original). On October 10, 2013, Exponent sent a letter to Bryan Zatica,
which was forwarded to NAVFAC. In the October 10, 2013 letter, Exponent stated that,
"[b]ased on our initial surface observations, made October 2 through 4, 2013, the
observed areas of poorly consolidated concrete of the roof structure can be removed and
repaired to meet the intended structural design and capacity requirements of the facility,
without requiring the overall removal/replacement of the roof structure."

In defendant's post-trial brief, defendant asserts that "[b]y November 8, 2013,
Exponent had completed its investigation, although LCC-MZT did not provide a report to
NAVFAC until November 21, 2013." In its report, dated November 8, 2013, which was
titled "Roof Deck Cast-In-Place Concrete Evaluation," Exponent stated that it had
performed destructive testing, as well as non-destructive testing, on the concrete roof.
Exponent further stated in the November 8, 2013 report:

> Based on our investigation, repair of the roof structure can be performed
> that will restore the full structural capacity of the P-913 concrete roof deck
> allowing the roof to meet its intended purpose and comply with all code
> requirements or other regulations laws and ordinances pertaining to this
> Facility. This repair can be performed from the underside of the roof deck
> to allow continuation of work on top of the roof. Exponent is working with
> repair material suppliers to develop appropriate repair details and
> procedures to meet the above objectives.

Exponent included a chart in its November 8, 2013 report which indicated the
"[a]pproximate locations of poorly-consolidated concrete," including "cavit[ies],"
"honeycombing," "rock pockets," and "debris/slag." In a letter dated November 20, 2013,
Exponent provided its repair plan for structural and non-structural repairs. Thereafter,
NAFVAC received Exponent's report, and the parties have jointly stipulated that NAFVAC
lifted the restrictions in the September 19, 2013 Stop Work Order on November 26, 2013.

According to Exponent's final report, which is dated August 18, 2014, repairs to
the concrete roof were complete in March 2014. On December 9, 2013, LCC-MZT's
subcontractor, Contech Services (Contech), mobilized to the site and began making
repairs to the concrete roof. According to a memorandum for record attached to a July 3,
2014 e-mail message sent by LCC-MZT project manager Jim Mortensen to John King,

---

[18] At the trial, NAVFAC contracting officer Mona Carlson described coring as "[a]ctually
taking a round cylin- -- removal of some to determine where the rebar is and the strength
of the contract -- concrete."

Bryan Zatica, and one other unidentified individual in January 2014, Steve Jirsa of Exponent tested Contech's repair work. Mr. Jirsa determined that Contech's repair work "all had to be removed" and replaced because "pumped grout patch material was found to have bubbled at the bonding between the substrate at the beam repairs." The memorandum for record states that Steve Jirsa held an on-site meeting on February 13, 2014, during which Mr. Jirsa requested that all repairs be made "by hand patch." The memorandum for record states that Contech completed all of the repairs by "hand patch" on March 13, 2014. According to the memorandum of record, "[i]t is therefore the conclusion of MZT that the product performed and the failure was a result of installation procedures by Contech."

Thereafter, Exponent produced a report that was dated May 8, 2014. In response to Exponent's May 8, 2014 report, NAVFAC provided comments to the May 8, 2014 report, to which Steve Jirsa of Exponent testified he remembered he had responded. Subsequently, Exponent produced another version of its report dated July 18, 2014. On July 28, 2014, Jim Mortensen of LCC-MZT sent an e-mail message to Steve Jirsa stating:

> Bryan and I reviewed the report and are concerned that if we turn it in as writing [sic] it will not support the actual conditions and repairs made at the site. As you are aware we worked with the insurance company to try and get this as a claim which did not have positive results. This would have had no impact to the government, but was not successful. We now have to recover the costs for testing based on the Stop Work notice to get the Navy to pay for the required testing: nothing outside of the visible damaged was found by either nondestructive or destructive testing. The stop work and the FAR clauses clearly indicate that if testing does not disclose any failure or defective work, then the government is required to pay for testing and the time extension
>
> The remaining issues are based on specific terms used in the reports that may lead someone to an inaccurate conclusion. Both your firms [sic] observations and MTC reports are fully documented to show field work was monitored. When you put "To the best of our knowledge" could lead to a conclusion that not all areas were monitored. Also there are some terms that would lead someone to believe damage was more than what it was and should be removed. Lastly, the issue was poorly consolidated concrete not poor concrete as eluded to in the report.

(capitalization in original).

In an attachment to his July 28, 2014 e-mail message to Steve Jirsa, Jim Mortensen requested the following changes:

The testing and analysis indicated that the voids and honeycombing in the roof deck slab and beams were generally due to lack of consolidation around rebar and chairs, and these conditions ~~typically~~ did not extend beyond areas of visible surface manifestation. Coring and GPR revealed no instances where poorly-consolidated slab concrete extended beyond what was visible on the surface. In a few instances, DT and NDT identified locations in which the visible areas of poorly-consolidated concrete on the beams extended beyond the surface manifestation to the interior of the beam.

<span style="color:red">poorly consolidated</span>

Based on our investigation, we concluded that proper repair of the roof structure would restore the full structural capacity and serviceability of the P-913 concrete roof deck. As such, we recommended structural repairs of all voids and honeycombing in the roof deck slabs and beams. The recommended structural repairs included removal of any ~~poor quality~~ concrete, including ~~extensive~~ chipping at areas of voids and honeycombing, and replacement with appropriate structural repair materials. Our repair recommendations were developed in conjunction with the manufacturer of the repair materials, Sika Corporation, whose technical representative visited the site and confirmed that the selected repair materials were proper for this application.

The structural repairs of the roof deck were implemented between November 2013 and March 2014. Numerous site visits were made by Exponent during this time to observe the repair work. In addition, daily monitoring of the repair work was provided by Materials Testing and Consulting, Inc. and Macro-Z Technology, including regular repair material sampling and

<span style="color:red">The</span>

testing. Periodic on-site guidance was also provided by the repair material manufacturer (Sika). ~~To the best of our knowledge, the~~ structural repairs of the P-913 roof deck are now complete and have been implemented in accordance with our recommendations. As such, the implemented repairs meet the intended structural and serviceability purposes, and comply with all code requirements or other regulations, laws and ordinances pertaining to this Facility.

(alterations in original). Steve Jirsa responded in a July 29, 2014 e-mail message to Jim Mortensen, stating that he would look at the edits and get back to Mr. Mortensen.

At trial, Steve Jirsa was asked whether he agreed with Mr. Mortensen's proposed changes, to which Steve Jirsa responded: "I think in general, yes." Steve Jirsa testified that he could not remember whether Exponent made the changes proposed by Jim Mortensen. Mr. Jirsa, however, indicated that one "could tell which changes were made by comparing your August 2014 report to the July 2014 report." In Exponent's August 18, 2014 final report, the clause in the above-quoted text stating: "and these conditions typically did not extend beyond areas of visible surface manifestation," is removed, the words "poor quality" are changed to "poorly-consolidated," and the word "extensive" is removed. The sentence: "To the best of our knowledge, the structural repairs of the P-913 roof deck are now complete and have been implemented in accordance with our recommendations," was removed and reworded as: "All of the work observed by Exponent was implemented in accordance with our recommendations; all reports to Exponent by personnel responsible for daily monitoring indicate that the structural repairs

of the P-913 roof deck are now complete and have been implemented in accordance with our recommendations."

Grounding and Energization of the P-913 Building

Plaintiff contends that NAVFAC caused LCC-MZT to experience issues in connection with getting the P-913 building grounded and energized which delayed LCC-MZT's completion of the project. Concerning grounding, LCC-MZT employee Jeremy Wastweet testified that LCC-MZT was unable to "drive the ground rods into the ground to the specified depth." Mr. Wastweet stated that a grounding rod was "a five-eighths diameter copper-coated round steel rod" that is inserted into the ground with "either a hammer or a small roto hammer." Although Mr. Wastweet stated that "[w]e used the standard methods and then also explored multiple other techniques to try to get them driven into the ground," Mr. Wastweet testified that the LCC-MZT team was unable to get the grounding rods to the specified depth because "[t]he ground was really hard." After discussing the grounding rod issues with NAVFAC, Mr. Wastweet stated that the grounding rod depth "never did actually meet the requirements of the specification, but the last fix that we applied were ground wells, drilled in ground wells." According to Mr. Wastweet, a ground well is "essentially instead of physically driving the ground rod into ground, you drill a hole in it to give it a path to go into new ground." Mr. Wastweet indicated that the ground rod was then inserted into the ground well, and that the ground well was filled with a material called "Vermiculite."

During the trial, Scott Wakefield, the owner and founder of PSW Electric, testified that PSW Electric worked as an electrical subcontractor "do[ing] the entire scope for the project" under the Contract involving the P-913 project. Mr. Wakefield testified that there were "grounding issues" with "several grounding systems on the project," including the "lightning protection system, the fence system, and then there were requirements for separate ground rod resistances and separate bonding resistances." Regarding the lightning protection system, Mr. Wakefield asserted that the "issue was that the design of the lightning protection system was not recognized by UL [Underwriters Laboratories], so they could not certify it." According to Mr. Wakefield:

It was an issue with the level of the resistance to meet the specified resistance. So when we tested the ground system, the specification would specify whether it had to be five ohms[19] or 25 ohms, and they consistently came out 30, 75, 90 -- way higher than what was specified.

Mr. Wakefield further testified:

The -- there were several RFIs [Requests for Information] regarding the design of the lightning protection system simply because it was a unique system. Most -- most lightning protection systems have air terminals on the

_____

[19] Jeremy Wastweet testified that an ohm is a "unit of measure resistance" of "electrical charges."

roof to attract the lightning and safely bring it to ground. This particular system, which I have never encountered and obviously neither has UL, did not have those in place, and this particular design used what they call a Faraday cage, which is designed to carry the voltage around the building envelope.

We had several concerns on the design of it, so we wrote RFIs regarding those.

And there were several questions because the specifications were vague regarding how to properly ground this system.

Mr. Wakefield testified that "[m]y understanding of a Faraday cage is that it is a system that is designed to essentially build a cage around a structure or a person. And it safely takes the electrical voltage and current around rather than a direct hit within the envelope."

Mr. Wakefield further testified that the ohm requirement of twenty-five ohms in LCC-MZT's Contract was not achievable. Mr. Wakefield stated that he had achieved twenty-five ohms on other projects, but he was unable to achieve the twenty-five ohms specifications on the P-913 project because "[t]he best I could guess is soil conditions of the site." According to the testimony of Mr. Wakefield, NAFVAC issued a variance and changed the twenty-five ohms requirement to thirty ohms, which PSW Electric was able to satisfy. Jeremy Wastweet also testified that NAVFAC changed the twenty-five ohms requirement in LCC-MZT's Contract to thirty ohms. Mr. Wakefield asserted that it took "close to a year" from the time PSW Electric began its grounding efforts to when PSW Electric was permitted to energize the building.

During his testimony, when asked whether PSW Electric could energize the building prior to completion of grounding, Scott Wakefield responded "[a]bsolutely not" because the "specifications required that the grounding resistances be met before the building could be energized." Mr. Wakefield indicated that the grounding needed to be complete before energization because "too high of a resistance could result in an electrical shock to the personnel within the building." During his testimony, Scott Wakefield and plaintiff's attorney Katherine Knudsen, had the following discussion:

Ms. Knudsen: Between -- we know the time frame, about a year I believe you testified, for getting the grounding done to the energization. Did that delay the completion of your work based on what you originally scheduled?

Mr. Wakefield: Through all the grounding systems, it delayed it a little, yes.

Ms. Knudsen: Okay. Did the inability to energize the building earlier -- did that impact any other work that you had to do?

Mr. Wakefield: It did.

Ms. Knudsen: What work?

Mr. Wakefield: Final energizing of the secondary distribution system panels and transformers and lighting and all of the subsystems to be able to test them and -- and for final testing of the systems.

During cross-examination of Scott Wakefield, Department of Justice attorney Kelly Krystyniak questioned Mr. Wakefield about grounding and energization:

Ms. Krystyniak: So you also testified that specifications of the contract required the building be grounded before it's energized. Do you recall that testimony?

Mr. Wakefield: I do.

Ms. Krystyniak: Okay. But it's not the case that you can't work on the grounding system of the building and the energization at the same time, correct?

Mr. Wakefield: Define "work on."

Ms. Krystyniak: Sure. Did you complete everything that you needed to do in order to energize the building -- just had to turn on the switch -- before you started working on the grounding system?

Mr. Wakefield: No.

Ms. Krystyniak: No. Those two paths are going on at the same time, correct?

Mr. Wakefield: Correct.

Ms. Krystyniak: Okay. And so, in fact, you might be able to energize the building before grounding is completed, but you also might not be able to, right?

Mr. Wakefield: You absolutely cannot.

Ms. Krystyniak: Both have to be done at the same time, right?

Mr. Wakefield: Both have to be complete before you can energize.

Ms. Krystyniak: Okay. Complete and done I understand are kind of terms of art. So the work has to be complete before you are able to energize, but the work to prepare for energization is going on at the same time as the work to prepare for grounding?

40

Mr. Wakefield: Correct.

On August 17, 2016, after the Contract was completed and the August 1, 2016 contracting officer's final decision, then-contracting officer Dana Bolte unilaterally issued Modification No. A00024 (Modification 24) to the Contract regarding the grounding issues LCC-MZT had experienced during construction. Modification 24 states that it incorporates Chief of the NAVFAC Contracting Office Eileen Mitchell's August 1, 2016 final decision, and provided:

> (2) An extension of time is required by reason of this modification. The contract is modified as follows:
>
> > a. The Substantial Completion Date (SCD), as further defined in 5252.211-9301 ~ Phased Construction Schedule, is hereby extended by one-hundred-thirty-five (135) calendar days to April 30, 2014. Liquidated damages, as further defined in 52.211-12, remain unchanged.
> >
> > b. The Contract Completion Date (CCD), as further defined in 5252.211-9301 ~ Phased Construction Schedule, is hereby extended by one-hundred-thirty-five (135) calendar days to July 1, 2014. Liquidated damages, as further defined in 52.211-12, remain unchanged.

Modification 24 continued:

> (3) The Government and contractor were unable to reach a final agreement in regard to cost and time associated with PC 0056 above. Accordingly, a unilateral definitized modification is hereby issued to provide an equitable adjustment based on the Chief Contracting Officer's Final Decision regarding reasonable costs.
> (4) Requests for additional compensation for this changed work shall be in accordance with FAR 52.233-1 DISPUTES (JUL 2002).

(capitalization in original). Modification 24 also increased the value of the Contract by $48,533.74.[20] As discussed below, there is a dispute between the parties, including their experts, as to whether the ground issues and energization issues addressed above were on the P-913 project's critical path.

---

[20] NAVFAC determined that LCC-MZT had substantially completed the work on June 11, 2014 and had completed the Contract on March 5, 2015.

Red Days and Weather

The Contract's Specifications state that "10 work days a month will be impacted by convoys and operations at the Explosive Handling Wharf Area," and that "[redacted] Road will not be accessible during convoys or operations at EHW." NAVFAC Contract specialist Jodus Hortin testified at trial that "Red days refer to days in which naval operations and convoy movements could be anticipated. They refer to various work restrictions that impact our construction activities at Naval Base Kitsap Bangor." While looking at a map of the area around the P-913 project site, NAVFAC construction manager Justin Nodolf testified:

> So during a red day itself, we have to secure [redacted] Road and do [redacted]; there's nothing that would be of concern. And at that point, there are [redacted] that would be deployed along -- I believe this is -- I can't remember what the name is. Basically coming up from the Marginal Wharf there, there's a road that kind of runs an east-to-west location. There you go. [Redacted]. That's right. That's [redacted] Road that joins [redacted] Road to [redacted] Road. . . .

> And approximately in the middle of this is where the first set of bollards are deployed and a sentry is placed. And then if you go ahead and back out from there. So in addition to that, so that secures [redacted] Road. The residual of [redacted] heading in this direction's already been secured. There's another set of pop-up barriers that are deployed closer to the OA gate to make sure there's no through access. The OA gate is located approximately at B2 where there's kind of a purple-looking mark. It might even say "Operation Area Access." The text is kind of hard to -- OA Gate, correct. So there's another [redacted] there to make sure that nobody can go down the road. And back out.

> So at that point, access onto [redacted] Road is then completely secured. And then -- then at that point they can do convoy movements down [redacted] Road. They would enter through [redacted] gate, which is located immediately adjacent to the P-913 location, which is -- I believe there's a call-out that shows the P-913 construction site, which is located adjacent to the Explosive Handling Wharf. Kind of where the yellow road and the red road meet is approximately where that site is located at. . . .

> [S]o it [redacted] will come down [redacted] Road. It will -- will transit all the way down [redacted] Road. They'll enter in the waterfront restricted area, of which that is a [redacted] zone. [Redacted]. And they also have special operating procedures when they have boats "in the barn," is what we like to call it when we have a submarine sitting within the wharf itself. And that's, I think, commonly referred as [redacted] Road, which is sitting down there along the waterfront. At that point then the convoy will then enter in the Explosive Handling Wharf and do whatever operation they need to do.

Robert Berger, who worked as LCC-MZT's quality control manager until September 2013, testified that he was familiar with Red Days and that Red Days were "when we got sequestered in the trailer and couldn't work, and sometimes got left there and forgot about." Jeremy Wastweet, who was LCC-MZT's superintendent until approximately September 19, 2013, and, subsequently, foreman, also testified about being sequestered on Red Days. Mr. Wastweet and plaintiff's counsel Craig Ramseyer had the following discussion at the trial about being sequestered on Red Days:

Mr. Ramseyer: So before the building had a roof on it, walls on it, basically dried in, how was your -- how were the workers on the site sequestered?

Mr. Wastweet: We were sequestered into our job trailer that had the windows blacked out and there was a guard that watched to make sure that we didn't look out the windows or exit the building.

Mr. Ramseyer: Were the guards armed?

Mr. Wastweet: Yes.

Mr. Ramseyer: And was there a standard period of time for which you were sequestered?

Mr. Wastweet: No.

Mr. Ramseyer: Could you ever plan on how long you were going to be sequestered when you got notice of a red day?

Mr. Wastweet: No.

Mr. Ramseyer: And were these guards military guards or rent-a-cops or both or what?

Mr. Wastweet: It was a combination of both.

Mr. Ramseyer: So sometimes there'd be Marines there?

Mr. Wastweet: Yes.

Mr. Ramseyer: Other times private security?

Mr. Wastweet: Yes.

Mr. Ramseyer: So when you were sequestered, did you ever get forgotten?

Mr. Wastweet: A few times.

43

Mr. Ramseyer: Give me an example of what would occur under those circumstances.

Mr. Wastweet: We would -- since we couldn't leave our job trailer, it's hard to know exactly what was going on. So the first few times we just stayed in there until they decided or remembered about us and decided to let us out. Once we identified that there was an issue, then we would call Dan Van Natta and let him know that we were in there for an abnormally long amount of time.

Mr. Ramseyer: When you talk about abnormally long, how long would you be in there in these instances when you were forgotten?

Mr. Wastweet: Five to six hours.

Mr. Ramseyer: Were you able to accomplish any work?

Mr. Wastweet: No, not when you're sitting in a job trailer.

Mr. Ramseyer: And then once -- once the building progressed and -- well, let me back up.

Before that building progressed, you had a tent over the site, correct?

Mr. Wastweet: Yes.

Bryan Zatica testified that LCC-MZT also experienced inclement weather during the fall of 2012. In order to proceed with work during inclement weather, Mr. Zatica stated that LCC-MZT "suggested putting in basically, for the lack of right terms, a circus tent of 24,000 square feet" to cover the entire building envelope. During the trial, plaintiff's attorney Craig Ramseyer and Mr. Zatica had the following colloquy about the suggestion:

Mr. Ramseyer: And to whom did you make this suggestion?

Mr. Zatica: We made it to NAVFAC.

Mr. Ramseyer: And do you recall who in particular?

Mr. Zatica: Actually, I think the whole group because I think we suggested it in a partnering meeting.

Mr. Ramseyer: And then what was the immediate response to that?

Mr. Zatica: Laughter.

44

> Mr. Ramseyer: From NAVFAC?
>
> Mr. Zatica: Yes.
>
> Mr. Ramseyer: Eventually did you continue to push this idea?
>
> Mr. Zatica: Well, we were continually being tasked with thinking outside the box so that we can pick up time: How are we going to do it? You know, they kept saying it was our issue. So in our mind we felt that was the best way to conceal yourself from the weather. And at the time we thought it would also help us in regard to the asset moves. But they did actually -- we submitted it, and they actually did approve it.

(capitalization in original). Prior to NAVFAC's approval of the tent, Mr. Zatica stated that LCC-MZT was required to provide NAVFAC with "the makeup of the tent and an engineering calculation." In its post-trial brief, plaintiff asserts that while the tent was "important in allowing the foundations to be built with minimal weather interference," "the tight proximity of workers within the tent, and the need to carefully work so as not to damage the tent with heavy equipment such as excavators, led to a loss of productivity." Jeremy Wastweet testified that, even when the tent was in place, workers were required to be sequestered in trailers during Red Day movements. Mr. Wastweet further testified on direct examination from Mr. Ramseyer:

> Mr. Ramseyer: Now, when the building had the tent over the site, were you allowed to sequester somewhere within the tent?
>
> Mr. Wastweet: No. I believe we were in the trailer.
>
> Mr. Ramseyer: You got sent back to the -- to the trailer out of the tent?
>
> Mr. Wastweet: Yes.
>
> Mr. Ramseyer: And so at what point in time -- well, strike that.
> Was there ever a point in time when you were allowed to sequester somewhere other than this construction trailer?
>
> Mr. Wastweet: We -- once the building vertical walls were complete, we were able to sequester inside the building.
>
> Mr. Ramseyer: All right. And by the way, sir, when you -- when you would be asked to sequester in the trailer, talking about two or three guys or you talking about more workers?
>
> Mr. Wastweet: More than that.
>
> Mr. Ramseyer: What was the maximum that you can recall being in there?

Mr. Wastweet: 12.

Mr. Ramseyer: Okay. And so once the walls were up on the building, was there a location where you would be put under guard again?

Mr. Wastweet: Yes. We had to be in visual sight. Everyone had to be in visual sight of the guard.

Mr. Ramseyer: So they were all gathered in one, let's say, corner or interior room?

Mr. Wastweet: Yes.

Mr. Ramseyer: Was that people who were -- include people who were working on the exterior of the building at the time?

Mr. Wastweet: Yes.

Mr. Ramseyer: Did it also include people who were working on the interior of the building?

Mr. Wastweet: Yes.

Mr. Ramseyer: So project came to a stop when you were sequestered even when the walls were up; is that right?

Mr. Wastweet: Yes.

LCC-MZT project manager Jim Mortensen also described being sequestered as being "in a room with a bunch of construction workers" and stated that "it's pretty tough put -- at one time we had 20 guys in a small job trailer."

During his testimony, Justin Nodolf stated that LCC-MZT was permitted to work during anticipated Red Days, but not during movements, provided LCC-MZT had a NAVFAC approved view obstruction plan. In a June 19, 2012 e-mail message to Daniel Braden of SWFPAC, Mr. Nodolf stated that he had attached a "draft view obstruction plan for P-913," to which Mr. Braden responded that he "need[ed] more information." In a November 16, 2012 e-mail message, Mr. Braden approved LCC-MZT's view obstruction plan and "authorized" LCC-MZT to work on anticipated Red Days. Mr. Nodolf testified that he did not recall any other view obstruction plans submitted by LCC-MZT between June 2012 and November 2012. Prior to approval of a view obstruction plan, according to Justin Nodolf, LCC-MZT "couldn't work on red days at all. They didn't have a view obstruction plan. So -- so on those days they would just stop work and -- and not work on those -- those days."

According to Jeremy Wastweet, the anticipated Red Day calendars that NAVFAC provided to LCC-MZT were not accurate, nor a "valuable planning tool" because "[t]hey changed on a -- on a regular basis and typically short notice as well." Mr. Wastweet asserted that, on average, changes to the anticipated Red Day calendar were made within twenty-four to forty-eight hours. Jim Mortensen described Red Days as a "moving target." Regarding the impact of the changes in anticipated Red Days, Jeremy Wastweet and plaintiff's attorney Craig Ramseyer engaged in the following discussion:

Mr. Ramseyer: [W]hen you would receive notice, let's say 24 hours, what did you do if you had deliveries scheduled for that next day that you were getting 24 hours' notice of a red day?

Mr. Wastweet: You had to make calls immediately and get them rescheduled for the -- the next time that they were available.

Mr. Ramseyer: You ever have instances where you couldn't get ahold of suppliers?

Mr. Wastweet: Yes.

Mr. Ramseyer: What would happen then?

Mr. Wastweet: They would attempt to deliver it and be turned away.

Mr. Ramseyer: And so as these changes occurred, what did -- what did it do to your ability to schedule the work?

Mr. Wastweet: Made it extremely difficult to plan something and stick to your plan.

Mr. Ramseyer: And in connection with certain deliveries, let's say concrete, if you had a day change very quickly to a red day and you had scheduled a concrete pour, couldn't you just reschedule that concrete pour for the following day and get back on schedule?

Mr. Wastweet: No.

Mr. Ramseyer: Why not?

Mr. Wastweet: Usually our pours were fairly large. So it would take the majority of the capacity of Hard Rock Ready-Mix. So when you change a pour like that, it's usually a week to two weeks out before you can reschedule it.
Mr. Ramseyer: So you would lose a week to two weeks on a concrete pour if you got late notice of a red day?

Mr. Wastweet: Yes.

Mr. Ramseyer: And what did that do to your ability to meet schedule?

Mr. Wastweet: Made it difficult to meet.

Mr. Ramseyer: And did these red-day changes occur throughout the project?

Mr. Wastweet: Yes.

Mr. Ramseyer: When you would set up a concrete pour, for instance, how far in advance were you typically setting up that concrete pour, planning that concrete pour?

Mr. Wastweet: At least two weeks in advance to be able to get the service that we needed.

LCC-MZT's Mr. Mortensen also testified regarding the impacts of receiving short notice regarding anticipated Red Days, stating:

> I thought about this the other day as I was putting a construction schedule together. Shifting days is not an easy thing to do for a superintendent. You get subcontractors, you get material suppliers, you get everybody lined up, and all of a sudden now you're going to tell them they can't do it on this day. So everybody gears up and makes that change. And then you turn around and say, Okay, wait a minute. Now you're going to be allowed to do it so we need you back on Tuesday, but Thursday we're going to have an interruption.

Robert Berger, LCC-MZT's quality control manager until approximately September 19, 2013, testified:
> [Y]ou know, we didn't know when red days would change. So I'd have inspectors scheduled to come in and do some work, and then all of a sudden we'd find out that today's a red day. Two days before it wasn't a red day, or the day before it wasn't a red day. And then all of a sudden it's a red day, so we'd have to reschedule everybody. And it got hectic.

Moreover, according to Mr. Berger, if an inspection had to be rescheduled, "[m]ost of the time" Mr. Berger was unable to move the "next phase of work until it's been inspected."

On August 14, 2013, NAVFAC and LCC-MZT had a partnering meeting during which the impacts of Red Days were discussed. On August 30, 2013, LCC-MZT and NAVFAC bilaterally executed Modification No. A00010 (Modification 10) to the Contract.

Modification 10 compensated LCC-MZT, among other things,[21] "for all additional labor material and associated costs regarding impacts associated with operation-restricted delays (Red Days) that were incurred June 14, 2013 through August 14, 2013." Modification 10 also changed the completion dates by modifying the Contract, as follows:

> Extension of time is required by reason of this modification. As per the agreement for PC 0019 (REA – Red Day Impacts), the contract is modified as follows:
>
> (a) The Substantial Completion Date (SCD), as further defined in 5252.211-9301 ~ Phased Construction Schedule, is hereby extended by 31 calendar days to **DECEMBER 16, 2013**. Liquidated damages, as further defined in 52.211-12, remain unchanged.
>
> (b) The Contract Completion Date, as further defined in 5252.211-9301 ~ Phased Construction Schedule, is hereby extended by 32 calendar days to **FEBRUARY 16, 2014**. Liquidated damages, as further defined in 52.211-12, remain unchanged.

(capitalization and emphasis in original). During his testimony, LCC-MZT project manager Jim Mortensen indicated that LCC-MZT and NAVFAC agreed that Red Days not addressed in Modification 10, such as Red Days occurring in the future, would be analyzed on a case-by-case basis. On August 26, 2013, Mr. Mortensen sent an e-mail message to the NAVFAC team, which stated:

> Mr. Hortin,
>
> We have a question regarding the future RED DAY impacts that we are to incorporate into the project schedule: it is our understanding that we have basically two (2) SCD [Substantial Completion Date] dates. The first is the hard date based on the impacts to August 14, 2013 and the second is the moving date based on the future RED DAY's. Our agreement at the partnering session was determined to be 22 RED DAYS to December 16, 2013 which moves the SCD to January 7, 2014. The question is how will this language be incorporated into the modification [10] - right now we don't see any of this included in the language of the amendment which provides for the extended SCD.

(capitalization in original). That same day, contracting officer Mona Carlson responded, stating:

> Mr. Mortensen ~ This is a multiple phase situation. The modification with your for [sic] signature addresses the impacts from previous red day

---

[21] Modification 10 increased the value of the Contract by $32,095.00 to compensate LCC-MZT for costs associated with groundwater controls on the construction project site.

impacts. It brings us to closure on previous days and reflects an extension to the SCD [Substantial Completion Date] and CCD [Contract Completion Date] (linked by 60 days). December 16, 2013 was longer than the actual days, but agreed to by both parties[.]

As part of the agreement we agreed to incorporate into the schedule "future" impacts associated with the actual red day calendar. These impacts may or may not be realized and will most likely change so no extension will be granted or addressed at this time. . . . The partnering notes reflect an agreement that if we can meet the "future" impact date without further delay, the Government will extend the SCD and CCD accordingly without further penalty of LDs. If this date is not met, we will have to revisit the cause as to why not. Accordingly, monthly partnering sessions were established to better handle the dates on a more frequent basis. Bottom line, we cannot address the future impacts as they have not been realized yet.

Is that any more clear?

(capitalization in original). In response, Mr. Mortensen stated that "[w]e concur with the below recap of the agreement and understand that future impacts will be handled when/if realized. We just needed to ensure the agreement was captured accurately so Mr. Baker who was not at the meeting, can sign the document."

Electrical Duct Bank Scaling Issue

LCC-MZT also experienced an issue with another electrical duct bank on the P-913 project in which the duct bank which was actually installed was double the size of what was indicated on the design plans. This issue was separate from the issues LCC-MZT experienced with respect to the undisclosed water line and the other electrical duct bank, discussed above. Scott Wakefield, the owner of LCC-MZT's subcontractor, PSW Electric, testified with regard to this issue on direct examination by plaintiff's counsel, Mr. Ramseyer, as follows:

Mr. Ramseyer: So was there an issue with a scale sizing of an electrical duct bank on the project?

Mr. Wakefield: There was.

Mr. Ramseyer: And what was that issue?

Mr. Wakefield: The issue was that the scale was half of what was actual on the – was half on the drawings of what was actually in the field.

Mr. Ramseyer: And did that impact your ability to do you contract work?

Mr. Wakefield: Well, it did in the fact that we were seeking approval of the change while performing the work, yes.

LCC-MZT's project manager Jim Mortensen testified that "the construction schedule identified the length and time that it would take to put in the duct bank, and the first notification on the production reports was September 17th of 2012, and the last duct bank was put in May 23rd, 2014." Plaintiff did not produce any documents at trial which were contemporaneous with when this electrical duct bank scaling issue was occurring on the project, however, in one of plaintiff's May 26, 2017 requests for a contracting officer's final decision, which are discussed below, plaintiff provided additional background on the electrical duct bank scaling issue, stating:

> LCC-MZT originally submitted RFI - 0056 on September 24, 2012 notifying the Government that while performing site measurements for layout of the site electrical duct banks that the scale on the Electrical Site Drawings ES-101, ES-111 and ES-121 appear to be incorrect and the scale appears to be approximately fifty percent (50%) of the scale that was measured in the field. The Government responded on October 2, 2012 and agreed that the scale shown on the drawings was incorrect. The Government instructed LCC-MZT to change the scale . . . .

> LCC-MZT requested in Serial Letter 0015 (Tab B) a Proposed Change (PC) be issued for the additional costs associated with the additional duct banks required by the change of the scale on the drawings dated March 5, 2013. The Government did not acknowledge receipt until March 11, 2013. The Government responded in Serial Letter 0039 dated April 30, 2013 (Tab C) that the Government finds the response to RFI 056 did not constitute a change to the contract requirements . . . .

The May 26, 2017 request for a contracting officer's final decision further explains that after additional correspondence between LCC-MZT and NAVFAC, "[t]he Government reversed its original position of 'no merit' and found 'partial merit,'" and that "[t]he Government issued PC 0021 for tracking purposes." (capitalization and emphasis in original). The May 26, 2017 request for contracting officer's final decision continues:

> LCC-MZT took exception to the Government's response in Serial Letter 0063 of only "Partial Merit" and the costs associated with our Electrical Subcontractor (PSW Electric) was the only impact due to the incorrect electrical scale. PSW installed the conduit associated with this work and LCC-MZT with the help of other subcontractors excavated the trench, placed the rebar, concrete encased and backfilled the additional lineal footage of the added duct banks. The work was interrupted throughout the process by red days, red day schedule changes, impacts from weather due to PC-0004 contract extension, and impacts due to the restricted site. The proposal submitted for PC 0021 was $464,587.00.

(capitalization and emphasis in original). LCC-MZT's May 26, 2017 request for a contracting officer's final decision explains that, after further correspondence between the parties, "[t]he Government sent LCC-MZT an offer to settle on January 5, 2016 for $325,608.00" for PC 0021, and that "LCC-MZT accepted the Government's offer for PC 0021 - Electrical Scale Change on February 5, 2016."

On May 20, 2016, the parties bilaterally executed Modification 20, which increased the Contract $322,905.00 in relation to "**PC 0021 ~ REA RFI 056 Electrical Drawing Scales**." (capitalization and emphasis in original). Modification 20 stated the following:

**The following items are applicable to this modification:**

(1) The subject contract is hereby modified to compensate the Contractor for all additional labor, material, equipment, and associated costs due to the incorrectly labeled electrical drawing scales as further defined in the Contractor's Request for Equitable Adjustment (REA) (Serial Letter No. 0015 dated March 5, 2013 and Serial Letter No. 0026 dated May 17, 2013), as negotiated on May 18, 2016. These documents are hereby incorporated by reference.

**PC 0021 ~ REA RFI 056 Electrical Drawing Scales**
**Increase: $322,905.00**

(2) Extension of time is not required by reason of this modification. All other terms and conditions remain unchanged.

(3) Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full (for both time and money) and for any and all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised. As a result, the total amount of the contract is hereby increased as follows:

Previous Contract Total:          $12,906,657.25
New Contract Total:               $13,229,562.25
Modification A00020 Total:        $322,905.00

(capitalization and emphasis in original).

<u>Substantial Completion, Contract Completion, Certified Claims, and Final Decisions</u>

The parties have jointly stipulated that NAVFAC determined that LCC-MZT's work under the Contract on the P-913 project was substantially complete on June 11, 2014. In a letter dated July 28, 2014 sent by NAVFAC to LCC-MZT, Dana Bolte, who was, at that time, serving as a NAVFAC contracting officer, stated:

52

In accordance with FAR 52.246-12 INSPECTION OF CONSTRUCTION, the Government has taken possession of all facilities within the scope of P-913 under the subject contract. After multiple Completion Inspections as described in paragraph 116 of Specification Section 01 45 0000 20, Substantial Completion was established on June 11, 2014. Outstanding deficiencies continue to be reviewed and/or resolved during the ongoing weekly Red Zone Meetings each Monday morning.

(capitalization in original). During the trial, Mr. Bolte testified

after we do beneficial occupancy, we turn it over -- the facility to the customer. There's normally a punch list with small items that need to be completed. It doesn't prevent the customer from using the facility, but they're still required to be completed per the contract. For example, painting, touchup, small repairs here and there.

In an e-mail message dated December 21, 2015, Mr. Bolte identified March 5, 2015 as the date on which LCC-MZT had achieved contract completion on the P-913 project. At the trial, Dana Bolte stated that "then there was a long delay in there, as you can see, till March 5th, 2015. We were waiting on manuals and certificates, administrative-type things." Thus, NAVFAC established a substantial completion date of June 11, 2014 and a contract completion date of March 5, 2015.

By letter dated May 8, 2015, LCC-MZT submitted requests for equitable adjustments (REAs) for "REAS Nos. 1 thru 40" to NAVFAC and requested payment of $5,990,372.39. (capitalization in original). On May 28, 2015, LCC-MZT submitted its first of three requests for a contracting officer's final decision. LCC-MZT's May 28, 2015 request for a contracting officer's final decision consisted of thirteen claims: REAs 17, 27, 29, and 32 through 40, as well as PC 0025. REAs 17, 27, 29, and 32 through 40, and PC 0025. Specifically, LCC-MZT's May 28, 2015 request for a contracting officer's final decision requested:

- In REA 17, LCC-MZT requested an adjustment to the Contract in the amount of $99,254.00 for price increases related to the government's FF&E package.

- In REA 27, LCC-MZT requested an adjustment to the Contract in the amount of $134,214.00 for direct costs associated with Red Day disruptions.

- In REA 29, LCC-MZT requested an adjustment to the Contract in the amount of $252,609.00 for testing costs related to the September 19, 2013 Stop Work Order, as well as a time extension of twenty-seven days.

- In REA 32, LCC-MZT requested an adjustment to the Contract in the amount of $956,578.00 for additional field overhead.

- In REA 33, LCC-MZT requested an adjustment to the Contract in the amount of $336,743.00 for loss of production due to stacking of trades, out of sequence work, and damage to different trades.

- In REA 34, LCC-MZT requested an adjustment "per the Eichleay Method" to the Contract in the amount of $574,497.03 for extended home office overhead.

- In REA 35, LCC-MZT requested an adjustment to the Contract in the amount of $91,714.53 for interest LCC-MZT incurred for non-payment of progress payments.

- In REA 36, LCC-MZT requested an adjustment to the Contract in the amount of $196,134.00 due to LCC-MZT's hiring of a schedule and claims consultant needed to prepare time impact analyses and REAs.

- In REA 37, LCC-MZT requested an adjustment to the Contract in the amount of $11,657.00 for additional fees LCC-MZT was required to pay the court-appointed receiver, which LCC-MZT asserted was caused by the government's delay.

- In REA 38, LCC-MZT requested an adjustment to the Contract in the amount of $293,522.56 for increased change order markup.

- In REA 39, LCC-MZT requested an adjustment to the Contract in the amount of $15,245.00 for attorney fees incurred by LCC-MZT as a result "of the Government's unwillingness to negotiate fairly on the impacts incurred by LCC-MZT."

- In REA 40, LCC-MZT requested an adjustment the Contract in the amount of $504,170.00 for additional costs LCC-MZT allegedly incurred in connection with PC 0004.

- PC 0025 was titled "Grounding Issue Additional Cost" and sought $29,706.00.

Subsequently, as discussed below, REAs 31 and 41 were submitted for a contracting officer's final decision later in two separate letters on May 26, 2017.

At the trial, NAVFAC contracting officer Dana Bolte testified that NAVFAC requested that the Defense Contract Audit Agency (DCAA) "audit" LCC-MZT's REAs, which Mr. Bolte stated NAVFAC "normally" did "with claims, especially big claims." Rozell Drake, who testified that she was an auditor with the DCAA, and had been for the last thirty years, and that she was assigned to examine LCC-MZT's REAs from "maybe" July to October 2015. Ms. Drake, who appeared to be a competent and intelligent individual, however, stated that she only "[v]aguely" remembered what her assignment with LCC-MZT entailed, stating, "I think it was -- it was, like, an equitable adjustment, I think. I'm guessing."[22] Ms. Drake also stated that she met with John King, who served as LCC-

---

[22] During Rozell Drake's direct testimony, conducted by plaintiff's counsel Katherine

MZT's scheduler, claims consultant, and interim project manager during the P-913 project, although Ms. Drake could not remember the amount of times she met with Mr. King. Ms. Drake did remember that she met with Mr. King more than two times, but could not remember if she met with Mr. King more than six times stating, "I don't know. I don't - - I don't know. I don't remember. Maybe six times."

On October 5, 2015, John King sent Bryan Zatica an e-mail message, attached to which was "a recap of the findings from the DCAA auditors." John King attached the following chart to his October 5, 2015 e-mail message:

LCC-MZT Team IV
P-913 EHW Security Force Facility
Contract #N44255-11-R-9009
Recap of DCAA Auditors Findings Regarding COFD

| Description | Original Submitted Amount | Revised Submitted Amount | Difference |
|---|---|---|---|
| PC #25 - Grounding Issue | $29,706.00 | $29,706.00 | $0.00 |
| REA 17 - FF & E Additional Cost | $99,254.00 | $66,956.00 | -$32,298.00 |
| REA 27 - Red Day Disruptions | $134,214.00 | $99,236.00 | -$34,978.00 |
| REA 29 - Stop Work & Additional Testing | $252,609.00 | $276,184.00 | $23,575.00 |
| REA 32 - Additional Field Overhead * | $956,578.00 | $861,161.00 | -$95,417.00 |
| REA 33 - Loss of Production | $336,743.00 | $336,743.00 | $0.00 |
| REA 34 - Additional Home Office Overhead ** | $574,497.03 | $213,964.42 | -$360,532.61 |
| REA 35 - Interest for Non-Payment *** | $91,714.53 | $91,714.53 | $0.00 |
| REA 36 - Schedule & Claim Consultant | $196,134.00 | $196,134.00 | $0.00 |
| REA 37 - Hill International | $11,657.00 | $11,657.00 | $0.00 |
| REA 38 - Additional Profit **** | $293,522.56 | $293,522.56 | $0.00 |
| REA 39 - Attorney Fees | $15,245.00 | $18,108.00 | $2,863.00 |
| REA 40 - Additional Cost PC 0004 ***** | $504,170.00 | $504,170.00 | $0.00 |
| Total | $3,496,044.12 | $2,999,256.51 | -$496,787.61 |

* Only includes Field Overhead to 6/11/14
** Only includes Home Office Overhead to 6/11/14
*** Interest calculated thru 3-31-15
**** Auditors did not review since base on Final Recovery
***** Auditors did not review

While looking at his October 5, 2015 e-mail message during the trial, John King testified that he forwarded the information in his October 5, 2015 e-mail message to Bryan Zatica to show Mr. Zatica "[j]ust where the differences were found between her [Rozell Drake's] review and our accounting system" and "to show him where we had -- we didn't agree with what the review was showing from our original REA, just so he'd have an idea."

---

Knudsen, Ms. Drake often quibbled with Ms. Knudsen over the definition of the terms used in Ms. Knudsen's questions.

In a memorandum dated December 31, 2015 and addressed to NAVFAC, DCAA stated that it agreed to NAVFAC's request for DCAA "to perform an examination of LCC-MZT's price adjustment claim to determine if proposed amounts comply with FAR 52.233-1" for LCC-MZT's REAs 32, 33, and 34. In its May 5, 2016 audit report, DCAA stated that it questioned all of the costs claimed in REAs 32, 33, and 34 because the "claimed costs are unrelated to the Government-caused delays ($1,772,386) and errors were found in the claimed costs in REAs 32 and 33 ($95,432). Additionally, we identified $184,293 of the direct labor costs in REA 32 that were claimed more than once in the total price adjustment claim."

On August 1, 2016, Eileen Mitchell, Chief of the NAVFAC Contracting Office, issued a contracting officer's final decision denying LCC-MZT's May 28, 2015 certified claim for 17, 27, 29, and 32 through 40. Eileen Mitchell's August 1, 2016 final decision, however, stated that the "Administrative Contracting Officer determined merit for the differing site condition associated with PC 0025" and provided LCC-MZT $28,438.37, plus interest, and 135 days of non-compensable delay.

On August 10, 2016, contracting officer Dana Bolte sent a letter to LCC-MZT stating that the "Government agrees to release all potential LD's [liquidated damages] for Phase B equaling **$157,384**." (capitalization and emphasis in original). Dana Bolte's August 10, 2016 letter, however, stated that potential liquidated damages for Phase A remained applicable. At trial, Mr. Bolte testified that Phase B liquidated damages were released to LCC-MZT, but he indicated that Phase A liquidated damages were not released to LCC-MZT. John King also testified at trial regarding liquidated damages and asserted that NAVFAC has retained $185,346.00 in liquidated damages. As stated above, Modification 9 to the Contract established that Phase A liquidated damages were relevant to the Substantial Completion Date under the Contract, while Phase B liquidated damages were relevant to the Contract Completion Date under the Contract.

In a letter dated May 26, 2017, LCC-MZT submitted its second of three requests for a contracting officer's final decision, for REA 31 to then-NAVFAC contracting officer Terry Holmberg. In REA 31, LCC-MZT requested an adjustment of $503,023.00 to the Contract because the government allegedly directed LCC-MZT to accelerate performance. In a second letter also dated May 26, 2017, LCC-MZT submitted its third and final request for a contracting officer's final decision, for REA 41. In REA 41, LCC-MZT requested an adjustment of $131,828.00 to the Contract for additional costs incurred related to the electrical duct bank scaling issue. On November 17, 2017, NAVFAC Chief of the Contracting Office, Eileen Mitchell, denied both LCC-MZT's second request for a contracting officer's final decision and LCC-MZT's third request for a contracting officer's final decision in full.

**DISCUSSION**

In the above-captioned case, LCC-MZT requested and received contracting officer final decisions on the following fourteen REAs, as well as PC 0025[23]:

|    | Claim Number | Claim Title | Amount Requested |
|----|-------------|-------------|------------------|
| 1  | REA 17 | "FF&E Cost Variance" | $99,254.00 |
| 2  | REA 27 | "Red Day Disruptions" | $134,214.00 |
| 3  | REA 29 | "Roof Stop Work" | $252,609.00 |
| 4  | REA 31 | "Acceleration" | $503,023.00 |
| 5  | REA 32 | "Additional Field Overhead" | $956,578.00 |
| 6  | REA 33 | "Loss of Production for Stacking of Trades, Out of Sequence Work, Trade Damage" | $336,743.00 |
| 7  | REA 34 | "Extended Home Office Overhead" | $574,497.03 |
| 8  | REA 35 | "Interest Expense for Non-Payment" | $91,714.53 |
| 9  | REA 36 | "Schedule & Claims Consultant Fees" | $196,134.00 |
| 10 | REA 37 | "Additional Receiver Fees" | $11,657.00 |
| 11 | REA 38 | "Additional Profit" | $293,522.56 |
| 12 | REA 39 | "Attorney Fees" | $15,245.00 |
| 13 | REA 40 | "Additional Costs Associated with PC 0004" | $504,170.00 |
| 14 | REA 41 | "Electrical Duct Bank" | $131,828.00 |
| 15 | PC 0025 | "Grounding Issue Additional Cost" | $29,706.00 |

---

[23] As discussed above, Chief of NAVFAC Contracting Office Eileen Mitchell's August 1, 2016 final decision stated that the "Administrative Contracting Officer determined merit for the differing site condition associated with PC 0025," which was related to the grounding specification issues on the P-913 project, and provided LCC-MZT $28,438.37, plus interest, and 135 days of non-compensable delay. Modification 24, which was issued on August 17, 2016, stated that it "incorporated by reference" Chief of NAVFAC Contracting Office Eileen Mitchell's August 1, 2016 final decision. Despite having been awarded $28,438.37 plus interest for PC 0025 in Modification 24, the total amount requested in plaintiff's second amended complaint still includes the full $29,706.00 previously awarded for PC 0025. As will be discussed below, however, aside from arguing that the delay from the grounding issue affected LCC-MZT's ability to complete the P-913 project in the time required, asserting that NAVFAC was solely responsible for such delay, and scattering such delay-related costs associated with the grounding delay throughout LCC-MZT's various other REAs, LCC-MZT does not specifically elaborate on any additional entitlement grounds specifically for PC 0025. For these reasons, the court does not address PC 0025 in a stand-alone section as it does for the remainder of plaintiff's REAs.

Whether plaintiff is entitled to relief based on the claims outlined above requires the court to interpret the Contract between LCC-MZT and NAVFAC and the modifications thereto. "Contract interpretation starts with the language of the contract." SUFI Network Servs., Inc. v. United States, 785 F.3d 585, 593 (Fed. Cir. 2015); see also Premier Office Complex of Parma, LLC v. United States, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (citing NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)); Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 824 (Fed. Cir. 2010), cert. denied, 562 U.S. 1178 (2011); Bell/Heery v. United States, 739 F.3d 1324, 1331 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); LAI Servs., Inc. v. Gates, 573 F.3d 1306, 1314 (Fed. Cir.), reh'g denied (Fed. Cir. 2009); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993); HCIC Enters., LLC v. United States, 147 Fed. Cl. 118, 124 (2020); Nw. Title Agency, Inc. v. United States, 126 Fed. Cl. 55, 57-58 (2016) (citing Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993)) ("The starting point for any contract interpretation is the plain language of the agreement."), aff'd, 855 F.3d 1344 (Fed. Cir. 2017); Beard v. United States, 125 Fed. Cl. 148, 158 (2016); Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 483-84 (2013).

"'"In contract interpretation, the plain and unambiguous meaning of a written agreement controls."'" Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1379 (Fed. Cir. 2009) (quoting Hercules Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002) (quoting Craft Mach. Works, Inc. v. United States, 926 F.2d 1110, 1113 (Fed. Cir. 1991))). "Terms must be given their plain meaning if the language of the contract is clear and unambiguous." SUFI Network Servs., Inc. v. United States, 785 F.3d at 593 (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003)); see also Canpro Invs. Ltd. v. United States, 130 Fed. Cl. 320, 347, recons. denied, 131 Fed. Cl. 528 (2017); Beard v. United States, 125 Fed. Cl. at 158 ("If the contract language is unambiguous, then it must be given its plain and ordinary meaning . . . ."). The United States Court of Appeals for the Federal Circuit stated in Massie v. United States:

> In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."

Massie v. United States, 166 F.3d 1184, 1189 (Fed. Cir. 1999) (quoting McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1996) (internal citations omitted)); Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000) (quoting McAbee Constr., Inc. v. United States, 97 F.3d at 1435; and Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998)); Harris v. Dep't of Veterans Affairs, 142 F.3d at 1467; see also Coast Prof'l, Inc. v. United States, 828 F.3d 1349, 1354 (Fed. Cir. 2016); Shell Oil Co. v. United States, 751 F.3d 1282, 1305 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2014); McHugh v. DLT Sols., Inc., 618 F.3d 1375, 1380 (Fed. Cir. 2010); Giove v. Dep't of Transp., 230 F.3d 1333, 1340-41

(Fed. Cir. 2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." (citations omitted)); <u>Gould, Inc. v. United States</u>, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, void, or superfluous"). A Judge of the United States Court of Federal Claims has explained:

> "The words of a contract are deemed to have their ordinary meaning appropriate to the subject matter, unless a special or unusual meaning of a particular term or usage was intended, and was so understood by the parties." <u>Lockheed Martin IR Imaging Sys., Inc. v. West</u>, 108 F.3d 319, 322 (Fed. Cir. 1997). "Under general rules of contract law we are to interpret provisions of a contract so as to make them consistent." <u>Abraham v. Rockwell Int'l Corp.</u>, 326 F.3d 1242, 1251 (Fed. Cir. 2003). "[A]n agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony. . . . [T]he provisions must be read together in order to implement the substance and purpose of the entire agreement." <u>Air-Sea Forwarders, Inc. v. United States</u>, 166 F.3d 1170, 1172 (Fed. Cir. 1999). "A reasonable interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant." <u>Medlin Const. Grp., Ltd. v. Harvey</u>, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (internal quotation marks omitted).

<u>Dynetics, Inc. v. United States</u>, 121 Fed. Cl. 492, 512 (2015); <u>see also Marquardt Co. v. United States</u>, 101 Fed. Cl. 265, 269 (2011) ("In interpreting contractual language, the court must give reasonable meaning to all parts of the contract and avoid rendering portions of the contract meaningless." (citation omitted)).

The Federal Circuit also has indicated that "'[t]he contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.'" <u>Arko Exec. Servs., Inc. v. United States</u>, 553 F.3d at 1379 (quoting <u>Hercules Inc. v. United States</u>, 292 F.3d at 1380-81; <u>see also LAI Servs., Inc. v. Gates</u>, 573 F.3d at 1314; <u>Gardiner, Kamya & Assocs., P.C. v. Jackson</u>, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (citations omitted); <u>Medlin Constr. Grp., Ltd. v. Harvey</u>, 449 F.3d at 1200; <u>Hunt Constr. Grp., Inc. v. United States</u>, 281 F.3d 1369, 1372 (Fed. Cir. 2002) ("We begin with the plain language when interpreting a contract . . . . The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts." (citations omitted)); <u>Beard v. United States</u>, 125 Fed. Cl. at 158 ("In construing the meaning of a contractual provision, the court does not interpret the disputed term or phrase in isolation, but 'construes contract terms in the context of the entire contract, avoiding any meaning that renders some part of the contract inoperative.'" (quoting <u>Pac. Gas & Elec. Co. v. United States</u>, 536 F.3d 1282, 1288 (Fed. Cir. 2008))).

It has been "'a fundamental precept of common law that the intention of the parties to a contract controls its interpretation.'" Tri-Star Elecs. Int'l, Inc. v. Preci-Dip Durtal SA, 619 F.3d 1364, 1367 (Fed. Cir. 2010) (quoting Beta Sys., Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988) (quoting Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 551, 195 Ct. Cl. 21, 30 (1971))); Alvin, Ltd. v. United States Postal Serv., 816 F.2d 1562, 1565 (Fed. Cir. 1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties."); see also Flexfab, LLC v. United States, 424 F.3d 1254, 1262 (Fed. Cir. 2005) ("[I]ntent is determined by looking to the contract and, if necessary, other objective evidence. In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer . . . ."); LaBatte v. United States, 142 Fed. Cl. 425, 433 (2019) (citations omitted); Canpro Invs. Ltd. v. United States, 130 Fed. Cl. at 347 ("Contract interpretation requires determining the intention of the parties.").

REA 27 – Red Day Disruptions

REA 27 sought an adjustment to the Contract in the amount of $134,214.00 and asserts that the "inability of the government to accurately provide a schedule at the beginning of the project or at the beginning of each month constitutes a contract change for time and costs" under the Changes clause, FAR § 52.243-4 (2012). In plaintiff's post-trial brief, plaintiff asserts that in REA 27, LCC-MZT "seeks its labor costs in the amount of $134,214 for the time workers were actually sequestered in the enclave." According to plaintiff, Modification 10 pertains only to Red Days occurring before August 14, 2013, and LCC-MZT is entitled to time and costs for Red Days occurring "from August 15, 2013 to the end of the Project," which plaintiff contends occurred when LCC-MZT achieved substantial completion on May 30, 2014. Plaintiff argues that "Red Days" were to be defined in the Specifications as "non-work days." Defendant, however, asserts that the Contract's Specifications state that LCC-MZT should anticipate ten Red Days per month, and that only April 2014 had more than ten anticipated Red Days. Defendant also argues that "LCC-MZT was already awarded all red days after December 16, 2014," as thirty Red Days appear to have been considered in Modification 24, which gave a 135-calendar day time extension of the Contract's Substantial Completion Date from December 16, 2013 to April 30, 2014. Defendant argues "LCC-MZT's red day claim also ignores the Contract specifications requiring that, for red days in excess of ten per month, it had to demonstrate that, on any particular red day, 50 percent or more of its work was impacted. Only then could it receive excusable—never compensable—delay." (internal references omitted).

As noted above, paragraph 1.2.1 of section 01 14 00 in the Contract's Specifications states:

> (1) 10 work days a month will be impacted by convoys and operations at the Explosive Handling Wharf Area. The impacted work days may not be consecutive. A schedule reflecting open or available timeframes will be provided to the Contractor after award, and monthly during the project. An updated schedule will be provided five (5) days prior to the beginning of

each month for the following month. Urgent operation requirements will require adjustments to the schedule. Changes resulting in less than 48 hours notice will be considered a changed condition.

(2) Notification, 10 days in advance of activities that will need to access the Waterfront Restricted Area (Explosive Handling Wharf Entry Control Point at [redacted]) will need to be coordinated with the Contracting Officer and SWFPAC Facilities.

[Redacted]; the contractor shall stop all exterior work and move to their personnel out of visual range of [redacted] Road. There will be approximately 300 convoys during this project.

During times of convoys past the construction site [sic] the contractor will be directed, by the Contracting Officer or designate, to a muster [sic] his forces so that they will not be in visual contact with the convoy. Contractor shall provide an area, or means to prevent observation of the convoy. Contractor shall submit a View Obstruction Plan for Contracting Officer approval.

(3) [Redacted] Road will not be accessible during convoys or operations at EHW. No Equipment or material deliveries will be allowed. Contractor will be restricted to the Construction Enclave during convoys and Operations at EHW. Access to the project site will be through the [redacted] Road Trail from [redacted] Road, material and equipment must be staged in the Construction Enclave or be brought in through the [redacted] Road Trail. Contractor parking will be relocated to a site within 5 miles of the project site. Exact location will be provided by the Contracting Officer. Contractor will be responsible for shuttling workers from this parking area.

a. All Zones:

(1) Direct access must be maintained to all facilities, roads, and structures at all times. As a minimum, a least one road (no less than 15') shall be provided for vehicle access to facilities or roads. Separate pedestrian access must be maintained.

(capitalization in original). The Contract's Specifications in paragraph 1.2.1 of section 01 14 00, therefore, provided LCC-MZT with an overview of what was to be expected on days with convoy movements, which the parties refer to as Red Days, and informed LCC-MZT that ten such Red Days were anticipated to occur each month, and could occur non-consecutively. As the above-quoted paragraph 1.2.1 of section 01 14 00 indicates, a change of a day's status to an anticipated Red Day with less than forty-eight hours' notice also was to be "considered a changed condition."

Section 01 32 17.00 20 in the Specifications required LCC-MZT to submit

schedules to NAVFAC. Paragraph 1.6.2.5 in section 01 32 17.00 20 provides that a "schedule of monthly anticipated adverse weather delays shall be represented by programming the Weather Calendar(s) to include non-work days occurring within work weeks and are in addition to the non-work days associated with Federal Holidays, and/or security delays." (capitalization in original). Anticipated days with adverse weather, therefore, were considered to be "non-work days," as were "Federal Holidays and/or security delays." Under the Contract, "[r]egular core working hours" were an eight-and-a-half-hour period "between 7:00 a.m. and 5:00 p.m., Monday through Friday, excluding Government holidays." The Contract's Specifications also state that a "lost workday due to weather conditions is defined as a day in which the Contractor cannot work at least 50 percent of the day on the impacted activity." Although the Contract's Specifications instructed LCC-MZT to anticipate and schedule non-work days due to weather, the Contract's Specifications also permitted LCC-MZT to "request an adjustment" if it experienced a lost work day due to weather.

Paragraph 1.6.2.6 in section 01 32 17.00 20 in the Contract's Specifications was titled "Anticipated Operation-Restricted Delays" and states:

> The Contractor shall use the requirements listed in Specification Section 01 14 00 "Work Restrictions" following schedule of anticipated monthly non-work days due to operations as the basis for establishing a [sic] "Operation-Restricted Delay Calendar" showing the number of anticipated non-workdays for each month due to operations, exercises and and [sic] are in addition to non-work days associated with weekends, Federal Holidays, and/or weather delays unless otherwise approved by the Contracting Officer.
>
> Schedule activity duration(s) shall be formulated with allowance for required adverse operational restrictions. Any activity duration, which could be impacted by prescribed operational restrictions (security drills, alerts, exercises or missile movements, etc.), due to the time period that the Contractor has scheduled the work, shall include an adjustment to include the anticipated operation-restricted delay. The number of anticipated adverse delays allocated to an activity will be reflected in the activity's calendar.

(capitalization in original). As discussed above, Section 01 14 00 in the Contract's Specifications addressed what the parties referred to as Red Days, which were days with convoy movements, and stated that ten Red Days were to be anticipated each month. Paragraph 1.6.2.6 in section 01 32 17.00 20, which instructed the contractor to incorporate "anticipated monthly non-work days due to operations" into an "Operation-Restricted Delay Calendar" required LCC-MZT to schedule ten "anticipated monthly non-work days due to operations" involving Red Days. Furthermore, as the above-quoted paragraph 1.6.2.6 of section 01 32 17.00 20 indicates, these ten anticipated monthly non-work days could be considered non-work days in addition to non-work days associated with weekends, Federal Holidays, and/or weather delays unless otherwise approved by

the Contracting Officer," which were outside of LCC-MZT's regular eight-and-a-half working hours occurring Monday through Friday, and not counted against the time allowed for LCC-MZT to complete the project. Furthermore, because the Contract's Specifications in paragraph 1.2.1 of section 01 14 00 instructed that LCC-MZT was supposed to anticipate only up to ten Red Days in a single month, a circumstance resulting in LCC-MZT actually experiencing more than ten Red Days on working days in a single month was to be considered a changed condition. This is in addition to the changed condition discussed above in paragraph 1.2.1 of section 01 14 00 regarding changes in the schedule of a Red Day's status with less than forty-eight hours' notice.

Paragraph 1.6.2.6 in section 01 32 17.00 20 in the Contract's Specifications also states:

A lost workday due to security, convoy, and/or operational restriction delay, is defined as scheduled workday activity(s) in which the contractor's workforce cannot work 50 percent or more of the day on the impacted activity(s). The contractor shall immediately notify the Contracting Officer when a lost workday due to restricted conditions has occurred and shall identify the activity(s) impacted; the operational-restricted condition encountered and the reason for resultant activity(s) impacted. The contractor shall record on Quality Control and Production Daily Reports the occurrence; the adverse restricted condition encountered, and reason for resultant activity(s) impacted.

Approved lost workday for security, convoy, and/or operational restriction delay shall be actualized by an added as-built schedule activity(s) with activity ID including MM/DD/YEAR of occurrence, and as predecessor to the impacted activity(s). The contractor may request an adjustment in accordance with the contract clauses and the terms of this section (including the allocation of Float) if an activity's number of actual adverse delay days exceeds the scheduled number of days anticipated and cause delay to project completion.

(capitalization in original). The language quoted above, discussing a "lost workday," appears to be the language defendant relies on when defendant argues that LCC-MZT is required to "demonstrate that, on any particular red day, 50 percent or more of its [LCC-MZT's] work was impacted. Only then could it receive excusable—never compensable—delay." A "lost workday," however, is "defined as [a] scheduled workday" during "which the contractor's workforce cannot work 50 percent or more of the day on the impacted activity(s)." As stated above, the Contract's Specifications contemplated that Red Days potentially could be treated as non-work days not counted against LCC-MZT's time to complete the project. A lost work day, when LCC-MZT could not work more than fifty percent of the scheduled workday, therefore, could be considered a changed condition, and was in addition to the two other circumstances, discussed above, which also could be considered changed conditions: (1) if LCC-MZT experienced greater than ten Red Days on working days in a single month, or (2) if LCC-MZT experienced a change of a

Red Day "resulting in less than 48 hours notice." Although the Contract's Specifications discussed above regarding anticipated Red Days do not specify whether the above three "changed condition[s]" were to result in LCC-MZT's ability to "request an adjustment" in compensability for the delays resulting from Red Days, as opposed to the adjustment in time to complete the project, since the Contract's Specifications already contemplated an adjustment in time for anticipated Red Days, it would appear that the three "changed condition[s]" discussed above could, in addition to giving LCC-MZT an adjustment in time, also result in giving LCC-MZT an adjustment in compensation, whereas a Red Day which did not meet one of the three "changed condition[s]" could only give LCC-MZT an adjustment in time.

In addition, LCC-MZT's decision to work on anticipated Red Days does not change that the Contract's Specifications contemplated that the ten anticipated Red Days could be treated as non-work days. Paragraph 1.2.1 in section 01 14 00 states that LCC-MZT could submit a view obstruction plan to NAVFAC, which LCC-MZT did, and which NAVFAC approved in November 2012. Thereafter, LCC-MZT was able to work during Red Days, although LCC-MZT's workers generally would be sequestered during convoy movements for indefinite periods of time in a trailer. Additionally, LCC-MZT was unable to receive deliveries during Red Days. According to plaintiff, by working on Red Days, LCC-MZT was able to complete some work, but LCC-MZT's ability to progress on the P-913 project was interrupted by the sequestration and inability to receive deliveries. LCC-MZT was not required to work on Red Days but chose to do so after NAVFAC approved LCC-MZT's view obstruction plan in November 2012.

On August 14, 2013, NAVFAC and LCC-MZT had a partnering meeting, at which the parties discussed Red Days. On August 30, 2013, LCC-MZT and NAVFAC bilaterally executed Modification 10 to the Contract, which compensated LCC-MZT "for all additional labor material and associated costs regarding impacts associated with operation-restricted delays (Red Days) that were incurred from June 14, 2013 through August 14, 2013 [sic]." Modification 10 stated:

(3) Extension of time is required by reason of this modification. As per the agreement for PC 0019 (REA – Red Day Impacts), the contract is modified as follows:

(a) The Substantial Completion Date (SCD), as further defined in 5252.211-9301 ~ Phased Construction Schedule, is hereby extended by 31 calendar days to **DECEMBER 16, 2013**. Liquidated damages, as further defined in 52.211-12, remain unchanged.

(b) The Contract Completion Date, as further defined in 5252.211-9301 ~ Phased Construction Schedule, is hereby extended by 32 calendar days to **FEBRUARY 16, 2014**. Liquidated damages, as further defined in 52.211-12, remain unchanged.

Revised Part 1, Section 00700, pages 8, 28, & 28a, are provided.

(4) Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full (for both time and money) and for any and all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised.

(capitalization and emphasis in original). In an August 26, 2013 e-mail message from NAVFAC contracting officer Mona Carlson to LCC-MZT's project manager Jim Mortensen, Ms. Carlson stated, "monthly partnering sessions were established to better handle the dates on a more frequent basis. Bottom line, we cannot address the future impacts as they have not been realized yet." Mona Carlson also stated in her August 26, 2013 e-mail message that future "impacts may or may not be realized and will most likely change so no extension will be granted or addressed at this time." Jim Mortensen also testified that Red Days occurring in the future would be analyzed on a case-by-case basis. Modification 10, therefore, only addressed the impact of Red Days occurring before August 14, 2013.

The August 26, 2013 e-mail correspondence between NAVFAC contracting officer Mona Carlson and Jim Mortensen indicates that NAVFAC and LCC-MZT agreed that Red Days after August 14, 2013 would be analyzed on an individual basis. The August 26, 2013 e-mail correspondence, however, does not indicate that NAVFAC agreed that all Red Days occurring after August 14, 2013 would be compensable. At trial, Mona Carlson testified that she considered Red Days occurring after August 14, 2013 to be "[p]otentially" and "[p]ossibly" compensable. The terms in paragraph 1.6.2.6 in section 01 32 17.00 20 of the Contract's Specifications were not altered or modified to change that Red Days could be treated as non-work days, and the Contract's Specifications do not indicate that LCC-MZT was to receive compensation for all non-work days associated with Red Days. Rather, the Contract's Specifications contemplated that Red Days could be treated in the same manner as other non-work days, such as weekend days, and only under the occurrence of one of the three "changed condition[s]," discussed above, could LCC-MZT receive compensation in relation to a Red Day. LCC-MZT has not demonstrated that the parties mutually altered the definition of Red Days in the Contract's Specifications, but only that the parties agreed that Red Days occurring after August 14, 2013 would be addressed by the parties on individual bases. As such, Red Days occurring after August 14, 2013, pursuant to the Contract's Specifications, continued to be treated as excusable non-work days, with ten anticipated Red Days per month, and only could be considered compensable if (1) Red Day operations exceeded greater than fifty percent of LCC-MZT's eight-and-a-half-hour workday, (2) there were more than ten Red Days in a given month, or (3) a scheduling change involving a Red Day occurred with less than forty-eight hours' notice. Whether LCC-MZT is entitled to excusable and/or compensable delay for Red Days experienced after August 14, 2013 is discussed below.

REA 27 also seeks "labor costs in the amount of $134,214 for the time workers were actually sequestered." To the extent LCC-MZT seeks labor costs occurring before August 14, 2013, LCC-MZT's claim is barred by the accord and satisfaction language in Modification 10, which states that acceptance of Modification 10 "constitutes an accord and satisfaction and represents payment in full (for both time and money) and for any and

all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised." The Contract's Specifications did not state that LCC-MZT would be entitled to work on Red Days. The Specifications also informed LCC-MZT that "[d]uring times of convoys past the construction site the contractor will be directed, by the Contracting Officer or designate, to a [sic] muster his forces so that they will not be in visual contact with the convoy. Contractor shall provide an area, or means to prevent observation of the convoy." LCC-MZT had to submit to NAVFAC and have NAVFAC approve its view obstruction plan in order to work on Red Days. That LCC-MZT's workers were to be sequestered during times of convoy movements was a condition required in order for LCC-MZT to be able to work on Red Days. LCC-MZT chose to work on the certain Red Days, during which LCC-MZT knew that its workers could be subject to sequestration during convoy movements. LCC-MZT, therefore, is not entitled to an increase in labor costs during such sequestration, as LCC-MZT made a decision to work on certain Red Days and was forewarned of the possible risk of sequestration during convoy movements. Whether LCC-MZT can recover for time lost during Red Days is discussed below.

<u>REA 29 – Roof Stop Work</u>

REA 29 relates to NAVFAC's September 19, 2013 Stop Work Order issued after the beams were removed following LCC-MZT's two concrete pours on August 28, 2013 and September 4, 2013, respectively. REA 29 asserts:

> LCC MZT Team IV performed the requested testing and analysis of the structural roof slab. The results of the testing and analysis were that the extent of damage did not extend beyond areas of visible surface manifestation on the underside of the roof structure. The testing and analysis did not uncover any new areas of concern or defects in the concrete slab or beams: it only identified those areas which were already present and needed to be repaired.

REA 29 seeks an adjustment of $252,609.00 and a time extension because, according to plaintiff, "the stop work was a disruption to the critical path activities of 27 calendar days." According to REA 29, LCC-MZT claims it is entitled to the extension under FAR § 52.246-12(h), which relates to impacts associated with inspection of construction.

In plaintiff's post-trial brief, plaintiff asserts that, while LCC-MZT "took responsibility for the repairs of the concrete voids," "the costs related to inspection of the structural integrity of the roof is the responsibility of NAVFAC." Plaintiff argues that NAVFAC directed LCC-MZT to examine the structural integrity of the building, and that Exponent, the third-party hired to evaluate the structural integrity of the building, "determined that the building was structurally sound." Plaintiff further asserts that NAVFAC contracting officer Mona Carlson "testified that the final analysis by Exponent indicated that there was nothing wrong with the concrete, that the roof was determined to be structurally sound, and that LCC-MZT was entitled to its inspection costs."

Defendant argues that "[a]ll costs associated with the concrete testing are the responsibility of LCC-MZT" because "LCC-MZT was solely responsible for the concrete pour and that, without the testing performed by Exponent, there was no way to determine the extent of the damage and repairs needed." Defendant contends that FAR § 52.246-12(h) does not apply for two reasons, arguing: "First, NAVFAC did not remove or tear out the concrete roof slab, although it could have elected to do so. The remaining conditions outlined in the paragraph are therefore not triggered." Defendant also asserts: "Second, even if NAVFAC had removed the defective roof slab, LCC-MZT is only entitled to an equitable adjustment *if* the work met Contract requirements. Here, no one disagreed that the roof slab, as poured, did not meet Contract specifications." (internal reference omitted) (emphasis in original).

The FAR clause cited in LCC-MZT's REA 27, FAR § 52.246-12, titled "Inspection of Construction," provides:

> If, before acceptance of the entire work, the Government decides to examine already completed work by removing it or tearing it out, the Contractor, on request, shall promptly furnish all necessary facilities, labor, and material. If the work is found to be defective or nonconforming in any material respect due to the fault of the Contractor or its subcontractors, the Contractor shall defray the expenses of the examination and of satisfactory reconstruction. However, if the work is found to meet contract requirements, the Contracting Officer shall make an equitable adjustment for the additional services involved in the examination and reconstruction, including, if completion of the work was thereby delayed, an extension of time.

FAR § 52.246-12(h). In order to show entitlement to an adjustment under FAR § 52.246-12(h), LCC-MZT, therefore, must show that: (1) "before acceptance of the entire work, the Government decide[d] to examine already completed work by removing it or tearing it out;" and that (2) the tested work met "contract requirements." See id. If LCC-MZT proves entitlement under FAR § 52.246-12(h), then LCC-MZT is entitled to an "equitable adjustment for the additional services involved in the examination and reconstruction, including, if completion of the work was thereby delayed, an extension of time." See id.

In the above-captioned case, as discussed above, during the first concrete pour on August 28, 2013, LCC-MZT's quality control manager Robert Berger, NAVFAC's engineering technician Dan Van Natta, and NAVFAC's construction manager Justin Nodolf disagreed as to whether a cold joint was forming. NAVFAC's Dan Van Natta and Justin Nodolf asserted that a cold joint was forming, while LCC-MZT's Robert Berger asserted "[t]here was no cold joint on this project" because "when the concrete is still plastic and you're placing concrete up against it and you're able to vibrate it together, there's no cold joint." Robert Berger also stated at trial that "[t]he concrete was setting, but it was still plastic. There was a video shown to us at a meeting after that placement that you could clearly see that the vibrator was going into the concrete, so it was not a cold joint." Dan Van Natta testified at trial that the video recording of the August 28, 2013 roof pour was

a short sequence of the concrete placement going from the beam pocket to the north and then coming back, watching a worker deposit, as I previously mentioned, over the first layer that had been deposited. I believe it also showed me digging my heel in to show that -- that it wasn't -- we weren't going to get consolidation there.

Mr. Van Natta asserted that he did not recall what happened to the video recording of the August 28, 2013 roof pour, although Mr. Van Natta testified that he did not delete the video recording and that "I'd have no reason to do that."

At trial, Robert Berger testified that he had worked in the construction industry for over thirty years and had worked a number of concrete construction projects, including when he was a "project manager on a concrete facility at Malmstrom that was a missile repair facility with large amounts of rebar and concrete. It was a full concrete structure." Mr. Berger stated that "about half of" his thirty-plus-years of construction experience was spent as a quality control manager, which was Mr. Berger's position on the P-913 project. Mr. Berger was a credible witness, asserting, multiple times, that, as quality control manager, his perception was that he did not consider himself as a worker for LCC-MZT or NAFVAC. Mr. Berger also stated, "[b]ecause my job is to make sure the done -- the work is done per the plans, per the specs, and per the drawings. I'm essentially a third-party-type employee." NAVFAC's Justin Nodolf testified that when he joined NAVFAC in 2011, he had no field experience as a construction manager, as Mr. Nodolf's previous position with Tetra Tech entailed "[p]rimarily hydraulic modeling." Prior to the P-913 project, Mr. Nodolf stated that he did not have any experience constructing a concrete building similar to the P-913 project. NAVFAC's Dan Van Natta had more construction experience than Justin Nodolf, as Mr. Van Natta had worked as a steel worker in the "Seabees" for twenty-three years. Dan Van Natta, however, testified that he had not constructed a concrete structure similar to the P-913 project while in the Seabees or any structure with reinforced concrete. Therefore, Mr. Berger had considerably more experience with concrete projects than both Mr. Van Natta, who had limited concrete construction experience, and Mr. Nodolf, who had no concrete construction experience. Additionally, as noted above, at trial, Mr. Nodolf displayed a more limited memory of events during the P-913 project than Mr. Berger, especially on cross-examination by plaintiff's counsel. Without Dan Van Natta's video recording of the concrete pour, determining the extent, and at which point, the concrete was or was not plastic during the August 28, 2013 roof pour is more difficult. Moreover, Mr. Berger's testimony appeared straightforward, whereas during cross-examination, Mr. Nodolf often claimed to have experienced memory lapses, many times preceded by noticeable pauses, before answering.

After the August 28, 2013 roof pour, LCC-MZT and NAVFAC had a meeting regarding the cold joints. Mr. Berger had the following colloquy with plaintiff's counsel Mr. Ramseyer regarding a meeting in which cold joints were discussed:

Mr. Ramseyer: Was the contracting officer at this meeting?

Mr. Berger: The contracting officer was there. Dan Van Natta was there. Mark Aguilar was there. I think Bryan Zatica was there. I'm not sure if John King was there. I think he was. Jeremy Wastweet was there. I was there. I can't remember any other names.

Mr. Ramseyer: So one of the main reasons for this meeting was to discuss this issue of a cold joint?

Mr. Berger: I believe it was. I -- like I say, I can't remember if that came up in the meeting or if that was specifically for the meeting or if it was a – a partnering meeting.

Mr. Ramseyer: Okay. But we do know that the cold joint issue was discussed?

Mr. Berger: Yes. They -- they showed the video on screen saying you – "Here's where you're going to have a cold joint."

Mr. Ramseyer: And based on your observations or viewing of that video, you did not see –

Mr. Berger: I did not.

Mr. Ramseyer: the cold joint?

Mr. Berger: I knew that, if I stopped the concrete placement, we would definitely have a cold joint. And in that location, you don't want a cold joint.

Mr. Ramseyer: At that meeting were you able to reach a resolution with the government?

Mr. Berger: No.

On August 30, 2013, NAVFAC issued Non-Compliance Notice No. 0003 to LCC-MZT, which stated, "[o]n 28 August 2013, NAVFAC NW representative was onsite to inspect the concrete placement of the structural roof slab and observed fresh concrete being placed over hardened non-plastic concrete." Non-Compliance Notice No. 0003 indicated that there was a "likelihood that a cold joint would occur in this location."

The second roof pour on September 4, 2013 did not appear to have had issues similar to the August 28, 2013 roof pour and appears to have been uneventful. According to the testimony of Bryan Zatica, there were "not really" any issues with the September 4, 2013 roof pour, and the September 4, 2013 roof pour "I know went fairly smoothly." On September 16, 2013, LCC-MZT began removing forms from the concrete on the P-913 building. Mr. Van Natta asserted that he saw "bug holes" and "huge rock pockets and

exposed bar in some areas." NAVFAC's then supervisory civil engineer, Mark Aguilar, testified that, when the forms were removed from the concrete, "[w]e saw some rock pockets, some exposed rebar, some cold joints." The photographs introduced into evidence at the trial showed exposed rebar and voids, and what the witnesses referred to as "rock pockets." Robert Berger testified that the "correct response" to the condition of the concrete would have been to do a "sack and patch. It's common in concrete construction. You -- done a lot of it." Bryan Zatica, when shown a photograph of what he considered to be a "rock pocket" on the P-913 project, testified "what you would do is you would chip at that and see how solid it is. So if there's a void behind it, then it's a rock pocket because the rocks will all fall out." Mr. Zatica also testified, after having been asked on cross-examination if the concrete was "sufficient to withstand and meet the specifications that were set forth in the contract?" that "[a]fter you chip it out and dry pack it, yes." Testimony also was presented regarding the difficulty of getting the concrete into the beams. Mr. Berger testified:

> On this project it was very difficult because the aggregate size was not really conducive to the mass of rebar that was in there, so it was difficult to get the stinger, which we call the vibrator down into it.
>
> We -- if I remember correctly, we requested that we be allowed to change the mix design to allow this concrete to better consolidate around the beams, and that was turned down.

Dan Van Natta agreed that "it would be very tough" for LCC-MZT to pour the concrete mix into certain areas surrounding the rebar.

On September 19, 2013, NAVFAC contracting officer Mona Carlson issued the Stop Work Order asserting that "with the removal of the forms (beginning September 16, 2013) severe defects in the concrete were observed in the underside of the deck and beams, including rock pockets, cold joints, exposed rebar, and debris. The structural integrity is now in question." In the September 19, 2013 Stop Work Order, Ms. Carlson stated:

> The Government finds that the structural integrity of the facility may have been compromised. In accordance with FAR 52.246-12 INSPECTION OF CONSTRUCTION, you are hereby directed to stop all work pertaining to structural concrete as further defined by Specification Sections 03 30 00 and 03 37 13 pending resolution of all the quality performance issues.

(capitalization in original). The September 19, 2013 Stop Work Order issued by Ms. Carlson also stated:

> [T]o mitigate associated impacts the Government hereby directs you to perform the following measures in order to fully determine the extent of damage and identify what corrective actions, if needed, will be taken to facilitate Government acceptance:

(a) Contractor shall provide an independent third party to facilitate additional inspection and analysis of the structural roof slab. The independent third party shall be a licensed, structural engineer possessing appropriate qualifications, as approved by Government [sic], to provide a report attesting to the structural capability of the roof slab. The third party engineer shall provide recommendations for additional testing as required to determine structural capability, and identify future performance and/or maintenance issues such as leaking, spalling, cracking, etc.

(capitalization in original). The September 19, 2013 Stop Work Order further stated, "[p]ending receipt of this direction, satisfactory corrective actions, and lifting of this stop work order, minor concrete work will be approved on a case-by-case basis with a detailed work plan for Government review and approval." The September 19, 2013 Stop Work Order indicated that the Stop Work Order would be lifted "[u]pon satisfactory receipt and approval of this information."

At trial, Steve Jirsa of Exponent testified that Exponent, a "forensic-related firm, consulting firm" with structural engineers, was retained in connection with the P-913 project, and that Exponent's

scope of the retention was essentially to identify any conditions related to the concrete roof structure, related to issues related to the placement of that structure, identify any sort of conditions that needed to be addressed, identify the -- the -- the scope of those conditions, the severity or nonseverity of those conditions, and then identify any sort of repair plans or repair measures to be undertaken and then actually to -- after that, to follow up and provide some quality control on the repair.

On October 9, 2013, Exponent provided a recommended plan to test the concrete roof, which was provided to NAVFAC, stating that the "objective of the plan outlined below is to determine the extent of poorly consolidated concrete and to repair any areas at which such conditions adversely affect the structural capacity or durability of the building." The October 9, 2013 report further states:

[W]e recommend a combination of destructive and nondestructive testing to determine if voids extend into the concrete beyond what are visible from surface defects. Nondestructive testing (NDT) techniques will be used to evaluate subsurface concrete in the region of the surface defects. Afterward, selected coring or chipping will be used to evaluate the accuracy of the NDT.

(capitalization in original). On October 10, 2013, Exponent sent a letter to Bryan Zatica, which was forwarded to NAVFAC, stating that, "[b]ased on our initial surface observations, made October 2 through 4, 2013, the observed areas of poorly consolidated

concrete of the roof structure can be removed and repaired to meet the intended structural design and capacity requirements of the facility, without requiring the overall removal/replacement of the roof structure." In a subsequent Exponent report dated November 8, 2013, Exponent stated:

> Based on our investigation, repair of the roof structure can be performed that will restore the full structural capacity of the P-913 concrete roof deck, allowing the roof to meet its intended purpose and comply with all code requirements or other regulations, laws and ordinances pertaining to this Facility. This repair can be performed from the underside of the roof deck to allow continuation of work on top of the roof. Exponent is working with repair material suppliers to develop appropriate repair details and procedures to meet the above objectives.

The November 8, 2013 Exponent report also stated that "the destructive and non-destructive testing has shown no evidence of systemic consolidation problems beyond what is visible on the surface." The November 8, 2013 Exponent report indicated that shoring was put into place in five locations "in an abundance of caution."

On August 18, 2014, Exponent provided its final report, which stated that Exponent "was retained by Macro-Z-Technology [MZT] at the request of NAVFAC to investigate voids and poor consolidation (honeycombing) in the concrete roof deck structure of the" P-913 project. Exponent stated: "Our overall objective was to restore the roof deck such that it would meet its originally intended purposes and comply with all requirements, laws and ordinances pertaining to this Facility." Exponent "concluded that proper repair of the roof structure would restore the full structural capacity and serviceability of the P913 concrete roof deck," repairs which included "chipping at all areas of voids and honeycombing, and replacement with appropriate structural repair materials." Exponent's August 18, 2014 final report stated that the required repairs were made between November 2013 and March 2014. At trial, plaintiff's counsel Mr. Ramseyer asked: "Now, as a result of your investigation, did you -- did you feel, if none of the repair work would have done -- been done, the structure would still have carried the design loads?" and Mr. Jirsa responded: "I believe it would have, yes."

As stated above, FAR § 52.246-12(h) applies, "[i]f before acceptance of the entire work, the Government decides to examine already completed work by removing it or tearing it out. See id. In the above-captioned case, NAVFAC was not the entity actually conducting the investigation into the structural capacity of the P-913 building. NAVFAC construction manager Justin Nodolf testified that NAVFAC chose to use a third party firm for the structural testing because NAVFAC "wanted to try to keep it as unbiased and independent so that way then there was no -- both parties would basically, you know, be equal on this one."[24] In the September 19, 2013 Stop Work Order, NAVFAC explicitly

---

[24] In defendant's post-trial brief, defendant asserts that LCC-MZT is not entitled to costs associated with Exponent's testing because "no one at LCC-MZT had structural engineering expertise, or could perform a structural analysis." Defendant's argument,

instructed LCC-MZT to hire "an independent third party," subject to NAVFAC's approval, "to facilitate additional inspection and analysis of the structural roof slab" and to "provide a report attesting to the structural capability of the roof slab."

In response to NAVFAC, LCC-MZT hired Exponent, an independent third party, which was approved by NAVFAC. Indeed, Exponent's August 18, 2014 final report states that LCC-MZT hired Exponent "at the request of NAVFAC to investigate voids and poor consolidation honeycombing in the concrete roof deck structure of the" P-913 project. Although defendant argues that "NAVFAC did not direct Exponent's scope of work," Exponent was tasked with providing the structural testing and reporting mandated in NAVFAC's September 19, 2013 Stop Work Order. Moreover, NAVFAC was fully aware of the structural testing, including coring, that Exponent was planning to engage in prior to the testing occurring, as Exponent's proposed repair plans were provided to NAVFAC in October 2013. During trial, Exponent engineer Steve Jirsa testified:

> Mr. Ramseyer: Your firm was submitted -- did you understand your firm was submitted to the Navy for purposes of investigation and compiling repair specifications?
>
> Mr. Jirsa: I do understand that, yes.
>
> Mr. Ramseyer: All right. And do you understand that your firm was approved to perform that work?
>
> Mr. Jirsa: Yes.
>
> Mr. Ramseyer: And, sir, when you performed the investigation, was all that information disclosed to NAVFAC?
>
> Mr. Jirsa: Yes.
>
> Mr. Ramseyer: And the repair specifications that you and/or Mr. McDonald[25] put together were submitted to the Navy before any repair work was done?
>
> Mr. Jirsa: Yes. I believe so.
>
> Mr. Ramseyer: And the repairs -- the repair specifications you put together

---

however, overlooks that the testimony at trial indicated that NAVFAC wanted to hire an independent third party because, as also stated by Justin Nodolf, "[w]e prefer to have somebody make that independent assessment," not because of a perceived lack of structural expertise on the part of LCC-MZT.

[25] Mr. Jirsa testified that Brian McDonald was "the head of the buildings and structures forensics practice" at Exponent, and that he was Mr. Jirsa's supervisor.

had the approval of NAVFAC to your knowledge?

Mr. Jirsa: To my knowledge, yes.

Thus, Exponent, after being cleared to do the work by NAVFAC, was performing work that met the approval of NAVFAC's September 19, 2013 Stop Work Order, and which had to be performed prior to NAVFAC lifting the restrictions indicated in its September 19, 2013 Stop Work Order.

To meet the requirements of the "inspection and analysis of the structural roof slab" in NAVFAC's September 19, 2013 Stop Work Order, Exponent proposed, in an October 9, 2013 report that was provided to NAVFAC, to test the structural capabilities of the roof through non-destructive testing, as well as destructive testing by "selected coring" to "evaluate the accuracy" of the non-destructive testing. Mr. Jirsa testified: "destructive testing included coring, taking core samples in different locations, drilling of the concrete, drilling into the concrete, and then chipping away of concrete." Contracting officer Mona Carlson described coring as "[a]ctually taking a round cylin- -- removal of some to determine where the rebar is and the strength of the contract -- concrete."[26] The photographs below in the appendix to Exponent's August 18, 2014 report are exemplary samples of coring:

---

[26] On cross-examination, in response to plaintiff's attorney Craig Ramseyer's question to NAVFAC contracting officer Mona Carlson, "when there is some exceptional testing done such as coring and ground-penetrating radar, if nothing is shown to be wrong, then there is a provision in the FARs that you're aware of that allows the contractor to recoup the cost of that testing, correct?" Ms. Carlson responded: "Correct."



Figure 22.    Location of slab cores CS-02 and CS-08, showing sound concrete
full depth of slab.  Left end of cores is top of slab.

Exponent's August 18, 2014 final report stated "we removed 47 cores." Thus, as part of
Exponent's assessment to satisfy NAVFAC's concerns regarding the structural capacity
of the P-913 building, and in order to provide a report to NAVFAC regarding the structural
capacity, concrete was removed from the roof poured by LCC-MZT.

As described above, the clause at FAR § 52.246-12(h) states that, to be entitled
to a contract adjustment, "the work" must be "found to meet contract requirements." See
id. Defendant asserts that LCC-MZT was unable to meet this requirement because "no
one disagreed the roof slab, as poured, did not meet Contract specifications." At the trial
on cross-examination, LCC-MZT's Bryan Zatica, when shown one of the photographs
depicting the roof slab after the forms were removed, was asked whether the concrete in

the photograph was "sufficient to withstand and meet the specifications that were set forth in the contract?" Bryan Zatica responded that "[a]fter you chip it out and dry pack it, yes." Once the Stop Work Order was issued, however, LCC-MZT was prevented from fixing most of the concrete irregularities until after Exponent conducted its review. The purpose of NAVFAC's September 19, 2013 Stop Work Order was not to determine whether the areas where there were voids, rock pockets, or honeycombing needed to be repaired, rather, NAVFAC's September 19, 2013 Stop Work Order was issued to determine whether the "structural integrity of the facility may have been compromised," and to "fully determine the extent of damage and identify what corrective actions, if needed, will be taken to facilitate Government acceptance." Exponent was to provide a report "attesting to the structural capability of the roof slab," and that an independent third-party inspector "determine structural capability" of the roof. Steve Jirsa of Exponent, however, indicated at trial that he "believe[d] it [the roof] would have" "carried the design loads" in accordance with the Contract absent repair. Exponent's August 18, 2014 final report stated that, "[b]ased on our investigation, we concluded that proper repair of the roof structure would restore the full structural capacity and serviceability of the P-913 concrete roof deck." In Exponent's August 18, 2014 final report, Exponent did not state that the roof, absent repair, was structurally compromised or that the roof, without repairs, did not meet the Contract's Specifications related to structural integrity. Nor did Exponent indicate that the concrete roof needed to be removed and replaced due to structural defects. Based on Exponent's reports and the testimony of Mr. Jirsa, it appears that the roof was structurally sound as poured, and that LCC-MZT did need to make repairs to the roof to fix voids, rock pockets, and honeycombing. Exponent's report did not mention the existence of cold joints, as alleged by Justin Nodolf and Dan Van Natta, or that the roof was structurally unsound, as apparently alleged by NAVFAC employee Mr. Starkel. The roof, as poured, appears to have met the structural requirements in the Contract, although Mr. Zatica did indicate certain further work should be done as part of finalizing the concrete pour.

NAVFAC's September 19, 2013 Stop Work Order required the hiring of an independent third party to test the structural integrity of the P-913 building, and, although the inspection involved removal of limited amounts of concrete from the roof, the inspection did not find that the P-913 building or roof was structurally compromised. Therefore, LCC-MZT is entitled to an equitable adjustment for the additional services involved in the examination and repair, as well as an extension of time if completion of the P-913 project was delayed by the Stop Work Order. Although defendant has argued that LCC-MZT can recover "only for those costs incurred because LCC-MZT could not progress on the critical path of the schedule with other concrete work," FAR § 52.246-12(h) supports that LCC-MZT can recover the costs of the "additional services involved in the examination and reconstruction." See id. Moreover, defendant has not identified specific cost elements in plaintiff's REA 29 which should not be recoverable. REA 29 seeks an adjustment of $252,609.00. Jim Mortensen testified that the costs in REA 29 were incurred in connection with Exponent's inspection of the structural integrity of the P-913 building and roof, which Mr. Mortensen were "[p]retty easy to compile" from invoices submitted to LCC-MZT. Mr. Mortensen also testified that LCC-MZT had a cost code set up to track costs associated with Exponent's testing.

Based on the evidence in the record, although the costs in REA 29 appear largely to be related to Exponent's inspection of the roof, the $252,609.00 claimed in REA 29 includes $2,194.06 for rental of shoring equipment during the month of December 2013, after Exponent's inspection was completed. As stated above, Exponent's inspection was complete in November 2013. The shoring rental costs in December 2013 appear to be related to the repairs being made to the underside of the roof during December 2013, rather than to Exponent's inspection of the roof, and LCC-MZT has stated that it is not seeking the costs of making repairs to the roof. Consequently, LCC-MZT is not entitled to receive $2,194.06 for rental of shoring equipment in December 2013. Thus, under REA 29, LCC-MZT is entitled to receive the difference of $252,609.00 and $2,194.06, which is $250,414.94, as the costs of Exponent's testing under FAR § 52.246-12(h). Whether LCC-MZT can recover an "extension of time" under FAR § 52.246-12(h) based on delay associated with NAVFAC's Stop Work Order depends on whether "completion of the work" was delayed, which is discussed below.

REA 40 – Additional Costs Associated with PC 0004

In REA 40, LCC-MZT asserts that it is entitled to $504,170.00 associated with the differing site condition involving the water line and duct bank because the "Government gave LCC-MZT no choice but to sign the Change Order [Modification 9] or go out of business." (brackets added). REA 40 also asserts that NAVFAC's Modification 9 "offer was neither fair nor equitable" because LCC-MZT submitted a time impact analysis "for one hundred fifty calendar days (150 cd) for completion of the project and the Government offered a phased construction completion schedule for seventy-six calendar days (76 cd) for SCD [Substantial Completion Date] and one hundred thirty-six calendar days for CCD [Contract Completion Date]." (capitalization in original). In its post-trial brief, LCC-MZT argues that it did not voluntarily sign Modification 9 because NAVFAC refused to negotiate the terms of Modification 9 and because LCC-MZT only was offered a time period of twenty-four hours to accept Modification 9. According to LCC-MZT's post-trial brief, LCC-MZT did not have an alternative to signing Modification 9 because "LCC-MZT had no ability to obtain funding by other means, as its line of credit was maxed out and it had no further bonding capacity." Plaintiff asserts that the "evidence here establishes that LCC-MZT was in dire financial straits as a direct result of NAVFAC's conduct in refusing to compensate LCC-MZT" for work LCC-MZT already had completed under the Contract. Plaintiff also asserts that "[t]he outstanding monies owed to LCC-MZT were compounded by NAVFAC's improper assessment of liquidated damages against LCC-MZT." Plaintiff states that "while NAVFAC was on the one hand attempting to extract millions of dollars in concessions out of LCC-MZT for its impacts due to the differing site conditions, NAVFAC was simultaneously assessing liquidated damages against LCC-MZT for this same differing site condition for which LCC-MZT had no responsibility or culpability."

Defendant argues that LCC-MZT has failed to establish that it was under duress when signing Modification 9. Defendant asserts that LCC-MZT made a "business decision" to sign Modification 9, that LCC-MZT failed to prove that LCC-MZT's "allegedly dire circumstances were the fault of NAVFAC," and that a "limited time offer is similarly insufficient to show duress." Defendant argues:

> [T]he evidence shows that there were other alternatives available to LCC-MZT other than signing Mod 9: namely, either wait for Ms. Carlson to return from vacation, or to negotiate with another Contracting Officer in her absence. Indeed, there were other Contracting Officers who could have signed Mod 9, such as Eileen Mitchell, the head of acquisitions, or one of Ms. Carlson's colleagues who had a warrant.

According to defendant, "[t]hrough Mod 9, LCC-MZT waived all recovery related to the utility line."

The United States Court of Appeals for the Federal Circuit has indicated that, "[t]o render a contract unenforceable for duress, a party must establish (1) that it involuntarily accepted the other party's terms, (2) that circumstances permitted no other alternative, and (3) that such circumstances were the result of the other party's coercive acts." N. Star Steel Co. v. United States, 477 F.3d 1324, 1334 (Fed. Cir. 2007) (citing Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1329 (Fed. Cir. 2003)); see also Dureiko v. United States, 209 F.3d 1345, 1358 (Fed. Cir. 2000); Emp'rs Ins. of Wausau v. United States, 764 F.2d 1572, 1576 (Fed. Cir. 1985) (quoting Fruhauf Sw. Garment Co. v. United States, 111 F. Supp. 945, 126 Ct. Cl. 51, 62 (1953) ("[T]he requirements to establish duress are exacting. Three elements must be found: '(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party.'")); Waverley View Inv'rs, LLC v. United States, 135 Fed. Cl. 750, 793 (2018) (quoting Dureiko v. United States, 209 F.3d at 1358), aff'd, 767 F. App'x 996 (Fed. Cir. 2019); IMS Engineers-Architects, P.C. v. United States, 92 Fed. Cl. 52, 66 (2010), aff'd, 418 F. App'x 920, reh'g and reh'g en banc denied (Fed. Cir. 2011); Aboo v. United States, 86 Fed. Cl. 618, 632, aff'd, 347 F. App'x 581 (Fed. Cir. 2009). "Duress occurs when a party involuntarily accepts another party's terms because the circumstances permitted no alternative and such circumstances were the result of the other party's coercive acts." Pew Forest Prods. v. United States, 105 Fed. Cl. 59, 67 (2012) (citing N. Star Steel Co. v. United States, 477 F.3d at 1334). Moreover, "[t]he mere stress of business conditions will not constitute duress. Instead defendant must have engaged in some wrongful conduct, or be the cause of plaintiff's plight, in order to shift responsibility for deals made by plaintiff under the stress of financial necessity." Sneeden v. United States, 33 Fed. Cl. 303, 310 (1995) (citing Johnson, Drake & Piper, Inc. v. United States, 531 F.2d 1037, 1043, 209 Ct. Cl. 313 (1976) and La Crosse Garment Mfg. Co. v. United States, 432 F.2d 1377, 1382, 193 Ct. Cl. 168, 176 (1970)); see also Artwohl v. United States, 434 F.2d 1319, 1326, 193 Ct. Cl. 382, 397 (1970). "A party to a contract will be bound by the terms thereof, unless there exists some defense to the contract, i.e., fraud, duress, or unless the contract is found to be unreasonable, unconscionable or contrary to public policy, or it produces an egregious, unfair or unreasonable result." Forest Env't Servs. Co. v. United States, 5 Cl. Ct. 774, 777 (1984) (emphasis in original) (citing United States v. 1,557.28 Acres of Land in Osage Cty., Kan., 486 F.2d 445 (10th Cir. 1973)).

For accord and satisfaction, "a claim is discharged because some performance other than that which was claimed to be due is accepted as full satisfaction of the claim."

Holland v. United States, 621 F.3d 1366, 1377 (Fed. Cir. 2010) citing O'Connor v. United States, 308 F.3d 1233, 1240 (Fed. Cir. 2002)), reh'g and reh'g en banc denied (Fed. Cir.), cert. denied, 565 U.S. 928 (2011); see also Info. Sys. & Networks Corp. v. United States, 148 Fed. Cl. 356, 363 (2020). The United States Court of Appeals for the Federal Circuit has stated:

> Discharge of a claim by accord and satisfaction occurs when some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim. Brock & Blevins Co. v. United States, 343 F.2d 951, 955, 170 Ct. Cl. 52 (1965). However, courts may refuse to bar a claim based upon the defense of accord and satisfaction where the parties continue to consider the claim after execution of a release. Winn-Senter Constr. Co. v. United States, 75 F. Supp. 255, 110 Ct. Cl. 34 (1948). "Such conduct manifests an intent that the parties never construed the release as an abandonment of plaintiff's earlier claim." A & K Plumbing & Mechanical, Inc. v. United States, 1 Cl. Ct. 716, 723 (1983).

Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1581 (Fed. Cir. 1993). Furthermore, as also stated by the Federal Circuit:

> Accord and satisfaction has been "aptly described" as a four-part test of "proper subject matter, competent parties, meeting of the minds of the parties, and consideration." Brock & Blevins Co. v. United States, 343 F.2d 951, 955 (Ct. Cl. 1965) (internal quotation marks and citation omitted); see Holland, 621 F.3d at 1382 (citing to O'Connor v. United States, 308 F.3d 1233, 1240 (Fed. Cir. 2002) for the same proposition, which in turn cites to Brock & Blevins, 343 F.2d at 955). While Community Heating does not use the term "meeting of the minds," see generally 987 F.2d 1575, its discussion of parties' continued consideration of a claim after execution of a release forms part of this inquiry for purposes of the accord and satisfaction doctrine, see id. at 1581 (citing Brock & Blevins, 343 F.2d at 955).

Meridian Eng'g Co. v. United States, 855 F.3d 1351, 1363–64 (Fed. Cir. 2018) (footnote omitted). Similarly, a Judge of the United States Court of Federal Claims wrote:

> The doctrine of accord and satisfaction is an absolute defense that terminates any previous right that a party may have had to assert a claim of the same subject matter. See C & H Commercial Contractors, Inc. v. United States, 35 Fed. Cl. 246, 252 (1996) (quoting Chesapeake & Potomac Tel. Co. v. United States, 228 Ct. Cl. 101, 108, 654 F.2d 711, 716 (1981)); accord McLain Plumbing & Elec. Svc., Inc. v. United States, 30 Fed. Cl. 70, 79-80 (1993). An "accord" is a contract under which both parties agree that one party will render additional or alternative performance in order to settle an existing claim made by the other party, and "satisfaction" is the actual performance of the accord. See id. The party asserting an accord and

satisfaction defense must establish four elements: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds; and (4) consideration. See id.; accord Brock & Blevins Co. v. United States, 170 Ct. Cl. 52, 59, 343 F.2d 951, 955 (1965).

An executed bilateral modification with a release provision usually constitutes an accord and satisfaction unless that release is either ambiguous or limited in scope. See Merritt–Chapman & Scott Corp. v. United States, 198 Ct. Cl. 223, 228-30, 458 F.2d 42 (1972); Brock & Blevins Co. v. United States, 170 Ct. Cl. at 59, 343 F.2d at 954-55.

Jackson Constr. Co. v. United States, 62 Fed. Cl. 84, 92 (2004). "'As a general rule, the execution by a contractor of a release which is complete on its face reflects the contractor's unqualified acceptance and agreement with its terms and is binding on both parties.'" K-Con Bldg. Sys., Inc. v. United States, 107 Fed. Cl. 571, 600 (2012) (quoting Clark Mech. Contractors, Inc. v. United States, 5 Cl. Ct. 84, 86 (1984)).

In the above-captioned case, LCC-MZT discovered the undisclosed water line and duct bank in July 2012. In NAVFAC contracting officer Mona Carlson's August 14, 2012 letter to LCC-MZT, Ms. Carlson stated that the water line and duct bank constituted a differing site condition and instructed LCC-MZT to submit an REA, including costs and schedule impacts, to NAVFAC. In the August 14, 2012 letter, Mona Carlson established PC [Proposed Change] 0004 "[f]or tracking purposes." LCC-MZT did not submit an REA for the differing site condition under PC 0004 until January 18, 2013. In the January 18, 2013 REA, LCC-MZT requested an adjustment of $999,701.00 to the Contract and asserted a schedule delay of 107 calendar days. LCC-MZT, however, excluded seven categories of costs from its January 18, 2013 REA, including "[s]chedule recovery" and inefficiencies related to a retaining wall. Bryan Zatica testified at trial that NAVFAC "responded back" to the January 18, 2013 REA and "said that they would not issue a change order with those items excluded." At trial, Mona Carlson indicated that she was concerned about NAVFAC's "exposure" on the items excluded from LCC-MZT's January 18, 2013 REA and testified "I'm not authorized to do partial settlements."

LCC-MZT resubmitted its REA for PC 0004 on April 17, 2013, a day before a scheduled partnering meeting on April 18, 2013. According to plaintiff's post-trial brief, the "compilation of the direct costs took time and developing an estimate of the impact costs was a difficult task." NAVFAC contracting officer Mona Carlson testified that the purpose of the April 18, 2013 partnering meeting was not specifically to address LCC-MZT's April 17, 2013 REA for PC 0004. Indeed, Justin Nodolf testified that NAVFAC lacked the time to review the entirety of LCC-MZT's April 17, 2013 REA for PC 0004 before the April 18, 2013 partnering meeting. Mr. Nodolf testified that

it would take us several months just to get through it to a point where we could at least establish an initial government position to be able to enter negotiations. And then depending on how the negotiations would -- would

go, it could be another month to two months to be able to award the -- the contract after that.

The NAVFAC representatives at the April 18, 2013 partnering meeting, however, decided to make a settlement offer of $1,500,000.00 to LCC-MZT regarding the April 17, 2013 REA and PC 0004, despite only having had one day to review LCC-MZT's April 17, 2013 REA, which NAVFAC had first asked for in August 2012. Justin Nodolf stated that the $1,500,000.00 settlement offer was arrived at as follows:

> So we were working basically the original proposal they gave us back in January. We'd gone through portions of it at that point. We had determined it was anywhere between 6– to 700,000 on direct costs. And so when Mona [Carlson] asked me, she said, how much -- how much should we offer them? And I said, well, it's like 6– to 700,000 direct costs. So she said, great. Should we just double it and round up? And that's where we came to the 1.5.

(brackets added). According to Jodus Hortin, a NAVFAC contract specialist assigned to the P-913 project, the $1,500,000.00 settlement offer was arrived at as follows:

> [I]t was a combination of the total costs presented, the original REA and our review of it, and the technical review and understanding of remaining activities. . . .

> Our position was the culmination of the seven or eight months it took to get a complete REA, our handling of the project site, our receipt of QC [quality control] daily reports, schedules. We didn't just review this issue and develop a position in the span of one business day. We were actively working towards it for months.

(brackets added). Jodus Hortin stated that he "remember[ed] the consensus being that we couldn't properly substantiate entitlement for anything higher than" $1,500,000.00.

As a result, at the April 18, 2013 partnering meeting, NAVFAC contracting officer Mona Carlson made the offer to settle LCC-MZT's April 17, 2013 REA for $1,500,000.00. At trial, Bryan Zatica and John King both Ms. Carlson's offer as a take-it-or-leave-it offer. Bryan Zatica also testified that Mona Carlson required that LCC-MZT decide whether to accept the $1,500,000.00 settlement offer within twenty-four hours. Ms. Carlson could not remember whether she said the $1,500,000.00 offer was "take-it-or-leave-it" and stated that it was a "possibility" that she said LCC-MZT needed to decide whether to accept the $1,500,000.00 offer within twenty-four hours. Mona Carlson, however, testified that she would not have "defaulted" or "terminated" LCC-MZT if LCC-MZT had not accepted NAVFAC's $1,500,000.00 offer within twenty-four hours. Bryan Zatica shared the understanding that NAFVAC would not have terminated LCC-MZT, as Mr. Zatica testified on cross-examination that he did not believe that LCC-MZT would have been terminated if LCC-MZT had declined to accept NAVFAC's offer of $1,500,000.00. Moreover, the

record before the court does not indicate that NAFVAC threatened to take contractual action or coercive action against LCC-MZT if LCC-MZT declined to accept NAVFAC's $1,500,000.00 settlement offer.

The record before the court also does not indicate that NAVFAC was unwilling to continue to address LCC-MZT's April 17, 2013 request for equitable adjustment following the conclusion of the April 18, 2013 partnering meeting. Jodus Hortin testified:

> If the 1.5 million wouldn't have been accepted, we would have entertained a more thorough comprehensive cost analysis in relation to the other information we requested and not received, further pursued how much of the work was compensable and -- and how much of the time extension was owned by the government. The 1.5 offer was presented in lieu of the additional time needed to perform that more granular line item robust assessment, and there was no guarantee that the ultimate outcome of an REA would have been higher or lower.

It appears that NAVFAC, therefore, was willing to evaluate LCC-MZT's April 17, 2013 request for equitable adjustment further if LCC-MZT had declined to accept the $1,500,000.00 settlement offer. Allowing NAVFAC to have more time to review and evaluate the April 17, 2013 request for equitable adjustment was an alternative to accepting NAVFAC's settlement of $1,500,000.00 at the time it was offered.

LCC-MZT agreed to, and signed, NAVFAC's $1,500,000.00 settlement offer on April 19, 2013, according to LCC-MZT's scheduler at the time of the April 18, 2013 partnering meeting, John King, because LCC-MZT was in need of a "cash infusion" as of April 2013. On direct examination, Bryan Zatica had the following colloquy with plaintiff's counsel Mr. Ramseyer about LCC-MZT's need for funds as follows:

> Mr. Ramseyer: So how badly did Macro-Z-Technology need cash at the time?

> Mr. Zatica: We needed it or we were going out of business, period.

> Mr. Ramseyer: If you did not accept the offer, did you feel that you would end up having to shut down the operations?

> Mr. Zatica: Yeah, we would have to close. I mean, it was an inordinate amount of stress in the fact that, you know, I've got a house that's on the line with the surety. The bank has my assets tied up. I have employees that have been with me 25 years. I've got to tell them that we're going out of business. You know, I've got children. I mean, it's not fun.

> Mr. Ramseyer: What about -- and you had no working capital from Larkor, correct?

Mr. Zatica: Nothing.

During the trial, MZT's Financial Statement and Supplementary Information for the year ending December 31, 2012 was admitted into evidence, which covered a period concluding approximately four months before the April 19, 2013 settlement offer from the government. In MZT's 2012 Financial Statement, MZT lists total costs in excess of billings[27] as $1,678,257.00. Of the $1,678,257.00 total costs in excess of billings, $930,370.00 are attributable to MZT's work on the P-913 project. The other $747,887.00 of costs in excess of billings were attributable to projects other than the P-913 project, indicating that MZT's cashflow problems in April 2013 were not solely caused by MZT's work on the P-913 project. Although Bryan Zatica testified that the LCC-MZT joint venture was not receiving contributions from LCC, the record before the court does not indicate that LCC's inability to contribute funds to LCC-MZT joint venture was caused by the actions of NAVFAC. Indeed, Bryan Zatica stated that, during the early stages of the P-913 project, "Larkor [sic] could not fund their portion of the joint venture" because "[t]hey were having financial issues," resulting in the appointment of a receiver for the LCC-MZT joint venture.

As stated above, "mere stress of business conditions will not constitute duress." Sneeden v. United States, 33 Fed. Cl. at 310. Although MZT may have been in need of funds in April 2013, the record before the court does not support that NAVFAC took improper coercive actions requiring LCC-MZT to accept NAVFAC's settlement offer. LCC-MZT could have permitted NAVFAC to further evaluate LCC-MZT's April 17, 2013 REA, and plaintiff and defendant could have further negotiated regarding the April 17, 2013 REA. Moreover, MZT's financial difficulties as of April 2013 were caused by a number of factors, not only by the Contract at issue in this case. LCC-MZT's position that it was forced to accept NAVFAC's April 18, 2013 settlement offer of $1,500,000.00 overlooks that LCC-MZT was not entitled to an instantaneous response to plaintiff's April 17, 2013 detailed request for an equitable adjustment, a request which NAVFAC first asked for in August 2012. The record before the court does not demonstrate that LCC-MZT was in a position of government-caused duress when it accepted NAVFAC's April 18, 2013 settlement offer for the April 17, 2013 REA. Indeed, it does not appear that plaintiff has demonstrated any of the three conditions identified by the Federal Circuit in North Star Steel Co. to establish duress: (1) that it involuntarily accepted the other party's terms, (2) that circumstances permitted no other alternative, and (3) that such circumstances were the result of the other party's coercive acts." N. Star Steel Co. v. United States, 477 F.3d at 1334.

On May 2, 2013, LCC-MZT and NAVFAC bilaterally executed Modification 9 to the Contract. Modification 9 states:

---

[27] At trial, Michael Becher, a partner in the accounting firm Miller Giangrande LLP, testified that costs in excess of billings were "costs that have been incurred in excess of what's actually been billed to the client."

The subject contract is hereby modified to compensate the Contractor for all additional labor, material, equipment, and associated costs regarding a differing site condition resulting from utility line interferences as further defined in the Contractor's Request for Equitable Adjustment (REA) (Serial Letter No. 0005) dated August 14, 2012, the Government's response (Serial Letter No. 0010) dated August 14, 2012, the Contractor's amended REA (Serial Letter No 0024) dated April 17, 2013, and the settlement reached April 19, 2013, summarized as follows. These documents are hereby incorporated by reference. This settlement accounts for all associated impacts including re-sequencing, acceleration, seasonal impacts, changes to means and methods, et cetera, necessary to provide for substantial completion as further defined in paragraph 2 below. Neither party's rights for contractual relief for future impacts/situations are waived by this settlement.

**PCO 0004 ~ REA – Utility Line Interference**          **Increase: $1,500,000**

(capitalization and emphasis in original). Modification 9 also states:

(2) Extension of time is required by reason of this modification. As per the agreement for PC 0004 (REA Utility Line Interference), the contract is modified as follows:

(a) Substantial Completion Date (SCD) of **NOVEMBER 15, 2013**, as further defined in 5252.211-9301 ~ Phased Construction Schedule, is hereby established. Liquidated damages, as further defined in 52.211-12, have been adjusted accordingly to provide for completion as agreed.

(b) The Contract Completion Date (CCD), as further defined in 5252.211-9301 ~ Phased Construction Schedule, is hereby extended by 125 calendar days to **JANUARY 15, 2014**. Liquidated damages, as further defined in 52.211-12, have been adjusted accordingly to provide for completion as agreed. . . .

(3) Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full (for both time and money) and for any and all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised.

(capitalization and emphasis in original).

In REA 40, LCC-MZT asserts that "Modification A00009 did not cover **$504,170.00** "of costs related to the differing site condition of the undisclosed water line and electrical duct bank addressed in PC 0004 and in LCC-MZT's April 17, 2013 request for equitable adjustment, and requests "payment for the additional cost associated with PC 0004 and obtaining a fair and equitable adjustment." (emphasis in original).

Modification 9 specifically identifies PC 0004, LCC-MZT's April 17, 2013 request for equitable adjustment, and the parties' April 19, 2013 settlement agreement, following the April 18, 2013 partnering meeting. Modification 9 states that the parties' "settlement accounts for all associated impacts including re-sequencing, acceleration, seasonal impacts, changes to means and methods, et cetera, necessary to provide for substantial completion." Modification 9 also contains accord and satisfaction language, stating: "Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full (for both time and money) and for any and all costs, impact effect, and for delays and disruptions arising out of or incidental to the work as herein revised." Plaintiff's request for additional alleged costs related to PC 0004 and the differing site conditions is barred by Modification 9, as the parties agreed in Modification 9 that Modification 9 addressed "all associated impacts including re-sequencing, acceleration, seasonal impacts, changes to means and methods, et cetera" and "all costs, impact effect, and for delays and disruptions" related to PC 0004 and the differing site conditions. Plaintiff, therefore, is not entitled to the additional amounts or time extensions sought in REA 40.

Delay to the P-913 Project's Critical Path

The parties in the above-captioned case dispute whether LCC-MZT is entitled to relief based on the delays to the project's critical path alleged by LCC-MZT. The United States Court of Appeals for the Federal Circuit has stated:

> "The general rule is that '[w]here both parties contribute to the delay neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each party." Blinderman [Constr. Co. v. United States], 695 F.2d [552,] 559 [(Fed. Cir. 1982)], quoting Coath & Goss, Inc. v. United States, 101 Ct. Cl. 702, 714–715 (1944). Courts will deny recovery where the delays are concurrent and the contractor has not established its delay apart from that attributable to the government.

P.R. Burke Corp. v. United States, 277 F.3d 1346, 1359 (Fed. Cir. 2002) (quoting William F. Klingensmith, Inc. v. United States, 731 F.2d 805, 809 (Fed. Cir. 1984)). "Delays generally fall into one of three categories: (1) excusable and compensable; (2) excusable but not compensable; and (3) not excusable." W. Stephen Dale & Robert M. D'Onofrio, Reconciling Concurrency in Schedule Delay and Constructive Acceleration, 39 Pub. Cont. L.J. 161, 163 (2010) (internal quotation marks and citation omitted). FAR § 52.249-10, titled "Default (Fixed–Price Construction) (APR 1984)," which was incorporated by reference into LCC-MZT's Contract, provides that a contractor may not be charged with liquidated damages if there is an excusable delay. See FAR § 52.249-10(b) (capitalization in original); see also England v. Sherman R. Smoot Corp. v. United States, 388 F.3d 844, 857 (Fed. Cir. 2004) ("A delay in a construction contract is excusable if it arises from either the government's action or external forces."); K-Con Bldg. Sys., Inc. v. United States, 131 Fed. Cl. 275, 321 (2017) (stating that liquidated damages, based on failure to timely complete work, may not be assessed against a contractor entitled to an extension of time for excusable delay). Judges of the United States Court of Federal Claims have stated

that "[f]ederal regulations provide for extensions of *time* for excusable delays (e.g., unusually severe weather), but do not provide for equitable adjustments for such delays." Edge Constr. Co. v. United States, 95 Fed. Cl. 407, 420 (2010) (emphasis in original) (citing FAR § 52.249-10; and Fraser Constr. Co. v. United States, 57 Fed. Cl. 56, 59 n.2 (2003)); see also JOHN CIBINIC ET AL., ADMINISTRATION OF GOVERNMENT CONTRACTS 487 (5th ed. 2016) (stating that, during periods of excusable delay, "[g]enerally, a contractor is excused from performance because of delays caused by factors for which neither it nor the government is responsible; however, the contractor must bear the cost impact of such delays"). "Moreover, to result in an excusable delay, 'the unforeseeable cause must delay the overall contract completion; i.e., it must affect the critical path of performance.'" K-Con Bldg. Sys., Inc. v. United States, 131 Fed. Cl. at 321 (quoting Sauer Inc. v. Danzig, 224 F.3d 1340, 1345 (Fed. Cir. 2000)); see also Weston/Bean Joint Venture v. United States, 123 Fed. Cl. 341, 385 (2015), aff'd, 652 F. App'x 972 (Fed. Cir. 2016); Martin Constr., Inc. v. United States, 102 Fed. Cl. 562, 575 (2011) ("In addition, to warrant a time extension, the contractor must show that the excusable event delayed activities along the critical path, which consists of activities that must be performed on schedule so as not to delay the entire project." (citations omitted)).

"When a contractor seeks an equitable adjustment for government-caused delay, 'the contractor has the burden of proving the extent of the delay, that the delay was proximately caused by government action, and that the delay harmed the contractor.'" Ultimate Concrete, LLC v. United States, 141 Fed. Cl. 463, 480 (2019) (quoting Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir. 1994)), recons. denied, No. 14-549C, 2019 WL 1375929 (Fed. Cl. Mar. 26, 2019); see also T. Brown Constructors, Inc. v. Pena, 132 F.3d 724, 734 (Fed. Cir. 1997) (quoting Wilner v. United States, 24 F.3d at 1401). "The Government's liability for delay-related damages is limited to those delays that it caused and that hew to the project's critical path." Fireman's Fund Ins. Co. v. United States, 92 Fed. Cl. 598, 666 (2010) (citing Wilner v. United States, 23 Cl. Ct. 241, 244 (1991)); see also MW Builders, Inc. v. United States, 134 Fed. Cl. 469, 508 (2017), recons. denied, 136 Fed. Cl. 584 (2018). Determination of the critical path is necessary for determining compensable delay because "'only construction work on the critical path ha[s] an impact upon the time in which the project [is] completed.'" Ultimate Concrete, LLC v. United States, 141 Fed. Cl. at 480 (alterations in original) (quoting Wilner v. United States, 24 F.3d at 1399 n.5 (quoting G.M. Shupe, Inc. v. United States, 5 Cl. Ct. 662, 728 (1984))).

In the above-captioned case, the following three categories of delay are relevant to determine whether LCC-MZT is entitled to an extension of time for excusable delay and/or an equitable adjustment for compensable delay: (1) Red Days; (2) NAVFAC's September 19, 2013 Stop Work Order; and (3) grounding and energization of the P-913 building.

Plaintiff's retained and offered William Manginelli of Trauner Consulting Services as an expert in the above-captioned case, to which defendant did not object. Mr. Manginelli was admitted as an expert in four areas: (1) acceleration; (2) loss of productivity; (3) extended field overhead; and (4) unabsorbed home office overhead.

During Mr. Manginelli's testimony at trial, Mr. Manginelli stated that there was "an embarrassing error" in his original expert report. Mr. Manginelli testified:

> Now, I should point out that, in -- in -- in getting ready for this trial[28] and looking at my report, I -- I have an error here that I need to point out. On Page 13 of my report, I talk about how the planned start and end for this roof activity, which is 1100, install roof primer. On Page 13 I talk about how that was planned to start on September 25th and end on October 1st.
>
> And then on the next page, once I'm comparing the actual start of the primer, I mistakenly used the October 1st date instead of the September 25th date.
>
> So where I conclude 49 days longer than planned that -- that the roof primer work began on November 19th, 49 days longer than planned, it's really 55. So I'm off six days there.

At the trial, counsel for the United States, Kelly Krystyniak, cross-examined Mr. Manginelli on his original expert report and she stated that "the change in days I expect is going to alter" Mr. Manginelli's "money, his days." The error in Mr. Manginelli's original expert report also impacted the numbers in the demonstratives plaintiff offered for use at trial associated with Mr. Manginelli's original expert report. In order to have coherent and usable testimony for the court to properly assess the case, as well as to allow reference to accurate demonstratives during Mr. Manginelli's testimony, Mr. Manginelli was excused to review his submitted report for accuracy. The court continued the trial to hear other witnesses. Mr. Manginelli returned to the stand the following day, with a revised expert report and revised demonstratives, which were added to the record in addition to Mr. Manginelli's original, faulty report and original, faulty demonstratives, which also remained in the record.

Mr. Manginelli's revised expert report differed from his original expert report in that, in his revised expert report, Mr. Manginelli asserted an additional six days of delay associated with NAVFAC's September 19, 2013 Stop Work Order, from forty-nine days to fifty-five days. Mr. Manginelli's error also changed his breakdown of the days he attributed to each delay on the P-913 project, as follows:

(1) In both his original and revised expert reports, Mr. Manginelli asserted that Red Days caused 71 calendar days of delay;

(2) In his original expert report, Mr. Manginelli asserted that "[d]elays to the energization of the building and the concrete roof concurrently caused 33 calendar days of delay." In his revised expert report, this number was changed to thirty-nine calendar days of delay;

---

[28] Mr. Manginelli's original expert report was dated July 30, 2018, almost one year before the first day of the trial in this case.

(3)   In his original expert report, Mr. Manginelli asserted that "[d]elays to the energization of the building caused 61 calendar days of delay." In his revised expert report, this number was changed to fifty-five calendar days of delay;

(4)   In both his original and revised expert report, Mr. Manginelli asserted that "[f]rom May 31, 2014 through June 11, 2014, the failure of NAVFAC to grant substantial completion to LCC-MZT caused 12 calendar days of delay. There was nothing located in the available documents to indicate that LCC-MTZ [sic] was responsible for this delay."

Despite the change in Mr. Manginelli's calculation of delays, both his original expert report and revised expert report stated that LCC-MZT is entitled to a total of 177 calendar days of excusable delay on the P-913 project. Mr. Manginelli's determination of how many of the 177 calendar days are compensable, however, were adjusted. In his original expert report, Mr. Manginelli asserted that all 177 calendar days would be compensable to LCC-MZT, unless the court finds that LCC-MZT was responsible for roofing delays, in which case only 144 of the 177 calendar days would be compensable to LCC-MZT. In Mr. Manginelli's revised expert report, Mr. Manginelli still stated that all 177 calendar days would be compensable to LCC-MZT if no fault of LCC-MZT is found by the court for the roofing delays, but he changed the number of days to which LCC-MZT would be entitled to compensable delay in the event the court finds LCC-MZT responsible for the roofing delays, to 138 calendar days. Due to this change in compensable calendar days, Mr. Manginelli's revised expert report also differed from his original expert report in the amounts for which he asserted LCC-MZT should be entitled compensation through LCC-MZT's various claims submitted to the court. For the purposes of this Opinion, the court refers to Mr. Manginelli's revised expert report, but weighs the reliability of his expert reports and his testimony, given the need for Mr. Manginelli to revise his original expert report during his testimony at trial, but only after the mistakes were identified to him by defendant's counsel. Also, as discussed below, Mr. Manginelli offered a number of unsupported conclusions in both his reports and in his testimony.

In his revised expert report, Mr. Manginelli stated that delays occurring after August 14, 2013 under the Contract are a source of dispute between LCC-MZT and NAVFAC. According to Mr. Manginelli's revised expert report, NAVFAC schedule analyst Casey Caughie required LCC-MZT, on a monthly basis, "to model the schedule and its impacts in multiple ways." For example, Mr. Manginelli contends in his revised expert report that Mr. "Caughie had LCC-MZT prepare seven different schedules all with a data date of August 14, 2013 to represent various delay issues experienced on the job." In his revised expert report, Mr. Manginelli asserted:

As a result of NAVFAC's active involvement in the schedule preparation process, the schedule updates produced after August 14, 2013 could not be used to reliably measure project delays. This was due both to the multiple variations of schedules produced with the same data date, making it difficult to determine which schedule to analyze, and the fact that NAVFAC was requiring certain schedule logic that did not necessarily model LCC-

MZT's plan for the work. This tainting of the schedules was not the fault of LCC-MZT, but rather the result of LCC-MZT following NAVFAC's directions. In fact, in its own analysis of the project, NAVFAC also did not use LCC-MZT's schedule updates produced after August 14, 2013. Rather, Caughie's own review of LCC-MZT's final TIA [time impact analysis] was based on the August 14, 2013 schedule and the as-built information for the project.

Because the schedule updates produced after August 14, 2013 could not be used to reliably measure project delays, a comparison of the August 14, 2013 schedule with the as-built project information was used to identify the impacts that caused the delays to the project after August 14, 2013.

Mr. Manginelli's revised expert report stated that there were two critical paths on the P-913 project, one which involved completion of the concrete roof, and a second involving energization of the P-913 building. Mr. Manginelli also identified anticipated Red Days as a NAVFAC-caused delay and asserted that, "[b]ecause of the nature of red days, and the significant disruption they have to all work activities, red days, in effect, suspend all work and take precedence over any other delays affecting the project." As discussed above, in his revised expert report, Mr. Manginelli stated:

Thus, based on this analysis, of the 177 calendar days of delay that occurred from August 14, 2013 through June 11, 2014:

- Red days caused 71 calendar days of delay.

- Delays to the energization of the building and the concrete roof concurrently caused 39 calendar days of delay.

- Delays to the energization of the building caused 55 calendar days of delay.

- From May 31, 2014 through June 11, 2014, the failure of NAVFAC to grant substantial completion to LCC-MZT caused 12 calendar days of delay. There was nothing located in the available documents to indicate that LCC-MTZ [sic] was responsible for this delay.

Mr. Manginelli concluded:

As a result of the delays that occurred during this period, LCC-MZT is entitled to a time extension of 177 calendar days. If it is determined that the delays to the concrete roof caused by NAVFAC's issuance of the stop work notice were not the responsibility of LCC-MZT, or that the stop work notice inappropriately prevented LCC-MZT from performing out-of-sequence concrete activities that would have mitigating this delay, then the entire 177-

calendar-day time extension due LCC-MZT should be compensable. If, on the other hand, the delays to the concrete roof are found to be the sole responsibility of LCC-MZT, then 138 calendar days of the 177-calendar-day time extension due LCC-MZT should be compensable and the remaining 39 calendar days should be non-compensable.

Defendant retained Stephen Weathers of Capital Project Management, Inc. (CPMI) and offered him at trial as defendant's expert witness. Mr. Weathers was offered and admitted as an expert in three areas: (1) critical path method scheduling; (2) schedule and delay analysis; and (3) construction damages. Mr. Weathers was a more credible witness at trial than plaintiff's expert and also had prepared a careful expert report on all issues, including the issues on which Mr. Manginelli offered a revised expert report. In his expert report, Mr. Weathers stated:

> Based upon CPMI's review of the project record and its detailed schedule/delay analyses it is CPMI's opinion that the delays on the project are best characterized as concurrent delay. It is CPMI's opinion that LCC-MZT is not entitled to any compensable delay on the project. CPMI is aware that while the definition or compensability of Red Days on the project was never formally modified by Contract, it is LCC-MZTs position that it is entitled to compensable delay for any Red Day that occurred after August 14, 2013. To the extent that LCC-MZT prevails in this argument, this would result in 24 days of compensable delay as addressed in detail later in this report.

Although Mr. Weathers concluded that LCC-MZT should not be entitled to additional excusable delay, he stated that "the $185,346 presently withheld as liquidated damages after April 30, 2014 should be returned to LCC-MZT" because

> based upon a review of the project record, it is noted that several modifications were issued during the timeframe leading to substantial completion with several being issued after substantial completion. It is also noted that several Red Days were experienced during the timeframe leading up to substantial completion and punchlist work on the exterior of the building could potentially have been impacted on Red Days. Furthermore, as is typical with many projects during the late stages of a project leading up to substantial completion, many activities occur at once, making it difficult to distinguish and isolate with precision what activities comprise the critical path. In this case, the delays occurring after April 2014 are intertwined such as to preclude a clear apportionment of delay responsibility. In sum, it would be fair to characterize the additional delay from April 30, 2014 through June 2, 2014 as excusable and non-compensable. Hence, the 33 day delay that the project sustained after April 2014 is considered concurrent.

90

As stated above, plaintiff offered William Manginelli as its expert on acceleration, loss of productivity, extended field overhead, and unabsorbed home office overhead. Regarding the delay related claims, Mr. Manginelli's revised expert report stated that "time extensions for delays through August 14, 2013 were resolved by bilateral contract modifications," and that "[d]elays after August 14, 2013 are the subject of a dispute between LCC-MZT and NAVFAC." Likewise, in Mr. Weathers' expert report, he began his time impact analysis with August 14, 2013. As stated above, in Modification 10, the parties resolved all Red Day delays occurring before August 14, 2013. Modification 10 established a Substantial Completion Date of December 16, 2013 and a Contract Completion Date of February 16, 2014.

In calculating the number of Red Days occurring after August 14, 2013, both Stephen Weathers, defendant's expert, and William Manginelli, plaintiff's expert, referenced the Red Days identified in LCC-MZT's monthly narrative report for its May 31, 2014 update, in which LCC-MZT identified fifty-six Red Days. In Mr. Weathers' expert report, Mr. Weathers stated that he found an additional five Red Days, for a total of sixty-one Red Days occurring on the P-913 project after August 14, 2013.[29] In Mr. Manginelli's revised expert report, Mr. Manginelli identified seventy-one Red Days occurring on the P-913 project after August 14, 2013. At trial, while Mr. Manginelli was being cross-examined by Department of Justice attorney Kelly Krystyniak about a chart he had prepared of Red Days occurring after August 14, 2013,[30] Mr. Manginelli identified seven alleged Red Days appearing on his chart, which had occurred on a weekend or federal holiday, and five for which LCC-MZT did not produce a Contractor Production Report.[31] In Mr. Weathers' expert report, he asserted that, "while all Red Days are considered excusable, not all of the Red Days encountered after August 14, 2013 can be considered compensable simply because they occurred." In Mr. Manginelli's revised expert report, Mr. Manginelli asserted:

> Because of the nature of red days, and the significant disruption they have to all work activities, red days, in effect, suspend all work and take precedence over any other delays affecting the project. For example, when a red day occurs, work cannot be performed, and, thus, it is not possible that another path of work is delaying the project. This is because it is not possible to mitigate the impact of an ongoing delay on a red day.

---

[29] Mr. Weathers identified the following five additional dates on which Red Days occurred: October 1, 2013; October 2, 2013; March 19, 2014; April 3, 2014; and April 7, 2014.

[30] Ms. Krystyniak noted at the trial that the undated chart prepared by Mr. Manginelli listing Red Days occurring after August 14, 2013 "came in subsequent to his original report."

[31] The seven alleged Red Days occurring on weekends or federal holidays and for which LCC-MZT did not produce a Contractor Production Report are October 5, 2013; October 6, 2013; November 28, 2013; January 18, 2014; January 19, 2014; April 13, 2014; and May 11, 2014. During his testimony, Mr. Manginelli also identified two weekend days on which Red Days occurred and on which LCC-MZT was on site and for which plaintiff did produce Contractor Production Reports, which were April 12, 2014 and May 10, 2014.

The court has determined that anticipated Red Days could be considered non-work days in the Contract's Specifications and are in addition to other non-workdays, such as weekend days, which are outside of LCC-MZT's working hours. Under the Contract's Specifications , LCC-MZT could be entitled to excusable, but not compensable, delay for delays incurred in connection with Red Days. The Contract's Specifications also contemplated that LCC-MZT could receive a compensable adjustment for Red Days under the following three circumstances: (1) if LCC-MZT's workers could not work for more than fifty percent of a Red Day; (2) there were more than ten Red Days on working days in a single month; or (3) there was a scheduling change related to an anticipated Red Day with less than forty-eight hours' notice to plaintiff. Furthermore, as discussed above, in order for a government-caused delay to become compensable, it must affect the project's critical path. See, e.g., Fireman's Fund Ins. Co. v. United States, 92 Fed. Cl. at 666 ("The Government's liability for delay-related damages is limited to those delays that it caused and that hew to the project's critical path.").

As discussed above Modification 10 was executed on August 30, 2013 and resolved all Red Days occurring through August 14, 2013. From August 15, 2013 to September 19, 2013, there were four Red Days, which occurred on August 15, 2013; August 16, 2013; August 19, 2013; and August 20, 2013, all of which were weekdays. The Red Days occurring on August 15, 2013; August 16, 2013; August 19, 2013; and August 20, 2013 transformed what would have been normal work days for LCC-MZT into potential non-work days. Plaintiff, however, has not attempted to prove that any individual Red Day met the above requirements to potentially be considered compensable delay. In LCC-MZT's August 15, 2013 Contractor Production Report, LCC-MZT states: "Today was scheduled to be a red day at 1:00 yesterday requiring us to cancel all deliveries and concrete placement scheduled for today. There were no moves today." As discussed above, paragraph 1.2.1 in section 01 14 00 indicates that, for Red Days, "[c]hanges resulting in less than 48 hours notice will be considered a changed condition." The August 15, 2013 Red Day, scheduled with less than forty-eight hours' notice, is, therefore, considered a changed condition under the Contract's Specifications. LCC-MZT does not appear to have incurred sequestration costs in connection with the August 15, 2013 Red Day, as there were no Red Day operations, also referred to in the Contractor Production Reports as "moves," on August 15, 2013. Based on the record before the court, it is unclear what financial impact, if any, LCC-MZT experienced when having to cancel deliveries on August 15, 2013, as LCC-MZT has not attempted to quantify the financial impact of any individual Red Day, including the August 15, 2013 Red Day. The August 15, 2013 Red Day, however, should be considered a NAVFAC-caused change from a workday to a non-work day and should also be considered a changed condition under the Contract's Specifications. As stated above, the revised expert report of William Manginelli and the expert report of Stephen Weathers both indicated that each of the four Red Days occurring in August 2013 delayed LCC-MZT's completion of the P-913 project, thereby affecting the project's critical path. LCC-MZT, therefore, is entitled to one day of excusable, compensable delay for August 15, 2013 as a result of NAVFAC scheduling a Red Day with less than forty-eight hours of notice.

On August 16, 2013, LCC-MZT's Contractor Production Report indicates that the Red Day operations were for a total of 115 minutes, which was less than fifty percent of the working hours on August 16, 2013. On August 19, 2013, LCC-MZT's Contractor Production Report provides that the Red Day operations were for a total of 100 minutes, again less than fifty percent of the working hours on August 19, 2013. On August 20, 2013, LCC-MZT's Contractor Production Report provides that the Red Day operations were for a total of 100 minutes, which also was less than fifty percent of the working hours on August 20, 2013. The expert reports of both William Manginelli and Stephen Weathers indicated that the four Red Days occurring in August 2013 delayed LCC-MZT's completion of the P-913 project, and during defendant's expert Stephen Weathers' testimony, Mr. Weathers stated that "what I found was that the [roof] Pour 2 activity slipped from August 19th, 2013 . . . to September 4th, 2013." Nevertheless, based on the Contractor Production Reports for each day, the Red Days occurring on August 16, 2013, August 19, 2013 and August 20, 2013 do not indicate that any of the three requirements contemplated by the Contract's Specifications, discussed above, have been met to be considered compensable delay.[32] Therefore, for the four Red Days occurring in August 2013, LCC-MZT is entitled to four days of excusable delay, but only August 15, 2013 also qualifies as a day of compensable delay.

On September 19, 2013, NAVFAC issued its Stop Work Order. As discussed above, under FAR § 52.246-12(h), LCC-MZT is entitled to an "equitable adjustment for the additional services involved in the examination and reconstruction, including, if completion of the work was thereby delayed, an extension of time," for the period during which Exponent was conducting its inspection of the P-913 building's structural integrity. The parties have jointly stipulated that NAFVAC lifted the restrictions included in the September 19, 2013 Stop Work Order on November 26, 2013. In Stephen Weathers' expert report for defendant, Mr. Weathers stated that LCC-MZT had intended to start putting the roof primer onto the P-913 building on September 17, 2013. Mr. Weathers determined that the restrictions in the September 19, 2013 Stop Work Order "impacted the completion of the structure, but also the installation of building roofing. These delays placed building roofing on the critical path and delayed substantial completion." In the revised expert report of plaintiff's expert William Manginelli, he stated that "[i]n the August 14, 2013 schedule, the longest path of work ran through the pouring of the structural concrete roof, to the completion of roof activities, to the installation and insulation of MEP [mechanical/electrical/plumbing] equipment, to interior finishes, and ultimately to pre-final inspection punchlist work." Mr. Manginelli asserted that "the stop notice delayed the start of the installation of the concrete roof primer from its planned start of September 25, 2013 until November 19, 2013, a delay of 55 calendar days to the concrete roof path of work."

---

[32] The record before the court only includes daily Contractor Production Reports for days occurring on the P-913 project after April 14, 2013. Plaintiff has not asserted that there were more than ten Red Days in April 2013. Furthermore, based on the record before the court, the only month after August 2013 which had greater than ten Red Days occurring on work days was April 2014, which is discussed below.

Although both expert witnesses agreed that placing the roof primer had shifted onto the critical path due to the issuance of the September 19, 2013 Stop Work Order, plaintiff's and defendant's expert witnesses gave different intended start dates for the installation start date for the primer, with defendant's expert Mr. Weathers providing a September 17, 2013 intended start date and plaintiff's expert Mr. Manginelli providing a September 25, 2013 intended start date. Mr. Manginelli used an LCC-MZT schedule with a data date of August 14, 2013 to determine the start for installation of the roof primer, whereas Mr. Weathers used an LCC-MZT schedule with a data date[33] of August 31, 2013. Although the schedules used by the experts are based off of different schedules with different data dates, it appears that both of the schedules used by the experts were created by LCC-MZT in mid-November of 2014, which was after substantial completion had been achieved on the P-913 project, as all of the schedules in the record before the court, in addition to listing a data date, list a separate date of either November 17, 2014, or November 19, 2014. Based on the record before the court, it appears that these schedules were submitted as part of LCC-MZT's "Time Impact Analysis," which was a set of documents LCC-MZT provided to NAVFAC in an attempt to explain to NAVFAC the ripple-effect of the various delays which occurred during the project, and in an attempt to request adjustments based on those delays. Because the schedules used by the experts are backward-looking, and contain information, on which items remained to be completed, and when such items were scheduled to begin, a schedule with a more recent data date would reflect more up-to-date information on when an outstanding project item was scheduled to begin. Therefore, the schedule with a data date of August 31, 2013, which was created after the fact, but represented the dates of when outstanding project items were scheduled to begin as of the day indicated by the data date, could have contained more up-to-date information as compared to the schedule with a less recent data date of August 14, 2013. Therefore, without more precise evidence offered by plaintiff, the court uses the schedule with a data date of August 31, 2013, which was the schedule used by Mr. Weathers, and which indicates that the start date for installing the roof primer was scheduled for September 17, 2013.

Both experts, Stephen Weathers and William Manginelli, stated in their respective expert reports that because of NAVFAC's September 19, 2013 Stop Work Order, LCC-MZT did not begin installing the roof primer until November 19, 2013, and that the result of the delay in work caused by the September 19, 2013 Stop Work Order was that installation of the roof primer had shifted to the critical path. There are sixty-three calendar

---

[33] Mr. Manginelli testified at the trial that a data date

> is a date that -- from which the scheduling software calculates the completion of the project. So the way scheduling software works is, it looks at the data date and then it looks at the plan to complete the job and it does a series of forward and backward passes to establish which path is longest, and that predicts then what the end date will be. So if you -- if you want to understand what the impact to something may be, you can calculate multiple schedules using the same data date but [sic] just simply changing the downstream logic.

days between September 17, 2013 and November 19, 2013. Because the September 19, 2013 Stop Work Order delayed the P-913 project's critical path for sixty-three days, and because the court concluded, above, that NAVFAC issued the September 19, 2013 Stop Work Order, but that, after review by Exponent, the roof was found to be structurally sound, and that limited, non-structural irregularities in the concrete pour could be repaired, LCC-MZT is entitled to sixty-three days of excusable, compensable delay.[34] Moreover, due to the court's award of sixty-three days of excusable, compensable delay for the period between September 17, 2013 and November 19, 2013, LCC-MZT is not entitled to additional days of excusable, or compensable, delay caused by Red Days which occurred during the same period, as doing so would result in the award of multiple days of delay for a single day occurring on the project.

Plaintiff's expert William Manginelli and defendant's expert Stephen Weathers disagreed as to the causes of delay experienced after the September 19, 2013 Stop Work Order was lifted on November 26, 2013. Mr. Manginelli alleged in his revised expert report that, "from November 20, 2013 until April 10, 2014, when the energization of the building was completed, there was [sic] 93 calendar days of delay that can be attributed to the energization of the building and the existence of red days." In Mr. Manginelli's testimony, he stated that he identified the building energization path and the concrete roof path as shifting onto the critical paths of the P-913 project after August 14, 2013. Regarding the concrete roof path, Mr. Manginelli stated:

> So when you talk about the roof, you know, I see in the record the terminology of the roof kind of goes all over the place. For example, there's reference to roof repairs. Those are actually on the underside of the roof, inside the building. Okay?
>
> So it -- it's -- it's a little bit confusing in terms of how the terminology "roof" has been used in the documents, I think. But essentially it's a -- it's a -- it's a built-up component, roof component of -- of structural concrete, waterproofing membranes, and topping concrete.

Mr. Manginelli testified further that "the roof path began to make progress and shifted off the critical path," and, therefore, no longer caused delay to the completion of the work under the Contract. He explained:

> [T]he concrete primer started on November 19th of 2013, with the start of the roof primer. Even though there were concrete repairs that remained, those repairs were underneath the roof itself. They were inside the building. But with the start of the roof primer, the roof itself, the watertight aspects of the roof, began to make progress. And that was, I believe, what was critical to make the building watertight so that -- so that the inside of the building could be completed.

---

[34] Compensation for the structural concrete testing during this period is discussed above in the section covering REA 29.

Regarding the building energization path, which continued to delay the project, Mr. Manginelli testified

> the building energization path, which I believe was concurrently critical with the roof, began to have issues associated with the design itself of the grounding system for the building. And -- and the building had a very sophisticated grounding system. The rebar within the concrete structure itself was all welded and also connected to the grounding system. And so there was a concern that stray currents, you know, anywhere on this site be grounded or directed to the grounding system.

> In April of 2013, the contractor was having trouble installing the grounding rods per the design, and the government altered the design, gave further instructions as to how to accomplish the driving of the grounding rods.

> In October -- October 16th, there were tests performed on that system. And again on October 31st. And those tests failed, and the government went back and made more changes to the design. So that path was continuing on past the -- the November 19th date where the roof primer started.

Mr. Manginelli further testified:

> The building energization path, however, remained delayed. And at this point I believe, for this time period of November 20 to April 10th -- November 20, 2013, to April 10th of 2014, it's solely critical, that is, the builder energization path.

> And I've detailed all these dates in my report, but just to summarize them on this chart here, the government did revise the design on November 27th of 2013. The contractor had some questions with respect to those revisions, and an RFI was issued in December of 2013. The government responded in January. Contractor had further questions. And then there was additional scope added by the government at the end of January.

> * * *

> So the -- so the original design had grounding rods because the tests -- there was a resistance test that the system had to pass. What the government had done was it -- the government designed the system, but then it also required a performance of that system. So you had really a method spec, if you will, which was defined to the contractor how to build it, the grounding system. But then there was also a performance test. And it had to test under 25-ohm resistance. Below -- 25 or below.

And so because this wasn't working, the government added something called grounding wells, which is an entirely different type of grounding system. It caused the contractor to have to now re- -- you know, mobilize different materials and so forth. That occurred at the end of January, the design change occurred at the end of January of 2014.

In March of 2014, the contractor began to install those grounding wells. And once that was done, the tests again failed. And then ultimately the government decided to accept the 30 ohms that the system had been achieving, in essence acknowledging that the system could not meet the performance spec of a 25-ohm max resistance.

* * *

And so shortly thereafter on April 10th, six days later, the -- the building was energized.

As I pointed out in the previous graphic, the plan date for that energization was in the August 14th, 2013, schedule was November 12th of 2013. Actually, actual energization on April 10th of 2014 would be 148 days later.

Thus, plaintiff's expert Mr. Manginelli contended that energization, and more specifically, grounding, was the only critical path after LCC-MZT began to install the roof primer on November 19, 2013 until energization occurred on April 10, 2014.

In Mr. Weathers' expert report, he asserted:

While the Government has acknowledged excusable delay to April 30, 2014 through the grounding building energize issue, it identified that LCC-MZT had incurred concurrent delays of its own through the date the building was energized that would have delayed the project independently from the grounding issue upon which LCC-MZT has focused its argument for entitlement to compensable delay.

Specifically, in order for the building to be energized, LCC-MZT had to complete work within the electrical room including the main switchboard transformers; T1, T2, T3 and T4; numerous electrical panels and all associated electrical conduit beforehand. In addition, LCC-MZT had to submit test reports following installation of the transformers and a building energizing plan for approval prior to energizing the building. Further, as the Government, notes the grounding issue was an independent issue that did not impact electrical room work and that this issue actually impacted the lightning protection system instead. Importantly, as the Government, contends the grounding issue that is the subject of LCC-MZT's delay claim did not actually prevent proper grounding of the equipment required to energize the building (had LCC-MZT actually been complete with all other electrical room work and ready to energize the building prior to the complete

resolution of the grounding issue). In effect, these were two separate paths of work leading to energizing the building. LCC-MZT has evaluated delays to only one of these paths.

Based upon a review of the project schedules, as well as LCC-MZT's Serial Letter 114 April 17, 2015 describing its progress towards energizing the building, CPMI found that LCC-MZT was not complete with electrical room equipment installation related activities until March 20, 2014, the power test report until March 27, 2014, and the energizing plan submission approval until April 7, 2014. Because of these issues the project record indicates that the building could not have been energized by LCCMZT any earlier than it was actually was energized (April 9, 2014) irrespective of any potential restrictions from the grounding issue, testing and RFI questions responses which also extended the building energizing to April 9, 2014 according to LCC-MZT. In response to this conclusion, LCC-MZT argues in Serial Letter 114 that the electrical room equipment was originally planned to be completed well in advance of the actual energizing the building, but that due the ongoing resolution of the grounding issue, there was no need to accelerate completion of the electrical work. Therefore, LCC-MZT essentially claims there was no concurrent delay through its own work to prepare for energizing the building because it was, instead, "pacing" its work in the electrical room along with the resolution of the grounding issue.

(internal references and footnote omitted).

Mr. Weathers also testified that, in addition to energization delays, LCC-MZT experienced continued delays attributable to roofing repairs, which he asserted, in contradiction to Mr. Manginelli's testimony, remained on the critical path after LCC-MZT started to install the roof primer on November 19, 2013, and delayed completion of the project. Mr. Weathers asserted:

Standing on the job December 11, 2013, LCC-MZT, by this schedule, anticipates that the structural roof repairs will be completed by January 28, 2014. I know from reading the project record that Contech does not complete these until March 13th, 2014. A delay from January 28th, 2014, through March 13, 2014.

In LCC-MZT's schedule titled "EHS-25 08-14-13 TIA," which has a data date of August 14, 2013 and appears to have been used by both Mr. Manginelli and Mr. Weathers, LCC-MZT indicates that LCC-MZT intended to have the building energized on November 12, 2013 and that there were seven days of float[35] associated with building

---

[35] "Float is the amount of time an activity can slip in the schedule without impacting the next subsequent activity (i.e., 'free float'), or the amount of time an activity can slip without impacting project completion (i.e., 'total float')." W. Stephen Dale & Robert M. D'Onofrio, Reconciling Concurrency in Schedule Delay and Constructive Acceleration, 39 Pub. Cont.

energization. At trial, Stephen Weathers testified that "[y]ou would at least need to move that date seven workdays out -- seven workdays out, which is close to nine calendar days. So the date that, if you wanted to use this schedule, he [Mr. Manginelli] could have started as of November 21st, 2013." As stated above, LCC-MZT also resumed roof work and began installing the roof primer on November 19, 2013.

The roof repairs appear to have continued until March 13, 2014. In LCC-MZT's memorandum for record, LCC-MZT states that its subcontractor, Contech, completed all of the repairs by "hand patch" on March 13, 2014, which LCC-MZT asserted was longer than anticipated due to failures in Contech's installation produces. To the extent that Contech's failures in roof repair caused delay to the project, such delay would not be considered government caused delay. See George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 237–38 (2005). As discussed above, delay attributed to meeting grounding specifications, however, delayed the completion of the project until April 4, 2014, more than three weeks after roof repairs were completed. Indeed, LCC-MZT's schedule with a data date of February 28, 2014 does not indicate roof repairs as being on the P-913 project's critical path, but does indicate that grounding remained on the critical path.

Regarding grounding, as discussed above, LCC-MZT employee Jeremy Wastweet and PSW Electric owner Scott Wakefield separately testified on the difficulties encountered when attempting to ground the lightning system, including that they were unable to drive the ground rods to the required depth due to the conditions of the ground. After discussing the ground rod issues with NAVFAC, Jeremy Wastweet stated that the ground rods "never did actually meet the requirements of the specification, but the last fix that we applied were ground wells, drilled in ground wells." According to the testimony of William Manginelli, LCC-MZT knew "in January that the grounding system has been changed. The design has been changed. It has to go out and procure materials." During his testimony, when asked whether PSW Electric could energize the building prior to completion of grounding, PSW Electric owner, Scott Wakefield, responded "[a]bsolutely not" because the "specifications required that the grounding resistances be met before the building could be energized" and because "too high of a resistance could result in an electrical shock to the personnel within the building."

Scott Wakefield and plaintiff's attorney Katherine Knudsen had the following discussion during trial:

> Ms. Knudsen: Between -- we know the time frame, about a year I believe you testified, for getting the grounding done to the energization. Did that delay the completion of your work based on what you originally scheduled?
>
> Mr. Wakefield: Through all the grounding systems, it delayed it a little, yes.

---

L.J. at 190. At trial, plaintiff's expert witness William Manginelli stated that "[n]egative float is when you're completing the project after the contract completion date."

Ms. Knudsen: Okay. Did the inability to energize the building earlier -- did that impact any other work that you had to do?

Mr. Wakefield: It did.

Ms. Knudsen: What work?
Mr. Wakefield: Final energizing of the secondary distribution system panels and transformers and lighting and all of the subsystems to be able to test them and -- and for final testing of the systems.

During cross-examination of Scott Wakefield, Department of Justice attorney Kelly Krystyniak and Mr. Wakefield had the following discussion:

Ms. Krystyniak: So you also testified that specifications of the contract required the building be grounded before it's energized. Do you recall that testimony?

Mr. Wakefield: I do.

Ms. Krystyniak: Okay. But it's not the case that you can't work on the grounding system of the building and the energization at the same time, correct?

Mr. Wakefield: Define "work on."

Ms. Krystyniak: Sure. Did you complete everything that you needed to do in order to energize the building -- just had to turn on the switch -- before you started working on the grounding system?

Mr. Wakefield: No.

Ms. Krystyniak: No. Those two paths are going on at the same time, correct?

Mr. Wakefield: Correct.

Ms. Krystyniak: Okay. And so, in fact, you might be able to energize the building before grounding is completed, but you also might not be able to, right?

Mr. Wakefield: You absolutely cannot.

Ms. Krystyniak: Both have to be done at the same time, right?

Mr. Wakefield: Both have to be complete before you can energize.

Ms. Krystyniak: Okay. Complete and done I understand are kind of terms of art. So the work has to be complete before you are able to energize, but the work to prepare for energization is going on at the same time as the work to prepare for grounding?

Mr. Wakefield: Correct.

According to Scott Wakefield and Jeremy Wastweet, NAFVAC issued a variance and changed the twenty-five ohms requirement to thirty ohms, which PSW Electric was able to satisfy. Mr. Wakefield asserted that it took "close to a year" from the time PSW Electric began its grounding efforts to when PSW Electric was permitted to energize the building. NAVFAC appears to have accepted thirty ohms for the purposes of grounding on April 4, 2014.

According to Mr. Weathers' testimony, however, which was discussed above, and which the court found credible, "the grounding issue was an independent issue that did not impact electrical room work." Mr. Weathers testified:

> [I]n order for the building to be energized, LCC-MZT had to complete work within the electrical room including the main switchboard transformers; T1, T2, T3 and T4; numerous electrical panels and all associated electrical conduit beforehand. In addition, LCC-MZT had to submit test reports following installation of the transformers and a building energizing plan for approval prior to energizing the building.

LCC-MZT's schedule with a data date of May 30, 2014 indicates that LCC-MZT did not finish installing the transformers until March 20, 2014.[36] Thereafter, LCC-MZT submitted its building energization plan on March 25, 2014, which was rejected by NAVFAC on April 1, 2014, and subsequently resubmitted by LCC-MZT to NAVFAC on April 4, 2014, and finally approved by NAVFAC on April 7, 2014. Thus, although grounding delayed the completion of the project until April 4, 2014, it appears that LCC-MZT, notwithstanding the grounding delay, was not able to energize the building, at the earliest, until April 7, 2014, because it experienced independent delays in completing other electrical room work necessary for building energization, such as installing the transformers and getting the building energization plan approved.

In William Manginelli's expert rebuttal report, Mr. Manginelli stated:

> According to LCC-MZT, once it realized the extent of the delay to the grounding work there was no need to meet the dates originally set forth for work related to the electrical room such as the installation of transformers and panels. Therefore, CPMI's allegations that LCCMZT was not, "pacing"

---

[36] At trial, Scott Wakefield of PSW Electric did not have a precise recollection of when the transformers were installed, stating that he "[t]hought it was February, early to mid-February" in 2013.

the electrical room work as a result of the delay to the grounding path is unsupported and contrary to the contemporaneous knowledge of the parties. A contractor may "pace" the work on one path because delays on the critical path create float in the other paths of work, creating the opportunity to perform some work more efficiently at a slower pace.

During cross-examination, Department of Justice attorney Kelly Krystyniak questioned Mr. Manginelli with respect to the above-quoted paragraph in his expert rebuttal report, and Mr. Manginelli testified that his "understanding" of LCC-MZT pacing the electrical room work came from "conversations John King," LCC-MZT's scheduler, interim project manager and claims consultant. Mr. Manginelli further testified on cross-examination as to the work needed to energize the building:

Ms. Krystyniak: My question to you was: If grounding doesn't occur until April but they're also not ready to turn on the lights until pretty soon close to there because of delay on the contractor's part, wouldn't that be concurrent delay? To which I believe you responded that they were -- they knew that the grounding was going to be driven out, and so maybe they slowed down intentionally, something along those lines? Or they diverted work?

Mr. Manginelli: I think what I said was I can't speak to intention. What I can speak to is priorities, right? So what happens in -- when you're managing all the various priorities -- let's -- let's -- let's say we're standing in January of -- where are we, 2014 now, right? We're standing in January. We just got brand new work scope from the government for the grounding system. We still have other components of the electrical system to install.

I think you asked me if they were -- if they slowed down the other work because of the -- the grounding scope, and I said I can't speak to their intent.

The -- what you have is a situation where you're managing priorities. So there's a -- there's a term that's -- that's -- that's thrown around that's used in our industry called "pacing," right? And the -- the idea there is that, as your priorities are focused on one thing more than the other, then the lesser priority work may slow down.

Whether that's intentional, whether there's some reason to have it intentional, there may be, there may be a cost savings to slow it down -- whether that's intentional or not, I can't really speak to. But I do think that that is what occurred during this time frame. In other words, the priorities became the grounding system over completing the internal mechanical and electrical room, which includes the transformers and some other components.

* * *

102

Ms. Krystyniak: So your conclusion that they intentionally -- I wouldn't use the word pacing -- your conclusion that they intentionally paced the work for the energization was again based on conversations with MZT and not independently verified?

Mr. Manginelli: No. I think that what I just testified to was that I don't know whether Mr. King's statement here is true. I don't know whether they intentionally paced or whether it was just a function of the priorities of having new work. I believe that either way the priorities of having new work are the important factor here. He indicated this statement, which I put in the rebuttal report, but that is not what -- it's not a driving factor for me in my conclusion.

* * *

Mr. Manginelli: What's a driving factor for me in my conclusion is the fact that there was new work scope that had to be planned and executed, and that that would have taken for any contractor a priority over the completion of the known work scope.

As indicated from the exchange at trial immediately above, Mr. Manginelli's conclusion that LCC-MZT's team was pacing its work is based on speculation and unverified conversations with John King. In plaintiff's post-trial brief, plaintiff does not cite to evidence to support that LCC-MZT's team was pacing the work necessary to energize the building in conjunction with the grounding work. LCC-MZT, therefore, has failed to show that LCC-MZT suffered a compensable delay due to the faulty grounding work because, as discussed above, it was concurrent with LCC-MZT's delay related to other aspects of building energization, including installing the transformers and getting the building energization plan approved. See United Constructors, LLC v. United States, 95 Fed. Cl. 26, 40 (2010) ("The general rule is that where both parties contribute to a delay, neither can recover damages." (citing P.R. Burke Corp. v. United States, 277 F.3d at 1359–60)).

On August 1, 2016, Eileen Mitchell, Chief of the NAVFAC Contracting Office, issued a contracting officer's final decision stating that the "Administrative Contracting Officer determined merit for the differing site condition associated with PC [Proposed Change] 0025," related to the grounding issue, and provided LCC-MZT with $28,438.37, plus interest, and 135 days of excusable delay. On August 17, 2016, Dana Bolte unilaterally issued Modification 24 to the Contract which increased the value of the Contract by $48,533.74 for the grounding issues LCC-MZT experienced during construction. Modification 24 states that it incorporates Chief of NAVFAC Contracting Office Eileen Mitchell's August 1, 2016 final decision and provides:

(2) An extension of time is required by reason of this modification. The contract is modified as follows:

a. The Substantial Completion Date (SCD), as further defined in 5252.211-9301 ~ Phased Construction Schedule, is hereby extended by one-hundred-thirty-five (135) calendar days to April 30, 2014. Liquidated damages, as further defined in 52.211-12, remain unchanged.

b. The Contract Completion Date (CCD), as further defined in 5252.211-9301 ~ Phased Construction Schedule, is hereby extended by one-hundred-thirty-five (135) calendar days to July 1, 2014. Liquidated damages, as further defined in 52.211-12, remain unchanged.

(capitalization in original). Modification 24 was the last adjustment by NAVFAC to the plaintiff's Contract's Substantial Completion Date, which was changed from December 16, 203 to April 30, 2014, and the Contract Completion Date, which was changed from February 16, 2014 to July 1, 2014.

At trial, NAVFAC scheduler Casey Caughie testified that Dana Bolte, who issued Modification 24 to the Contract, had asked him prior to the issuance of Modification 24 to consider LCC-MZT's time impact analysis for the grounding issue, as well as Red Days which occurred during that time period. At trial, while looking at a March 10, 2015 memorandum that he prepared for Mr. Bolte prior to the issuance of Modification 24, Mr. Caughie testified that:

Dana [Bolte] also told me to consider the red days again. And at that point the contractual substantial completion date was the 16th of December of 2013. So what he described to me to do was to say that up to that point red days are under the contract and after that point it's outside of the contract period, so give them all the red days for lost work that -- that happens after that date.

Casey Caughie's March 10, 2015 memorandum indicates that he concluded that there were thirty Red Days occurring between December 16, 2013 and April 9, 2014. Modification 24, therefore, appears to have incorporated the thirty Red Days found by Mr. Caughie between December 16, 2013 and April 9, 2014 within the 135-day extension in Modification 24, and awarded LCC-MZT with excusable, non-compensable delay related to those thirty Red Days.

Casey Caughie's March 10, 2015 memorandum does not, however, appear to account for the five Red Days which occurred on November 20, 2013, November 21, 2013, November 25, 2013, November 26, 2013, and November 27, 2013. Based on the Contractor Production Reports, the anticipated Red Days on November 20, 2013 and November 21, 2013 were canceled at the end of the previous respective days, without time for LCC-MZT to schedule any deliveries. Although the anticipated Red Days on November 20, 2013 and November 21, 2013 were canceled, as discussed above, per the Contract's Specifications, LCC-MZT could be entitled to one day of excusable delay for each anticipated Red Day. As also discussed above, provided there was a delay to the critical path, LCC-MZT could be entitled to compensable delay for anticipated Red Days

under the following three circumstances: (1) if LCC-MZT's workers could not work for more than fifty percent of a Red Day; (2) there were more than ten Red Days on working days in a single month; or (3) there was a scheduling change related to an anticipated Red Day with less than forty-eight hours' notice to plaintiff. Because Red Day operations were canceled within forty-eight hours' notice on November 20, 2013 and November 21, 2013, those two days meet the requirements and could be considered excusable and compensable days of delay according to the Contract's Specifications. As discussed above, however, compensability also is dependent on whether the delays affected the project's critical path. See Fireman's Fund Ins. Co. v. United States, 92 Fed. Cl. at 666. Because the anticipated Red Days operations on November 20, 2013 and November 21, 2013 were canceled, it is unclear what impact, if any, these cancellations had on the critical path. Although the Contractor Production Reports for these two days indicate that deliveries could not be rescheduled because of the short notice, there is no indication that the inability to reschedule the deliveries affected work items which were on the critical path on these two days, and plaintiff has not provided evidence to support that scheduled work items which were on the critical path on these two days were otherwise affected by the cancellation of these two anticipated Red Day operations. As explained in Mr. Weathers expert report, the cancellation of the anticipated Red Days in November 2013 "should not be considered compensable as no impact to the critical progress was demonstrated," and plaintiff's expert Mr. Manginelli did not specifically address the cancellation of the anticipated Red Days in November 2013 in his revised expert report. Because plaintiff has not demonstrated impact to the critical path, plaintiff is entitled to excusable delay for November 20, 2013 and November 21, 2013, but not compensable delay. For the remaining November 2013 Red Days not accounted for in Mr. Caughie's March 10, 2015 memorandum, the Red Day operations on November 25, 2013 were limited to 114 minutes and the Red Day operations on November 26, 2013 were limited to twenty-eight minutes, both of which are less than fifty percent of the working hours on those days. Red Day operations on November 27, 2013 also were limited to less than fifty percent of the work hours, with only 119 minutes of activity related to Red Day operations. The Contractor Production Reports for November 25, 2013, November 26, 2013, and November 27, 2013 also do not indicate that Red Day operations were scheduled with less than forty-eight hours' notice. LCC-MZT, therefore, is entitled to excusable delay for those five days in November 2013 not accounted for in Mr. Caughie's March 10, 2015 memorandum, but none of them are compensable.

Mr. Caughie also did not account for the Red Days occurring in December 2013 prior to December 16, 2013, which was, as discussed above, the date from which Modification 24's Substantial Completion Date was extended, and the date beginning which the time extension in Modification 24 included Mr. Caughie's tally of remaining Red Days which had occurred during the P-913 project. According to a list prepared by plaintiff's expert William Manginelli,[37] there were four Red Days which occurred during

_____

[37] The court notes that unlike Mr. Manginelli, defendant's expert Mr. Weathers did not prepare a list of every Red Day occurring after August 14, 2013. Instead, Mr. Weathers separated the number of Red Days occurring within different time periods, without stating the exact days on which a Red Day occurred. Although the court refers to Mr. Manginelli's

that time period. Based on the Contractor Production Reports, on December 12, 2013, there were 220 minutes of Red Day operations, which is less than fifty percent of LCC-MZT's working hours on December 12, 2013. On December 13, 2013, the Red Day operations occurred for only 140 minutes. LCC-MZT's December 14, 2013 Contractor Production Report does not indicate that there were Red Day operations or that December 14, 2013 was scheduled as a Red Day but subsequently canceled with less than forty-eight hours' notice, and LCC-MZT, therefore, is not entitled to an excusable or compensable delay on December 14, 2013. On December 16, 2013, there were 134 minutes of Red Day operations, which is less than fifty percent of LCC-MZT's working hours. The Contractor Production Reports for December 12, 2013, December 13, 2013, and December 16, 2013 do not indicate that Red Day operations were scheduled with less than forty-eight hours' notice. Thus, LCC-MZT is entitled to three days of excusable, delay for Red Days occurring in December 2013 prior to December 16, 2013, but none of the three days are compensable.

According to Mr. Manginelli's chart, there were twenty-five Red Days on working days between December 16, 2013 and April 9, 2014. As stated above, Modification 24's 135-day extension incorporated Mr. Caughie's count of thirty Red Days during this timeframe. The discrepancy between the twenty-five Red Days counted by Mr. Manginelli, and the thirty Red Days counted by Mr. Caughie is unclear, as Mr. Caughie did not list the dates of the alleged thirty Red Days in his March 10, 2015 memorandum. Upon the court's review of the Contractor Production Reports of the Red Days listed in Mr. Manginelli's chart, none of the Red Days occurring between December 16, 2013 and April 9, 2014 had Red Day operations impacting more than fifty percent of LCC-MZT's eight-and-a-half working hours or indicated that Red Day operations were scheduled with less than forty-eight hours' notice, and, as indicated above, December 2013, January 2014, February 2014, and March 2014 did not have more than ten Red Days a month on work days. LCC-MZT, therefore, is not entitled to additional compensation for Red Days experienced between December 16, 2013 and April 9, 2014.

From April 9, 2014 to May 30, 2014, the only delays identified by the parties' experts were delays related to Red Days. For the month of April 2014, as discussed above, Red Days occurring from April 1, 2014 to April 9, 2014 were accounted for in the 135-day extension awarded in Modification 24. After review of the Contractor Production Reports, however, the court counted eleven total Red Days on work days in the month of April 2014, eight of which occurred after April 9, 2014. LCC-MZT, therefore, is entitled to eight days of excusable delay for the month of April 2014. In addition, although none of the Contractor Production Reports for the Red Days in April 2014 indicate that Red Day operations impacted for more than fifty percent of LCC-MZT's working hours on those days or that the Red Days were scheduled with less than forty-eight hours' notice, the Contract's Specifications in paragraph 1.2.1 of section 01 14 00, state that "10 work days a month will be impacted by convoys and operations at the Explosive Handling Wharf

list of Red Days, the court also conducted extensive review of the Contractor Production Reports in the record before the court, thereby verifying the accuracy of Mr. Manginelli's list.

Area." The Contract's Specifications in paragraph 1.6.2.6 of section 01 32 17.00 20 states that the "contractor may request an adjustment in accordance with the contract clauses and the terms of this section (including the allocation of Float) if an activity's number of actual adverse delay days exceeds the scheduled number of days anticipated and cause delay to project completion." Because there were more than ten days of Red Days on working days in April 2014, LCC-MZT is entitled to an adjustment of both time and money for the eleventh Red Day in April 2014, as the extra Red Day was a change from the number of anticipated Red Days in the Contract's Specifications. The last Red Day occurring in April 2014 was on April 30, 2014. According to LCC-MZT's EHS-33 schedule with a data date of March 31, 2014, LCC-MZT intended to engage in work on the P-913 project's critical path on April 30, 2014. LCC-MZT, therefore, is entitled to one day of excusable, compensable delay for April 30, 2014. Although LCC-MZT could be entitled to the labor rates of when its laborers were sequestered on April 30, 2014, because April 30, 2014 constitutes a day of compensable delay, and the Red Day operations are documented in LCC-MZT's April 30, 2014 Contractor Production Report, LCC-MZT's REA 27 does not contain the necessary labor rates for the court to calculate damages related to sequestration, and plaintiff did not provide any additional documentation or any testimony at trial about the labor rates for April 30, 2014. In sum, from April 9, 2014 to April 30, 2014, LCC-MZT is entitled to eight days of excusable delay, one day of which is considered compensable delay.

In May 2014, there were six Red Days occurring on working days. On May 8, 2014, there were 258 minutes of Red Day operations, which exceeds fifty percent of LCC-MZT's scheduled eight-and-a-half working hours for May 8, 2014. LCC-MZT's May 8, 2014 Contractor Production Report indicates that LCC-MZT was working on NAVFAC's punch-list on May 8, 2014, which LCC-MZT's EHS-34 schedule with a data date of April 30, 2014 identifies as being on the P-913 project's critical path. LCC-MZT, therefore, is entitled to on day of excusable, compensable delay for May 8, 2014. LCC-MZT's Contractor Production Reports for the remaining Red Days in May 2014 do not indicate that any of the Red Day operations occurred for more than fifty percent of LCC-MZT's working hours or were scheduled with less than forty-eight hours' notice. The Contractor Production Report for May 28, 2014 states, however, that LCC-MZT was notified at 1:00 p.m. that the following day, May 29, 2014, was going to be a Red Day. Therefore, LCC-MZT is entitled to one day of excusable, compensable delay for May 29, 2014, as the Red Day operations were scheduled with less than 48 hours' notice, provided that there was a delay to the critical path. As with the Contractor Production Report for May 8, 2014, the Contractor Production Report for May 29, 2014 indicates that LCC-MZT was working on NAVFAC's punch-list on May 29, 2014, which LCC-MZT's EHS-34 schedule with a data date of April 30, 2014 identifies as being on the P-913 project's critical path. In addition, LCC-MZT's May 29, 2014 Contractor Production Report indicates that LCC-MZT also was working on "site prep & fence construction," which "came to a halt" during the May 29, 2014 Red Day operations. LCC-MZT's EHS-34 schedule with a data date of April 30, 2014 indicates that the "Perimeter Fence" activity was scheduled to be completed on May 16, 2014, and had ten days of float. By May 29, 2014, the ten days float associated with fencing had thus expired, and the perimeter fence activity, in addition to NAVFAC's punch-list, also was on the critical path. LCC-MZT, therefore, is entitled to one day of

excusable, compensable delay for May 29, 2014, as the Red Day operations were scheduled with less than forty-eight hours' notice and delayed the critical path. In sum, for May 2014, LCC-MZT is entitled to six days of excusable delay, two days of which are compensable, for May 8, 2014 and May 29, 2014. Similar to the April 30, 2014 Red Day, LCC-MZT might be entitled to the labor rates of when its laborers were sequestered on May 8, 2014 and May 29, 2014, as the Red Day operations are documented in LCC-MZT's Contractor Production Reports for those two days, but, as with the April 30, 2014 Red Day, LCC-MZT's REA 27 does not contain the necessary labor rates for the court to calculate damages related to sequestration.

In LCC-MZT's EHS-35 schedule with a data date of May 30, 2014, LCC-MZT listed a substantial completion date of May 30, 2014. NAVFAC, however, recognized substantial completion on June 11, 2014. In William Manginelli's revised expert report, Mr. Manginelli stated that "NAVFAC began using the project, allowing other contractors and government employees to occupy the facility and the project site as of May 28, 2014, which, according to LCC-MZT, met the definition of substantial completion that was agreed to when substantial completion was establish [sic] in A00009." The May 28, 2014 letter Mr. Manginelli refers to in his revised expert report is a letter from NAVFAC stating that "you are notified that the following Government Contractors or Government individuals are approved for access to your site" beginning on June 1, 2014. In Mr. Weathers' expert report for defendant, Mr. Weathers stated:

> It appears that LCC-MZT's own issues with completing the work and punchlist contributed to, if not drove, the delays to substantial completion through June 2, 2014. LCC-MZT's analysis has not addressed its slow progress. However, based upon a review of the project record, it is noted that several modifications were issued during the timeframe leading to substantial completion with several being issued after substantial completion.

Mr. Weathers concluded that "it would be fair to characterize" the delay "through June 2, 2014 as excusable and non-compensable." Mr. Weathers, however, did not attempt to characterize the delay, or otherwise explain why there was a delay from June 2, 2014 until NAVFAC recognized substantial completion on June 11, 2014.

Modification 9 provides:

| Phase | Description | Start Date | Completion Date |
|-------|-------------|------------|-----------------|
| A | SUBSTANTIAL COMPLETION. Completion of all on-site construction efforts identified in the contract documents for CLIN 0001 less work identified as punch list items or administrative submittals required for contract closeout as identified in Phase B below. Substantial completion is achieved upon issuance of a Final Building Occupancy Date (BOD) letter. Punch list work is limited to work that does not preclude the Government use of the construction work. Warranty period begins as specified in each partial BOD letter. | Contract Award Date | November 15, 2013 |
| B | CONTRACT CLOSE-OUT. Documents necessary to close out the contract such as OM&N, as-builts, admin submittals necessary to close out the contract for CLIN 0001. Documents necessary for final inspection and acceptance are not included as close out submittals. | Determined by Contractor | January 15, 2014 |

In LCC-MZT's Contractor Production Reports for May 28, 2014, May 29, 2014, and May 30, 2014, LCC-MZT states that it was performing punch-list work as well as "Sack & Patch misc.," "site prep & fence construction," and "install benches at bathroom 119 & 138." LCC-MZT, therefore, was completing work through May 30, 2014. NAVFAC's May 28, 2014 letter indicates that NAVFAC began allowing its contractors to use the P-913 building on June 1, 2014, which indicates that LCC-MZT received a building occupancy date letter on May 28, 2014. LCC-MZT, however, was still completing non-punch-list work as of May 28, 2014, and LCC-MZT's own schedule does not indicate a substantial completion date until May 30, 2014. May 31, 2014 was a Saturday and June 1, 2014 was a Sunday, which are non-work days. LCC-MZT's Contractor Production Reports from June 2, 2014 through June 11, 2014 indicate that LCC-MZT was completing punch-list work and cleaning the site. The court concludes that NAVFAC incorrectly defined substantial completion under LCC-MZT's Contract as occurring on June 11, 2014,[38] and that substantial completion instead occurred on June 2, 2014, the Monday after NAVFAC informed LCC-MZT that its contractors were authorized to use the P-913 building and when LCC-MZT only had punch-list work remaining to complete. LCC-MZT, therefore, is entitled to nine days of excusable, compensable delay, as NAVFAC's delayed issuance of substantial completion appears to be the sole cause of the delay after June 2, 2014 to June 11, 2014.

---

[38] According to LCC-MZT's June 11, 2014 Contractor Production Report, SWFPAC inspected the P-913 facility on June 11, 2014, at 2:00 p.m.

Based on the court's above discussion, LCC-MZT is entitled to the following delays, as summarized in the below chart:

| Time Period | Excusable Delay | Compensable Delay |
|---|---|---|
| August 15, 2013 to September 16, 2013 | 4 days | 1 day |
| September 17, 2013 to November 19, 2013 | 63 days | 63 days |
| November 20, 2013 to December 16, 2013 | 8 days | 0 days |
| December 17, 2013 to April 9, 2014 | 0 days | 0 days |
| April 10, 2014 to May 30, 2014 | 14 days | 3 days |
| May 31, 2014 to June 11, 2014 | 9 days | 9 days |
| **Total** | 98 days of excusable delay | 76 days of compensable delay |

As indicated in the above chart, LCC-MZT is entitled to ninety-eight days of excusable delay, seventy-six of which constitute compensable delay. In Modification 24, NAVFAC set the Contract's Substantial Completion Date as April 30, 2014 and the Contract Completion Date as July 1, 2014. A ninety-eight-day extension of time extends the Substantial Completion Date to August 6, 2014 and the Contract Completion Date to October 7, 2014.

NAVFAC has continued to retain $185,346.00 in liquidated damages due to LCC-MZT's alleged late completion. On August 10, 2016, contracting officer Dana Bolte sent a letter to LCC-MZT stating that the "Government agrees to release all potential LD's [liquidated damages] for Phase B equaling $157,384." (capitalization in original). As discussed above, Modification 9 established that Phase A liquidated damages were to be applied if substantial completion was not achieved by the Substantial Completion Date, whereas Phase B liquidated damages were to be applied if contract completion was not achieved by the Contract Completion Date. Dana Bolte's August 10, 2016 letter stated that LCC-MZT remained subject to potential liquidated damages for Phase A. During his testimony at trial, Mr. Bolte also testified that Phase B liquidated damages were released to LCC-MZT, but he indicated that Phase A liquidated damages had not been released to LCC-MZT. The $185,346.00 in liquidated damages, therefore, appear to be liquidated damages withheld as Phase A liquidated damages. Based on the court's above conclusions, the revised Substantial Completion Date under the Contract becomes August 6, 2014, which the court found that LCC-MZT achieved on June 2, 2014. Consequently, NAVFAC cannot withhold Phase A liquidated damages, and LCC-MZT is entitled to $185,346.00, which NAVFAC is inappropriately withholding as liquidated damages. LCC-MZT may also be entitled to interest on the amount of liquidated damages

withheld, which is discussed below.

REA 32 – Additional Field Overhead

In REA 32, LCC-MZT seeks an adjustment of $956,578.00 due to costs associated with additional field office overhead, also known as extended field office overhead incurred due to alleged government delays. In its post-trial brief, plaintiff states that $390,480.00 for field office overhead was compensated through modifications, and that the $956,578.00 requested in REA 32 does not include amounts previously awarded for field office overhead in earlier modifications. As discussed below, LCC-MZT and its expert, Mr. Manginelli, asserted that LCC-MZT had a daily rate for field office overhead of $3,119.00, and that LCC-MZT is entitled to $3,119.00 multiplied by the number of compensable days of delay.

In defendant's post-trial brief, defendant states:

Defendant does not contest that, should the Court find that LCC-MZT is entitled to recover any direct costs, it would be entitled to a "10/5/3" markup on those costs.[39] However, by seeking to recover both direct costs with markup, and a daily rate for 177 days of delay, it seeks to recover twice which, as Mr. Bolte explained, is impermissible double-dipping.

Defendant also asserts that, "because field office overhead is largely labor, Mr. Weathers [defendant's expert] estimates that REA 32 includes 4,600 LCC-MZT labor hours. LCC-MZT, similarly, cannot recover these costs twice." (internal references omitted). Defendant alternatively argues that "[s]hould the Court determine that LCC-MZT is entitled to recover a daily rate for field office overhead, it should adopt the rate calculated by" defendant's expert Mr. Weathers, at $2,733.00 per day, "rather than" plaintiff's expert Mr. Manginelli's rate of $3,119.00 per day, because "neither LCC-MZT nor Mr. Manginelli have ever clarified which components make up Mr. Manginelli's daily rate." In plaintiff's post-trial brief, plaintiff argues that defendant's application of the "10/5/3" markup rates to plaintiff's REA for additional field office overhead is "nonsensical" because the "10/5/3 rule applies to direct costs -- field office overhead represents an indirect costs, not a direct cost." Plaintiff asserts that defendant's interpretation of the 10/5/3 rule "would mean that a contractor could not recover field office overhead, which would be advance and implicit waiver of such costs based on the 10/5/3 contractual provision."

---

[39] NAVFAC contracting officer Dana Bolte testified regarding the "10/5/3" approach as follows:

So they get 10 percent on the prime's direct cost. So any -- any work, direct work or direct costs MZT had, they get a 10 percent markup. On the 5 percent, any of their subs' direct costs, they get a 5 percent markup on. And then the 3 percent is home office.

Mr. Bolte asserted that LCC-MZT elected in its proposal to receive the "10/5/3" markup on "any change to the contract."

A Judge of this court had stated that "[f]ield overhead costs, otherwise known as jobsite overhead, are administrative costs that 'increase as a result of passage of time on a project,' such as field worker salaries, work trailer costs, and temporary utility fees." JMR Constr. Corp. v. United States, 117 Fed. Cl. at 441 (quoting WILLIAM SCHWARTZKOPF & JOHN J. MCNAMARA, CALCULATING CONSTRUCTION DAMAGES 157-58 (2000)); see also George Sollitt Constr. Co. v. United States, 64 Fed. Cl. at 242 (stating that an extended field office overhead claim "requests damages for costs that are increased due to maintaining a presence at the construction site for a longer period than originally anticipated in the bid"). "Field office overhead refers to fixed periodic costs incurred at the contractor's field office. Examples are rent paid for a job trailer, field office telephone expense, and salaries of clerical workers stationed in the field office." JAMES ACRET & ANNETTE DAVIS PERROCHET, CONSTRUCTION LITIGATION HANDBOOK § 7:16 (3d ed. 2020).

Another Judge of the Court of Federal Claims indicated:

The recovery of home office[40] and field office overhead is intended to compensate a contractor for delays in contract performance caused by the Government. The theory for this recovery is that the contractor plans for the expenditure of resources on a project based upon the expected duration of the project, and if a project extends for a longer duration than planned, a greater level of resources must be devoted to the project. When the delay is the responsibility of the Government, it is appropriate for the contractor to recover the increased expenditure of overhead resources caused by the delay.

Delhur Indus., Inc. v. United States, 95 Fed. Cl. 446, 467 (2010) (citations omitted). Extended field overhead costs, if proven, are potentially recoverable in this court. See JMR Constr. Corp. v. United States, 117 Fed. Cl. at 441; see also K-Con Bldg. Sys., Inc. v. United States, 107 Fed. Cl. at 597 ("There is no question that, as a general rule, a contractor can recover extended overhead as damages for government-caused delay." (citations omitted)); George Sollitt Constr. Co. v. United States, 64 Fed. Cl. at 242 ("Extended field office overhead also may sometimes be recovered as delay damages.").

At trial, NAVFAC contracting officer Dana Bolte and Department of Justice attorney Ms. Murdock-Park had the following exchange about the "10/5/3" approach:

---

[40] Whether LCC-MZT is entitled to recovery of unabsorbed home office overhead, also known as extended home office overhead, is discussed below when addressing plaintiff's REA 34 – "Extended Home Office Overhead." Examples of home office overhead include "expenses incurred at the contractor's home office," include rent, salary, and telephone expense. See JAMES ACRET & ANNETTE DAVIS PERROCHET, CONSTRUCTION LITIGATION HANDBOOK § 7:16.

Ms. Murdock-Park: Have you ever heard of the concept of 10/5/3?

Mr. Bolte: Yeah, that's a -- if you're referring to field office overhead, that is -- 10/5/3 is a percentage, 10 percent/5 percent/3 percent. It's a NAVFAC standard for a con- -- it's a choice a contractor can accept to recoup field office overhead, extended field office overhead.

Ms. Murdock-Park: What is the other choice that the contractor could make? Mr. Bolte: They could go with a different method of a daily rate, or we negotiate a daily rate, and that cost would be applied if we ever extended the contract due to government-caused delays. That's a method.

They could use -- they could charge those overhead costs as a direct cost. That's allowable per the FAR. And there's the percentage method where they accept the NAVFAC alternate. There's also, if they didn't want the 10 percent/5 percent/3 percent standard, they could negotiate higher rates.

On cross-examination, Mr. Bolte and plaintiff's attorney Craig Ramseyer had the following discussion about the 10/5/3 markup:

Mr. Ramseyer: There was a little discussion about, on Friday [on direct examination], with regard to the 10/5/3 mechanism for markups; correct?

Mr. Bolte: Yes.

Mr. Ramseyer: And I think the feeling was, for instance, a 10 percent on a -- on another direct cost was a markup to cover field overhead; correct?

Mr. Bolte: Extended field office overhead, yes.

Mr. Ramseyer: And you understand that field overhead is a function of time?

Mr. Bolte: Not necessarily.[41]

---

[41] Plaintiff's expert William Manginelli described extended field office overhead as "time-related costs," testifying:

[T]he field overhead costs are costs that are required to keep the job progressing every day. So we characterize these as -- as -- as primarily time-related costs in that the theory is that, if the job goes longer, these costs continue to carry on, if you will.

So the easiest example is the -- the field trailer that the -- that the project manager is working out of, the Porta-Johns, things like that, that are not related to any particular item of work but are simply required in order to stay on the job.

Mr. Ramseyer: Well, each day a contractor's out there, he's incurring costs for that trailer and the supervisors that cost part of that, the water and the drinking fountain, the power to the site. Those are all parts of field overhead in your recollection; correct?

Mr. Bolte: Yes.

Mr. Ramseyer: And the longer that goes on, the longer he has to pay that; right?

Mr. Bolte: Yes.

Mr. Ramseyer: And in your experience, that field overhead expense pool is normally taken down to, like, a daily rate?

Mr. Bolte: That's an option the contractor can choose.

Mr. Ramseyer: All right. So when the -- when you have a time-related damage such as this, there's -- and the claim is that it is extended field overhead, there's no direct costs to mark up. The very damage is the extended field overhead; correct?

Mr. Bolte: If -- so with the 10 percent/5 percent/3 percent rule, it doesn't matter if the contract is extended or not. MZT only got those percentage markups for field office overhead.

Mr. Ramseyer: On the direct costs?
Mr. Bolte: On direct costs, yes.

Mr. Ramseyer: Right?

Mr. Bolte: It's -- it is a risk which method you decide to choose.

Mr. Ramseyer: So if, in fact, the contract has been delayed hypothetically for six months and the only damage the contractor is seeking is that six months, extra months that that trailer's out there and the power's coming to the site, you're spending money on water and supervisors and all that, there's no direct costs to mark up. The very damage you're seeking is that six months; right?

Mr. Bolte: Yes.

In the Contract, paragraph 4, titled "**Change Order Markup Rates**," provides:

In accordance with Section 00100, as part of the Contractor's proposal the contractor shall provide proposed modification/change order percentage rates, for field overhead, home office overhead, primes overhead on subcontractors (for construction work only), and proposed profit. Markup rates for design firms will be negotiated when needed. The proposed change order markup rates will be awarded as part of the contract and will be used as the markup for both additive and deductive modifications for both prime and all subcontractors for modifications totaling up to a cumulative total value of 10% of the base bid amount. Any modification exceeding 10% (cumulative total value) of the original contract amount will be negotiated in accordance with FAR Part 15, DFARS Part 215, and any other applicable Federal Regulations.

(capitalization and emphasis in original).

LCC-MZT's proposal for the P-913 project was not offered or admitted into evidence, although it is listed on plaintiff's pre-trial exhibit list. As discussed above, however, NAVFAC contracting officer Dana Bolte testified that, "for this contract, they [LCC-MZT] bid 10 percent/5 percent/3 percent,"[42] with the ten percent accounting for LCC-MZT's "[e]xtended field office overhead." Plaintiff does not dispute that it proposed, and that LCC-MZT and NAVFAC agreed to such figures for the markup rates described in paragraph 4 of the Contract, and that such markup rates were incorporated into the various modifications which occurred throughout the project. Paragraph 4 of the Contract, quoted above, did not, however, prevent LCC-MZT from requesting or recovering damages for the additional field office overhead expenses incurred by LCC-MZT over the time in which the project was extended due to government-caused delay, which the court found, above, was seventy-six days of compensable delay, with such delay going unrecognized by NAVFAC, and unawarded by way of any previous modification or change order executed during the project. LCC-MZT would be entitled to such additional field office overhead consistent with the seventy-six days of compensable delay found by the court, provided the court is able to determine the quantum of damages, which, as discussed below, the parties' experts propose can be determined by a daily rate of field office overhead incurred throughout the project, which is discussed below. The court notes, however, that in a number of REAs before the court, including REA 32, LCC-MZT added a ten percent markup on top of the base costs requested, as well as a five percent markup for "Prime Mark Up on Subcontractors," a three percent markup for "Prime Home Office Overhead," and a three percent markup for "Prime Profit." To the extent that LCC-

---

[42] The fourth markup rate discussed in paragraph 4 is "proposed profit," which, for a reason which is unclear, was not included as part of Mr. Bolte's general discussion of the "10/5/3" markup rates. In a number of LCC-MZT's REAs before the court, LCC-MZT also requests a three percent markup related to "Prime Profit." (capitalization in original). In addition, LCC-MZT submitted an REA for "Additional Profit," which is discussed below. (capitalization in original).

MZT requests an additional ten percent markup related to field office overhead on top of its requested base costs in REA 32, which, allegedly, represents the total amount of additional field office overhead incurred on the project, less the amount previously awarded to LCC-MZT through the various contract modifications, such additional markup would be unallowable as duplicative. In sum, LCC-MZT is not prevented or limited by paragraph 4 from receiving the extended field overhead costs requested in REA 32, but is limited to extended field overhead costs in accordance with court's finding above that LCC-MZT is entitled to seventy-six days of compensable delay.

As discussed above, plaintiff's and defendant's experts proposed different daily rates for the court to use for calculating extended field office overhead on the project. Plaintiff's expert witness William Manginelli stated in his revised expert report that LCC-MZT's daily field overhead rate should be $3,119.00. Mr. Manginelli's revised expert report provided:

> A review of LCC-MZT project costs identified that LCC-MZT has spent a total of $2,966,760 on field office overhead costs from the project's NTP [notice to proceed] through substantial completion, a period of 826 calendar days. These field office overhead costs include project supervision, site safety, office trailer, portable toilets, utilities for the office trailer, office supplies, drinking water, rental equipment, fuel, dump fees, small tools and consumables, cell phones, reproduction and copier costs, construction lighting, administrative, insurance, and tax costs. According to LLC-MZT [sic], of this amount, $390,480 was compensated for in contract modifications.

> The field office overhead costs incurred during this 826-calendar-day period, minus what was reimbursed in contract modifications, produces a daily field office overhead rate of $3,119.

(capitalization in original; footnote omitted). Regarding the $390,480.00 of compensation in contract modifications, William Manginelli testified: "I asked Mr. King to go back through the change orders and tell me what amount of field overheads have been paid through the change order markups just to ensure that there was no double counting of -- of field overhead costs."

In the expert report of defendant's expert witness Stephen Weathers, he stated that he "generally agrees with" the "methodology" used by Mr. Manginelli to calculate LCC-MZT's daily rate of extended field office overhead. Mr. Weathers, in his expert report, however, also asserted that "the amount of costs associated with field general conditions[43] incurred by LCC-MZT on the project total $2,648,206," minus "$390,480 in Contract Modifications for general conditions type costs," which produces a total of $2,257,726.00. Mr. Weathers' expert report stated that "[d]ividing the total general

---

[43] Mr. Weathers testified that "'[g]eneral conditions,'" or "GCs," "is also a word used commonly for field office overhead."

conditions incurred on the project ($2,257,726) by the project duration of 826 days (i.e., from March 7, 2012 to June 11, 2014) results in an average daily general conditions rate of $2,733."

The experts' dispute regarding the appropriate daily rate for extended field office overhead stems from the experts differences in the experts' calculations of field overhead cost pools, with plaintiff's expert, Mr. Manginelli, finding a total cost pool of $2,966,760.00, and defendant's expert, Mr. Weathers, finding a total cost pool of $2,648,206.00. In Mr. Manginelli's revised expert report, he states that a "review of LCC-MZT project costs identified that LCC-MZT has spent a total of $2,966,760 on field office overhead costs from the project's NTP [Notice to Proceed] through substantial completion, a period of 826 calendar days." Mr. Manginelli then cited to an exhibit attached to his revised expert report, titled "Job Cost Detail," which is a 196-page document that appears to be a ledger kept by LCC-MZT of expenditures, cost codes, time spent, and dates associated with LCC-MZT and subcontractor work throughout the duration of the P-913 project. Aside from being included as an exhibit attached to Mr. Manginelli's revised expert report and cited to in his revised expert report, no explanation or detail was provided on the figures included in the "Job Cost Detail" in the revised expert report. The last page in the "Job Cost Detail" provides the following totals:

JOB: 1303 - P-913 EXPLOSIVES LCC-MZTTEAMIV

| REF # | JR | DATE | DOCUMENT | DESCRIPTION | LABOR | MATERIAL | SUBCON | EQUIP | O/H-OTHR | BILLINGS |
|-------|----|----|----|----|----|----|----|----|----|----|
| JOB  1303 | | TOTALS: | LABOR HOURS: 51159.00 | COST TOTALS: | 15,144,873.59 | 2,732,179.12 | 4,575,631.63 | 7,425,783.65 | 411,279.19 | 0.00 | 12,265,442.49 |

It is unclear how Mr. Manginelli calculated his extended field office overhead cost pool out of the immediately above numbers. Mr. Manginelli's revised expert report does not contain a chart indicating how Mr. Manginelli sorted through LCC-MZT's costs to determine the extended overhead cost pools.

At trial, Stephen Weathers, defendant's expert, testified:

In this case, Mr. Manginelli arrived at a daily rate of $3,119. I did a similar exercise based upon the cost report that I had available, and I came up with $2,733 a day.

We're not too far off. . . . I had asked for backup to let me know what cost elements Mr. Manginelli was including in his pool of field office overhead costs of $2.966 million. That has not been provided to me as we sit here today.

I've provided in my report a road map to exactly how I arrived at my pool of cost of $2.257 million. And these costs -- I think the Court understands this

117

-- include site supervision, trailers, insurance costs, walkie-talkies, cell telephones, the -- the costs that comprise the -- the infrastructure that the contractor sets up to manage the project over the course of the -- the duration.

In Mr. Weathers' expert report, he attached as an exhibit a list of costs which total $2,935,498.93, which is slightly less than Mr. Manginelli's figure of $2,966,760.00. Mr. Weathers' report determined that there are costs of $2,648,205.93, minus $390,480.00 for contract modifications, for "Total GCs" of $2,257,725.93.

At the trial, plaintiff's attorney Craig Ramseyer cross-examined Stephen Weathers regarding his cost pool, as follows:

Mr. Ramseyer: So, for instance, they [LCC-MZT] have as an overhead cost "MOB [mobilization] OF EQUIP [equipment]," and you did not include that in your overhead pool, true?

Mr. Weathers: True.

Mr. Ramseyer: And, for instance, they have bond premium costs, you did not include that in your overhead pool, correct?

Mr. Weathers: Correct.

Mr. Ramseyer: That's the PP -- "P&P BONDS"?

Mr. Weathers: Performance of [sic; and] payment bonds.

Mr. Ramseyer: Okay. And you know that as a -- over time, a contractor will pay an additional premium or have to renew their bonds if the project doesn't finish within a certain time period, correct?

Mr. Weathers: Correct.

Mr. Ramseyer: So whether or not they have to pay the additional premiums is a function of whether the project has run over or not?

Mr. Weathers: Yes.

Mr. Ramseyer: All right. And so I think we'll agree, but maybe not, that experienced persons such as yourself and Mr. Manginelli, reasonable minds can disagree on what should be an overhead pool and what should not be in an overhead pool for purposes of conducting -- of calculating a daily rate?

Mr. Weathers: Yes. And I just -- if I can just talk about the bond.

Typically, that's a fairly large sum that's paid right out of the start of the project when they purchase the performance of payment bonds. But you're correct, then over time, to the extent there's a modification, there's a bond that's fixed to that. So it would be a small growth.

But, yes, the fact that I'm at 2700 and Mr. Manginelli's at 3100, I call us in the ballpark. I would have just liked to have seen his cost component so I could have perhaps pointed out this is not a time-related expense and should not be included in the pool.

(capitalization in original).

Of the costs excluded from the extended field office overhead cost pool used by Mr. Weathers, with the exception of performance and payment bonds, the court is unable, based on the record before the court, to determine that any of the excluded costs should be added back into the extended field office overhead cost pool and potentially be awarded to plaintiff. Mr. Weathers was not cross-examined about the majority of the excluded field office overhead costs, and Mr. Manginelli did not provide a basis as to why those amounts should be included in the extended field office overhead cost pool. The payment and performance bonds, however, appear to increase over time and in connection with modifications, of which there were twenty-five to the Contract. The court, therefore, concludes that the extended field office overhead pool should be found to be $2,648,205.93 (Mr. Weathers' cost pool) plus $86,943.00 (payment and performance bonds) minus $390,480.00 (amount used by both Mr. Weathers and Mr. Manginelli for contract modifications), producing a total extended field office overhead cost pool of $2,344,218.93. The extended field office overhead cost pool of $2,344,218.93 is divided by the 826-day figure used by both Mr. Weathers and Mr. Manginelli to produce a daily rate of $2,838.04. As stated above, the court determined that LCC-MZT is entitled to seventy-six days of compensable delay. Seventy-six times the daily rate of $2,838.04 produces extended field office overhead costs of $215,691.04, to which LCC-MZT is entitled as damages.

REA 34 - Extended Home Office Overhead

REA 34 states that "LCC-MZT is requesting payment for the extended home office overhead per the Eichleay Method[44] for the extended time LCC-MZT spent on the project due to the Governments Delays Impacts and Disruption" in the amount of $574,497.03 for 348 "Total delay days." In Mr. Manginelli's revised expert report, he asserted that there were "574 calendar days of impacts that delayed the project's contract completion date from August 8, 2013 until March 5, 2015," which according to Mr. Manginelli, "establishes

---

[44] As discussed below, the "Eichleay Method" mentioned in plaintiff's REA 34 refers to a calculation of damages for extended home office overhead as originally described in Eichleay Corp., ASBCA No. 5183, 60–2 B.C.A. (CCH) ¶ 2688, adhered to on recons., ASBCA No. 5183, 61-1 B.C.A. (CCH) ¶ 2894 (1960).

that LCC-MZT is due $790,439 in unabsorbed home office overhead for this impact." In plaintiff's post-trial brief, plaintiff asserts that "[w]hen a contract is extended, there is a potential for unabsorption, meaning that the home office now has to support the Project for a longer period, but that project may not be able to fully absorb its share of the home office." As discussed below, plaintiff argues in its post-trial brief that the <u>Eichleay</u> formula does not require that "LCC-MZT's forces be completely idle during a government-caused delay." Plaintiff contends that the periods of indefinite suspension in the above-captioned case include "the notice to proceed delay, utility disruption and Red Days."

Defendant argues that "LCC-MZT presented no evidence at trial that it was instructed by the Contracting Officer to standby on the Contract, must [sic] less indefinitely." Defendant argues that during Red Days, LCC-MZT often was able to work on those days and, therefore, LCC-MZT was not indefinitely delayed by Red Days. Defendant also asserts that REA 34 includes claims for delays which were previously addressed by bilateral modifications, including "35 days of delay for the bid protest filed at Contract award (modification A00003); 125 days of delay for the utility line interference (Mod 9); and 31 days of delay attributable to red days prior to August 14, 2013 (Mod 10)." (internal references omitted). Defendant further contends that "[e]ach of these bilateral modifications include 'accord and satisfaction' language."

As stated by a Judge of the United States Court of Federal Claims:

> The term "home office overhead" refers to the general administration costs of running a business, such as accounting and payroll services, general insurance, salaries of upper-level management, heat, electricity, taxes, and depreciation. <u>See</u> <u>e.g.</u>, <u>Interstate Gen. Gov't Contractors, Inc. v. West</u>, 12 F.3d 1053, 1058 (Fed. Cir. 1993). These are indirect costs, "expended for the benefit of the whole business, [and thus] by their nature cannot be attributed or charged to any particular contract." <u>Nicon, Inc. v. United States</u>, 331 F.3d 878, 882 (Fed. Cir. 2003) (quoting <u>Altmayer v. Johnson</u>, 79 F.3d 1129, 1132 (Fed. Cir. 1996)).

> Contractors typically recoup these indirect costs by allocating them to individual contracts in proportion to those contracts' direct costs. <u>Charles G. Williams Constr., Inc. v. White</u>, 271 F.3d 1055, 1057–58 (Fed. Cir. 2001); Ralph C. Nash & John Cibinic, <u>Unabsorbed Overhead and the "Eichleay" Formula: Rampant Confusion</u>, 16 No. 5 Nash & Cibinic Report ¶ 23 (May 2002). But, in the event of a government-caused delay or suspension of work, "the stream of direct costs against which to assess a percentage [of home office overhead]" is decreased. C.B.C. <u>Enterprises, Inc. v. United States</u>, 978 F.2d 669, 671 (Fed. Cir. 1992). The resulting shortfall is termed "unabsorbed" home office overhead. <u>Nicon, Inc. v. United States</u>, 331 F.3d at 882.

<u>JMR Constr. Corp. v. United States</u>, 117 Fed. Cl. at 442 (alterations in original); <u>see also</u> <u>The Redland Co. v. United States</u>, 97 Fed. Cl. 736, 746 (2011) ("Home office overhead

120

is among a contractor's indirect costs, "costs 'that are expended for the benefit of the whole business, [and] by their nature cannot be attributed or charged to any particular contract.'" (citing Nicon, Inc. v. United States, 331 F.3d 878, 882 (Fed. Cir. 2003)); George Sollitt Constr. Co. v. United States, 64 Fed. Cl. at 241 ("Extended home office overhead costs are a type of delay damages that may sometimes be recovered."). Additionally, the Federal Circuit has explained:

> Where the government suspends performance of a contract, the contractor's indirect costs, such as home office [overhead], often accrue beyond the amount originally allocated to that particular contract. These additional indirect costs may thus be "unabsorbed." The Court of Claims consistently allowed a contractor to recover not only additional direct costs that accrue to a contract where completion of performance is delayed by the government, but also any unabsorbed, indirect costs that result.

West v. All State Boiler, Inc., 146 F.3d 1368, 1372 (Fed. Cir. 1998) (alterations in original). The Judge of the United States Court of Federal Claims in JMR Construction Corp. stated that "[t]he Circuit has held that the so-called 'Eichleay' formula is the sole method through which contractors are able to recover for unabsorbed home office overhead." JMR Constr. Corp. v. United States, 117 Fed. Cl. at 442 (citing E.R. Mitchell Constr. Co. v. Danzig, 175 F.3d 1369, 1372 (Fed. Cir. 1999) (citing Eichleay Corp., ASBCA No. 5183, 60–2 B.C.A. (CCH) ¶ 2688)).

When applying the Eichleay formula:

> The Eichleay formula requires that contractors satisfy several "strict prerequisites." Nicon, 331 F.3d at 882. First, the contractor must demonstrate that there was a government-caused delay not excused by a concurrent contractor-caused delay. P.J. Dick Inc. v. Principi, 324 F.3d 1364, 1370 (Fed. Cir. 2003). Second, the contractor must show that it incurred additional overhead expenses, either because the contract's performance period was extended or because the contractor would have finished prior to the un-extended performance period's close. Id. Third, the contractor must establish that it was required to remain "on standby" for the duration of the delay. Id.

JMR Constr. Corp. v. United States, 117 Fed. Cl. at 442; see also Kudsk Constr., Inc. v. United States, 144 Fed. Cl. 446, 452 (2019); Jackson Constr. Co. v. United States, 62 Fed. Cl. at 96–103.

The "standby inquiry," is "multifaceted." P.J. Dick, Inc. v. Principi, 324 F.3d 1364 (Fed. Cir. 2003). "In making that inquiry, the court should first determine whether the CO [contracting officer] has issued a written order that suspends all the work on the contract for an uncertain duration and requires the contractor to remain ready to resume work immediately or on short notice." Id. at 1371. If so, "the contractor need not offer further proof of standby," but if not, "the contractor must then prove standby by indirect evidence,"

and meet three requirements. Id. "First, the contractor must show that the government-caused delay was not only substantial but was of an indefinite duration," "[s]econd, the contractor must show that during that delay it was required to be ready to resume work on the contract, at full speed as well as immediately," and "[t]hird, the contractor must show effective suspension of much, if not all, of the work on the contract." Id. (citations omitted). Furthermore,

> [i]f the contractor can make a prima facie showing of the standby elements, "the burden of production shifts to the government to show either that it was not impractical for the contractor to obtain 'replacement work' during the delay, or that the contractor's inability to obtain or perform replacement work was caused by a factor other than the government's delay."

JMR Constr. Corp. v. United States, 117 Fed. Cl. at 443 (emphasis in original) (quoting Nicon, Inc. v. United States, 331 F.3d at 883).

Regarding the delays related to (1) the bid protest from a disappointed bidder, which occurred at the GAO upon Contract award to LCC-MZT, (2) the utility line differing site conditions and (3) Red Days through August 14, 2013, all such delays resulted in bilateral contract modifications, Modifications 3, 9, and 10, which each included "accord and satisfaction" language, thus, barring claims for additional costs associated with those modifications.

LCC-MZT also requests Eichleay damages for the extended home office overhead it alleges it incurred during the period for which the Stop Work Order was issued in relation to the concrete pour on August 28, 2013. As discussed above, when making the inquiry into whether the contractor was on standby, "the court should first determine whether the CO [contracting officer] has issued a written order that suspends all the work on the contract for an uncertain duration and requires the contractor to remain ready to resume work immediately or on short notice." P.J. Dick Inc. v. Principi, 324 F.3d at 1371 (capitalization in original). If so, "the contractor need not offer further proof of standby." Id. The Stop Work Order issued on September 19, 2013 by NAVFAC contracting officer Mona Carlson stated: "In accordance with FAR 52.246-12 INSPECTION OF CONSTRUCTION, you are hereby directed to stop all work pertaining to structural concrete as further defined by Specification Sections 03 30 00 and 03 37 13 pending resolution of all the quality performance issues." (capitalization in original). Additionally, in the Stop Work Order, Ms. Carlson stated: "Pending receipt of this direction, satisfactory corrective actions, and lifting of this stop work order, minor concrete work will be approved on a case-by-case basis with a detailed work plan for Government review and approval." This language of the Stop Work Order reflects that the only work that was ordered to be stopped was "work pertaining to structural concrete." It does not indicate, however, that all work on the project needed to be stopped. The Stop Work Order, therefore, does not establish that "the CO has issued a written order that suspends all the work on the contract." P.J. Dick Inc. v. Principi, 324 F.3d at 1371. Moreover, John King testified that during the period of time in which the Stop Work Order was in effect, NAVFAC did approve and permit some concrete work to take place, including "shotcrete work," as well as "some

cast-in-place concrete work too." On September 27, 2013, NAVFAC issued a letter permitting LCC-MZT "to proceed with shotcrete activities pertaining to the loading dock walls, sally ports, and transformer walls." Given the scope of work that the Stop Work Order suspended, i.e., structural concrete work only, LCC-MZT cannot rely on the Stop Work Order itself as proof that it was on standby during the duration of the Stop Work Order, for purposes of proving standby and entitlement to Eichleay damages for that period.

As indicated above, the United States Court of Appeals for the Federal Circuit in P.J. Dick stated that if the contractor cannot prove standby through the Stop Work Order, "the contractor must then prove standby by indirect evidence." P.J. Dick Inc. v. Principi, 324 F.3d at 1371. "First, the contractor must show that the government-caused delay was not only substantial but was of an indefinite duration," "[s]econd, the contractor must show that during that delay it was required to be ready to resume work on the contract, at full speed as well as immediately," and "[t]hird, the contractor must show effective suspension of much, if not all, of the work on the contract." Id. (citations omitted). As determined above, LCC-MZT cannot show "effective suspension of much, if not all, of the work on the contract," as the language of the Stop Work Order stated that the work to be stopped was "work pertaining to structural concrete." Id.

As also discussed above, the Stop Work Order directed that LCC-MZT "provide an independent third party," which was required to be a government-approved, licensed, structural engineer, "to facilitate additional inspection and analysis of the structural roof slab," including a "report attesting to the structural capability of the roof slab." The Stop Work Order also stated that "[p]ending receipt of this direction satisfactory corrective actions and lifting of this stop work order minor concrete work will be approved on a case-by-case basis with a detailed work plan for Government review and approval." The same day the Stop Work Order was issued, September 19, 2013, LCC-MZT submitted a letter in response to NAVFAC's Stop Work Order, in which LCC-MZT stated that "LCC-MZT will provide an independent third party to facilitate additional inspection and analysis of the Roof Slab Structural Concrete Placement #1." (capitalization in original). Steven Jirsa, who at the time of the P-913 project worked for Exponent, testified that LCC-MZT retained Exponent in connection with the P-913 project at Naval Base Kitsap Bangor. Mr. Jirsa stated that Exponent's "scope of the retention was essentially to identify any conditions related to the concrete roof structure." On October 9, 2013, Exponent provided a recommended plan to test the concrete roof, determine the extent of the defects, and develop a repair plan. In defendant's post-trial brief, defendant asserts, "[b]y November 8, 2013, Exponent had completed its investigation, although LCC-MZT did not provide a report to NAVFAC until November 21, 2013." In a report dated November 8, 2013, which was titled "Roof Deck Cast-In-Place Concrete Evaluation," Exponent stated that it performed destructive testing, as well as non-destructive testing, on the concrete roof. On November 19, 2013, LCC-MZT was permitted to start installation of the roof primer. In a letter dated November 20, 2013, Exponent provided its repair plan for structural and non-structural repairs. Thereafter, NAFVAC received Exponent's report, and the parties have jointly stipulated that NAFVAC lifted the restrictions in the September 19, 2013 Stop Work

Order on November 26, 2013. Therefore, the scope of Exponent's work was limited to "work pertaining to structural concrete," similar to the language of the Stop Work Order.

Plaintiff also includes Red Days occurring after August 14, 2013 in its Eichleay damages calculation. In plaintiff's post-trial brief, LCC-MZT does not put forth specific argument or analysis for why it should be entitled to Eichleay damages for Red Days or other delays. Instead, plaintiff argues for Eichleay damages entitlement for all delays generally, stating:

> NAVFAC has asserted that LCC-MZT was not on standby and is thus not entitled to Eichleay damages. The basis for this assertion appears to be that LCC-MZT continued to perform some work during periods of delay. However, it is not required that LCCMZT's forces be completely idle during a government-caused delay. Indeed, "application of the Eichleay formula does not require that the contractor's work force be idle. It simply requires that overhead be unabsorbed because performance of the contract has been suspended or significantly interrupted and that additional contracts are unavailable during the delay when payment for the suspended contract activity would have supported such overhead." Interstate General Government Contractors, Inc. v. West, 12 F.3d 1053, 1057 (Fed. Cir. 1993). "Contractors that perform 'minor tasks' during a government-caused delay are not precluded from proving standby. . . . It is sufficient, for purposes of establishing standby, if a contractor can demonstrate that work was 'stopped or significantly slowed.'" JMR Construction Corp. v. U.S., 117 Fed. Cl. 436, 443 (2014).

Plaintiff's argument that a contractor's workforce need not be idle to prove standby was discussed by the United States Court of Appeals for the Federal Circuit in P.J. Dick:

> A closer reading of Interstate indicates that its reference to "idleness" simply means the workers need not be "physically standing by idly." Id. at 1057 n. 5 (referencing a quote in a previous opinion and stating "these two phrases ['stand by idly and suspend its work'] clearly refer to standing by in the sense that no work is being performed on the contract, not that there must be workers physically standing by idly"); see also id. at 1057 n. 4 ("If the test were whether the contractor's work force assigned to the contract in issue was standing by, the contractor would be penalized for, and thus deterred from, mitigating its damages for direct costs by reassigning its employees to other jobs or laying them off during the period of delay.").

P.J. Dick, Inc. v. Principi, 324 F.3d at 1372 (emphasis in original; footnote omitted). In P.J. Dick, the plaintiff argued that "a contractor is automatically on standby any time there is a government-caused delay of an uncertain duration extending the performance of the contract, at the end of which the contractor can be required to immediately resume work." Id. at 1370. The Federal Circuit in P.J. Dick, however, disagreed, finding that, as outlined above, there are two additional elements that must be established, creating the three-

pronged standby inquiry. See id. at 1369-72. In discussing the third prong, that "the contractor must show effective suspension of much, if not all, of the work on the contract," the Federal Circuit explained: "Indeed, every case where this court has held a contractor to be placed on standby has involved a complete suspension or delay of all the work or at most continued performance of only insubstantial work on the contract." Id. at 1372.

At trial in the above-captioned case, several members of LCC-MZT testified that once the view obstruction plan was approved by NAVFAC, in an e-mail message on November 16, 2012, which was prior to the August 14, 2013 date in plaintiff's Eichleay damages calculation, LCC-MZT was permitted to work on Red Days, although they remained sequestered during actual asset movements, for the duration of the project. Moreover, LCC-MZT was permitted to work both prior to and after a Red Day's asset movements. LCC-MZT's inability to work during Red Day asset movements did not continue consecutively from one day into the next, let alone from one month into the next. Mr. King testified that LCC-MZT "made progress on every day we worked out there." Furthermore, while LCC-MZT was not able to receive deliveries on Red Days after the View Obstruction Plan was approved, LCC-MZT has not established that the work performed on Red Days was unsubstantial, or "minor." See P.J. Dick Inc. v. Principi, 324 F.3d at 1374 (citing Altmayer v. Johnson, 79 F.3d at 1134).

Regarding the delays incurred due to the inability to meet grounding specifications, discussed above, the court found that there was concurrent delay because LCC-MZT was not able to otherwise energize the building, as LCC-MZT had experienced delays to other tasks necessary to energize the building, such as installing transformers and getting the Building Energization Plan approved. As stated above, a prerequisite to receiving Eichleay damages is that the contractor incurred "government-caused delay not excused by a concurrent contractor-caused delay." JMR Constr. Corp v. United States, 117 Fed. Cl. at 442 (citing P.J. Dick Inc. v. Principi, 324 F.3d at 1370). Because there was concurrent contractor-caused delay involved with energization of the P-913 project, plaintiff is not entitled to receive Eichleay damages related to government-caused delays regarding building energization. In sum, plaintiff has not carried its burden to establish that it is entitled to recover any Eichleay damages for delays on the P-913 project, which included delays caused by the Stop Work Order, Red Days, or the inability to meet grounding specifications.

REA 31 – Acceleration

In REA 31, LCC-MZT seeks an adjustment of $503,023.00 because NAVFAC allegedly "directed LCC-MZT to accelerate, work additional shifts, work week-ends to mitigate the Government's Delays, Impacts and Disruptions." Plaintiff's expert witness, William Manginelli, stated that LCC-MZT is entitled to an adjustment of $324,039.00 for acceleration costs, which is substantially lower than the amount claimed by plaintiff in REA 31. Plaintiff asserts that, "[t]hroughout the Project, NAVFAC denied it had any responsibility for any delay, thereby forcing LCC-MZT to accelerate, both constructively by its actions, and directly through its Progress Letters." (capitalization in original). In plaintiff's post-trial brief, plaintiff asserts that REA 31 seeks "costs associated with

acceleration which includes trade stacking, working out of sequence, working overtime, and working weekends, to mitigate the delays, impacts and disruptions that were out of LCC-MZT's control." According to plaintiff, NAVFAC's alleged "directions to accelerate" caused LCC-MZT to "increase the number of crews, add shifts and perform weekend work, and re-sequence work." Plaintiff's post-trial brief also states that "REA 31 is solely for the additional overtime and weekend work."

Defendant argues that LCC-MZT is not entitled to an adjustment for acceleration. Defendant, quoting REA 31, asserts:

> LCC-MZT's REA does not assert which work was accelerated, when (or if) a request for a time extension was ever made, and whether the agency either denied the request or failed to act on it, and thus cannot meet elements one, two, or three. Instead, the REA claims generally that "[t]he Governments Delays Impacts and Disruptions included but were not limited to (1) differing site conditions (2) Red Days (3) Stop Work (4) FFE installation and (5) acceleration due to not acknowledging additional time for the Governments Delays Impacts and Disruptions."

(internal references omitted). Defendant contends that the "Contract progress notices were not intended to direct to [sic] LCC-MZT complete the Contract work sooner than anticipated, but rather to recoup delay already encountered." Defendant also argues that REA 31 seeks costs "duplicative of those settled by the multiple bilateral modifications signed throughout the course of the Contract," including Modifications 3, 9, and 10.

Under the Changes clause in FAR § 52.243-4, the contracting officer may issue a written order "[d]irecting acceleration in the performance of the work." See FAR § 52.243-4(a). "Even absent a formal order under the Changes clause, the contracting officer may still *constructively* change the contract, 'either due to an informal order from, or through the fault of, the government.'" Zafer Taahhut Insaat v. Ticaret A.S., 833 F.3d 1356, 1361 (Fed. Cir. 2016) (emphasis in original) (quoting NavCom Def. Elecs., Inc. v. England, 53 F. App'x 897, 900 (Fed. Cir. 2002)). The United States Court of Appeals for the Federal Circuit in Fraser Construction Co. v. United States determined that, in order to succeed on a constructive acceleration claim, a contractor must prove "five elements:"

> (1) that the contractor encountered a delay that is excusable under the contract; (2) that the contractor made a timely and sufficient request for an extension of the contract schedule; (3) that the government denied the contractor's request for an extension or failed to act on it within a reasonable time; (4) that the government insisted on completion of the contract within a period shorter than the period to which the contractor would be entitled by taking into account the period of excusable delay, after which the contractor notified the government that it regarded the alleged order to accelerate as a constructive change in the contract; and (5) that the contractor was required to expend extra resources to compensate for the lost time and remain on schedule.

Fraser Constr. Co. v. United States, 384 F.3d 1354, 1360-61 (Fed. Cir. 2004); see also Garco Constr., Inc. v. Sec'y of Army, 856 F.3d 938, 945-46 (Fed. Cir. 2017) (finding that contractor "fail[ed] to mak[e] a prima facie case of constructive acceleration" because subcontractor "JTC never formally requested a time extension, and the government, therefore, could not have denied JTC's non-existent request"); cert. denied, 138 S. Ct. 1052 (2018); Zafer Taahhut Insaat v. Ticaret A.S., 833 F.3d at 1362; United Constructors, LLC v. United States, 95 Fed. Cl. at 40 (quoting Fraser Constr. Co. v. United States, 384 F.3d at 1360-61). In United Constructors, the Judge of the United States Court of Federal Claims wrote:

> The general rule is that where both parties contribute to a delay, neither can recover damages. P.R. Burke Corp. v. United States, 277 F.3d 1346, 1359–60 (Fed. Cir. 2002); In re R.J. Lanthier Co., Inc., ASBCA No. 51636, 04–1 BCA ¶ 32481, 2003 WL 22953681 (Dec. 9, 2003) ("When performance is, arguendo, 'delayed by multiple causes acting concurrently, and only one cause is excusable, i.e., where other causes lie with the contractor, courts and boards have adopted the approach that neither party will benefit from the delay. Consequently, in a "Changes" clause analysis, a contractor cannot recover acceleration costs flowing from a concurrent delay, unless the record supports a clear apportionment of the delay and expense attributable to each party.'") (quoting Appeal of Hemphill Contracting Co., Inc., ENGBCA No. 5840, 94–1 BCA ¶ 26491, 1993 WL 476309 (Nov. 12, 1993)). But see W. Stephen Dale, &, Robert M. D'Onofrio, Reconciling Concurrency in Schedule Delay and Constructive Acceleration, 39 PUB. CONT. L.J. 161, 194, 227–28 (2010) (arguing that concurrent delays are "excusable but not compensable" and entitle the contractor to more time; requiring the contractor to adhere to original schedule constitutes constructive acceleration).

United Constructors, LLC v. United States, 95 Fed. Cl. at 40.

Referencing the four Progress Letters sent to LCC-MZT in late 2012 and early-to-mid 2013, plaintiff argues that the "[a]cceleration was directed by NAVFAC due to the delays, impacts, and disruptions arising out of the differing site conditions, Red Days, and other impacts." As discussed above, however, delays arising out of the differing site conditions of the water line and electrical duct bank, as well as Red Days through August 14, 2013, were resolved by bilateral contract Modifications 9 and 10, respectively. Modification 9 includes the following language:

> The subject contract is hereby modified to compensate the Contractor for all additional labor, material, equipment, and associated costs regarding a differing site condition resulting from utility line interferences as further defined in the Contractor's Request for Equitable Adjustment (REA) (Serial Letter No. 0005) dated August 14, 2012, the Government's response (Serial Letter No. 0010) dated August 14, 2012, the Contractor's amended REA

(Serial Letter No 0024) dated April 17, 2013, and the settlement reached April 19, 2013, summarized as follows. These documents are hereby incorporated by reference. This settlement accounts for all associated impacts including re-sequencing, acceleration, seasonal impacts, changes to means and methods, et cetera, necessary to provide for substantial completion as further defined in paragraph 2 below. Neither party's rights for contractual relief for future impacts/situations are waived by this settlement.

(emphasis added). Modification 9 further stated: "Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full (for both time and money) and for any and all costs, impact effect, and for delays and disruptions arising out of or incidental to the work as herein revised." As concluded in earlier in this Opinion, this language bars plaintiff from recovery of any costs related to the utility line, including costs related to acceleration.

Modification 10 also has identical "accord and satisfaction" language to that which appears in Modification 9. As discussed above, Modification 10 stated:

The subject contract is hereby modified to compensate the Contractor for all additional labor, material, equipment, and associated costs regarding impacts associated with operation-restricted delays (Red Days) that were incurred June 14, 2013 through August 14, 2013 as further defined in the Contractor's Request for Equitable Adjustment (REA) (Serial Letter No. 0034 dated July 16, 2013, No. 0036 dated July 19, 2013, and No. 0037 dated July 19, 2013), and the settlement reached August 14, 2013, summarized as follows. These documents are hereby incorporated by reference.

Modification 10 extended the Substantial Completion Date of the Contract by "31 calendar days to **DECEMBER 16, 2013**," and the Contract Completion Date by "32 calendar days to **FEBRUARY 16, 2014**," and stated: "Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full (for both time and money) and for any and all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised." (capitalization and emphasis in original). Although Modification 10 does not include the above-stated language in Modification 9 which explicitly bars acceleration claims, the accord and satisfaction language in Modification 10 quoted above encompasses costs "arising out of or incidental to the work as herein revised." Therefore, plaintiff's claim for acceleration damages arising out of any Red Days through August 14, 2013, the date up to which Modification 10 provided LCC-MZT excusable delay for Red Days, is also barred.

Previously, the court determined that the delay associated with the inability to meet grounding specifications was concurrent with LCC-MZT's own delay in achieving building energization. As was indicated above, the court in United Constructors stated, "[t]he general rule is that where both parties contribute to a delay, neither can recover

damages." See United Constructors, LLC v. United States, 95 Fed. Cl. at 40 (citing P.R. Burke Corp. v. United States, 277 F.3d at 1359–60). LCC-MZT, as a contributor to the delay, therefore, is not entitled to acceleration costs for the delay arising out of the problems with the grounding specifications.

Additionally, plaintiff requests acceleration costs it alleges were incurred because of delays caused by Red Days occurring after August 14, 2013. As determined above, plaintiff could be entitled to an award of one calendar day of contract extension for each Red Day that occurred after August 14, 2013, notwithstanding that LCC-MZT was not awarded such an extension for Red Days which coincided with other periods of compensable delay, such as delays caused by the Stop Work Order, or with days already constituting non-work days, such as federal holidays and weekend days, or when the Red Day had already been accounted for in a Contract Modification, such as the thirty Red Days included in the 125-calendar-day extension pursuant to Modification 24. As discussed above, the United States Court of Appeals for the Federal Circuit in Fraser Construction Company v. United States indicated that, to be entitled to acceleration costs, a contractor must establish that it "encountered a delay that is excusable under the contract." See Fraser Constr. Co. v. United States, 384 F.3d at 1361. The Federal Circuit in Fraser, however, did not specify whether it is sufficient to establish excusable, non-compensable delay, as opposed to excusable, compensable delay, in order to recover acceleration costs. See id. Generally, the difference between the two is the existence of concurrent delay. See W. Stephen Dale & Robert M. D'Onofrio, Reconciling Concurrency in Schedule Delay and Constructive Acceleration, 39 Pub. Cont. L.J. 161, 163 (2010) ("For a delay to qualify as excusable and compensable, the Government must have been 'the *sole* proximate cause of the contractor's additional loss, and the contractor [must] not have been delayed for *any other reason* during that period.' This obligation thus includes the requirement that 'there was no concurrent delay on the part of the contractor.'" (emphasis and alteration in original) (quoting Triax-Pac v. Stone, 958 F.2d 351, 354 (Fed. Cir. 1992) and George Sollitt Constr. Co. v. United States, 64 Fed. Cl. at 238)). As discussed earlier in this Opinion, however, Red Days have the potential to be considered excusable, non-compensable delay, as opposed to excusable, compensable delay, consistent with the Contract's Specifications, and not because there is, or is not, concurrent delay associated with a given Red Day. In addition, provided that plaintiff can establish that the critical path of the project was impacted, the circumstances under which LCC-MZT may be entitled to compensation for a Red Day are: (1) if LCC-MZT's workers could not work for more than fifty percent of a Red Day; (2) there were more than ten Red Days on working days in a single month; or (3) there was a scheduling change related to an anticipated Red Day with less than forty-eight hours' notice to plaintiff. Although the Fraser allows the recovery of acceleration costs if excusable delay is established, regardless of compensability, see Fraser Constr. Co. v. United States, 384 F.3d at 1361, LCC-MZT's Contract's Specifications specifically limit compensation only to Red Days meeting any of the three circumstances described above. Therefore, provided that LCC-MZT has met the remaining elements outlined by the Federal Circuit in Fraser, which is discussed below, LCC-MZT could only be entitled to compensation for Red Days which the court has found to constitute excusable, compensable, delay, per the Contract's Specifications.

As the Federal Circuit in <u>Fraser Construction Co. v. United States</u> noted, to prove for entitlement to acceleration damages the contractor must prove "that the contractor made a timely and sufficient request for an extension of the contract schedule," and "that the government denied the contractor's request for an extension or failed to act on it within a reasonable time." <u>Id.</u> On May 8, 2015, LCC-MZT submitted REA 27, along with the majority of its other REAs. By this time, however, the P-913 project had already achieved substantial completion, which the court has concluded occurred on June 2, 2014. In its post-trial brief, LCC-MZT does not appear to argue that any other relevant request was made during the pendency of the project for an extension of time in relation to Red Days occurring after August 14, 2013. In defendant's post-trial brief, defendant argues that LCC-MZT did not assert "when (or if) a request for a time extension was ever made, and whether the agency either denied the request or failed to act on it."

In its post-trial brief, LCC-MZT asserts, however, that in addition to providing a time extension in relation to Red Days through August 14, 2013, "[t]he parties further agreed that any delays incurred due to Red Days or other Owner causes <u>after</u> August 14, 2013 would be separately analyzed later." (emphasis in original). Based on e-mail correspondence between LCC-MZT and NAVFAC shortly after the August 14, 2013 partnering session, it appears that LCC-MZT is referring to an informal agreement between LCC-MZT and NAVFAC not to provide LCC-MZT with relief for Red Days following August 14, 2013 until after they were realized, and that a schedule would be made which accounted for future Red Days, and that if LCC-MZT could finish the project within the time allotted in that schedule, NAVFAC would not assess any liquidated damages going forward. On August 26, 2013, Mr. Mortensen sent an e-mail message to the NAVFAC team member Jodus Hortin, which stated:

> Mr. Hortin,
>
> We have a question regarding the future RED DAY impacts that we are to incorporate into the project schedule: it is our understanding that we have basically two (2) SCD [Substantial Completion Date] dates. The first is the hard date based on the impacts to August 14, 2013 and the second is the moving date based on the future RED DAY's. Our agreement at the partnering session was determined to be 22 RED DAYS to December 16, 2013 which moves the SCD to January 7, 2014. The question is how will this language be incorporated into the modification [10] - right now we don't see any of this included in the language of the amendment which provides for the extended SCD.

(capitalization in original). That same day, Ms. Carlson responded, stating:

> Mr. Mortensen ~ This is a multiple phase situation. The modification with your for signature addresses the impacts from previous red day impacts. It brings us to closure on previous days and reflects an extension to the SCD

and CCD [Contract Completion Date] (linked by 60 days). December 16, 2013 was longer than the actual days, but agreed to by both parties[.]

As part of the agreement we agreed to incorporate into the schedule "future" impacts associated with the actual red day calendar. These impacts may or may not be realized and will most likely change so no extension will be granted or addressed at this time. . . . The partnering notes reflect an agreement that if we can meet the "future" impact date without further delay, the Government will extend the SCD and CCD accordingly without further penalty of LDs. If this date is not met, we will have to revisit the cause as to why not. Accordingly, monthly partnering sessions were established to better handle the dates on a more frequent basis. Bottom line, we cannot address the future impacts as they have not been realized yet.

Is that any more clear?

(capitalization in original). Mr. Mortensen stated in response that "[w]e concur with the below recap of the agreement and understand that future impacts will be handled when/if realized. We just needed to ensure the agreement was captured accurately so Mr. Baker [the court-appointed receiver assigned to the LCC-MZT joint venture] who was not at the meeting, can sign the document." Thus, LCC-MZT and NAVFAC appear to have agreed that Red Days occurring after August 14, 2013 "would be handled when/if realized," but if the Project was completed "without further delay, the Government will extend the SCD [Substantial Completion Date] and CCD [Contract Completion Date]" to include the Red Days that were realized. (capitalization in original).

During direct examination of Jeremy Wastweet, LCC-MZT's superintendent and foreman during the P-913 project,[45] plaintiff's counsel Mr. Ramseyer and Mr. Wastweet had the following conversation regarding the documentation in the Daily Production Reports of times when LCC-MZT was sequestered due to asset movements on Red Days:

Mr. Ramseyer: We talked a little bit about this sequestering, and did you set up a cost code so you could track the time that your workers were actually sequestered and not working?

Mr. Wastweet: Yes.

Mr. Ramseyer: And so when you went through the sequestering process on the days when you had to sequester, at the end of the day on your production reports or in some other reports would you cost code the time of all those individuals?

---

[45] As indicated above, Jeremy Wastweet was demoted from superintendent to foreman on approximately September 18, 2013.

Mr. Wastweet: Yes.

Mr. Ramseyer: Would that be turned in to the office?

Mr. Wastweet: Yes.

Mr. Ramseyer: And did that allow those sequestered hours to be tracked?

Mr. Wastweet: Yes.

Thus, the testimony at trial demonstrates that LCC-MZT was notifying NAVFAC of when sequestering was actually occurring. It also appears that Red Days were discussed or identified in several of the monthly partnering meetings, monthly schedule updates, and schedule narratives. The record before the court, however, does not reflect that the plaintiff sent requests for extensions of time to the defendant for Red Days occurring post-August 14, 2013 until LCC-MZT began submitting several iterations of its Request for Equitable Adjustment Time Impact Analysis (REA TIA), starting with Serial Letter No. 0105, dated August 6, 2014. By that time, substantial completion of the contract had already occurred, as the court determined above that substantial completion occurred on June 1, 2014. LCC-MZT, therefore, has not established that it "timely" requested an extension of time for Red Days. See Fraser Constr. Co. v. United States, 384 F.3d at 1361 (contractor must have "made a timely and sufficient request for an extension of the contract schedule"). The court, again, notes a credibility issue with respect to plaintiff's expert. Mr. Manginelli, in his original expert report and revised expert report, stated, "in consideration of NAVFAC's denial of the initial submission of its TIAs, LCC-MZT accelerated the work where and how it could, incurring substantial costs." Because LCC-MZT's initial Time Impact Analysis was submitted on August 6, 2014, at a time when substantial completion had already occurred, this submission could not have occasioned LCC-MZT to have to accelerate work on the project.

Even if the court were to find that LCC-MZT's entries on Daily Production Reports, monthly schedule updates and narratives, or conversations during monthly partnering meetings could, in some way have constituted requests for extensions of time, there is no indication that NAVFAC represented to LCC-MZT that LCC-MZT would not be permitted to recoup the time it spent sequestered during Red Day movements. As discussed above, NAVFAC represented at the August 14, 2013 partnering meeting, as well as in an e-mail message on August 26, 2013, that Red Days occurring after August 14, 2013 would be addressed in the future on an individual basis. Mona Carlson's August 26, 2013 email message stated that "if we can meet the 'future' impact date without further delay, the Government will extend the SCD and CCD accordingly without further penalty of LDs [Liquidated Damages]. If this date is not met, we will have to revisit the cause as to why not." (capitalization in original). Thus, it appears that NAVFAC did not represent to LCC-MZT that no extension of time would be granted for future Red Days. On the contrary, Ms. Carlson's e-mail message indicates that NAVFAC was prepared to provide LCC-MZT with additional time for actualized Red Days if there were no further delays, and that it was only after substantial completion, in NAVFAC's responses to LCC-MZT's

REA's, and in Chief of the NAVFAC Contracting Office Eileen Mitchell's August 1, 2016 final decision, that the government represented to LCC-MZT that LCC-MZT would not be awarded an extension of time for Red Days occurring after August 14, 2013. LCC-MZT has not established that "the government denied the contractor's request for an extension" for Red Days, thereby prompting LCC-MZT to accelerate work in response to the denial of its request. See Fraser Constr. Co. v. United States, 384 F.3d at 1360-61. LCC-MZT, therefore, is not entitled to acceleration damages in relation to Red Days.

LCC-MZT also requested acceleration damages in relation to delay caused by the September 19, 2013 Stop Work Order. While the court found above that NAVFAC's Stop Work Order entitled LCC-MZT to 63 days of excusable, compensable delay, from September 17, 2013 to November 19, 2013 that only establishes the first element in an acceleration analysis. In its post-trial brief, LCC-MZT generally asserts that "[t]hroughout the Project, NAVFAC denied it had any responsibility for any delay, thereby forcing LCC-MZT to accelerate, both constructively by its actions, and directly through its Progress Letters." As noted above, the four contract progress notices issued by NAVFAC in 2012 and 2013 were in relation to delays arising out of the differing site conditions of the utility line, which were resolved by bilateral modifications with accord and satisfaction language, and would not entitle plaintiff to additional damages for an acceleration claim. In plaintiff's expert's revised report, however, plaintiff's expert Mr. Manginelli cited to Serial Letter No. 81, issued by NAVFAC contracting officer Mona Carlson on January 30, 2014, as evidence of a NAVFAC order for LCC-MZT to accelerate work. Serial Letter No. 81 states:

> On Monday, January 27, 2014, your Project Manager provided the Government with a resequenced Network Analysis Schedule (NAS), with a Data Date of 20-Jan-14 and a Print Date of 22-Jan-14. We believe this schedule was intended to accurately reflect your plan to complete the remaining work on this contract, in a timelier manner, by Area (i.e. Areas 1 thru 7 and an All Area Finish). After a review of this NAS, the Government notes that the Finish Dates of the following activities has past [sic], as of 27 January 2014:
>
> Area #1
> A1.1020 CMU Repairs – 22 Jan 14
> A1.1030 Roof Repairs – 20 Jan 14
> A1.1040 CMU Wall Repairs Complete – 22 Jan 14
> A1.1050 Roof Repairs Complete – 20 Jan 14
>
> Area #2
> A2.1010 Sack & Patch Walls – 22 Jan 14
> A2.1020 CMU Repairs – 22 Jan 14
> A2.1030 Roof Repairs – 22 Jan 14
> A2.1035 CMU Wall Repairs Complete – 22 Jan 14
> A2.1040 Roof Repairs Complete – 22 Jan 14
> A2.1050 Hang Ceiling Wires – 24 Jan 14
> A2.1060 Electrical Hangers – 24 Jan 14
> A2.1070 HVAC Hangers – 24 Jan 14
> A2.1080 Sprinkler Hangers – 24 Jan 14

* * *

Area #3
A3.1060 Hang Ceiling Wires – 21 Jan 14
A3.1070 Electrical Hangers – 23 Jan 14
A3.1080 HVAC Hangers – 23 Jan 14
A3.1090 Sprinkler Hangers – 21 Jan 14

Area #4
A4.1010 Sack & Patch Walls – 24 Jan 14
A4.1020 CMU Repairs – 24 Jan 14
A4.1030 Roof Repairs – 24 Jan 14
A4.1040 CMU Wall Repairs Complete – 24 Jan 14
A4.1050 Roof Repairs Complete – 24 Jan 14

Your NAS shows a Finish Date of 25-Mar-14. Given that these activities are not complete as of 27 January 2014, our confidence in your completion by 25 March 2014 remains a concern. In accordance with FAR 52.236-15 Schedules for Construction Contracts, you are hereby directed to take the necessary measures to complete these activities and maintain your finish date of 25 March 2014 including increasing the number of shifts, overtime, additional crews, etc., to ensure progress will be regained. Submit a plan, no later than February 5, 2014 detailing the actions to be taken to finish the work activities listed above and maintain schedule with each subsequent NAS submission.

(capitalization in original).

Serial Letter No. 81 was not discussed by any of the witnesses at trial. As discussed above, Steve Jirsa from Exponent determined that Contech's repair work "all had to be removed" and replaced because "pumped grout patch material was found to have bubbled at the bonding between the substrate at the beam repairs." To the extent that the delays to the action items listed in Serial Letter No. 81 relate to the rework of Contech's roofing repair work, plaintiff would be unable to recover any acceleration costs because that delay was not considered a government-caused delay, and any request by NAVFAC for LCC-MZT to make up time for the non-excusable delay would not entitle LCC-MZT to acceleration costs related to those items. Moreover, LCC-MZT has not pointed to any document or testimony during trial which indicates that LCC-MZT requested an extension of time in relation to the delay caused by the Stop Work Order, other than the REAs which LCC-MZT submitted after the substantial completion date of the project. Therefore, as was the case with LCC-MZT's claim for acceleration costs associated with Red Days occurring after August 14, 2013, LCC-MZT has failed to show that it timely requested an extension in relation to the delay caused by the Stop Work Order. LCC-MZT, therefore, has not met its burden of proof for entitlement to acceleration damages related to the delay caused by the Stop Work Order, or any of the other causes of delay discussed above.

REA 33 - Loss of Production for Stacking of Trades, Out of Sequence Work, Trade Damage

In REA 33, LCC-MZT seeks an adjustment of $336,743.00 because of alleged "loss of production due to stacking trades, out of sequence work, overtime work and trade damage performed to mitigate the Governments Delays Impacts and Disruptions." The narrative to REA 33 states, in identical language to LCC-MZT's REA for acceleration (REA 31), discussed above, that: "The Government on no less than four (4) occasions (See NAVFAC Serial Letters 0012, 0014, 0023 & 0037) directed LCC-MZT to accelerate, work additional shifts, work week-ends to mitigate the Government's Delays, Impacts and Disruptions." (capitalization in original). The narrative included in REA 33 defines "Government Delays, Impacts and Disruptions" as including "but not limited to (1) differing site conditions, (2) Red Days, (3) Stop Work (4) FFE installation, and (5) acceleration due to not acknowledging additional time for the Government's Delays, Impacts and Disruptions." (capitalization in original). This language also is identical to that used in REA 31. In the section of REA 33 titled "Estimate & Supporting Documents," LCC-MZT provides a spreadsheet of what appears to be LCC-MZT's comparison between budgeted and actual costs for eight "WORK ELEMENT[s]," including: "3rd Party QC Testing," "Concrete Pavement," "Door & Ballistic Installation," and "Grading restoration." (capitalization in original). The spreadsheet attached to REA 33 aggregates the differences between these budgeted and actual costs, which, after including additional costs for "Painter Trade Damage," "WSFP – trade Damage," and "HVAC – Trade Damage," as well as "Apartment Rental," and "CSP (temp apartment)" costs, totals $271,061.89. (capitalization in original). Another page of the spreadsheet in REA 33 adjusts the $271,061.89 for items such as "Equipment Ownership and Operating Expenses," field and home office overhead, prime profit, bond premium and "B & O [business and occupation] Tax," to come up with LCC-MZT's final total claim amount of $336,743.00. (capitalization in original). The remainder of LCC-MZT's REA 33 is dedicated to over 100 pages of unexplained cost matrices, subcontractor invoices, and daily reports, some of which are handwritten and illegible.

Chief of the NAVFAC Contracting Office Eileen Mitchell's August 1, 2016 final decision denied the claims in LCC-MZT's REA 33 in full. Focusing primarily on the sequence of events involving the differing site conditions caused by the utility line, and the reference in REA 33's narrative to the four contract progress notices in 2012 and 2013, the contracting officer's final decision concluded that REA 33 had no merit because then-NAVFAC contracting officer Mona Carlson was "within the authority of FAR clause 52.236-15, Schedules for Construction Contracts" to have "directed LCC-MZT to increase the number of crews; increase the number of shifts or alter work schedules to allow for longer production days; establish a secondary pre-fabrication production area; and increase work days to seven calendar days per week," and that in so doing, the contracting officer took "steps necessary to improve the project's progress because LCC-MZT failed to implement an effective recovery plan." As explained in the fourth and final contract progress notice sent by Mona Carlson on April 12, 2013, LCC-MZT was

approximately "174-calendar days behind the CCD [Contract Completion Date]," and "[t]o date, you have failed to facilitate the resolution of your claim regarding the unforeseen utility line interferences."

In his revised expert report, Mr. Manginelli used a different calculation than what was used by LCC-MZT when LCC-MZT submitted REA 33, which aggregated the difference between budgeted and actual costs. Mr. Manginelli asserted that LCC-MZT is entitled to a higher, $507,044.94 amount under REA 33 for loss of productivity, compared to the $336,743.00 submitted by plaintiff to the contracting officer. Mr. Manginelli's revised expert report asserted that an

> appropriate methodology for calculating lost productivity resulting from the delay and impacts described above, is a measured-mile approach. The measured mile approach is the comparison of productivity for unimpacted (efficient) and impacted (inefficient) work on the same project. The measurement of inefficiency is essentially the measurement of productivity relative to that attained in performing the unimpacted work. The results are then related back to a quantifiable amount of additional labor or equipment hours. The resulting damages are only calculated once the comparative measurement is completed.

Mr. Manginelli further asserted, however, that "[a]s a result of the project being continuously impacted" by delays, "LCC-MZT was not able to perform any of its work as it had planned." Mr. Manginelli asserted, "[t]hus, there was no unimpacted period that could be used in the measured mile." Instead, Mr. Manginelli compared LCC-MZT's work on the P-913 project to an unrelated P-971 project which, as discussed above, was a previous building project that LCC-MZT had worked on, also on Kitsap Bangor Naval Base, in 2004, and which Mr. Manginelli generally asserted "was also subject to red days and operational restrictions." Mr. Manginelli alleged that "[b]ecause LCC-MZT had performed well on that project, it used the actual performance cost and labor records" from the P-971 project "as a basis for calculating its bid on this project." Mr. Manginelli attempted to reason that "[g]iven that LCC-MZT used the production rates achieved on the P-971 project as the basis for its bid on this project, a reasonable measure of the lost productivity would be its labor overrun on this project." Mr. Manginelli also asserted that LCC-MZT's bid was reasonable because it was "within 2.3% of the next low bidder."

As noted above, in Mr. Manginelli's revised expert report, he argued that $507,044.94 is owed to LCC-MZT for loss of productivity. In explaining how he arrived at that figure, Mr. Manginelli's revised expert report stated that "[t]o complete the entire project, LCC-MZT expended $3,068,077 for 51,159 total labor hours." (footnote omitted). Mr. Manginelli further asserted that the 51,159 total labor hours, however, "is inclusive of change order hours," i.e., hours spent which were compensated by the various modifications to the Contract, and that "LCC-MZT does not separate change order hours from its overall labor hours," but "does separate out labor costs for change orders from its overall labor costs," consisting of "approximately $500,000 on labor costs associated with change order work." In order to arrive at the number of labor hours expended on the

136

project not inclusive of the amount "associated with change order work," Mr. Manginelli divided the amount of labor hours LCC-MZT expended on the total Contract, 51,159 labor hours, by the total amount he asserted was expended on the project, $3,068,077, to come up with a "labor rate of $59.97." Mr. Manginelli calculated that "LCC-MZT spent approximately 8,337 hours on change order work ($500,000 / 59.97) and 42,822 hours on contract work." In order to calculate the amount of labor hours and costs he alleges are associated with loss of production on contract work, Mr. Manginelli asserted:

> LCC-MZT's estimate establishes that LCC-MZT planned to expend 35,438 hours to construct the project. However, as noted above, 42,822 hours were expended on contract work. Therefore, 7,384 hours were lost due to the inefficiency caused by the impacts described herein. That figure multiplied by the effective labor rate of $59.97 equals a total loss due to inefficient work of $442,818, without markups.

(footnote omitted). After markups, which includes $44,281.80 associated with "Prime Contractor Field Office OH [overhead] (10%)," the final total cost for loss of production in Mr. Manginelli's revised expert report increased to $507,044.94. Plaintiff's argument in its post-trial brief for REA 33 is exclusively based on Mr. Manginelli's analysis.

Defendant's expert Mr. Weathers, in his expert report, challenged Mr. Manginelli's calculation of entitlement for loss of productivity, stating that plaintiff's expert's calculation "has not considered any inefficient hours incurred on the project that are traceable to LCC-MZT's actions/inactions." Also, with regard to Mr. Manginelli's comparison of this project to the P-971 project, Mr. Weathers asserted that "[t]here has been no evidence provided to demonstrate that LCC-MZT had performed well on the P-971 project and/or that LCC-MZT used the actual performance cost and labor records from this project performed 8 years ago as a basis for calculating LCC-MZT's bid on this project." Additionally, Mr. Weathers' expert report stated that Mr. Manginelli's analysis, "while framed as a measured mile analysis is tantamount to a total cost claim where the amount claimed is based on the difference between (1) the actual hours incurred on the base Contract scope of work as compared to (2) the bid hours." In addition to relying on Mr. Weathers' analysis, defendant argues in its post-trial brief that since "LCC-MZT has essentially submitted a total labor cost claim," "to recover under a total cost approach, a contractor must prove: '(1) the impracticability of proving its actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs.'" (quoting Propellex Corp. v. Brownlee, 342 F.3d 1335, 1339 (Fed. Cir. 2003)). Defendant contends that LCC-MZT has not established any of these four requirements. Defendant further asserts, regarding Mr. Manginelli's deduction of $500,000-worth of labor hours from his total cost calculation, that Mr. Manginelli

> was unable to provide a clear answer as to which labor, exactly, that figure covered. In his deposition, he testified that the figure represented "labor associated" with change orders. But at trial, he claimed that the $500,000 was intended to encompass all potential duplication, including "the roof testing," "extended field overhead," "directed acceleration associated with

the utility relocation" and "red-day disruption." Neither Mr. Manginelli nor any other LCC-MZT witness was able to explain which costs make up the $500,000 deduction. And as Mr. Weathers testified, LCC-MZT's other REAs—without taking into account *any* labor associated with already-paid change orders or roof repair—seek recovery of 15,586 hours. This amount is over twice the number of hours sought by REA 33.

(internal citations omitted; emphasis in original).

A loss of productivity claim "is based upon the theory that individual compensable changes to a Contract, taken as a whole, can have such a disruptive effect on the contractor's performance that the contractor has a compensable claim for costs in addition to the amounts of its individual change orders." Jackson Constr. Co., Inc. v. United States, 62 Fed. Cl. at 103–04.

In Ace Constructors, Inc. v. United States, a Judge on the United States Court of Federal Claims has stated that a contractor may recover for loss of productivity, also known as "loss of efficiency,"

if it can establish both that a loss of efficiency has resulted in increased costs and that the loss was caused [by the government]." Cibinic and Nash 745. "That loss of productivity of labor resulting from improper delays caused by defendant is an item of damage for which plaintiff is entitled to recover admits of no doubt." Luria Bros., 369 F.2d at 712 (citing Abbett Elec. Corp. v. United States, 142 Ct. Cl. 609, 162 F. Supp. 772 (1958)) (emphasis added). Productivity is, by its very nature, difficult to measure or quantify. The impossibility of proving the amount of loss of productivity with exactitude does not bar recovery for the loss. Luria Bros., 369 F.2d at 712 (citing Needles v. United States, 101 Ct. Cl. 535, 618, 1944 WL 3698 (1944)). A plaintiff need not prove loss of productivity "by books and records; almost always it has to be proven by the opinions of expert witnesses." Luria Bros., 369 F.2d at 712. "However, the mere expression of an estimate as to the amount of productivity loss by an expert witness with nothing to support it will not establish the fundamental fact of resultant injury nor provide a sufficient basis for making a reasonably correct approximation of damages." Id. (citing Wunderlich Contracting, 351 F.2d at 968).

Ace Constructors, Inc. v. United States, 70 Fed. Cl. 253, 282 (2006), aff'd, 499 F.3d 1357 (Fed. Cir. 2007); see also Sauer Inc. v. Danzig, 224 F.3d at 1348-49 (finding that the contractor "need not establish delay to overall contract completion to succeed on its disruption claim"); Edge Constr. Co. v. United States, 95 Fed. Cl. at 420.

In Propellex Corp. v. Brownlee, the United States Court of Appeals for the Federal Circuit stated:

138

> [T]he preferred way for a contractor to prove increased costs is to submit actual cost data because such data "provides the court, or contracting officer, with documented underlying expenses, ensuring that the final amount of the equitable adjustment will be just that—equitable—and not a windfall for either the government or the contractor." Dawco Constr., Inc. v. United States, 930 F.2d 872, 882 (Fed. Cir. 1991), overruled on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995).

Propellex Corp. v. Brownlee, 342 F.3d at 1338-39. The Federal Circuit in Propellex further explained that alternative to proving increased costs through actual cost data, contractors can use the total cost method, in which

> the measure of damages is the difference between the actual cost of the contract and the contractor's bid. See Raytheon Co. v. White, 305 F.3d 1354, 1365 (Fed. Cir. 2002). Before a contractor can obtain the benefit of the total cost method, it must prove: (1) the impracticability of proving its actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs. Servidone, 931 F.2d at 861.

Propellex Corp. v. Brownlee, 342 F.3d at 1338. A further alternative to proving increased costs through actual cost data, is the measured mile method which is "a form of total cost calculations that requires subjective judgment calls by the expert, who estimates damages by comparing periods of production that are unaffected by the contractor's alleged government-caused delay, with periods during which delays affected its production adversely." Daewoo Eng'g and Constr. Co., Ltd. v. United States, 73 Fed. Cl. 547, 580-81 (2006), aff'd, 557 F.3d 1332 (Fed. Cir.), reh'g and reh'g en banc denied, (Fed. Cir.), cert. denied, 558 U.S. 990 (2009); see also Fireman's Fund Ins. Co. v. United States, 92 Fed. Cl. at 699-704. "Contract Boards have accepted the Measured Mile method on occasion. We assume that a finder of fact faced with such a method of estimating damages would want to have confidence in the experts' ability and objectivity." Daewoo Eng'g and Constr. Co., Ltd. v. United States, 73 Fed. Cl. at 581 ("We did not have such a level of confidence in plaintiff's experts. Cross examination showed their choices of productive and non-productive periods to be arbitrary at best. More likely, they were chosen to achieve a pre-determined result.").

Because of the errors in Mr. Manginelli's original expert report prepared for the plaintiff, and his often unpersuasive testimony offered at trial before and also after he revised his report, especially compared to defendant's expert Mr. Weathers on the same subject matter,[46] Mr. Manginelli's credibility has been scrutinized carefully by the court before arriving at conclusions on the various requests for damages included in plaintiff's complaint. For example, although Mr. Manginelli made mention of the measured mile method in his analysis for loss of productivity, Mr. Manginelli ultimately concluded that

---

[46] As noted above, the court found Mr. Weathers more credible and far more persuasive in his testimony at trial and in his expert report than Mr. Manginelli, plaintiff's expert.

"there was no unimpacted period that could be used in the measured mile," and that "a reasonable measure of the lost productivity would be its labor overrun on this project." As explained above, Mr. Manginelli took what he alleged were the planned, or bid, labor hours for the project and subtracted them from the labor hours actually expended on the project, and then subtracted the labor hours allegedly resulting from modifications to the Contract, for a cumulative difference of 7,384 labor hours, to all of which Mr. Manginelli believes LCC-MZT is entitled. Mr. Manginelli's analysis, however, demonstrates no degree of specificity when accounting for either the 8,337 labor hours he claimed he discarded as associated with "change order work," or the additional 7,384 labor hours to which he believes LCC-MZT is entitled as lost to inefficiency. Therefore, it is unclear the extent to which the additional labor hours requested include labor hours caused by delays or impacts for which the court has found, above, that LCC-MZT should not be compensated, or for which plaintiff may have contributed to delays that each party asserted were caused by the other party. As discussed throughout the Opinion, the court has found that several of the delays claimed by plaintiff were not compensable because either the defendant was not solely responsible for the delays, or because the Contract's Specifications did not provide for compensation. For example, in the case of anticipated Red Days, the court has found that the only circumstances under which LCC-MZT may be entitled to compensation for a Red Day are: (1) if LCC-MZT's workers could not work for more than fifty percent of a Red Day; (2) there were more than ten Red Days on working days in a single month; or (3) there was a scheduling change related to an anticipated Red Day with less than forty-eight hours' notice to plaintiff. Indeed, the court found above that the vast majority of Red Days after August 14, 2013 did not rise to become considered compensable. Because plaintiff's expert Mr. Manginelli does not explain the origin of the additional labor hours claimed, the court cannot accept the labor hours identified and claimed by Mr. Manginelli or the plaintiff, as plaintiff bears the burden of proof to recover any additional labor hours. See Ace Constructors, Inc. v. United States, 70 Fed. Cl. at 274 (stating that "the burden is on" the contractor "to establish the amount of the equitable adjustment by a preponderance of the evidence" (citing Teledyne McCormick-Selph v. United States, 218 Ct. Cl. 513, 588 F.2d 808, 810 (1978))).

In addition, although LCC-MZT has consistently maintained that it is not looking to recover costs associated with concrete repairs, especially for the work done by LCC-MZT's subcontractor, Contech, due to Contech's initial faulty concrete repair, Mr. Manginelli's lost productivity analysis seems calculate compensation for such additional labor hours associated with concrete repairs. If Mr. Manginelli only reduced the additional labor hours, as he claims, by those associated with the various modifications to the Contract, work which concrete repair would not be considered because it was not subject to any modification, and if the amount of labor hours included in LCC-MZT's bid did not account for the significant concrete repairs that occurred on the project, which could not have been foreseen when LCC-MZT submitted its bid for this project, then Mr. Manginelli's calculation would necessarily include the additional labor hours for concrete repair in the 7,384 labor hours to which Mr. Manginelli believes LCC-MZT is entitled. Because Mr. Manginelli did not identify, explain, or break down with any degree of specificity the allocation of claimed additional labor hours, his calculations cannot be

verified and plaintiff has not met its burden of proof to establish entitlement to the cost of such additional labor hours.

Mr. Manginelli and the Department of Justice attorney, Ms. Krystyniak, had the following exchange on cross-examination about the nature of the 8,337, or $500,000.00-worth of labor hours plaintiff's expert had deducted from the total labor hours incurred on the project:

Ms. Krystyniak: Okay. Okay. So I'd like to turn now to your loss of productivity analysis. So your report opines that MZT is entitled to recover approximately $442,00 plus markup associated with their loss of productivity on the project, correct?

Mr. Manginelli: I believe that's correct. I think I have the report --

\* \* \*

Ms. Krystyniak: Because, Mr. Manginelli, your loss of productivity analysis doesn't change depending on who's found to be at fault for the roof, correct?

Mr. Manginelli: Correct.

Ms. Krystyniak: You opine that, regardless, MZT is entitled -- regardless of who is to blame for the roof, MZT is entitled to recover their loss of productivity?

Mr. Manginelli: Yes. On the -- the base -- on the basis this analysis was done, yes.

\* \* \*

Ms. Krystyniak: So instead, because -- you concluded that because MZT had based their bid on the P-913 contract on the P-971 contract, on which they told you they had performed well, you could just look at the total number of hours that they bid on this contract and see what the labor overrun was and that would be your loss of productivity. Is that fair?

Mr. Manginelli: With some adjustments, I felt that was about the best approach available given the documentation that was available, yes.

Ms. Krystyniak: And which adjustments did you make?

Mr. Manginelli: I took out hours that I believed were associated with other REAs, like you mentioned the roof, for example.

Ms. Krystyniak: Mm-hmm.

Mr. Manginelli: As -- as well as change orders. So I'm referring to the $500,00 that I translated into hours on an earlier page in the report.

Ms. Krystyniak: So it's your testimony that $500,000 represents hours reflected in the REAs that are also pending before the government?

Mr. Manginelli: Yes. My -- my intent was to make a deduction so that there was no duplication. And on that I worked with Mr. King.

* * *

Ms. Krystyniak: So when I spoke to you last November [during your deposition], you told me that that $500,000 represented change order work, so work that had already been performed and compensated, correct?

Mr. Manginelli: Yes. I think the -- this is about the third time in this deposition that we discussed this 500,000, and I admitted that I needed to go back and verify the -- the purpose of it. The -- the change orders were not just previous change orders or approved change orders. They were the change orders that -- that Mr. King had put together.

And so I -- admittedly at this point in time, I was, you know, confused as to what exactly he had done, and since then I went back and went over that with him.

* * *

Ms. Krystyniak: Okay. So at the time you testified that it was your understanding that it was just hours or estimate of labor hours associated with change orders, but you've since gone back and verified that $500,000 encompasses change orders and REAs?

Mr. Manginelli: Yes. I think earlier in the deposition I had indicated that I was not sure. That I needed to go back and check that.

Ms. Krystyniak: And so you hadn't confirmed that before opining that MZT is entitled to recover under their loss of productivity?

Mr. Manginelli: Well, again, I had gone over those numbers with Mr. King early on and asked him that -- you know, what I wanted that number to represent, but I did not get into the details of what the number was.

* * *

Ms. Krystyniak: So essentially -- I think you said this already, but essentially your loss of productivity analysis is a comparison between the hours that they bid and the labor hours that they ended up spending, correct?

Mr. Manginelli: Yes, with a deduction to try to ensure there was no duplication of other changes.

Ms. Krystyniak: And you already mentioned this, but you did not do two paths of loss of productivity, one for which MZT is liable for the roof issues and one for which it is not, correct?

Mr. Manginelli: No. My understanding was that the 500,000 took that out of the productivity and into a different REA.

Ms. Krystyniak: So the 500,000 took out all the labor in change orders, correct? That's your understanding?

Mr. Manginelli: Yes.

Ms. Krystyniak: And also all the labor associated with the roof work?

Mr. Manginelli: Yes. Well, not the labor associated with the roof work. I believe it was testing associated with the roof work.

Ms. Krystyniak: Sure. And I think your report indicates that there is a pending REA for cost associated with the roof testing that you are not opining on, correct?

Mr. Manginelli: That's correct.

Based on this conversation at trial between Mr. Manginelli and Ms. Krystyniak, it indeed appears that Mr. Manginelli's analysis included in his revised expert report and testimony was not specific on the types of labor hours that he deducted from the total labor hours on the project, and he testified that he did not "get into the details of what the number was" when preparing either his original expert report or revised expert report. Without any degree of specificity or certainty in his analysis and calculations, Mr. Manginelli as plaintiff's expert witness, was not able to support, by a preponderance of the evidence, that defendant was responsible for the additional labor hours and costs LCC-MZT seeks to recover. LCC-MZT's REA 33, as submitted in LCC-MZT's request for contracting officer's final decision was similarly without explanation on these issues. Therefore, without further explanation in plaintiff's REA 33, and because plaintiff solely relies on Mr. Manginelli's analysis and calculations, the court finds that LCC-MZT has failed to establish entitlement to compensation for loss of productivity.

<u>REA 17 - Furniture, Fixtures, and Equipment (FF&E) Cost Variance</u>

LCC-MZT's REA 17 states that it "is to provide the adjustment due to the price increases from the FF&E package quotation to purchase, storage and installation." In plaintiff's post-trial brief, plaintiff asserts that LCC-MZT is entitled to $99,254.00 because of price increases from the prices quoted in Modification 2, as well as for "extended" storage fees incurred by LCC-MZT. Plaintiff argues that Modification 2 was issued in July 2012, which is "approximately two years before project completion." (emphasis in original). According to plaintiff, "LCC-MZT was directed to purchase the FF&E by NAVFAC on February 21, 2013," and "[w]hile NAVFAC claims that LCC-MZT should have arranged for 'late delivery,' this would also result in added cost, and there is no testimony to the contrary. Overall, it would be inequitable for LCC-MZT to absorb these costs." Plaintiff asserts that its claimed increased costs constitute a change under the Changes clause, FAR § 52.243-4.

By contrast, defendant argues that LCC-MZT failed to comply with the terms in the Contract when purchasing the FF&E, and that LCC-MZT's claimed costs are not attributable to government action. Defendant contends that Modification 2 "was planned, with its terms agreed upon in the original Contract," and "fairly compensated LCC-MZT in accordance with the Contract." According to defendant's post-trial brief, "the Contract specifications require prior approval to receive additional compensation for discontinued items; unless otherwise approved, FF&E was required to be purchased and installed 'exactly as designed and specified, or approved equal, by the Government, URS [Corporation] and its subcontractor.'"

The Changes clause, FAR § 52.243-4, cited by plaintiff, states:

(a) The Contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes—

(1) In the specifications (including drawings and designs);

(2) In the method or manner of performance of the work;

(3) In the Government-furnished property or services; or

(4) Directing acceleration in the performance of the work.

FAR § 52.243-4(a).

As discussed above, section 01 50 01 of the Contract's Specifications, titled "PROCUREMENT AND INSTALLATIONS OF FURNITURE, FIXTURES AND EQUIPMENT," provides at paragraph 1.1 that LCC-MZT "shall provide the procurement and installation of all Furnishings, Fixtures, and Equipment (FF&E) exactly as designed and specified or approved equal by the Government, URS, and it's subcontractor 3B Designs during the design phase of this project." (capitalization in original). Paragraph

1.2.1 in section 01 50 01 of the Contract's Specifications states that the FF&E package was to be a "planned modification," and that "[u]pon receipt of required funding, the Prime Contractor shall be authorized by the Contracting Officer, as a planned modification to the construction contract, to procure and install all Final FF&E using Federal Government price schedules (NAVSUP BPAs and/or GSA)." (capitalization in original). Paragraph 1.2 states that the FF&E package awarded was to include "shipping, freight, handling, installation, and the contractor's FF&E Handling and Administration Rate (HAR) percentage as applied to the final FF&E total cost." (capitalization in original). Regarding the Handling and Administration Rate, paragraph 1.2.1 states:

> The HAR [Handling and Administration Rate] includes all of the Prime Contractor's effort related to storage, coordination, handling, administration of subcontractors, and all other associated costs and profit for the procurement of FF&E. The Prime Contractor will propose in the contract solicitation the FF&E HAR. The prime Contractor's proposed HAR may not exceed 5 percent of the total FF&E costs, as noted on the bid schedule.

(capitalization in original). Regarding "PROCUREMENT AND INSTALLATION" of the FF&E, paragraph 1.3 in Section 01 50 01 of the Contract's Specifications states:

> The Contractor shall coordinate the building completion date with the installation dealer(s) specified in the FF&E Package.

> The FF&E package provided to the Prime Contractor at the modification award shall reflect current pricing certified by the manufacturers and the Interior Designer of Record, NAVFAC NW. Pricing will be guaranteed, but the Prime Contractor shall be responsible for verifying the pricing prior to the award of the modification.

> The Prime Contractor shall anticipate possible manufacturer price increases if order placement is delayed. It is recommended to order the FF&E product once the planned modification is awarded and funds are received to avoid incurring additional costs. Delayed production and delivery dates can be noted at the time of order placement to coincide with building completion dates. Any costs incurred due to manufacturer price increases will be the burden of the Prime Contractor.

(capitalization in original).

On July 3, 2012, NAVFAC contracting officer Mona Carlson unilaterally issued Modification 2, which increased the value of the Contract by $514,026.25 to compensate LCC-MZT for the costs, but not for the time, associated with providing and installing the FF&E package set forth in Modification 2, which included items such as beds, rifle cabinets, treadmills, squat racks, microwaves, and televisions. Attached to Modification 2 is a document titled "**FINAL COST ESTIMATE SUMMARY - revised**," (capitalization and emphasis in original), which included a line-item breakdown of the $514,026.25 provided

to LCC-MZT through Modification 2. The breakdown included the prices for all of the FF&E items to be purchased, including a subtotal of $226,882.00 for items manufactured by Turnbull, and a subtotal of $106,335.74 for all other items. An amount of $95,882.00 was added to the Turnbull items for "**Installation**," and an amount of $21,267.15 was added to the remaining items for "Delivery and Installation." (capitalization and emphasis in original). An amount of $39,181.92 was added for "WA State Sales/Use Tax" at 8.7%, and an amount of $24,477.44 was added for "Contractor's HAR" at 5%. (capitalization in original). A separate document attached to Modification 2, titled "**STEEL BERTH AND LOCKER QUOTE**," indicates that the prices for the items manufactured by Turnbull were taken from a quote dated August 15, 2011, but Modification 2 does not indicate from what date the remaining items in the FF&E package were quoted. (capitalization and emphasis in original).

According to Bryan Zatica's testimony, NAVFAC issued Modification 2 when LCC-MZT "roughly" was mobilizing to the project site. Bryan Zatica testified that "typically"

> [y]ou want to do it [the FF&E] at the very end. You want to have them come in -- and unfortunately they don't show up like a desk. They show up with pieces and parts, screws and nuts and all that stuff. So you want to make sure that the place is cleaned, ready, install the FF&E, wipe it down, walk out the door.

According to the testimony of LCC-MZT's project manager Jim Mortensen, in February 2013, he attempted to "request proposals for the FF&E package only to have the suppliers tell me that we weren't authorized to purchase." Thereafter, LCC-MZT requested authorization from NAVFAC to purchase from the sources in the FF&E package. On February 21, 2013, Mona Carlson sent LCC-MZT a letter stating that LCC-MZT was "hereby authorized to utilize General Services Administration (GSA) supply sources for the purchase of furniture, fixtures, and equipment (FF&E) under the subject contract." Based on the invoices included in REA 17, LCC-MZT ordered at least some of the items in the FF&E package by late June of 2013, and stored the FF&E package offsite until it was installed. When attempting to install the FF&E package, Jim Mortensen testified that LCC-MZT "had to build an alternate route to offload it on the job site" because "[m]ost of the furniture and accessories that went in the building would not fit through the doors on the -- from the parking lot side because they had shielded barriers, concrete barriers, wouldn't allow you to get in and around inside the building."

LCC-MZT's REA 17 seeks compensation "due to price increases from the FF&E package quotation to purchase, storage, and installation." [sic] LCC-MZT's post-trial brief asserts that "[i]ncreased material prices, new prices for the replacement of discontinued items, extended storage costs and costs for construction of an alternate access route are" included in REA 17. Regarding storage costs, as discussed above, paragraph 1.3 of section 01 50 01 of the Contract's Specifications states that LCC-MZT "shall coordinate the building completion date with the installation dealer(s) specified in the FF&E Package," and that "[d]elayed production and delivery dates can be noted at the time of order placement to coincide with building completion dates." Paragraph 1.3 of section 01

50 01, therefore, indicates that LCC-MZT could have requested a delayed delivery date instead of having stored the FF&E package offsite. The record before the court does not indicate whether LCC-MZT would have incurred additional fees if it had chosen to delay delivery instead of storing the FF&E package offsite.[47] Regardless, Modification 24 compensated LCC-MZT for storage costs, which were included in the five percent markup of $24,477.44 for LCC-MZT's Handling and Administration Rate, as explained in paragraph 1.2.1 of section 01 50 01 of the Contract's Specifications, which states that "HAR [Handling and Administration Rate] includes all of the Prime Contractor's effort related to storage, coordination, handling, administration of subcontractors, and all other associated costs and profit for the procurement of FF&E." (capitalization in original). Moreover, paragraph 1.2.1 in section 01 50 01 of the Contract's Specifications provides that LCC-MZT's "proposed HAR may not exceed 5 percent of the total FF&E costs." LCC-MZT, therefore, received the maximum in storage costs based on the amount awarded to LCC-MZT through Modification 24, in accordance with the Contract's Specifications, and is not entitled to additional FF&E storage costs.

As discussed above, also included in plaintiff's request in REA 17 for $99,254.00 were additional installation costs resulting from having to build an "alternate route" to off-load the FF&E package onto the job site. As stated above, paragraph 1.2.1 of section 01 50 01 of the Contract's Specifications states that the amount of the FF&E modification "will be the actual cost of these items from the Federal Government price schedules (NAVSUP BPAs and/or GSA), including any freight and installation charges from the furniture supplier as well as the Prime Contractor's HAR." (capitalization in original). Paragraph 1.2.1 also stated that the Handling and Administration Rate was to include "all of the Prime Contractor's effort related to storage, coordination, handling, administration of subcontractors, and all other associated costs and profit for the procurement of FF&E." (emphasis added). As explained above, LCC-MZT received the maximum allowable Handling and Administration Rate per the Contract's Specifications, which was five percent. Included in the award for Modification 2 were amounts of $95,822.00 and $21,267.15 related to installation, as well as $24,477.44 for LCC-MZT's Handling and Administration Rate. Thus, NAVFAC compensated LCC-MZT for installation in accordance with the Contract. Moreover, REA 17 does not include an amount specifically related to the additional costs associated with having to build an alternate route. LCC-MZT's Jim Mortensen, who testified that he prepared REA 17, had the following exchange with plaintiff's attorney, Mr. Ramseyer on direct examination regarding the amount requested REA 17:

---

[47] At closing argument, plaintiff's attorney asserted:

> [T]here's a good chance -- and we haven't had any direct testimony on this -- but I would suggest to the Court that there's going to be an extra cost for a delayed delivery, and it's going to be -- you are going to also run into the issue of not being able to pick out of inventory and hold product that has been discontinued. So I don't think it was a -- I don't think it's a feasible -- from a practical standpoint, I just don't think that that would be feasible.

Mr. Ramseyer: And after having compiled the costs in this matter, can you tell us what the amount of this REA 17 submitted to the government was?

Mr. Mortensen: Well, REA 17 was the difference of the cost.

Mr. Ramseyer: Yes.

Mr. Mortensen: What we did is we went through and priced it all out and came back. And at the bottom it says $99,254.00

Plaintiff's REA 17 compiled all of the costs of material and labor from LCC-MZT and its subcontractors related to the FF&E package, and appears to subtract the amounts received through Modification 24, although LCC-MZT has not identified the specific nature of many of the figures used in LCC-MZT's breakdown of expenditures related to the FF&E package. The amount that LCC-MZT allegedly expended to build the alternate route does not appear to be derivable out of the expenditure spreadsheets attached to REA 17, and this amount also was not provided during the trial, nor did LCC-MZT offer testimony regarding the costs to build an alternate route. The court, therefore, is unable to determine how much LCC-MZT expended above and beyond what was awarded in Modification 2 specifically to complete the alternate route. LCC-MZT, therefore, has not met its burden to establish entitlement to additional costs for building an alternate route for the installation of the FF&E package.

Additionally, plaintiff's REA 17 requested costs related to the increased prices of items to replace FF&E package items which were discontinued by the time LCC-MZT purchased the FF&E package, as well as costs related to the increase in prices of non-discontinued items which were described as more expensive at the time they were procured by LCC-MZT from the time they were quoted and funds were awarded to LCC-MZT in Modification 2. Modification 2 was awarded on July 3, 2012, and LCC-MZT was authorized by NAVFAC to purchase the FF&E package on February 21, 2013. Modification 2 indicated that the prices for the items manufactured by Turnbull were based on a quote dated August 15, 2011, and Modification 2 does not indicate the date on which the remaining items were quoted. Based on the invoices attached to REA 17, it appears that LCC-MZT ordered at least some of the items in the FF&E package by late June of 2013. Regarding the discontinued items, paragraph 1.3.11 in section 01 50 01 of the Contract's Specifications states: "Submit any revisions or deviations caused by discontinued items to the Contracting Officer for approval by the NAVFAC Interior Designer." Paragraph 1.3.10 of section 01 50 01 states that "price adjustments must be negotiated" for the FF&E package. To the extent LCC-MZT attempted to replace discontinued items, LCC-MZT was required by the Contract to contact NAVFAC for approval for changes to the FF&E package based on discontinued items.

The record before the court, however, does not indicate that LCC-MZT contacted NAVFAC about a change to the FF&E package caused by discontinued items. In Chief of the NAVFAC Contracting Office Eileen Mitchell's August 1, 2016 final decision, Ms. Mitchell states that "[t]here is no record that you notified the ACO regarding FF&E price

changes and that you waited to file a claim with the alleged price differences." (capitalization in original). Regarding the increased costs of items at the time LCC-MZT ordered the FF&E package, the Contract's Specifications in paragraph 1.3 of section 01 50 01, quoted above, stated that "[t]he Prime Contractor shall anticipate possible manufacturer price increases if order placement is delayed." The record before the court does not provide a basis on which to determine whether the alleged price increases were the result of the delayed ordering of the FF&E package, or were the result of NAVFAC using outdated prices at the time it issued Modification 2. In REA 17, LCC-MZT provided certain quotations of FF&E items in October 2012, but LCC-MZT has not established that the prices used in Modification 2 were not accurate at the time Modification 2 was issued on July 3, 2012. Moreover, as was the case with the replacement of discontinued items, the record before the court does not indicate that LCC-MZT notified NAVFAC regarding any increased prices. Finally, paragraph 1.3 of section 01 50 01 stated that "[a]ny costs incurred due to manufacturer price increases will be the burden of the Prime Contractor." As such, LCC-MZT has not met its burden to establish entitlement to increased purchase costs related to the FF&E package as claimed in REA 17.

REA 36 – Schedules & Claims Consultant Fees

In REA 36, LCC-MZT seeks $196,134.00 for additional costs incurred by its subcontractor Mirack from December 17, 2013 to March 27, 2015. The narrative in REA 36 states:

MIRACK [sic] Construction provided LCC-MZT consulting services for the Time Impact Analysis and Request for Equitable Adjustment from December 2013 through March 2015. These services included but were not limited to (1) Review of all Correspondence to and from Owner (2) Weekly and Monthly Schedule Review (3) Review of Daily Logs from Superintendent and Quality Control Personnel (4) Client Meetings (5) Preparation of Time Impact Analysis and (6) Preparation of the Additional Costs.

(capitalization in original). The narrative in REA 36 further asserts, in similar language to many of LCC-MZT's other REAs:

The Government required LCC-MZT to accelerate, stack trades and re-sequence the work to mitigate the Government's disruptions, impacts, delays to meet the December 16, 2013 Substantial Completion Date and February 16, 2014 Contract Completion Date. The Government's Delays, Impacts and Disruptions delayed the completion of the project and required LCC-MZT to hire a schedule and claims consultant to prepare the Time Impact Analysis and Requests for Equitable Adjustments. Per FAR clauses 52.243-04-Contract Changes, 52.236-02 Differing Site Conditions, 52.246-12-Inspection, 52.236-11-Use & Possession, 52.242-14-Suspension of Work, 52.245-01-Government Property and 52.211-13-Time Extensions, LCC-MZT is requesting payment of these additional costs.

149

(capitalization in original). REA 36 includes markups, assigning 10% for "Prime Field Office Overhead," 5% for "Prime Mark Up on Subcontractors," 3% for "Prime Home Office Overhead," 3% for "Prime Profit," and 0.484% for "B & O Tax." (capitalization in original). REA 36 also includes Mirack's monthly invoices, with the first charge on December 17, 2013, and the last charge on March 27, 2015. The only description provided in each invoice is "Consulting for P-913 EHW Security Force Facility Claim and Schedule." The monthly invoices only are broken down by week, indicating how many hours are being charged by Mirack for that week, with hours charged at the rate of $155.00 per hour. In plaintiff's post-trial brief, plaintiff argues that "LCC-MZT was forced to obtain assistance from a consultant given the difficulty caused by the delays to the Project." (citing Clark Concrete Contractors, Inc. v. Gen. Servs. Admin., GSBCA No. 14340, 99–1 BCA ¶ 30280, 1999 WL 143977 (1999)). Plaintiff asserts that "[w]hile NAVFAC has argued that it is unclear what services were provided and whether LCC-MZT is seeking costs relating to prosecution of claims, this is simply not accurate." Plaintiff contends that it produced Mirack's invoices, "which demonstrate that LCC-MZT is only seeking costs for invoices issued by Mirack during the extended duration." Plaintiff also contends that Mr. King, who was Mirack's employee and served as LCC-MZT's scheduler, claims consultant, and interim project manager, "testified that REA 37 [sic] only seeks costs incurred by LCC-MZT for changes-related work during the extended duration." According to plaintiff, "NAVFAC's expert, Mr. Weathers, concurred that LCC-MZT is entitled to these costs if they were incurred in preparing REAs and associated time impact analyses, but he believes the invoices" in REA 36 "are not clear as to what the consultant was doing during the claimed time period."

During the trial, defendant's expert Mr. Weathers was briefly questioned about REA 36 on direct examination, and provided a demonstrative which offered his opinion that "[t]o the extent LCC-MZT can establish that it incurred the scheduling and consulting cost as a result of the requirement to establish its entitlement to time extensions, LCC-MZT would be entitled to these costs." In defendant's post-trial brief, defendant argues that because "LCC-MZT was solely responsible for scheduling and, to perform under the Contract, it needed an approved Scheduler." Defendant also argues that "costs expended for prosecution of claims against the Government are not recoverable unless part of 'contract administration,'" and that plaintiff cannot recover for costs associated with REAs, because "[c]osts incurred for preparing the REAs are part of LCC-MZT's costs for 'prosecution of claims against the Government.'" (quoting Tip Top Constr., Inc. v. Donahoe, 695 F.3d 1276, 1283 (Fed. Cir. 2012) (citing FAR 31.2015-47(f)(1))). Defendant further contends that "[t]he Scheduler, therefore, is properly part of LCC-MZT's overhead costs and already recovered under the Contract's terms, not a separate cost for which it is entitled to compensation," and that "[w]hether the Scheduler was an employee of LCC-MZT, or a subcontractor—such as Mr. King through Mirack—was part of the means and methods that determined [sic] by LCC-MZT." In addition, defendant contends that the invoices do not "point to what portions [of each invoice] relate to which REAs." Defendant also argues that "the costs claimed are unreasonable" because "Mirack costs are marked up twice:" once for CJW, the company to which Mirack was a subcontractor and "which contracted with LCC-MZT," and then another time for LCC-MZT. Defendant also asserts

that LCC-MZT did not ever "present evidence that Mr. King was actually even approved as the Project's Scheduler." (capitalization in original). Defendant also contends that "the timeframe presented for recovery under the REA is unreasonable." Finally, defendant argues that "LCC-MZT failed to demonstrate with necessary particularity that the invoices attached to its REA relate to anything other than items Contractually required, or to the prosecution of its claims against NAVFAC," but that "if the Court determines that LCC-MZT is entitled to recover any portion of its scheduling and claim consulting costs, LCC-MZT's claims should be limited to only those amounts proven to be related to its computation of the TIA [Time Impact Analysis]." (capitalization in original).

FAR § 31.205-33(b) provides that "[c]osts of professional and consultant services are allowable," subject to certain limitations. FAR § 31.205-33(b) (2020). Relevant to the case brought by plaintiff, one of the limitations, which is set forth in FAR § 31.205-47, states that "the prosecution of claims or appeals against the Federal Government" are "unallowable." FAR § 31.205-47(f) (2020). In Tip Top Construction, Inc. v. Donahoe, 695 F.3d 1276, the United States Court of Appeals for the Federal Circuit examined whether consulting fees incurred during the negotiation of an equitable adjustment were classified as general contract administration costs, or costs "incurred in connection with the prosecution of a CDA claim, the former being recoverable, but the latter not." Id. at 1282-83 (citing Bill Strong Enters., Inc. v. Shannon, 49 F.3d 1541, 1549 (Fed. Cir. 1995), overruled on other grounds, Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995)). The Tip Top court, quoting the Federal Circuit's previous analysis in Bill Strong, stated:

"If a contractor incurred the cost for the genuine purpose of materially furthering the negotiation process, such cost should normally be a contract administration cost allowable under FAR 31.205-33, even if negotiation eventually fails and a CDA claim is later submitted. On the other hand, if a contractor's underlying purpose for incurring a cost is to promote the prosecution of a CDA claim against the Government, then such cost is unallowable under FAR 31.205-33."

Tip Top Constr., Inc. v. Donahoe, 695 F.3d at 1283-84 (capitalization in original) (citations omitted) (quoting Bill Strong Enters., Inc. v. Shannon, 49 F.3d at 1549–50; see also Meridian Eng'g Co. v. United States, 122 Fed. Cl. 381, 422 (2015) ("[T]he trial court should determine whether certain costs are for contract administration or CDA prosecution, based on whether or not the costs were incurred for 'the genuine purpose of materially furthering the negotiation process,' i.e., for contract administration purposes." (quoting Bill Strong Enters., Inc. v. Shannon, 49 F.3d at 1550)), aff'd in part, rev'd in part on other grounds, 885 F.3d 1351 (Fed. Cir. 2018); SUFI Network Servs., Inc. v. United States, 105 Fed. Cl. 184, 192–93 (2012); Env't Tectonics Corp. v. United States, 72 Fed. Cl. 290, 298 (2006); SAB Constr., Inc. v. United States, 66 Fed. Cl. 77, 90 (2005), aff'd, 206 F. App'x 992 (Fed. Cir. 2006).

In REA 36, LCC-MZT claims entitlement to "Schedule & Claims Consulting Fees" incurred from LCC-MZT's use of subcontractor Mirack from December 2013 to March 2015. The parties stipulated that LCC-MZT used Mirack's employee, John King, as LCC-

MZT's scheduler for the P-913 project. He replaced Mr. Kugan, also a subcontractor to LCC-MZT, as scheduler in November 2012. Mr. King was LCC-MZT's only scheduler for the duration of the project after Mr. Kugan's departure. The parties stipulated that, in addition to his role as scheduler, Mr. King also performed other "various duties on the Project," such as claims consultant and "interim project manager." Based on the record before the court, it appears that the costs claimed in REA 36 relate to the services provided to LCC-MZT by no one other than Mr. King, as it appears that no other individual was acting in the capacity of LCC-MZT's scheduler or claims consultant between December 2013 and March 2015.

As discussed throughout this Opinion, LCC-MZT engaged in multiple negotiations and exchanges of information with NAVFAC in an attempt to agree on how exactly the project was impacted by the various delays. To the extent that the costs claimed in REA 36 were incurred from Mr. King's assistance in preparing LCC-MZT's Time Impact Analysis, such costs were incurred to benefit the project and for the "genuine purpose of materially furthering the negotiation process," Bill Strong Enters., Inc. v. Shannon, 49 F.3d at 1550, and, therefore, would be allowable costs in accordance with FAR § 31.205-33. Mr. King testified, however, that he also assisted in the preparation of LCC-MZT's three requests for a contracting officer's final decision, the first of which request was submitted by letter dated May 28, 2015, and which contained language stating that the letter is "intended as a claim by LCC-MZT Team IV (LCC-MZT) pursuant to the Contract Disputes Act of 1978, as amended (48 U.S.C. [§] 601-613), and constitutes a written demand for payment of additional sums due LCC-MZT as set forth below on the above referenced project." As discussed above, LCC-MZT is not entitled to any consulting costs which were incurred in relation to the "prosecution of claims or appeals against the Federal Government," see FAR § 31.205-47, and "if a contractor's underlying purpose for incurring a cost is to promote the prosecution of a CDA claim against the Government, then such cost is unallowable." See Tip Top Constr., Inc. v. Donahoe, 695 F.3d at 1284. Therefore, to the extent that the costs requested in REA 36 were incurred from Mr. King's assistance in preparing LCC-MZT's requests for a contracting officer's final decision, such costs are not recoverable in this court.

As stated above, the only description included in each of the invoices is that the invoices were for "Consulting for P-913 EHW Security Force Facility Claim and Schedule," and no testimony was provided at trial to further explain each invoice. (capitalization in original). The generality of this description in each invoice means the court is unable to determine which part of each invoice, if any, were the result of Mr. King's assistance to prepare the requests for a contracting officer's final decision. Based on the record before the court, it appears that LCC-MZT and Mr. King began preparing LCC-MZT's requests for a contracting officer's final decision no later than December 17, 2014. That LCC-MZT began preparing the requests for a contracting officer's final decision on December 17, 2014 was alluded to in a May 8, 2015 letter from LCC-MZT to NAVFAC which stated that, during the negotiation process of LCC-MZT's Time Impact Analysis, NAVFAC sent a letter to LCC-MZT on December 17, 2014 in which NAVFAC "restated the Government's position for partial merit and contract extension of eight (8) days for Red Days and inclement weather," and that "LCC viewed this [December 17, 2014] letter as the final line

in the sand and started preparation to submit for a Contracting Officer's Final Decision." (capitalization in original). Because the invoices in REA 36 from December 2014 to March 2015 do not differentiate which costs, if any, are associated with Mr. King's assistance in the preparation of the LCC-MZT's requests for a contracting officer's final decision, and no testimony was provided to explain the breakdown of each invoice, there is no way for the court to determine which costs, if any, after December 17, 2014, were not incurred "in connection with . . . the prosecution of claims against the Federal Government," as deemed unallowable by FAR § 31.205-47. LCC-MZT, therefore, has not met its burden of proof to establish entitlement to the costs associated with the invoices in REA 36 from December 17, 2014 to final month of invoices in REA 36, March 2015.

For the earlier invoices included in REA 36, from December 2013 to December 16, 2014, LCC-MZT, as noted above, could be entitled to such scheduling and consulting costs to the extent such costs were incurred in relation to the seventy-six days of excusable, compensable delay found by the court earlier in this Opinion. Based on the absence of testimony at trial and the absence of exhibits in the record before the court, it is unclear, however, if such costs also may have been included in the cost pools used by the parties experts to determine the daily field office overhead incurred during the P-913 project, discussed earlier in this Opinion. Indeed, defendant's expert Mr. Weathers explained in his expert report that both he and Mr. Manginelli derived their respective daily rates for field office overhead using field office overhead cost pools which included costs for LCC-MZT's supervisors, such as the project manager. Although Mr. King was an employee of Mirack during the P-913 project, the parties have jointly stipulated Mr. King served as an interim project manager on the P-913 project, in addition to scheduler and claims consultant. Because of the lack of specificity relating to what work is covered by the invoices, and due to the ambiguity of Mr. King's role for the duration of the P-913 project, it is unclear whether the scheduling and consulting costs requested in REA 36 were included in this court's award to LCC-MZT for additional field office overhead. LCC-MZT, therefore, has not met its burden to establish that it is entitled to the additional costs associated with scheduling or claim consulting as requested in REA 36.

REA 39 – Attorney Fees

REA 39 "seeks recovery of attorneys' fees in the amount of $15,245.00 paid in connection with preparing LCC-MZT's request for a contracting officer's final decision." Attached to REA 39 was the invoice from the Procopio firm, dated March 12, 2015, the firm which also represents plaintiff during the proceedings in this court in the above-captioned case. The invoice indicates that $3,352.00 were for services for the month of February 2015, as well as $10,190.07 charged as "BALANCE FORWARD," for a total of $13,542.07. The invoice does not indicate when the $10,190.07 "BALANCE FORWARD" was incurred, or even what "BALANCE FORWARD" references, and there is no evidence in the record to support the $10,190.07 marked as "BALANCE FORWARD." (capitalization in original). The $3,352.00 charges for February 2015 include the following line-item breakdown of the services conducted by the firm:

Re:   WHARF SECURITY FORCE FACILITY

For Professional Services Rendered Through February 28, 2015

**Fees**

| DATE | ATTY | DESCRIPTION | HOURS |
|---|---|---|---|
| 02/02/15 | KMK | Prepare email to client regarding elements necessary for a contracting officer's final decision, deadlines for the same and other applicable requirements. | 1.70 |
| 02/03/15 | CAR | Telephone conference with Receiver regarding response from NAVFAC. Telephone conference with Mr. Zatica regarding negotiations. E-mail to client regarding constant contact with Contracting Officer.  E-mail to client regarding request for Contracting Officer's Final Decision. | 0.90 |
| 02/03/15 | KMK | Prepare email to client regarding statutory requirements for requesting a contracting officer's decisions and timing for filing the same, government's response and filing complaint; Draft form request for contracting officer's decision. | 1.70 |
| 02/05/15 | CAR | Review Macro-Z's correspondence with Design Air.  Telephone conference with Mr. Zatica regarding Design Air claim. | 0.50 |
| 02/06/15 | CAR | E-mail exchange with client regarding pass-thru agreement for Design Air. | 0.20 |
| 02/11/15 | CAR | E-mail exchange with Mr. Mortensen regarding subcontractor certifications. | 0.30 |
| 02/11/15 | KMK | Prepare certification of claim for letter for subcontractors. | 0.60 |
| 02/13/15 | CAR | Review multiple client e-mails. | 0.20 |
| 02/17/15 | CAR | E-mail to client regarding PSW claims. | 0.20 |
| 02/19/15 | CAR | Telephone conference with Attorney Doyle regarding claim of her client, PSW Electric. E-mail to clients regarding same. | 0.70 |
| 02/25/15 | CAR | Receipt and review of Bolte e-mail.  E-mail to client regarding same. | 0.20 |
| | | SERVICES TOTAL | $3,352.00 |

REA 39 also includes markups of 5% for "Prime Mark Up on Subcontractors," 3% for "Prime Home Office Overhead," 3% for "Prime Profit," and 0.484% for "B & O Tax." In Chief of NAVFAC Contracting Office Eileen Mitchell's August 1, 2016 final decision, LCC-MZT's REA 39 for attorney fees was addressed and denied in full.

On the eighth day of trial, defendant orally moved for a judgment as a matter of law pursuant to Rule 52(c) (2019) of the Rules of the United States Court of Federal Claims on a number of issues, including REA 39. Defendant asserted that there was no testimony offered with respect to REA 39, nor was REA 39 ever moved into evidence. In response, plaintiff's attorney Mr. Ramseyer explained that he believed that, before trial, there was a status conference in which the court indicated that issues of attorney's fees would be deferred to post trial. Similarly, plaintiff's attorney Ms. Knudsen's impression also was that REA 39 would be dealt with after the trial, even though REA 39 was not for attorney's fees related to preparing this litigation, but was for attorney's fees related to preparing the request for contracting officer's final decision, and was submitted in the

154

request for contracting officer's final decision.[48] On the ninth day of trial, when defendant's motion for judgment as a matter of law was again discussed, plaintiff offered to withdraw the claim in REA 39. Rather than offering to recall Mr. King, who had prepared the narrative to REA 39, as a witness, the parties agreed to admit REA 39, but not the narrative, and no additional testimony was offered to support the REA. Defendant's motion for judgment as a matter of law also was denied.

Chief of the NAVFAC Contracting Office, Eileen Mitchell, who had both REA 39 and the accompanying narrative, addressed REA 39 in her August 1, 2016 final decision, as follows:

> LCC-MZT asserts that its disagreements with the Government on time impacts required legal counsel and advice. FAR Paragraph 31.205-47(f) states "*Costs not covered elsewhere in this subsection are unallowable if incurred in connection with -- (1) Defense against Federal Government claims or appeals or the prosecution of claims or appeals against the Federal Government.*" I find no merit; these claimed costs are contrary to the FAR costs principles.

(capitalization and emphasis in original). In defendant's post-trial brief, defendant asserts that "[f]or many of the same reasons that LCC-MZT is not entitled to recover any portion of its claims for Mr. King's scheduling and claim consultant fees, it is not entitled to recovery for its claim for attorney fees." (internal citations omitted). Defendant further asserts:

> Plaintiff's counsel stated that the attorney fees in REA 39 were for costs associated with "the contracting officer's final decision of bracing that together." Examination of the line items in the one invoice attached to REA 39 demonstrates that all of the costs claimed are either for unallowable claim preparation costs, or for other unallowable costs.

The court reviewed the application of FAR § 31.205-47 and the limitation of recovering costs which are incurred "in connection with . . . the prosecution of claims against the Federal Government," FAR § 31.205-47(f), when addressing REA 36, above. This FAR provision also applies to attorneys' fees. See FAR § 31.205-47(a) (including "the costs of legal services" in the definition of "*Costs*" (emphasis in original)). As stated above, costs incurred related to the preparation of LCC-MZT's requests for a contracting officer's final decision are unallowable, as each request stated that it was "intended as a claim by LCC-MZT Team IV (LCC-MZT) pursuant to the Contract Disputes Act of 1978, as amended (48 U.S.C. 601-613), and constitutes a written demand for payment of additional sums due LCC-MZT as set forth below on the above referenced project." See Tip Top Constr., Inc. v. Donahoe, 695 F.3d at 1284 (quoting Bill Strong Enters., Inc. v.

---

[48] Notably, Department of Justice attorney Ms. Murdock-Park did not share plaintiff's counsels' position, and she stated that "I do not have the same recollection, Your Honor. I also don't remember this being directed to defer."

<u>Shannon</u>, 49 F.3d at 1550 ("[I]f a contractor's underlying purpose for incurring a cost is to promote the prosecution of a CDA claim against the Government, then such cost is unallowable under FAR 31.205-33. (capitalization in original)); <u>see</u> <u>also</u> <u>SUFI Network Servs., Inc. v. United States</u>, 105 Fed. Cl. at 192 (stating that "there is no <u>per</u> <u>se</u> bar to recovery of the plaintiff's attorneys' fees "that pre-date a contractor's actual filing of its Board appeal," but identifying <u>Bill Strong</u> as "the leading authority on the allowance of legal costs in government contracts").

At trial in the above-captioned case, no testimony was provided to support any of the charges included in the single February 2015 invoice from the Procopio firm, which was attached to REA 39, even after the discussion of whether or not to admit REA 39 and the attached invoice, but not to admit the narrative to REA 39, and counsel did not ask to recall Mr. King. Furthermore, the $10,190.07 entry for fees labeled as "BALANCE FORWARD" in the February 2015 invoice are not supported by evidence in the record, and, therefore, plaintiff has not met its burden to establish that the $10,190.07 charged as "BALANCE FORWARD" are recoverable. (capitalization in original). With respect to the line-item costs in the February 2015 invoice, which, on their face, relate to assistance with the preparing LCC-MZT's requests for a contracting officer's final decision, or further litigation, such costs are unallowable in accordance with FAR § 31.205-47(f), and fall under the analysis, discussed above, set forth in <u>Bill Strong</u> and its progeny. <u>See, e.g.</u>, <u>Bill Strong Enters., Inc. v. Shannon</u>, 49 F.3d at 1549–50. For the balance of line-items that do not on their face implicate FAR § 31.205-47(f) as unallowable costs, the court is unable to determine whether such costs were incurred in relation to events that the court has determined above to have been the result of government-caused, compensable, delay. Therefore, plaintiff has not met its burden to demonstrate the costs were allowed, and, LCC-MZT, therefore, is not entitled to the costs included in REA 39.

<u>REA 37 – Additional Receiver Fees</u>

In REA 37, LCC-MZT seeks an adjustment to the Contract in the amount of $11,657.00 because "LCC-MZT incurred additional cost for the Court appointed Receiver for the joint venture" due to the various delays to the P-913 project. REA 37 states that "Hill International provided administration of the contract per the mandate of the Superior Court of California for LCC-MZT." In plaintiff's post-trial brief, plaintiff argues "if the Court finds that the Project was delayed due to the actions of NAVFAC, LCC-MZT is permitted to recover such receiver costs incurred as a direct result of the delay." According to plaintiff, defendant's expert witness Stephen Weathers indicated that, if such delay is proven, LCC-MZT would be entitled to receiver costs of $23.00 per day of delay.

In defendant's post-trial brief, defendant argues that "LCC-MZT is not entitled to these costs [for the receiver] because it has not established causation or foreseeability." Defendant argues that "[p]articularly because the Receiver was appointed after the joint venture began having problems and LCC-MZT was responsible for bringing about the receivership, it is also responsible for any attendant costs." According to defendant, "[e]ven if LCC-MZT could establish causation due to the Government's actions, it still cannot establish that it is entitled to recover any Receiver costs because such costs were

not foreseeable at the time the parties entered into the Contract." Defendant cites to breach of contract cases, such as, <u>Vermont Yankee Nuclear Power Corp. v. Entergy Nuclear Vermont Yankee, LLC</u>, 683 F.3d 1330 (Fed. Cir.), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2012), in which the United States Court of Appeals for the Federal Circuit stated, generally, that "a plaintiff must show that the type of damages are foreseeable as well as the fact of damage." <u>See</u> <u>id.</u> at 1344–48.

In plaintiff's REA 37, plaintiff is seeking another set of damages arising out of the delay incurred on the P-913 project. As discussed above, in order to establish entitlement to compensation for delay, a contractor must prove that the government was solely responsible for the delay, and, in addition, that the government was the "<u>sole</u> proximate cause of the contractor's additional loss." <u>See</u> <u>George Sollitt Constr. Co. v. United States</u>, 64 Fed. Cl. at 229 ("For the government to be found to have caused compensable delay, the general rule is that the government must have been 'the <u>sole</u> proximate cause of the contractor's additional loss, and the contractor would not have been delayed for <u>any other</u> <u>reason</u> during that period.'" (all emphasis in original) (quoting <u>Triax-Pac v. Stone</u>, 958 F.2d at 354)); <u>see</u> <u>also</u> <u>Reconciling Concurrency in Schedule Delay and Constructive</u> <u>Acceleration</u>, 39 Pub. Cont. L.J. at 163. That the government must be the sole proximate cause of the contractor's loss is similar to the requirement in establishing entitlement to various types of damages in breach of contract cases that the damages must have been foreseeable when the contract was awarded. <u>See, e.g.</u>, <u>Vermont Yankee Nuclear Power</u> <u>Corp. v. Entergy Nuclear Vermont Yankee, LLC</u>, 683 F.3d at 1334); <u>see</u> <u>also</u> <u>Shell Oil Co.</u> <u>v. United States</u>, 130 Fed. Cl. 8, 34 (2017) (stating that to recover expectation damages for a breach of contract, the plaintiff "must show that: '(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty'" (quoting <u>Indiana Michigan Power Co. v. United States</u>, 422 F.3d 1369, 1373 (Fed. Cir. 2005)); <u>DMS Imaging Inc., v. United States</u>, 123 Fed. Cl. 645, 655 (2015). Plaintiff bears the burden of proof to establish that the damages were foreseeable at the time of contract formation. <u>See</u> <u>DMS Imaging, Inc. v. United States</u>, 123 Fed. Cl. at 655 (citing <u>Yankee Atomic Elec. Co. v. United States</u>, 536 F.3d 1268, 1273 (Fed. Cir. 2008)).

In the above-captioned case, the Contract NAVFAC awarded to LCC-MZT had been set aside as a Section 8(a) contract. LCC was an eligible Section 8(a) contractor, and although MZT was not, MZT entered into a joint venture with LCC. As stated by Bryan Zatica, LCC "could not fund their [LCC's] portion of the joint venture. They [LCC] were having financial issues." The parties have jointly stipulated that on September 27, 2012, a California State court directed that Kenneth Baker of Hill International be appointed as receiver of the LCC-MZT joint venture. Bryan Zatica testified that "Mr. Baker was a court-appointed receiver for MZT and Larkor to ensure that when the Navy did pay us that the money went appropriately to the vendors and suppliers and not to one company or the other." Although the court has found that LCC-MZT is entitled to ninety-eight days of excusable delay, seventy-six of which days are compensable, LCC-MZT is not entitled to additional receiver fees for the seventy-six days of excusable, compensable delay because the government was not the "sole proximate cause" of the financial difficulties experienced by the joint venture partner, LCC, which resulted in the necessity to have a court-appointed receiver assigned to LCC, and the receiver fees incurred by LCC-MZT

were not foreseeable at the time LCC-MZT was awarded the Contract. As discussed earlier in this Opinion, there is no evidence in the record that NAVFAC contributed to LCC's financial difficulties, which began toward the beginning of performance under the Contract. LCC-MZT, therefore, has not met its burden of proof to establish entitlement to additional receiver fees for a period of compensable delay.

REA 41 – Electric Duct Bank

REA 41, dated February 5, 2016, is a claim for additional costs, in the amount of $131,828.00, associated with the installation of an electrical duct bank due to the fact that the actual electrical duct bank was double the size of what was indicated in the design plans. The costs sought in REA 41 due to the electrical duct bank's size are unrelated to plaintiff's REA 40, discussed above, in which LCC-MZT sought additional costs related to the undisclosed location of a water line and a separate electrical duct bank. The water line and electrical duct bank related to REA 40 were the subject of PC 0004 and Modification 9 to the Contract. In plaintiff's post-trial brief, plaintiff states:

> The duct bank identified in REA 41 is not the same electrical duct bank that was mislocated on the drawings. This claim arises because the contract drawings incorrectly identified the actual size of the duct bank. The duct bank shown on the plans was half the size of what was actually installed at the Project.

LCC-MZT's project manager Mr. Mortensen testified that the duct bank which was relevant to PC 0004 and REA 40 "is not the same duct bank as these duct banks" related to REA 41, and that "[t]hese [REA 41] duct banks are on the drawings and shown." Mr. Mortensen also testified with regard to REA 41 on direct examination by plaintiff's counsel, Mr. Ramseyer, as follows:

> Mr. Ramseyer: Did you have involvement in compiling the costs associated with REA 41, "Electrical Duct Bank"?
> Mr. Mortensen: I did.
>
> * * *
>
> Mr. Ramseyer: And what issue is this?
>
> Mr. Mortensen: This has to do with the production of installing the duct bank. There's a copy of the construction schedule in the back of the REA. When you go out and put a project together, you anticipate putting your underground utilities in before you put your building up so that your utilities are constructed in one continuous flow.
>
> When I look at the -- the construction schedule, I believe there were seven or eight days allowed for putting this duct bank in. Number one, they were a little short because they didn't know that it was twice as much as what

they thought it was. But that seven or eight days was extended over about 17 months.

So you start an activity, and you stop the activity. So now you're testing -- instead of being able to test, say, ten feet, you're only testing three feet. So now you got three times the testing going on in there.

And that's why this was put together is because they were -- because of PC 004, which was the modification to put -- to relocate the water line and the duct bank. That is not the same duct bank as these duct banks. These duct banks are on the drawings and shown. They -- there was no flow. No consistency.

As I said, at one point we not only dug up and started to install the duct bank but turned around and had to rebury it in order to keep the concrete work flowing on the building. And that all has to do with red days as well.

Mr. Ramseyer: All right. And then describe for me once again the process by which you compiled the costs.

Mr. Mortensen: The costs on this were compiled the same way, actual costs versus what was put in the proposal. The original proposal.

* * *

Mr. Ramseyer: And what's that schedule included in this REA for?

Mr. Mortensen: That schedule is to represent what was originally proposed for installation.

Mr. Ramseyer: Okay. And then you have a recap of production reports. Do you see that?

Mr. Mortensen: I do.

Mr. Ramseyer: And what's the -- what's the purpose of including the production daily reports recap?

Mr. Mortensen: Again, the construction said -- the construction schedule identified the length and time that it would take to put in the duct bank, and the first notification on the production reports was September 17th of 2012, and the last duct bank was put in May 23rd, 2014. That's not an eight-day or 16-day activity.

Mr. Ramseyer: Do you feel that you accurately captured the costs associated with the extended performance and disrupted performance of

installing the duct bank?

Mr. Mortensen: I went through as meticulously as I could to look at every production report to identify the cost, yes.

Mr. Ramseyer: All right. And as you look at Line 37 of the worksheet, what's the total cost here?

Mr. Mortensen: Line 37 is $131,828.

Regarding REA 41, LCC-MZT provided a letter on May 26, 2017 which states, in part:

> This letter is in response to **NAVFAC NW's Serial Letter PRB222/0142 – Request for Equitable Adjustment (REA) ~ Changed Conditions, Disruptions to Construction, Loss of Production due to Stacking Trades, Out of Sequence Work and Overtime Work to Mitigate the changes associated with the Incorrect Scale Shown on the Electrical Drawings dated October 4, 2016** and is intended as a claim by LCC-MZT Team IV (LCC-MZT) pursuant to the Contract Disputes Act of 1978, as amended (48 U.S.C. 601-613), and constitutes a written demand for payment of additional sums due LCC-MZT as set forth below on the above referenced Project.
>
> LCC-MZT originally submitted RFI - 0056 on September 24, 2012 notifying the Government that while performing site measurements for layout of the site electrical duct banks that the scale on the Electrical Site Drawings ES-101, ES-111 and ES-121 appear to be incorrect and the scale appears to be approximately fifty percent (50%) of the scale that was measured in the field. The Government responded on October 2, 2012 and agreed that the scale shown on the drawings was incorrect. The Government instructed LCC-MZT to change the scale . . . .
>
> LCC-MZT requested in Serial Letter 0015 (Tab B) a Proposed Change (PC) be issued for the additional costs associated with the additional duct banks required by the change of the scale on the drawings dated March 5, 2013. The Government did not acknowledge receipt until March 11, 2013. The Government responded in Serial Letter 0039 dated April 30, 2013 (Tab C) that the Government finds the response to RFI 056 did not constitute a change to the contract requirements . . . .

(capitalization and emphasis in original). The May 26, 2017 request for a contracting officer's final decision further explains that after additional correspondence between LCC-MZT and NAVFAC, "[t]he Government reversed its original position of '<u>no merit</u>' and found '<u>partial merit</u>,'" and that "[t]he Government issued PC 0021 for tracking purposes." (capitalization and emphasis in original). The May 26, 2017 request for contracting

officer's final decision continues:

> LCC-MZT took exception to the Government's response in Serial Letter 0063 of only "<u>Partial Merit</u>" and the costs associated with our Electrical Subcontractor (PSW Electric) was the only impact due to the incorrect electrical scale. PSW installed the conduit associated with this work and LCC-MZT with the help of other subcontractors excavated the trench, placed the rebar, concrete encased and backfilled the additional lineal footage of the added duct banks. The work was interrupted throughout the process by red days, red day schedule changes, impacts from weather due to PC-0004 contract extension, and impacts due to the restricted site. The proposal submitted for PC 0021 was $464,587.00.

(emphasis in original). LCC-MZT's May 26, 2017 request for a contracting officer's final decision explains that, after further correspondence between the parties, "[t]he Government sent LCC-MZT an offer to settle on January 5, 2016 for $325,608.00" for PC 0021, and that "LCC-MZT accepted the Government's offer for PC 0021 - Electrical Scale Change on February 5, 2016." LCC-MZT's May 26, 2017 request for a contracting officer's final decision further explains, however:

> The Government arbitrary [sic] reduced the material cost by $5,000.00 and the LCC-MZT's labor cost by $80,000.00. The Government indicated that the offer to settle was only the direct cost for the "<u>Design Error</u>" and did not include the cost impact for Out of Sequence Work, Stacking of Trades, Overtime, Week-end Premium Time, Additional Dewatering, Import of Suitable Backfill, Export of Unsuitable Material, Red Days Disruptions, Red Day Changes and Impacts due to a restricted Site. . . .

> LCC-MZT had reservations regarding the arbitrary deduction of the costs associated with the installation of the additional duct banks and had the following understanding with the Contracting Officer, Mr. Dana Bolte

>> 1) PC0021 and all cost associated with the PC can only be for the design error and cannot include any costs associated with impacts of installation, government delays, or any other costs other than the design error with the scale.

>> 2) Any additional costs with impacts of installation, government delays will be submitted as a separate REA for review by the government.

>> 3) The language within the modification for inclusion of PC0021 will state that it is solely for the design error and will not exclude LCC-MZT Team IV from submitting a [sic] REA for the additional costs associated with the duct bank

installation.

LCC-MZT prepared REA 041 - Electrical Duct Bank dated February 5, 2016 (Tab J) and submitted [REA 41] to the Government on February 11, 2016 for the impacts incurred during the installation for the additional duct banks that were due to Government delays, Disruptions to Construction, Loss of Production due to Stacking of Trades, Out of Sequence Work, Overtime Premium Pay and Week-end Work. The Government responded on October 4, 2016 denying REA 041 -- Electrical Duct Banks over four years after LCC-MZT submitted the original notification to the Government.

(capitalization and emphasis in original).

On May 20, 2016, the parties bilaterally executed Modification 20, which increased the Contract $322,905.00 in relation to "**PC 0021 ~ REA RFI 056 Electrical Drawing Scales**." (capitalization and emphasis in original). Modification 20 stated the following:

**The following items are applicable to this modification:**

(1) The subject contract is hereby modified to compensate the Contractor for all additional labor, material, equipment, and associated costs due to the incorrectly labeled electrical drawing scales as further defined in the Contractor's Request for Equitable Adjustment (REA) (Serial Letter No. 0015 dated March 5, 2013 and Serial Letter No. 0026 dated May 17, 2013), as negotiated on May 18, 2016. These documents are hereby incorporated by reference.

**PC 0021 ~ REA RFI 056 Electrical Drawing Scales**
**Increase: $322,905.00**

(2) Extension of time is not required by reason of this modification. All other terms and conditions remain unchanged.

(3) Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full (for both time and money) and for any and all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised. As a result, the total amount of the contract is hereby increased as follows:

Previous Contract Total:        $12,906,657.25
New Contract Total:             $13,229,562.25
Modification A00020 Total:      $322,905.00

(capitalization and emphasis in original).

At trial, Mr. Mortensen testified on cross-examination that REA 41 had nothing to do with Modification 00020 (Modification 20). Mr. Mortensen and Department of Justice attorney Margaret Jantzen had the following colloquy during trial:

> Ms. Jantzen: Did you consider Modification 20 when you were preparing this REA [41]?
>
> Mr. Mortensen: And Modification 20 is?
>
> Ms. Jantzen: The modification dealing with the electrical duct bank.
>
> Mr. Mortensen: Two entirely different duct banks, ma'am, in consideration of what was being requested.
>
> Ms. Jantzen: Okay. So it was your understanding that that modification didn't impact this issue?
>
> Mr. Mortensen: That is correct.

As noted above, however, Modification 20 references "**PC 0021 ~ REA RFI 056 Electrical Drawing Scales**" and states that it was for "all additional labor, material, equipment, and associated costs due to the incorrectly labeled electrical drawing scales as further defined in the Contractor's Request for Equitable Adjustment (REA) (Serial Letter No. 0015 dated March 5, 2013 and Serial Letter No. 0026 dated May 17, 2013)." Therefore, it appears that Mr. Mortensen was incorrect when he testified during the trial that Modification 20 was not related to REA 41, which also relates to, and requests costs for, the scaling issue of the electrical duct bank.

In plaintiff's post-trial brief, plaintiff argues:

> In agreeing to partial payment, LCC-MZT had the following understanding with Mr. Bolte, the Contracting Officer negotiating this issue: (1) All costs to be paid shall only be for design error and cannot include any costs associated with impacts of installation, government delays or any other costs other than the design error with the scale; (2) any additional costs with impacts of installation, government delay will be submitted as a separate REA for review by the government; and (3) the language within the modification for this issue shall state that it is solely for the design error and will not exclude LCC-MZT from submitting a REA for the additional costs associated with the duct bank installation.

Despite LCC-MZT's assertions in its post-trial brief that LCC-MZT and NAVFAC contracting officer Dana Bolte had agreed, prior to the execution of Modification 20, that Modification 20 was only an agreement to "partial payment," and that "any additional costs with impacts of installation, government delay will be submitted as a separate REA for review by the government," Modification 20, which was bilaterally executed, included no

language indicating that Modification 20 was not a memorialization of the parties' complete agreement regarding PC 0021 and the issues related to the incorrect scaling of the electrical duct bank. To the contrary, Modification 20 states that it is for "all" costs "associated with the "incorrectly labeled electrical drawing scales," and includes accord and satisfaction language. As stated above, ""[a]s a general rule, the execution by a contractor of a release which is complete on its face reflects the contractor's unqualified acceptance and agreement with its terms and is binding on both parties.'" K-Con Bldg. Sys., Inc. v. United States, 107 Fed. Cl. at 600 (quoting Clark Mech. Contractors, Inc. v. United States, 5 Cl. Ct. at 86). Moreover, at trial, no testimony was given to the effect that despite the execution of Modification 20, the parties agreed that LCC-MZT would be permitted to recover additional costs related to PC 0021 that were not included in Modification 20, aside from Mr. Mortensen's statement that Modification 20 was not related to REA 41. Therefore, the accord and satisfaction language in Modification 20 bars any additional recovery related to the PC 0021 and the scaling issue of the electrical duct bank. LCC-MZT is not entitled to any recovery associated with REA 41.

REA 38 – Additional Profit

In REA 38, LCC-MZT seeks to recover "additional profit," which it also refers to as additional "markup," in the amount of $293,522.56. The narrative for LCC-MZT's REA 38 states:

> The Change Order Markup rates proposed by LCC-MZT were for changes with an aggregate total up to ten percent (10%) of the original contract value or $1,059,000.00. LCC-MZT has received Change Orders that total $2,224,105.25. LCC-MZT has submitted Proposed Change Requests (PCs) that total $556,411.00 and Requests for Equitable Adjustments (REAs) that total $4,148,935.26. Therefore, the total modifications, PCs and REAs total $6,929,451.51.

The narrative for LCC-MZT's REA 38 further states that "LCC-MZT is requesting additional markup on all change orders, PCs and REAs that exceed an aggregate total of ten percent (10%) the [sic] original contract value [f]or an additional markup of (5%) on $5,870,451.51." Plaintiff's REA 38 in the record before the court does not include any documentation to support or further explain the totals referenced above which were used in the narrative to REA 38.

Plaintiff does not provide the mathematical steps it took to derive the amount requested in REA 38, however, based on the above, plaintiff appears to have calculated the $293,522.56 by first subtracting ten percent of the original Contract value of $10,590,000.00, or $1,590,000.00, from the $6,929,45.51 figure alleged to account "for all change orders, PCs and REAs," which subtraction equals $5,870,451.51, and then by taking five percent of the $5,870,451.51 figure, which equals $293,522.58, which is two cents higher than the $293,522.56 requested in REA 38.

At the trial, Mr. King, who prepared REA 38, testified as follows on direct examination from plaintiff's counsel Mr. Ramseyer regarding how he derived the amount for the additional markup in REA 38:

> Mr. Ramseyer: All right. So how -- how did you go about calculating the amount that was due as contained in REA 38, Exhibit 703?
>
> Mr. King: At the time of preparation, it included all -- it included the PC 25, which was the grounding issue, REAs 1 through 40, and – yeah, and that's – that's how – and then I subtracted off the 10 percent of the original contract amount.

Mr. King also testified that "[t]he total modifications, PCs, and REAs came out to 6.9 million, with the REAs making up 4.148 million and the PCs of 556,411 at the time this document was prepared in May of 2015."

Mr. King also answered in the affirmative at trial when asked if paragraph 4 of the Contract "formed the basis of your belief" that LCC-MZT is entitled to an additional five percent profit markup "on amounts exceeding 10 percent" of the original contract value. Plaintiff's post-trial brief also states that "[s]uch additional markup is authorized" by paragraph 4 of the Contract. Paragraph 4 of the Contract states, in part:

> **4. Change Order Markup Rates**. In accordance with Section 00100, as part of the Contractor's proposal, the contractor shall provide proposed modification/change order percentage rates, for field overhead, home office overhead, prime's overhead on subcontractors (for construction work only), and proposed profit. Markup rates for design firms will be negotiated when needed. The proposed change order markup rates will be awarded as part of the contract and will be used as the markup for both additive and deductive modifications for both prime and all subcontractors for modifications totaling up to a cumulative total value of 10% of the base bid amount. Any modification exceeding 10% (cumulative total value) of the original contract amount will be negotiated in accordance with FAR Part 15, DFARS Part 215, and any other applicable Federal Regulations.

(first emphasis in original; second emphasis added).

At trial, the president of MZT, Mr. Zatica, testified on cross-examination that LCC-MZT proposed a three percent markup for additional profit on change orders modifications. There appears to be no document in the record before the court which directly confirms that NAVFAC accepted the three percent markup for additional profit proposed by LCC-MZT, however, that a three percent markup for additional profit was agreed to by the parties is not in dispute. As discussed below, pursuant to paragraph 4 of the Contract, the contractor was to propose the rate in its bid, and that "[t]he proposed change order markup rates will be awarded as part of the contract." Although LCC-MZT's bid proposal was not offered or admitted into the record, NAVFAC appears to have

accepted LCC-MZT's bid proposal and awarded LCC-MZT the Contract in this case. Absent any argument to the contrary, it would follow that NAVFAC and LCC-MZT agreed to this three percent markup rate for additional profit by way of NAVFAC accepting LCC-MZT's proposal and awarding plaintiff the Contract. In addition, several of LCC-MZT's REAs submitted to NAVFAC for a contracting officer's final decision, and included in the record before the court, include a three percent markup rate for additional profit, on top of the various underlying costs requested. Nevertheless, as explained in plaintiff's post-trial brief, "LCC-MZT submitted this REA based on what it considered to be a reasonable five percent markup for the amount of the total value of changes exceeding ten percent of the original contract amount."

Defendant disputes plaintiff's entitlement to a five percent additional profit, as well as plaintiff's interpretation of paragraph 4 of the Contract, instead reading paragraph 4 to provide that the markup rates become negotiable only when an individual modification is equal to or exceeds 10% of the original Contract value. Defendant asserts that "[n]one of LCC-MZT's change orders or REAs exceed this amount." Defendant further argues that "LCC-MZT offered no testimony or evidence that there were any discussions regarding a higher profit margin with NAVFAC, or that it had successfully negotiated a similar profit rate on any of its other contracts with NAVFAC." Defendant argues alternatively that

> even if the Court agrees with LCC-MZT's interpretation of the Contract provision, no evidence was presented at trial to support the assertion that LCC-MZT would have been able to negotiate a five percent profit rate. Rather, the evidence established that LCC-MZT's base bid included an estimated profit amount of 3.57 percent, and that LCC-MZT included a three percent profit markup on each of its submitted REAs that include a profit markup.

In plaintiff's post-trial brief, plaintiff argues that defendant's interpretation "reads the phrase 'cumulative total value' right out of the Contract. To the extent that plaintiff argues for entitlement to additional profit markup on the twenty-five individual Contract modifications which were executed throughout the duration of the P-913 project, twenty-two of the twenty-five Contract modifications included accord and satisfaction language, thereby barring the award of additional costs. For the three Contract modifications which did not include accord and satisfaction language, plaintiff has not presented supporting evidence or argument which would establish that LCC-MZT's proposed three percent profit markup was not already incorporated in the total amounts which were awarded in each of the Contract modifications. Therefore, plaintiff is not entitled to additional profit markup on the twenty-five modifications to the Contract.

With respect to the REAs presented to NAVFAC and to this court for which plaintiff argues in REA 38 for a "reasonable" five percent additional profit markup, as noted above, several of LCC-MZT's REAs already include a three percent profit markup on the direct costs requested in the REAs. Plaintiff has provided no argument to establish that it should be entitled to an additional five percent on top of the three percent profit markup it has already requested in its various REAs, and paragraph 4 of the Contract, quoted above,

does not explicitly provide for an additional negotiated profit markup rate. Furthermore, the court determined that plaintiff is not entitled to all of the REAs which were submitted by plaintiff to the court. Aside from the liquidated damages which the court found that NAVFAC is improperly withholding, in this Opinion, the court has found that LCC-MZT is entitled only to the costs in REA 29 for the concrete testing required by the stop work order, in the amount of $250,414.94, and the costs for additional field office overhead in REA 32 for seventy-six days of excusable, compensable delay in the amount of $215,691.04. Had either of these entitlements been recognized by NAVFAC during the course of the P-913 project, the costs would have been awarded through Contract modifications. Therefore, in accordance with paragraph 4 of the Contract, LCC-MZT would have been entitled to the three percent additional profit markup for such costs, and not a negotiated, or "reasonable" five percent, as neither of the underlying amounts awarded for REA 29 and 32 exceeds, individually or in the aggregate, ten percent ($1,059,000.00) of the original Contract ($10,590,000.00). LCC-MZT, therefore, is entitled to a three percent profit markup on $250,414.94 in connection with REA 29, which equals $7,512.45, and a three percent profit markup on $215,691.04 in connection with REA 32, which equals $6,470.73, for a total additional profit markup of $13,983.18.

REA 35 - Interest Expense for Non-Payment

REA 35 states that "LCC-MZT is requesting payment of the interest incurred for Government non-payment." When submitted in LCC-MZT's May 28, 2015 request for a contracting officer's final decision, REA 35 sought $91,714.53, which appears to be based on a calculation from April 2014 to March 2015, at an annual interest rate of 5%, calculated monthly, of "BILLINGS NOT PAID BY OWNER," as stated in the subheading in the document attached to REA 35. (capitalization in original). In plaintiff's REA 35 as submitted in plaintiff's May 28, 2015 request for a contracting officer's final decision, plaintiff did not request interest in connection with the various REAs plaintiff simultaneously submitted for a contracting officer's final decision.

Chief of the NAVFAC Contracting Office Eileen Mitchell's August 1, 2016 final decision addressed the $91,714.53 sought in connection with REA 35, stating:

> Your claim asserts the Government owes LCC-MZT interest on withheld payments totaling $91,714.553 without supporting documentation for the calculation. I find that the Government does owe you interest, in accordance with the Contract Disputes Act and FAR Section 33.208 - Interest on Claims for the 135 days extension associated with PC 0025 – Grounding Issue. Interest accrued on your claim from May 28, 2015 to time of payment.

(capitalization in original). The August 1, 2016 contracting officer's final decision awarded LCC-MZT interest in the amount of $21,290.18 in connection with its granting of the "135 calendar day extension to the contract, or $651,375 [in liquidated damages] (135 days X $4,413 = $595,755 and 135 days X $412 = $55,620)." The August 1, 2016 contracting officer's final decision explained that "FAR clause 52.211-12 Liquidated Damages – Construction rate in the contract is Phase A $4,413 per day and Phase B $412 per day." The award of $21,290.18 in the August 1, 2016 contracting officer's final decision was

calculated by tracking Treasury Rates as adjusted for each 6-month period, "as fixed by the Treasury Secretary," beginning on May 28, 2015, the first date LCC-MZT submitted a request for a contracting officer's final decision.

The day before trial, however, plaintiff provided to defendant a document with an entirely revised formula to calculate the interest sought in REA 35.[49] In this newly provided document, plaintiff seeks $50,544.54 of "Total Interest for Non-Payment & Liquidated Damages," as well as an additional total of $486,467.29 in "Interest for Outstanding REAs." For the portion sought under "Total Interest for Non-Payment & Liquidated Damages," LCC-MZT begins the interest calculation on some of the alleged non-payment as early as 2012. For the portion sought under "Interest for Outstanding REAs" in the new document, all interest calculations start on May 28, 2015, the date on which LCC-MZT submitted its initial request for a contracting officer's final decision.

In defendant's post-trial brief, defendant argues that because "[t]he claim presented by LCC-MZT at trial is vastly different from the claim presented to the Contracting Officer," this court lacks jurisdiction to hear the claim. Alternatively, defendant argues that "if the Court were to determine that it has jurisdiction over the claim and that LCC-MZT is entitled to interest, it would be entitled to CDA interest," not Prompt Payment Act interest, because "the Prompt Payment Act does not require payment of interest when the Government does not make payment due to a dispute over the amount of payment due, or over Contract compliance." (capitalization in original).[50] Furthermore, defendant argues that LCC-MZT is not entitled to any interest on REAs which the court finds to have no merit.

Regarding defendant's first argument, defendant contends that the court lacks jurisdiction to hear plaintiff's claim because "[t]he amount of interest currently claimed in connection with REA 35, as updated and presented to defendant on July 7, 2019, was never presented to the Contracting Officer as a sum certain." The United States Court of Appeals for the Federal Circuit has stated that "'[t]he CDA [Contract Disputes Act] grants [the United States Court of Federal Claims] jurisdiction over actions brought on claims within twelve months of a contracting officer's final decision.'" K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1005 (Fed. Cir. 2015) (quoting James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1541 (Fed. Cir. 1996) (citing 41 U.S.C. § 609(a))). "Jurisdiction requires both that a claim meeting certain requirements have been submitted to the relevant contracting officer and that the contracting officer have issued a final decision on that claim." Id. (citation omitted). FAR § 2.101 provides that:

---

[49] During defendant's opening argument, Department of Justice attorney Ms. Murdock-Park stated that "last night, at approximately 6:30 p.m. local time, I received three exhibits from plaintiffs [sic] which were marked as Exhibits 1519 through 1521. These were marked as summaries and reserved, We received these documents for the first time last night."

[50] It does not appear that the plaintiff raised the issue of entitlement to Prompt Payment Act interest at trial or in its post-trial brief.

> Claim means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract. However, a written demand or written assertion by the contractor seeking the payment of money exceeding $100,000 is not a claim under 41 U.S.C. chapter 71, Contract Disputes, until certified as required by the statute. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim. The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a), if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

FAR § 2.101 (2020). "A claim need not 'be submitted in any particular form or use any particular wording . . . [, but it must provide] a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.'" K-Con Bldg. Sys., Inc. v. United States, 778 F.3d at 1005 (alterations in original) (quoting Contract Cleaning Maint., Inc. v. United States, 811 F.2d 585, 592 (Fed. Cir. 1987)); see also Reflectone, Inc. v. Dalton, 60 F.3d at 1575 ("We hold that sentence [1] of FAR 33.201 sets forth the only three requirements of a non-routine "claim" for money: that it be (1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain.").

Although plaintiff's submission of REA 35 included in its May 28, 2015 request for a contracting officer's final decision provided a different methodology to calculate interest, REA 35 contained a clear statement of plaintiff's claim to entitlement to interest at the time and identified $91,714.53 as the amount to use as a basis for the calculation. Although the narrative to REA 35 as submitted in the May 28, 2015 request for a contracting officer's final decision was minimal, and the contracting officer stated that it lacked "supporting documentation for the calculation," the contracting officer was able to find partial merit for the claim in REA 35. The methodology the contracting officer adopted to find partial merit is the same methodology plaintiff now suggests using to calculate its revised interest request with respect to its REAs submitted the court, i.e., by tracking Treasury Rates as fixed by the Treasury Secretary, and adjusting for each 6-month period, beginning on May 28, 2015, the date in which LCC-MZT submitted its initial request for a contracting officer's final decision.

Furthermore, a plaintiff's recovery of interest in this court in connection with a contract dispute is a statutory obligation which is triggered under the Contract Disputes Act, provided that a plaintiff's underlying request for the amount in dispute meets the jurisdictional threshold requirements of a claim, and provided further, that an amount in connection with the claim is found to be due to the contractor. The Contract Disputes Act states: "Interest on an amount found due a contractor shall be paid to the contractor for the period beginning with the date the contracting officer receives the contractor's claim, pursuant to section 7103(a) of this title, until the date of payment of the claim." 41 U.S.C. § 7109(a)(1) (emphasis added). Therefore, although LCC-MZT included interest as a

stand-alone REA in its May 28, 2015 request for a contracting officer's final decision, it was not required to, and the substance, or lack thereof, in plaintiff's REA 35 does not bar plaintiff's recovery of interest to the amounts found due by this court on plaintiff's various underlying claims. See, e.g., Essex Electro Eng'rs, Inc. v. United States, 22 Cl. Ct. 757, 766–67 (1991) ("The fact that these submissions [for interest] were properly certified and purport to be claims is irrelevant. If there were no CDA claims, a separate claim for interest would be ineffective, and if there had been CDA claims, a separate claim for interest would normally be a non-sequitur.").

Regarding defendant's second argument, defendant contends the Prompt Payment Act, 31 U.S.C. §§ 3901-3907 (2018), is not applicable to the interest sought by plaintiff because, according to defendant, "the Prompt Payment Act does not require payment of interest when the Government does not make payment due to a dispute over the amount of payment due, or over Contract compliance," and "LCC-MZT explained at trial that REA 35 related to disputed amounts withheld, including amounts withheld for liquidated damages." Defendant further contends that "if the Court were to determine that it has jurisdiction over the claim and that LCC-MZT is entitled to interest, it would be entitled to CDA interest," rather than Prompt Payment Act interest. Defendant asserts that "CDA interest accrues from the date the contracting officer receives a proper claim and runs until payment of the amount due on the claim received." Prompt Payment Act interest, on the other hand, runs from "the day after the required payment date and ending on the date on which payment is made." 31 U.S.C. § 3902 (2018).

The United States Court of Federal Claims and numerous Boards of Contract Appeals have recognized that the Prompt Payment Act applies only in cases in which no disagreement exists over the claim. See George Sollitt Constr. Co. v. United States, 64 Fed. Cl. at 304 ("Disputed contract payment amounts are subject to Contract Disputes Act interest, 41 U.S.C. § 611, not Prompt Payment Act interest."); see also Woodies Holdings, L.L.C. v. United States, 143 Fed. Cl. 485, 504 (2019); Bay Cnty, Fla. v. United States, 114 Fed. Cl. 755, 759 ("Although both the PPA and CDA call for interest to be paid by the government, the statutes apply in differing circumstances. When there is no disagreement over a payment to be made under a contract, the PPA applies. If there is a dispute over a contract claim, the CDA is the appropriate statutory authority and its interest provisions are applicable to that claim." (citing Env't Safety Consultants, Inc. v. United States, 95 Fed. Cl. 77, 99 (2010), sub. det., 97 Fed. Cl. 190, appeal dismissed, 459 F. App'x 907 (Fed. Cir. 2011))), sub. det., 117 Fed. Cl. 131 (2014); Cargo Carriers, Inc. v. United States, 34 Fed. Cl. 634, 645 (1995) (holding that there was no waiver of sovereign immunity to allow Prompt Payment Act interest when nonpayment by the agency is the result of a dispute with the business concern), aff'd, 135 F.3d 775 (Fed. Cir. 1998); MCI Worldcom Commc'ns, Inc. v. Soc. Sec. Admin., GSBCA No. 16169–SSA, 04–2 BCA ¶ 32,689, at 161,761, 2004 WL 1798094 (2004) (holding that, "as a matter of law, any claim for PPA interest on the disputed amount from the date of partial payment to the date on which the contracting officer received MCI's certified claim of April 4, 2003, must be denied"), appeal dismissed sub nom. Barnhart v. MCI Worldcom Commc'ns, Inc., 120 F. App'x 321 (Fed. Cir. 2005); Marut Testing & Inspection Servs., Inc. v. Gen. Servs. Admin., GSBCA No. 15,412,02–2 BCA ¶ 31,945, at 157,824, 2002 WL 1813662

(2002) (holding that because the payment amount was in disagreement, Prompt Payment Act interest did not run upon receipt of the payment request, and awarding CDA interest from the date the contractor filed its certified CDA claim with the contracting officer), appeal dismissed, 66 F. App'x 886 (Fed. Cir. 2003). In Laurelwood Homes LLC v. United States, a Judge of the United States Court of Federal Claims noted:

> Several other judges of this court have acknowledged that the PPA is not applicable when there is a dispute over the payment in question. E.g., Southern Comfort Builders, Inc. v. United States, 67 Fed. Cl. 124, 156 (2005). Similarly, this Court adopts the rationale that interest is only available when Government payments are "inadvertently late, and not when the Government refuses to pay or questions its underlying liability." Inversa, S.A. v. United States, 73 Fed. Cl. 245, 247 (2006); see also George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 304 (2005).

Laurelwood Homes LLC v. United States, 78 Fed. Cl. 290, 292–93 (2007). The court concurs with the above-cited holdings that Prompt Payment Act interest is not applicable when there is a dispute over the payment.

As discussed above in this Opinion, the court found that plaintiff is entitled to $250,414.94 in connection with REA 29 due to the concrete testing required by the Stop Work Order. The court also found that plaintiff is entitled to $215,691.04 in connection with REA 32 for additional field office overhead incurred from the seventy-six days of excusable, compensable delay for which the court found LCC-MZT entitled. The court also found that, in connection with REA 38, LCC-MZT is entitled to a three percent profit markup on the above entitlements for REAs 29 and 32, in the amount of $7,512.45 for REA 29, and $6,470.73 for REA 32, for a total profit markup of $13,983.18. The total entitlements for REAs 29, 32 and 38 equal $480,089.16. With respect to these REAs for which the court has found LCC-MZT entitled, the government disputed such entitlement, as evidenced in the August 1, 2016 final decision of Chief of the NAVFAC Contracting Office, Eileen Mitchell, which denied REAs 29, 32, and 38 in full. The court also found that LCC-MZT is entitled to the remaining contract balance currently withheld, in the form of liquidated damages, in the amount of $185,346.00. The circumstances in the above-captioned case with respect to the withholding of payments by NAVFAC are not unlike the case of George Sollitt, in which a Judge of the United States Court of Federal Claims stated:

> Even if Sollitt had been granted an equitable adjustment extending the time of contract performance, it still would not be entitled to Prompt Payment Act interest for the delayed or withheld payment of portions of its monthly invoices. Sollitt alleges that the Navy delayed or withheld payments of Sollitt's monthly invoice amounts for two reasons: "anticipated liquidated damages" and delayed performance." The retention of liquidated damages is clearly evidenced in the record of invoice payments, and the court notes

> that this retention constitutes the Navy's assertion of a dispute over its liability for these withheld amounts. . . . [A]ny retention due to delays in contract performance also evidences a dispute between the parties as to when the Navy was liable for certain portions of Sollitt's monthly invoices. Disputed contract payment amounts are subject to Contract Disputes Act interest, 41 U.S.C. § 611 [recodified at 41 U.S.C. § 7109], not Prompt Payment Act interest.

George Sollitt Constr. Co. v. United States, 64 Fed. Cl. at 304 (alterations and ellipses added; internal references omitted) (citing Gutz v. United States, 45 Fed. Cl. 291, 298 (1999)). As discussed throughout this Opinion, NAVFAC, on a number of occasions, warned LCC-MZT of its authority to assess liquidated damages against LCC-MZT for the various delays on the project, and ultimately did withhold payments due to the delays. As in the case in George Sollitt, the various warnings from NAVFAC constitute the government's "assertion of a dispute over its liability for these withheld amounts," and "the retention of payments" from NAVFAC also evidences a dispute between the parties." See id. Therefore, the court finds that LCC-MZT is not entitled to the calculation of interest in accordance with the Prompt Payment Act, but is entitled to interest in accordance with the Contract Disputes Act at 41 U.S.C. § 7109(a)(1), which, as noted above, states: "Interest on an amount found due a contractor shall be paid to the contractor for the period beginning with the date the contracting officer receives the contractor's claim, pursuant to section 7103(a) of this title, until the date of payment of the claim." 41 U.S.C. § 7109(a)(1) (emphasis added); see also FAR § 2.101 ("[A] written demand or written assertion by the contractor seeking the payment of money exceeding $100,000 is not a claim under 41 U.S.C. chapter 71, Contract Disputes, until certified as required by the statute."). All of the claims for which the court has found LCC-MZT entitled to payment, specifically REAs 29, 32 and 38 were submitted and certified to by LCC-MZT in its May 28, 2015 request for a contracting officer's final decision. May 28, 2015, therefore, is the date beginning on which LCC-MZT is entitled to interest on all of the amounts to which this court has found LCC-MZT prevails. See id. With respect to the interest rate, 41 U.S.C. § 7109(b) states:

> Interest shall accrue and be paid at a rate which the Secretary of Treasury shall specify as applicable for each successive 6-month period. The rate shall be determined by the Secretary of Treasury taking into consideration current private commercial rates of interest for new loans maturing in approximately 5 years.

Id.

As stated above, the court has found that LCC-MZT is entitled to a total of $480,089.16 for REAs 29, 32 and 38, and $185,346.00 in Contract payments withheld as liquidated damages. This totals $665,435.16. The following table applies the interest rate "which the Secretary of Treasury [has] specif[ied] as applicable for each successive 6-month period," 41 U.S.C § 7109(b), as adjusted for the amount of days in that period, to

the amount the court has found LCC-MZT is entitled to, beginning May 28, 2015, and ending April 23, 2021, the date of the issuance of this Opinion:

| Interest Rate Period Begin | Interest Rate Period End | Annual Interest Rate in Effect | Amount of Days in Period | Amount Owed | Interest Owed for Period |
|---|---|---|---|---|---|
| 5/28/2015 | 6/30/2015 | 2.125% | 34 | $665,435.16 | $1,317.20 |
| 7/1/2015 | 12/31/2015 | 2.375% | 184 | $665,435.16 | $7,966.99 |
| 1/1/2016 | 6/30/2016 | 2.500% | 182 | $665,435.16 | $8,272.49 |
| 7/1/2016 | 12/31/2016 | 1.875% | 184 | $665,435.16 | $6,289.73 |
| 1/1/2017 | 6/30/2017 | 2.500% | 181 | $665,435.16 | $8,249.57 |
| 7/1/2017 | 12/31/2017 | 2.375% | 184 | $665,435.16 | $7,966.99 |
| 1/1/2018 | 6/30/2018 | 2.625% | 181 | $665,435.16 | $8,662.05 |
| 7/1/2018 | 12/31/2018 | 3.500% | 184 | $665,435.16 | $11,740.83 |
| 1/1/2019 | 6/30/2019 | 3.625% | 181 | $665,435.16 | $11,961.88 |
| 7/1/2019 | 12/31/2019 | 2.625% | 184 | $665,435.16 | $8,805.62 |
| 1/1/2020 | 6/30/2020 | 2.125% | 182 | $665,435.16 | $7,031.61 |
| 7/1/2020 | 12/31/2020 | 1.125% | 184 | $665,435.16 | $3,773.84 |
| 1/1/2021 | 4/23/2021 | 0.875% | 112 | $665,435.16 | $1,786.65 |
| | | | | | Total Interest: $93,825.45 |

## CONCLUSION

As stated above, the court finds that plaintiff is entitled to $250,414.94 in connection with REA 29 due to the concrete testing required by the Stop Work Order. The court also finds that plaintiff is entitled to $215,691.04 in connection with REA 32 for additional field office overhead incurred from the seventy-six days of excusable, compensable delay to which the court finds LCC-MZT entitled. The court also finds that, in connection with REA 38, LCC-MZT is entitled to a three percent profit markup on the above entitlements in REA 29 and 32, in the amount of $7,512.45 for REA 29, and $6,470.73 for REA 32, for a total profit markup of $13,983.18. The total entitlement for REAs 29, 32 and 38 equals $480,089.16. Additionally, defendant is currently withholding $185,346.00 in liquidated damages. The court finds LCC-MZT is entitled to ninety-eight

total days of excusable delay, resulting in entitlement to all liquidated damages currently withheld. Therefore, the total entitlement to LCC-MZT prior to interest is $665,435.16. Finally, the court finds LCC-MZT is entitled to $93,825.45 as interest on $665,435.16 pursuant to REA 35 for a total entitlement to plaintiff of $759,260.61. Based on the record before the court, the plaintiff has failed to prove its entitlement to its remaining claims. Many of the claims presented were vague or not substantiated by particularized and clear invoices in the record, documentation or testimony. Moreover, plaintiff's expert William Manginelli made multiple mistakes in his calculations and offered unsupported conclusions in his expert reports and in his testimony at trial. To the contrary, defendant's expert Stephen Weathers was more credible in his expert report and as an expert witness at trial. The Clerk of the Court shall enter **JUDGMENT** in the amount of $759,260.61 for plaintiff.

      **IT IS SO ORDERED.**

<div align="right">

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

</div>